Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANIRAJ ASHIRWAD GNANARAJ, Individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>LILIUM N.V. F/K/A QELL ACQUISITION CORP., BARRY ENGLE, DANIEL WIEGAND, and GEOFFREY RICHARDSON,<br><br>　　　Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

　　　Plaintiff Maniraj Ashirwad Gnanaraj ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other

– 1 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lilium N.V. f/k/a Qell Acquisition Corp. ("Lilium" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Lilium securities between March 30, 2021 and March 14, 2022, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United

– 2 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Lilium purports to be a next-generation transportation company focused on developing an electric vertical take-off-and-landing ("eVTOL") aircraft, the Lilium Jet, for use in a new type of high-speed air transport system for people and goods.

8.      Defendant Lilium is incorporated in the Netherlands with its principal executive offices at Claude-Dornier Strasse 1, Bldg. 335, 82234 Wessling, Germany. The Company's shares trade on the NASDAQ exchange under the ticker symbol "LILM." Prior to the merger on September 14, 2021 between Qell Acquisition Corp., a special purpose acquisition company ("SPAC") or blank check company, and Lilium GmbH (the "Merger"), the Company's shares traded under the ticker symbol "QELL."

9.      Defendant Barry Engle ("Engle") served as the founder and Chief Executive Officer ("CEO") of the Company prior to the Merger. Following the Merger, Defendant Engle has served as a Director of the Company.

10.      Defendant Daniel Wiegand ("Wiegand") has served as the CEO and a Director of the Company following the Merger. Prior to the Merger, Defendant Wiegand served as the founder and CEO of Lilium GmbH.

– 3 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

11.     Defendant Geoffrey Richardson ("Richardson") has served as the Chief Financial Officer ("CFO") of the Company following the Merger. Prior to the Merger, Defendant Richardson served as Lilium GmbH's CFO.

12.     Defendants Engle, Wiegand, and Richardson are sometimes referred to herein as the "Individual Defendants."

13.     The Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     were directly involved in the day-to-day operations of the Company at the highest levels;

(c)     were privy to confidential proprietary information concerning the Company and its business and operations;

(d)     were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

– 4 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

17.     On March 30, 2021, the Company filed with the SEC a current report on Form 8-K which was signed by Defendant Engle. The 8-K included, in pertinent part, a press release dated March 30, 2021 which announced the business combination of Qell Acquisition Corp. and Lilium GmbH (the "Merger Announcement Press Release"). The Merger Announcement Press Release stated the following, in pertinent part, regarding the Lilium Jet and its batteries:

> ***The Lilium 7-Seater Jet has a projected cruise speed of 175 mph at 10,000 feet and a range of 155+ miles, including reserves.*** It is the culmination of five years of technology development across four generations of technology demonstrators, including Lilium's full-scale 5-Seater.
>
> *            *            *
>
> Lilium has successfully developed, tested and refined the underlying technology for electric vertical take-off and landing jets – Lilium's proprietary Ducted Electric Vectored Thrust ("DEVT") technology, along with key control systems, aircraft and battery architecture. DEVT technology enables Lilium to scale to higher-capacity aircraft and keep noise emissions and ground footprint low. More information about the 7-Seater Lilium Jet, and underlying technology, can be found at lilium.com/jet.

– 5 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(Emphasis added.)

18.    The Merger Announcement Press Release stated the following, in pertinent part, regarding the Lilium Jet's certification process and its cash required to commercialize the Lilium Jet:

**Path to Serial Production and Commercialization**
***The proceeds from the transaction are intended to fund the launch of commercial operations, planned for 2024. This includes the finalization of serial production facilities in Germany, launch of serial production aircraft and completion of type certification.***

(Emphasis added.)

19.    On August 11, 2021, the Company filed with the SEC a proxy statement (the "Proxy") which was signed by Defendants Engle and Wiegand. The Proxy included, in pertinent part, regarding the Lilium Jet:

Currently, our development efforts are focused on the Lilium Jet, including our ongoing certification process with European Union Aviation Safety Agency ("EASA") and Federal Aviation Administration ("FAA"), and building out our manufacturing capacity to produce the Lilium Jet.

\*      \*      \*

The new and developing eVTOL aircraft market has been made possible by a convergence of innovation across battery technology, lightweight materials, sensors and computing power, and propulsion technology.

\*      \*      \*

The Lilium Jet architecture is based on our proprietary Ducted Electric Vectored Thrust ("DEVT") technology, which has been developed and rigorously tested over the last five years. While the majority of our eVTOL competitors leverage open rotor engines, which are based on

– 6 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

unducted, contra-rotating propeller blades, DEVT consists of electric turbofans mounted within a cylindrical duct. DEVT offers four fundamental advantages over open propeller eVTOL architectures: lower noise, higher payload, safety and highest market penetration for ducted fans in commercial aviation, and scalability to larger aircraft in the future.

We believe these technology advantages will enable Lilium's regional shuttle service model to carry more passengers (or cargo) per jet on longer (regional) trips than open propeller eVTOL aircraft. ***The specifications for the Lilium Jet under development call for the aircraft to be able to cruise at 175 mph at 10,000 feet for up to 155 miles*** and to have 7 seats (one for the pilot) or 210 cubic feet of cargo space representing 50% more (passenger) capacity than an open propeller eVTOL architecture would have at comparable noise levels . [sic]

\* \* \*

**Our Competitive Strengths**
We believe that our business benefits from a number of competitive strengths, including the following:
•Proprietary DEVT technology unlocks higher unit economic potential The majority of our competitors use 'open propeller' eVTOL architectures. Lilium employs its own proprietary DEVT technology, a differentiated propulsion system refined over five years, which provides four mission critical advantages[.]

\* \* \*

**Our Lilium Jet**
… We are designing the Lilium Jet in accordance with the strictest aerospace standards and guidelines established by the relevant regulatory authorities, and consistent with the leading original equipment manufacturers ("OEMs") commercial aerospace programs.

\* \* \*

– 7 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

The Lilium Jet is a fixed wing aircraft, which makes it efficient in cruise flight, similar to commercial airliners. The two main wings, two fixed canard (front) wings and the aerodynamic design of the fuselage contribute significantly to the overall cruise efficiency, providing all the lift to support the weight of the aircraft during horizontal cruise flight. The power consumption in cruise flight is projected to be around 10% of the hover flight power consumption. Due to the propulsion system's planned installation in the rear of the wing, the jet's power consumption decreases by the inverse of the velocity squared from hover flight to cruise flight, as the wings create more lift with increasing forward speed. Since the small-sized engines will be embedded into the wings of the aircraft, the wetted area is significantly reduced, which minimizes drag further during cruise flight.

The disadvantage of the ducted fans' small footprint is that the Lilium Jet is expected to consume roughly twice the power in hover flight than an eVTOL propeller based aircraft of a similar weight. However, since we plan to operate a regional shuttle service, *we aim for less than 60 seconds per mission in the pure hover phase and 30 – 60 minutes in cruise flight. As a result, we estimate that the associated increase in energy consumption in hover flight is around 5% of the overall mission energy budget*.

\*      \*      \*

**Our Business Plan and Prospects**
*The specifications for the Lilium Jet under development call for the aircraft to be able to cruise at 175 mph in 10,000 feet for up to 155 miles* and to have 7 seats (one for the pilot) or 210 cubic feet of cargo space representing 50% more (passenger) capacity than an open propeller eVTOL architecture would have at comparable noise levels. We believe the combination of longer average trip lengths and higher passenger capacity per jet (thus a higher load factor) will provide greater time savings to customers, more competitive pricing, and superior unit economics as compared to open propeller eVTOL architecture.

(Emphasis added.)

– 8 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

20.     The Proxy included, in pertinent part, regarding the Lilium Jet's certification process:

> We have applied for Type Certification ("Type Certification") with the EASA in 2017 and for concurrent Type Certification with the FAA in 2018. Receiving a Type Certificate in accordance with stated regulatory standards will certify compliance to the applicable airworthiness standards for the Lilium Jet, which is a necessary prerequisite to undertaking commercial operations. In 2020, the Lilium Jet received CRI-A01 certification basis from EASA (similar to the G-1 from the FAA, which we expect to obtain in the coming months), setting forth a set of performance requirements we have agreed with the regulators for the Lilium Jet. We are progressing towards a targeted Type Certification in 2024, which would position us as one of the first companies to enter the eVTOL market. Importantly, achieving both EASA and FAA certification will allow our Lilium Jets to operate in Europe, the U.S., and any other countries where the national civil aviation authorities recognize these certifications (examples may, but are not guaranteed to include, India, Russia, and certain countries within the Middle East, South East Asia and major parts of Central and South America). We believe that the national civil aviation authorities of these countries would accept a Type Certification from EASA and FAA; however, we cannot assure that this will be the case and the actual acceptance is dependent on the authorities' review when the Type Certification is presented. In addition, certain other countries have bilateral agreements in place with EASA, including technical implementation procedures to validate an EASA Type Certification. These countries include China, Japan, Canada and Brazil, for which some additional validation work would be required. More details about the Lilium Jet's certification process and regulation are below under "— *Regulation*".

> \*        \*        \*

> In 2018, our application for Type Certification of the serial aircraft was accepted by EASA and FAA, and we subsequently started the development program for our 7-seater serial aircraft based on the

– 9 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

technologies developed and refined over the previous generation of aircraft demonstrators.

\* \* \*

• **Progress in concurrent Type Certification with clear path to commercialization**

• We have had regular engagement with both the FAA and EASA since 2017, and in 2018, both authorities accepted our application for Type Certification.

• In December 2020, we received from EASA the CRI-A01, the certification basis, for the 7-seater Lilium Jet (similar to the G01 from the FAA, which we expect to obtain in the coming months). The CRI-A01 an important milestone in the certification process and confirms EASA's agreement on the certification basis of our serial aircraft design, based on EASA's SC-VTOL and additional means of compliance which specify the means by which the requirements contained in the basic regulations can be met. The CRI-A01 also provides a roadmap of the tests and metrics that we need to implement and comply with to achieve full Type Certification of the Lilium Jet (as further discussed below under "— Regulation — Aircraft Certification")

• We are targeting Type Certification by 2024, which we believe would put us among the first companies certified to launch an eVTOL service. We believe that receiving Type Certification from both EASA and the FAA will enable us to access many other markets, beyond Europe and the U.S., where the national civil aviation authorities recognize these certifications (examples may, but are not guaranteed to include, India, Russia, and certain countries within the Middle East, South East Asia and major parts of Central and South America). We believe that the national civil aviation authorities of these countries would accept a Type Certification from EASA and FAA; however, we cannot assure that this will be the case and the actual acceptance is dependent on the authorities' review when the Type Certification is presented.

• *We believe the rigorous FAA and EASA certification processes for eVTOL aircraft create high barriers to entry for potential market entrants. Therefore, we see it as a competitive advantage that we have engaged frequently with EASA and FAA since 2017, and that we were*

– 10 –

*one of the earliest players whose application for Type Certification was accepted by both authorities. This provides us dual advantages of being one of the first movers in the sector and likewise being substantially familiar with the details of requirements established by the regulators.*

\* \* \*

**Regulation**

*The Lilium Jet and our operations are designed to comply with existing regulations, policies, and procedures of the relevant aviation authorities*, although we note for the avoidance of doubt that our business model has yet to be tested or regulatorily approved. In the first years of service and as long as no "new" or changed regulatory framework is available and applicable, the Lilium Jet will operate under the existing aviation regulatory framework using conventional means of navigation and communication, facilitated by the onboard pilot.

We are required to comply with the safety regulations for the jet itself in addition to all operational aspects such as flight operations, crew training and the vertiport requirements. While some adaptations are required to existing regulations, we believe that the similarity of our operations to existing services (including piloted helicopters and other small aircraft) could mean that a close-to-comprehensive set of rules already exists.

**Aircraft Certification**

*We are designing and producing the Lilium Jet to industry aeronautical standards and applicable regulatory requirements.*

For international certification, the first airworthiness authority we approached is EASA. We applied for EASA Type Certification in 2017 and for concurrent FAA Type Certification validation through provisions provided by the bilateral agreement between the European Union ("EU") and the U.S authorities in 2018. The FAA will reserve the right to verify compliance to their airworthiness requirements, but a maximum of regulatory alignment is being pursued. At the beginning

– 11 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

of 2018, both authorities accepted our application for certification and we have been in frequent interaction with both authorities since then.

In July 2019, EASA published a novel set of rules for the certification of eVTOL aircraft, "Special Conditions for Small-Category VTOL Aircraft" ("SC-VTOL"), applicable to aircraft with a maximum of 9 passenger seats and a maximum certificated take-off mass of 3,175kg or less. We intend that the Lilium Jet will be certified under SC-VTOL. In relation to the FAA certification process, we intend that the Lilium Jet will be certified under the recently reformed "Part 23 — Airworthiness Standards: Normal Category Airplanes", modified by Special Conditions to address the novelties of e-VTOL aircraft.

General and technical familiarization activities have been performed to engage EASA and FAA in the development of the Lilium Jet. In December 2020, EASA issued the initial CRI A01 for the Lilium Jet. CRI A01 is the Type Certification basis for SC-VTOL which is the equivalent to the G-1 issue paper from the FAA. This represents a significant milestone in the certification process since it provides a roadmap of the tests and metrics that will be relevant for full Type Certification of the Lilium Jet. Initial aircraft and system certification plans have been submitted.

***A detailed certification program including all the means of compliance will be further defined over the course of 2021.*** The certification program sets the stage for the design and testing process. ***After successful verification by EASA, the Lilium Jet will receive Type Certification in accordance with stated regulatory standards, which certifies compliance to the applicable airworthiness standards for the Lilium Jet.***

Once certified by EASA and the FAA, we expect that the Lilium Jet Type Certification will be recognized by national civil aviation authorities around the world, since many countries' national civil aviation authorities have bilateral agreements, working arrangements or other collaboration activities with EASA or FAA (examples may, but are not guaranteed to include, India, Russia, and certain countries within the Middle East, South East Asia and major parts of Central and

– 12 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

South America). As a result, we believe that our Lilium Jet will be allowed to operate in any country that recognizes and accepts the EASA and FAA regulatory standards (even though we cannot assure that this will be the case), which would potentially enable us global market access. We cannot assure you that regulatory authorities in any other country will accept these standards; however, airlines regularly rely on bilateral agreements to operate internationally.

We also initiated the process to obtain a Design Organization Approval ("DOA") issued by the EASA for the Lilium Jet's design and a Production Organization Approval ("POA") issued by the responsible national civil aviation authority of Germany for the Lilium Jet's manufacture. The DOA program has started with the Type Certification application in 2017. We have prepared and submitted several DOA processes for engineering and airworthiness certification to EASA for the initial investigation and desk audit. We started process roll-out, training and proper application in 2020. We intend to perform the first comprehensive set of EASA on-site audits in the second half of 2021. The DOA approval program takes place in parallel with the Lilium Jet Type Certification activities.

The POA program has started with the application to the airworthiness authorities in May 2020. Most of the required processes and regulations have been filed with the German Federal Aviation Office (Luftfahrt-Bundesamt (LBA)) for review, which is planning audits in 2022. We already have fast prototyping capabilities for 80 core processes in place. When we receive our DOA, we expect to receive our POA thereafter, which is the final step before receiving our Type Certification.

\*       \*       \*

Lilium has applied for Type Certification with the EASA in 2017 and for concurrent Type Certification with the FAA in 2018. Receiving a Type Certificate in accordance with stated regulatory standards will certify compliance to the applicable airworthiness standards for the Lilium Jet, which is a necessary prerequisite to undertaking commercial operations. ***In 2020, the Lilium Jet received CRI-A01 certification basis from EASA (similar to the G-1 from the FAA, which we expect***

– 13 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*to obtain in the coming months), setting forth a set of performance requirements we have agreed with the regulators for the Lilium Jet. We are progressing towards a targeted Type Certification in 2024, which would position us as one of the first companies to enter the eVTOL market.*

(Emphasis added.)

21.    The Proxy included, in pertinent part, regarding the Lilium Jet and its batteries:

*Battery System*
*The battery system is a critical component of the Lilium Jet.*
Due to rapid improvements in energy density levels, estimated by Roland Berger as increasing approximately 7% per year, the era of electric aviation is possible today. The battery system must fulfill several key requirements:
• it must supply high energy density levels in order to achieve the required range;
• *it must supply the high-power density required for vertical takeoff and landing phases*;
• it should have fast charging capabilities to enable high infrastructure throughput; and
• it should have a long lifetime or cycle rate.

*The Lilium Jet's engines are designed to be powered by a proprietary battery system which is being developed by Lilium in collaboration with third parties based on large format Lithium-ion pouch batteries.* We have selected a battery cell chemistry based on a silicon-dominant anode combined with conventional NMC (Nickel, Manganese and Cobalt) cathodes and electrolytes. We believe this combination offers the best compromise of energy and power density at a low state of charge ("SoC", the level of an electric battery's charge relative to its capacity), which determines the effective usable battery capacity. The majority of battery cell production should be on standard lithium-ion pouch cell production lines. *We have invested in a leading battery technology supplier, securing exclusive rights for the eVTOL market for this chemistry.*

– 14 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

***Supplier and in-house measurements of the pouch cells have yielded nominal energy density levels of 330 watt-hour per kilogram, which is projected to enable a physical aircraft range of 155 miles (our target for entry into service).*** This prediction is based on our testing and simulation of engine efficiency as well as on well-known and standard prediction methods for aircraft design for batteries, engines, motors, and other components of the aircraft. ***We anticipate energy density levels and power levels at low SoC to further improve which will improve the operating range of our Lilium Jet as these improvements occur.***

We anticipate that the battery should provide a sufficient cycle life (over 800 standard charge/ discharge cycles measured until 80% capacity). We are continuing to test and optimize the cycle life of the prototype cell we are designing for the Lilium Jet. In operations, we intend to replace the battery $2-3$ times a year given the projected number of flight hours during the operation of an aircraft within passenger shuttle networks. Cost is another key factor within the operating economics of our Lilium Jet. ***In terms of technology and production, our cells are an evolution from today's automotive batteries, but will be produced at a premium over automotive batteries in order to meet our stricter aerospace safety and performance requirements.***

We are targeting a battery system to be capable of fast charge (80% charge in 15 minutes, full charge within 30 minutes), which is key to enable smooth operations and quick turnovers. We are working with leading suppliers for charging technology using equipment based on chargers for the electric trucking industry.

Our battery system design consists of multiple independent packs each built up of multiple modules, creating significant redundancy across the energy system as a whole. We are designing the battery casing to protect against the effects of multiple-cell thermal runaway. When thermal runaway occurs in a module, it needs to be contained within the module, with the remaining modules and packs remaining unaffected to supply enough power and energy for continuous safe flight and

– 15 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

landing. ***We have successfully validated an early version of a battery system in the Phoenix technology demonstrator, incorporating many of the technologies of our envisioned and certifiable series solution.*** We continue to conduct technology development and demonstrations to determine the most appropriate technology for the Lilium Jet. The challenges and risks intrinsic in refining our battery system may take longer or be more difficult or costly than we anticipate. ***The full battery and energy management system will be certified as a part of the aircraft certification process and will undergo rigorous testing to prove compliance with the requirements set by the authorities. We are developing the battery pack design and energy management in-house as part of our core technology, while we work with third parties on the design of the battery cells and some components of the energy management system.***

(Emphasis added.)

22.     The Proxy included, in pertinent part, regarding the cash required to commercialize the Lilium Jet:

**Capital Resources and Liquidity Requirements**
 …

***We believe that our current cash and cash equivalents, together with the cash that we expect to receive from the Business Combination, including the PIPE Financing, will provide sufficient funding to commercially launch our 7-seater Lilium Jet***, though we cannot assure that this will actually be the case. If our pro forma cash resources, including the proceeds of the Business Combination and the PIPE Financing, are insufficient to finance our future cash requirements, we will need to finance our future cash needs through a combination of public or private equity offerings, debt financings, partnerships or grant funding, which may require certain covenants or restrictions on our business.

23.     The Proxy included, in pertinent part, the following regarding the Qell Acquisition Corp.'s due diligence connected to the Merger:

– 16 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

On December 2, 2020, Qell and Lilium executed a customary non-disclosure agreement that did not include a standstill provision, and Lilium provided the representatives of Qell with certain key non-public information for Qell to begin conducting preliminary business and financial due diligence with respect to Lilium. …

Throughout December 2020 and early January 2021, Qell continued its dialogue with its advisors and consultants … Qell also met with other emerging technology companies focused on urban and regional air mobility to explore potential business combinations and better its understanding of the market. ***Mr. Engle, Mr. Gabbita and other Qell representatives and Qell advisors discussed and considered the findings from their preliminary due diligence review (including diligence relating to Lilium's technology, commercial strategy, manufacturing and supply chain approach, and financial forecasts).*** …

\*      \*      \*

***Between February 1, 2021 and March 29, 2021, representatives of Qell conducted further business and financial due diligence with respect to Lilium and, over the same period of time, Qell's strategic, financial, technical, legal, tax and other advisors conducted due diligence with respect to Lilium, in each case, based on information available in the data room (including through oral and written responses from the management team of Lilium) and customary due diligence calls with the management team of Lilium.*** In early February 2021, Qell's technical due diligence advisor, a Europe-based firm with expertise in development and certification of new aircraft, visited Lilium's headquarters in Munich on multiple occasions. During these visits, the firm conducted interviews with key Lilium technical personnel, including Mr. Wiegand, and toured Lilium's design, testing and production facilities in Munich. These visits were part of the independent technical analysis it was conducting for Qell on Lilium's historical aircraft performance, current design for the 7-seater, and approach to aircraft certification. Also, Qell, through its advisors,

– 17 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

conducted an on-site review of Lilium's manufacturing process and scale up capabilities.

\* \* \*

In addition, the Qell Board believes the following aspects of due diligence, relative comparison to other opportunities available to Qell, and transaction attributes were all key factors in securing their support for the Business Combination.

\* \* \*

**Results of Due Diligence.** The Qell Board considered the scope of the due diligence investigation conducted by Qell and its outside advisors and evaluated the results thereof and information available to it related to Lilium, including:
• diligence on market;
• extensive meetings and calls with Lilium's management team regarding its operations and projections and the proposed transaction;
• in-person visits to Lilium facilities in Munich by Mr. Engle, Mr. Gabbita and by Qell's technical and business advisors;
• Goodwin's findings relating to Lilium's material intellectual property findings;
• Hogan Lovells' material FAA and EASA findings;
• The commercial diligence findings of Qell's advisors;
• Qell's technical advisor's technical and certification diligence findings;
• KPMG's IPO readiness and tax diligence findings; and
• review of materials related to Lilium made available, including with respect to financial statements, material contracts, key metrics and performance indicators, benefit plans, intellectual property matters, labor matters, information technology, privacy and personal data, litigation information, environmental matters, export control matters, FAA and other regulatory matters and other legal and business diligence matters.

(Emphasis added.)

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

24.     On September 14, 2021, the Company issued a press release entitled "Lilium closes business combination with Qell Acquisition Corp., will begin trading on Nasdaq under the symbol "LILM" on September 15" which stated the following, in pertinent part, regarding the cash required to commercialize the Lilium Jet:

> As a result of the business combination, Lilium will receive approximately $584 million of gross proceeds, prior to transaction expenses, including from funds managed by leading strategic and long-term financial investors including Atomico, Baillie Gifford, LGT and its affiliate impact investing platform Lightrock, funds and accounts managed by BlackRock, Tencent, Ferrovial, Palantir, Honeywell, FII Institute and private funds affiliated with PIMCO. ***Net cash from the transaction will be used to fund the commercial launch of Lilium's 7-Seater Jet.***
>
> *        *        *
>
> Tom Enders, Chairman of the Board, said:
>
> "… It will not be an easy journey but ***we have the technology, the team and the resources to be very confident that Lilium will make it happen***. Our role as a Board of Directors is to make strategic decisions, to supervise, to coach and to advise. …"

(Emphasis added.)

25.     On February 28, 2022, the Company released its "Business Update FY 2021" which was signed by Defendants Wiegand and Richardson which stated the following, in pertinent part, regarding the Lilium Jet and its certification process:

> Design changes for a simpler aircraft and a robust certification path
> ***We continue to assess and, as a result of the PDR [Preliminary Design Review] process to date, are implementing certain changes to simplify the design and to reduce technical and certification risk.*** For example:
> - Through a slightly larger and more powerful engine design, we will reduce the number of engines from 36 to 30 to (i) reduce part count,

– 19 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

weight and system complexity; (ii) improve aerodynamic balance between main wings and canards (front wings); (iii) create potential for lower material and maintenance costs; and (iv) improve design flexibility in the future.

(Emphasis added.)

26.     The statements referenced in ¶¶17-25 above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Lilium materially overstates the Lilium Jet's design and capabilities; (2) Lilium materially overstates the likelihood for the Lilium Jet's timely certification; (3) Lilium misrepresents its ability to obtain or create the necessary batteries for the Lilium Jet; (4) the SPAC-merger would not and did not generate enough cash to commercially launch the Lilium Jet; (5) Qell Acquisition Corp. did not engage in proper due diligence regarding the Merger; and (6) as a result, Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

### The Truth Emerges

27.     On March 14, 2022, in the morning during trading hours, market analyst Iceberg Research released a report regarding the Company entitled "LILIUM NV – THE LOSING HORSE IN THE EVTOL RACE" which detailed several alleged issues with the Company (the "Iceberg Report").

28.     The Iceberg Report stated the following, in pertinent part, regarding the Lilium Jet's design and capabilities (or lack thereof):

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1. German company Lilium is building an electric vertical take-off and landing aircraft (eVTOL) - the Lilium Jet. *Its objective is for the Jet to fly up to 155 miles. But none of Lilium's demonstrators have flown for more than three minutes even after seven years of work.* eVTOL industry leader Joby Aviation Inc. has flown 150 miles on its current model.

2. Many experts have raised serious doubts about the Jet's ability to fly 155 miles. This is largely due to its configuration of 36 ducted fans (recently reduced to 30) that devour power during takeoff and landing (hovering), and leaves little power for actual flight.

*        *        *

The Jet has an unconventional design with a propulsion system consisting of 36 wing flaps. These flaps serve as lifting and control surfaces and each contains a ducted electric fan - a design that emits less noise according to Lilium.

*        *        *

*Lilium's technology choices dramatically shave range*

Lilium is aiming for regional travel over longer distances, rather than short intra-city hops. Its target is to go 155 miles on its Jet.

[Image omitted.]

*Lilium's ambitious claims suggest a technological edge. But its eVTOL fails the test of practicality.* None of its flight demonstrators have delivered more than three minutes on test flights over the last seven years. eVTOL industry leader Joby has flown further and faster than anyone else. Joby flew over 150 miles on the longest eVTOL test flight to date in July 2021. The company set another record after its plane hit airspeeds of 205 mph during a test flight earlier this year.

How much further can the Lilium Jet go if it has not flown for more than a few minutes? We spoke to two experts – an aerospace specialist

– 21 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

and former Lilium employee - to get a sense of the problems with Lilium's aircraft. ***The main problem lies with its power hungry design - the ducted electric vectored thrust. The design of the Lilium Jet is peculiar when compared to most eVTOL peers, which use regular propellers that spin in the open air. The Jet has 36 fan-like engines on its wing flaps.*** Each fan spins within an enclosure (or duct) and the moveable flaps tilt up during the hover phase (vertical takeoff and landing) then shift forward for horizontal flight (cruising).

*Joby S4 vs the Lilium Jet*

[Image omitted.]

***The fans consume more electricity in hover than a propeller aircraft of similar weight.*** This is explained by the Jet's disc load - defined as the ratio of aircraft weight to area of rotors used during lift - which is 10x higher than open propeller eVTOLs. Higher disc loads raise power requirements and lower efficiency, and in turn, means less batteries and range for actual flight. It also requires batteries with high power even at a low state of charge when the aircraft lands.

*The Lilium Jet's disc load relative to other configurations*

– 22 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS



Source: Lilium blog

We could not find any other company in the industry trying to build a 7-seater and at 3,175kg, Lilium's Jet is 1.5x heavier than Joby's 2,180kg S4. Carrying that much more weight requires powerful batteries.

\*       \*       \*

(Emphasis added.)

29.     The Iceberg Report stated the following, in pertinent part, regarding the Lilium Jet's certification prospects and timing:

6. Both Joby and Lilium hope aviation authorities will certify their eVTOLs for commercial flight in 2023. This means both firms must have sufficient test flights for certification credit to hit that target. Joby is closer to the mark with ~1,000 test flights under its belt. **Lilium is likely to miss the 2023 target by miles. It has completed less than 50**

– 23 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*test flights on its fourth and fifth (current) demonstrators.* We believe the design of its Jet further complicates the certification process.

\*      \*      \*

This silenced the critics but our research invalidates Lilium's arguments:

1. *Lilium underestimates hover time that regulators will require*

CTO Alastair McIntosh claims the Lilium Jet would hover for a very short time i.e., less than 60 seconds, of which takeoff would require 10-25 seconds and landing another 20 seconds.

*The aerospace specialist we spoke to said McIntosh assumes perfect conditions during takeoff and landing. He does not account for buffer time aviation regulators would require for bad weather conditions, hindrances such as drones and birds, and altitude needs i.e., vertiports will be surrounded by buildings of different heights.* According to the specialist, *regulators would require at least 2.5 minutes of hovering to account for these risks and doing so would drain the Jet's batteries and slash up to 66% of its 155-mile target.* He added that the transition from hover to flight should not be too quick as the ride would be bumpy and uncomfortable for passengers.

\*      \*      \*

*Lilium lags far behind Joby and will not meet its certification timeline*

Above all, progress with aviation authorities is all that matters because you can get the money, build a fantastic aircraft, but if you don't have progress on certification, it doesn't matter.

The novelty of eVTOLs and plans for them to fly over congested urban areas means the bar for certification would be high. Yet for all its technical issues, Lilium still expects full certification from aviation authorities in 2023, the same year as Joby which shows far more promise.

– 24 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

Joby has conducted more than 1,000 test flights and boasts the longest eVTOL test flight to date. It recently announced the start of conformity testing with the Federal Aviation Administration, which means Joby has a conforming prototype of its aircraft. This is a key milestone in the certification process as the only tests, including measures such as 'flight hours', that are valid in the context of certification are those conducted using a conforming aircraft.

***Lilium only has a demonstrator and it isn't clear when a conforming prototype will be ready. It probably won't be soon.*** The company has completed about 45 unmanned flights on its last (20 flights) and current (~25 flights) demonstrators, both 5-seaters, and the duration of each flight was no longer than three minutes. ***Lilium has performed zero tests for the 7-seat Jet it plans to commercialise.***

***Our consulting specialist underlined that design simplicity is essential to facilitate the certification process.*** But Lilium's plane adds complexity as its ducted fans are responsible for both propulsion and navigation. Ella Atkins, an aerospace engineering professor from the University of Michigan, shares this view, "Each of the motors will induce vibrations in the wings, and the fans may not all spin with the same efficiencies as wear and tear set in. It will be complicated to write software to reliably control all that."

While Lilium received CRI-A01 certification from the European Union Aviation Safety Agency (EASA) last year, ***the company has not explained that the CRI-A01 means little to nothing at all. It merely sets the rules the plane must meet for certification and marks the beginning of a long and complex process [] that is likely to stretch beyond 2024.***

(Emphasis added.) (Internal citation omitted.)

30.     The Iceberg Report stated the following, in pertinent part, regarding the Company's ability to obtain or create its necessary batteries for the Lilium Jet:

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

4. Lilium promises its Jet has ready access to battery cells with energy density of 320-330 Wh/kg. ***One of the sources it relies on to show these batteries are within reach is Zenlabs Energy Inc. Zenlabs is a 34.8% Lilium-owned associated company whose CEO Sujeet Kumar was accused by General Motors of misrepresenting battery performance***, while at his previous company Envia Systems.

*     *     *

Batteries have been a source of controversy for Lilium. German aviation magazine *Aerokurier* published doubts about Lilium's 5-seat prototype and battery performance in 2020. Four engineers concluded the 5-seater could not fulfill CEO Daniel Wiegand's repeated promise that the plane could fly 186 miles at 186 mph and still have reserve power to spare. ***One of the engineers told Aerokurier that just 60 seconds of hovering would have shaved off more than half of the company's range target at the time.***

**Lilium quotes battery performance numbers of an associated company whose CEO was accused of misrepresentation by GM**

Lilium published a white paper and a blog post in March and April 2021 respectively, to defend itself against these criticisms. Its two arguments were:

1. A short hovering period minimizes the handicap caused by the Jet's battery consumption during takeoff and landing.

2. Lilium has ready access to batteries with energy densities of more than 300 Wh/kg at the cell level.

This silenced the critics but our research invalidates Lilium's arguments:

1. Lilium underestimates hover time that regulators will require
CTO Alastair McIntosh claims the Lilium Jet would hover for a very short time i.e., less than 60 seconds, of which takeoff would require 10-25 seconds and landing another 20 seconds.

– 26 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

The aerospace specialist we spoke to said McIntosh assumes perfect conditions during takeoff and landing. He does not account for buffer time aviation regulators would require for bad weather conditions, hindrances such as drones and birds, and altitude needs i.e., vertiports will be surrounded by buildings of different heights. ***According to the specialist, regulators would require at least 2.5 minutes of hovering to account for these risks and doing so would drain the Jet's batteries and slash up to 66% of its 155-mile target.*** He added that the transition from hover to flight should not be too quick as the ride would be bumpy and uncomfortable for passengers.

2. Lilium quotes battery performance numbers of an associated company whose management was accused of misrepresentation of its battery performance

Lilium has shown confidence in its battery technology on many occasions. McIntosh himself wrote: "A common, and reasonable, concern that is often raised is whether current battery technology can support Lilium's architecture and its energy needs. The answer is simple: Yes:" The company's investor presentation also shows battery technology has been "secured exclusively", but no further details have been given on the source.

[Image omitted.]

As per its white paper, the Jet can fly ~160 miles, with 320 Wh/kg battery cells, and 60 seconds of hover time. ***There are issues with Lilium's assumptions. Lilium does not consider security reserves in its calculations.*** And ***its stated density of 320-330 Wh/kg is far above existing battery technology***. Electric vehicle maker Tesla, viewed as a leader in battery range, has commercialized batteries with energy densities of 260 Wh/kg at cell level. eVTOL competitor, Vertical Aerospace, said commercially available battery cells are currently ~270 Wh/kg at best.
***In other words, the energy density of battery cells required by Lilium, designed to sustain repeated charges and discharges, are currently not available commercially.*** To prove the battery technology is

– 27 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

available, Lilium's white paper quotes Zenlabs Energy Inc - a 34.8%-owned associated company [Pg 17] – that reported battery cells in the lab with 315 Wh/kg energy densities while achieving 1,000 charge-discharge cycles. Zenlabs Energy CEO Sujeet Kumar was CTO at now-defunct Envia Systems from 2007-2017. **Both Sujeet and Envia were accused of misrepresenting Envia's battery technology to investors and a customer (General Motors) in 2013.** The automaker cancelled its contract with Envia on the grounds it was "predicated on a number of statements and representations made by Envia and Envia's representatives that, in retrospect and in light of more recent statements by Envia, appear to have been inaccurate and misleading." The battery sent to GM had actually been purchased from a Japanese supplier and not produced internally.

[Image omitted.]

Even if we ignore Kumar's past, Zen labs' purported 315 Wh/kg is a nominal figure based solely on laboratory testing at the cell level. The WSJ showed that laboratory breakthroughs rarely manifest in the real world.

McIntosh wrote last year that Lilium "will soon publish an additional blog article, which is fully focused around our battery design and we can't wait to show more: We were unable to find the article on Lilium's website.

***We believe that Lilium voluntarily misrepresented its access to batteries to raise SPAC money, despite not having the battery technology.*** In fact, Lilium's mysterious battery cell supplier may be Zen labs, although Lilium does not clarify the source of its battery technology.

This gives rise to two problems. Lilium is likely to lag Joby and other companies that use readily available battery cells, which gives them a head start for development, certification, and commercialisation, while Lilium continues to patiently wait for the battery it requires. We also expect Lilium to run out of cash in 18 months as we show below. This means shareholders face dilution when Lilium taps the equity markets.

– 28 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS

The reality of its batteries and the limitations they create on the Jet's development will soon become obvious.

(Emphasis added.)

31.    The Iceberg Report stated the following, in pertinent part, regarding the SPAC-merger and its generation of enough cash to commercially launch the Lilium Jet:

7. We estimate that Lilium has about 18 months before its cash runs dry.

*       *       *

**Cash burn gives Lilium 18 more months under conservative assumptions**

Lilium has about 18 months before its cash runs dry, based on the average of cash spent ($65m) in the last two quarters - $56.5m in 3Q21 and $72.7m in 4Q21 - and liquidity of $400m at the end of 2021.

This estimate is generous. Cash burn is likely to accelerate as Lilium may increase its headcount by another 10%, from 900-1,000 at present. We also noted that Lilium initially told investors in August 2021 (see below) that the SPAC cash was enough to '*commercially launch our 7-seater Lilium Jet*'.

[Image omitted.]

Lilium has since changed its stance, as shown in an October 2021 prospectus, which states the cash will only progress '*...part of the certification, production and commercialization...*'. This implies further capital raises are not too far away, but financing risk will be high as the market starts to scrutinise Lilium's progress against more advanced peers.

*       *       *

– 29 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**A Sponsor eager to make a buck "no matter which company wins"**

The case of Lilium raises questions on the quality of due diligence conducted by sponsor Qell Partners LLC prior to the merger. *Bloomberg* reported in December 2020 that Qell's CEO Barry Engle was 'looking to acquire a company that will profit off the rapid changes happening in transportation no matter which company wins the EV or even self-driving game'.

"If this is a gold rush, you can stake your claim and hope you get lucky and find a nugget," Engle said.

\*       \*       \*

***Against this backdrop and with a cash runway of 18 months, Lilium will have no choice but to forcibly dilute shareholders through additional fundraisings, while its commercialization effort lags peers.***

(Emphasis added.)

32.     On this news, Lilium's stock price fell $1.25 per share, or 34%, to close at $2.44 per share on March 14, 2022, on unusually heavy trading volume, damaging investors.

33.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Lilium during the Class Period (the "Class") and were damaged upon the revelation of the alleged

– 30 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

40.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

– 32 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities are traded in efficient markets;

(d)   the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)   the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)   Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

41.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

– 33 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45.      During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

47.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such

– 34 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

48.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

49.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

50.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

51.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### Against The Individual Defendants

53.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

55.     As officers of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to

– 36 –

correct promptly any public statements issued by the Company which had become materially false or misleading.

56.     Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

57.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

– 37 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated: April 18, 2022                      Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

– 38 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS