**THE WHITEHEAD LAW FIRM, L.L.C.**
C. Mark Whitehead III
(FL Bar Roll #559881)
cmw@whiteheadfirm.com
1330 West Avenue, Suite C402
Miami Beach, FL 33139
Telephone: (337) 740-6006
Facsimile: (337) 205-7754
*Local Counsel for Lead Plaintiff Jonathan Coon*

**KAHN SWICK & FOTI, LLC**
Kim E. Miller (admitted phv)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
*Lead Counsel for Lead Plaintiff Jonathan Coon*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 23-CV-80232-ROSENBERG/REINHART**
**Class Action / Jury Trial Demanded**

MANIRAJ ASHIRWAD GNANARAJ,
Individually and on behalf of all others similarly
situated,

    Plaintiff,

    v.

LILIUM N.V. F/K/A QELL ACQUISITION
CORP., BARRY ENGLE, DANIEL
WIEGAND, and GEOFFREY RICHARDSON,

    Defendants.

**<u>AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW</u>**

# TABLE OF CONTENTS

Page:

OVERVIEW ................................................................................................................... 2

JURISDICTION AND VENUE .................................................................................... 4

PARTIES ....................................................................................................................... 5

    I.      Plaintiff ............................................................................................................ 5

    II.     Defendants ....................................................................................................... 5

FACTUAL BACKGROUND ........................................................................................ 8

    I.      Lilium and the Emergence of eVTOLs ........................................................... 8

    II.     Events Leading up to the Merger ................................................................... 14

    III.    Confidential Witness Statement ..................................................................... 19

    IV.    Timeline ......................................................................................................... 25

DEFENDANTS' SCHEME TO DEFRAUD THE MARKET ..................................... 25

    I.      Defendants Claimed to have Secret, Advanced Battery Technology
         Capable of Powering the Lilium Jet ............................................................... 29

    II.     Defendants Claim the "Low Noise" of their Jet Will Be a Commercial
         Advantage ....................................................................................................... 42

    III.    Defendants Repeatedly Confirm the Impossible Target of
         Commercialization in 2024 ............................................................................ 44

        A.     Defendants' Fraudulent Narrative Regarding Lilium's
              Certification Timeline ......................................................................... 45

        B.     The Design of the Lilium Jet was Not Yet Complete ........................... 52

        C.     Defendants' Fraudulent Pathway to Profitability ................................. 54

        D.     Post-Merger, Defendants Become Silent about the 2024
              Target Date .......................................................................................... 56

        E.     The Truth About the 2024 Target Date Emerges ................................. 59

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS ...................................................................................................... 62

    I.      Materially False or Misleading Statements and Omissions in the
         Pre-Registration Statement Filings ............................................................... 62

        A.     False or Misleading Statements about the Lilium Jet's Batteries ........ 63

        B.     False or Misleading Statements about the Lilium Jet's Hover Time ..... 65

        C.     False or Misleading Statements about the Lilium Jet's Range ............. 67

        D.     False or Misleading Statements and Omissions about Lilium's
              Timeline to Certification and Commercialization ............................... 70

        E.     False or Misleading Statements and Omissions about Lilium's
              Financial Projections ........................................................................... 75

II.    Materially False or Misleading Statements and Omissions in the
       August 5, 2021, Registration Statement ............................................................ 77

       A.    Timeline to Launch and Production ......................................................... 78

       B.    Lilium's Financial Projections ................................................................ 79

       C.    The Capacity of Lilium's Batteries: Implications for Range,
             Speed, and Hover ................................................................................... 81

       D.    The Registration Statement Misrepresented Lilium's Partnerships
             with Palantir and Azul ............................................................................ 84

LOSS CAUSATION ................................................................................................... 87

DEFENDANTS ACTED WITH SCIENTER .......................................................... 89

    I.    Defendants Had Significant Motive and Opportunity to Misrepresent
          Lilium's Business ............................................................................................ 90

          A.    The Merger ............................................................................................. 90

          B.    Performance Incentives .......................................................................... 93

    II.   Defendants Intended to Deceive Investors or Were Severely Reckless ................... 94

          A.    The Original Timeline for Certification of the Lilium Jet ..................... 94

          B.    Defendants' Denials in the Face of Contrary Evidence and
                Purported Access to "Secret" Information Support a
                Strong Inference of Scienter .................................................................. 94

          C.    Later Contradictory Statements and Remedial Measures
                Taken by Defendants Support a Strong Inference of Scienter ............. 96

          D.    CW1 and Other Anonymous Former Employees Support a
                Strong Inference of Scienter .................................................................. 97

          E.    Red Flags Known to the Individual Defendants Support a
                Strong Inference of Scienter .................................................................. 98

          F.    The Critical Nature of the Lilium Jet, Defendants' High-Level
                Positions and Involvement, and Their Access to, and Knowledge of,
                Contradictory Information ................................................................... 100

          G.    Terminations of Wiegand and Richardson Support Scienter ............. 102

          H.    Corporate Scienter ............................................................................... 102

PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY .............................. 102

THE PRESUMPTION OF RELIANCE .................................................................. 103

SHORT SELLERS SERVE A VITAL ROLE IN THE PUBLIC MARKETS ......... 104

CONTROL PERSON ALLEGATIONS .................................................................. 108

CLASS ACTION ALLEGATIONS ......................................................................... 109

CLAIMS FOR RELIEF .......................................................................................... 111

PRAYER FOR RELIEF .......................................................................................... 122

JURY TRIAL DEMANDED ................................................................................................. 123

CERTIFICATE OF SERVICE ........................................................................................... 124

1.      Lead Plaintiff Jonathan Coon ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of Lilium N.V. ("Lilium" or the "Company") and Qell Acquisition Corp. ("Qell") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Lilium's press releases, technical blog, demonstrator vehicle videos, and other investor materials; (v) analyst reports and independent media reports regarding Lilium and Qell, their stock price movement, pricing and volume data; (vi) reports by research firm Iceberg Research; (vii) aircraft certification processes provided by the European Union Aviation Safety Agency ("EASA") and the Federal Aviation Administration ("FAA"); (viii) other publicly available material and data; and (ix) interviews of persons with knowledge of the allegations contained herein, including a former employee of Lilium. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

2.      Plaintiff brings this federal securities class action against Defendants (defined below) asserting violations of:

(i)      Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule10b-5(a), (b), and (c) promulgated thereunder by the U.S. Securities Exchange Commission (the "SEC") (17 CFR § 240.10b-5), on behalf of himself and all others who purchased the securities of Lilium (f/k/a Qell) between March 30, 2021 and March 14, 2022, inclusive (the Class Period");

(ii)     Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(a), and Rule 14a-9 promulgated thereunder by the SEC (17

1

CFR § 240.14a-9), on behalf of himself and all other shareholders of Qell, as of the July 16, 2021 record date (the "Record Date") that were entitled to vote on Qell's proposed merger with Lilium GmbH; and

(iii)    Sections 11, 12 and 15 of the 1933 Securities Act (the "Securities Act"), 15 U.S.C. §§ 77k, l, and o, on behalf of himself and all others who purchased or otherwise acquired Lilium securities pursuant or traceable to the Registration Statement[1] and the SEC filings incorporated therein by reference.

## OVERVIEW

3.       "If you're trying to attract investors, you have to have an ambitious vision, but at which point are you misleading investors with big numbers?" said a former Lilium engineer about the Company to *Forbes*. The line can be crossed. Ask Elizabeth Holmes. Like Holmes with Theranos, Defendants in this action relentlessly touted, among other things, the purported advantages of Lilium's electric takeoff and landing aircraft ("eVTOL") over competitor models, including its access to secret, exclusive "advanced" battery technology that would allow its power-hungry eVTOL to fly 155+ miles in a single trip. Defendants claimed, and continued to reinforce, that Lilium's eVTOL was on track to be "first-to-market," despite fierce competition in the industry. Initially, around 2019 and 2020, some were rightfully skeptical of these claims. To silence such criticism at a time when soliciting investor support for a SPAC business combination was imperative, Defendants (in furtherance of their scheme) commissioned and disseminated a "White Paper," supposedly blessed by five independent experts, to prove to the market that Lilium's design and assumptions were viable. Being an extremely cash-intensive business with no revenues, going public through the SPAC was essential for Lilium to continue conducting its business. The White Paper and other Class Period statements were critical to giving investors the

---

[1]    The "Registration Statement" encompasses the Registration Statement/Proxy Statement/Prospectus filed on Form F-4a on August 5, 2021 (document dated August 4, 2021), all exhibits thereto, and all materials incorporated therein.

impression that Lilium *currently* possessed the requisite technology and ability, and indeed was well on its way, to building and commercializing a superior eVTOL — not at some theoretical time in the distant future, but by 2024, with profits following soon thereafter. Investors and analysts alike took notice. As a result of their scheme and fraudulent statements, Defendants were able to effectuate the SPAC combination, raising approximately $584 million, and conferring significant personal benefits on the Individual Defendants, while simultaneously buying themselves more time by gambling that technology and innovation would eventually catch up to their fraudulent representations, with investors being none the wiser.

4.     Unbeknownst to investors, however, Defendants' timeline for certification and commercialization of Lilium's eVTOL was never feasible, and their representations about the state of Lilium's technology were false and misleading. Ultimately, the market learned the true material facts, previously concealed by Defendants' scheme and misrepresentations, through a research report published by Iceberg Research on March 14, 2022, which erased the artificial inflation extant in Lilium's stock, thereby causing substantial damage to Plaintiff and other members of the Class. On that news, the price of Lilium Stock fell from $3.69 per share at closing on Friday, March 11, 2022, to $2.44 per share on Monday, March 14, 2022, an approximately 34% drop, on unusually high trading volume.

5.     The Iceberg Report revealed, among other things, that batteries capable of the energy density that Lilium had used to calculate its 155+ mile range estimate were not commercially available at the time, and are, to this day, still years away from being commercially available. It also revealed that Lilium was unlikely to meet its timeline of certification in 2023 (which would allow for commercialization by 2024) — a fact later quietly confirmed by Lilium itself. Indeed, Defendant Yves Yemsi, an Airbus veteran who joined the company as chief program

officer in 2019, stated that achieving this timeline would be "extremely difficult," while a former Loads and Aeroelasticity Engineer at the Company told Plaintiff that Lilium's claims of being able to fly 155+ miles were "far-fetched." In fact, the timeline was so unrealistic that it had led CW1 to quit the Company. Iceberg also later discovered that the five aeronautics professors displayed prominently in the White Paper had indeed reviewed the calculation methodologies in the paper, but did not agree with numerical assumptions contained therein, severely undermining the White Paper's conclusions, and revealing its true deceptive purpose. In the end, Iceberg summed up appropriately that Lilium had "chosen to make Hail Mary claims of a miraculous battery cell that would beat anything on the market. Similar to Theranos, this [was] Lilium's way of 'faking it till you make it.'"

## JURISDICTION AND VENUE

6.     The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5(a), (b), and (c) promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5); Section 14(a) (15 U.S.C. § 78n(a)) of the Exchange Act and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder; and Sections 11, 12, and 15 (15 U.S.C. §§ 77k, l, and o) of the Securities Act.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. §78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

8.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this district to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b), and Section 22 of the Securities Act. Defendant Lilium's principal U.S. presence in in Boca Raton, Florida, where its U.S. legal department is based. Substantial acts in furtherance of the alleged fraud and/or the effects of the fraud have occurred in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## PARTIES

### I.      Plaintiff

11.     Plaintiff, as set forth in the Certification at ECF No. 30-1 and Declaration at ECF No. 41-2, and incorporated herein by reference, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged by the federal securities law violations, fraudulent scheme, and false and/or misleading statements and/or material omissions alleged herein. Plaintiff purchased shares of the Company prior to the Record Date and was entitled to vote on the September 14, 2021 merger between Qell and Lilium GmbH (the "Merger"). Plaintiff acquired his shares of Lilium traceable to the Registration Statement and the SEC filings incorporated therein by reference.[2]

### II.     Defendants

12.     Defendant Lilium, f/k/a Qell Acquisition Corp., purports to be a transportation company focused on developing a novel eVTOL aircraft, the Lilium Jet, for use in the air transport

---

[2] Plaintiff originally purchased shares of Qell. Prior to the Merger, he was entitled to either redeem his shares for cash or exchange them for shares of Lilium. Pursuant to the alleged scheme and materially false and misleading statements in the Registration Statement, Plaintiff chose to acquire shares of Lilium.

of people and goods.

13.     Defendant Lilium is incorporated in the Netherlands with its principal executive offices at Claude-Dornier Strasse 1, Bldg. 335, 82234 Wessling, Germany. Lilium's American subsidiary, Lilium Aviation, Inc., maintains offices at 2385 N.W. Executive Center Dr. Suite 300, Boca Raton, FL 33431. Lilium's shares trade on the NASDAQ exchange under the ticker symbol "LILM."

14.     Prior to the Merger, the company developing the Lilium Jet was known as Lilium GmbH.

15.     Defendant Qell was a special purpose acquisition company ("SPAC") or a blank check company, incorporated in the Cayman Islands with its principal executive offices at 505 Montgomery Street, Suite 1100, San Francisco, CA 94111. Shares of Qell traded on the NASDAQ under the ticker symbol "QELL."

16.     To effectuate the Merger, Qell formed Lilium B.V., a holding company (the "Holdco") and Queen Cayman Merger LLC, a Cayman Islands limited liability company (the "Merger Sub"). Both the Holdco and the Merger Sub were wholly owned by Qell and formed for the sole purpose of effectuating the Merger. Prior to the Merger, the Holdco was converted into a Dutch public limited liability company and changed its name to Lilium N.V. Subsequently, Lilium GmbH became a wholly owned subsidiary of Lilium N.V.

17.     Defendant Barry Engle ("Engle") was the Chief Executive Officer ("CEO"), co-founder, and Director of Qell prior to the Merger. Defendant Engle was one of two directors who managed the Holdco, and was individually authorized to represent the Holdco. Defendant Engle was also the CEO and a member of Qell Partners LLC, the sponsor of the SPAC ("the Sponsor"). The Sponsor held 9,487,500 shares, approximately 20% ownership, of Qell prior to the Merger

and 7,658,555 shares of Lilium post-Merger. Following the Merger, Defendant Engle has served as a Director of the Company.

18.     Defendant Daniel Wiegand ("Wiegand") was the CEO and Founder of Lilium GmbH and was the CEO and sole Executive Director of the Company from the time of the Merger through August 1, 2022, at which time Wiegand was demoted to Chief Engineer for Innovation and Future Programs. Pursuant to the Business Combination Agreement with Qell, after the Merger, Wiegand was the sole recipient of Class B shares of the Company, which entitled him to 3x super voting rights.

19.     Defendant Geoffrey Richardson ("Richardson") was the Chief Financial Officer ("CFO") of Lilium GmbH and continued in that role from the time of the Merger through January 16, 2023. Pursuant to his November 14, 2020 offer letter, Lilium agreed to pay Richardson a success fee equal to 0.5% of all financing proceeds secured by Lilium, including financing proceeds secured by Lilium in connection with the Merger (provided the value of the success fee may not exceed $4,000,000), subject to Richardson's continued employment through the consummation of the Merger.

20.     Defendant Yves Yemsi ("Yemsi") was the Chief Program Officer for the Lilium Jet, a role which he held at the Lilium GmbH and continues to hold with the Company post-Merger.

21.     Defendant Alastair McIntosh ("McIntosh") was the Chief Technology Officer of Lilium GmbH and continues to hold that role in the Company post-Merger.

22.     Defendants Engle, Wiegand, Richardson, Yemsi, and McIntosh are sometimes referred to herein as the "Individual Defendants."

23.     Defendants Engle, Wiegand, Richardson, Yemsi, and McIntosh each made statements in proxy statements filed with the SEC. In this context, Defendants Lilium, Engle,

7

Wiegand, Richardson, Yemsi, and McIntosh are sometimes collectively also referred to as the "Proxy Defendants."

24.     Defendants Engle and Wiegand are also liable for Plaintiff's Securities Act Claims. Engle signed the Registration Statement on behalf of Lilium B.V. and the "Letter to Shareholders of Qell Acquisition Corp." accompanying the Registration Statement, soliciting shareholder votes for the Merger. Both Defendants Wiegand and Engle are named in the Registration Statement as individuals who would become directors of Lilium N.V. after the Merger. Defendants Engle and Wiegand are sometimes referred to as the "Securities Act Defendants."

## FACTUAL BACKGROUND[3]

### I.     Lilium and the Emergence of eVTOLs

25.     Recognizing the need for a cost-effective solution to reduce urban congestion and improve cargo delivery without reliance on fossil fuels, over 200 companies have begun developing small electric aircraft that can take off and land vertically, known as eVTOLs. These aircraft are intended to be easy to fly and less expensive to operate than traditional aircraft. They can take advantage of existing helicopter infrastructure or small "vertiports," and with the theoretically lower noise of the electric motors, can land close to warehouses or intra-city targets. Most companies envision eVTOLs as having 2-4 passenger seats plus a pilot and running short routes, for example, from Manhattan to Newark Airport — a ride that can take upwards of an hour by car but would take a mere 6-10 minutes via eVTOL — leading to the nickname "air taxis."

26.     Seeking to capitalize on this trend, Defendant Wiegand and three of his fellow graduates from the Technical University of Munich co-founded Lilium GmbH in 2015. The concept these four developed, originally for a school project but later with plans to certify and

---

[3] Throughout this Complaint, all emphasis in quotations is added unless otherwise noted.

commercialize the design, was an eVTOL powered by ducted fans. These fans would be embedded in the wings and front canards of the aircraft and would be smaller than the "open rotors" used by competitors in the eVTOL space. Lilium is currently the only eVTOL being developed with the ducted fan design.

27.     According to Lilium, the primary advantage of the ducted fans was that they would produce approximately five times lower noise than open propeller eVTOL configurations of similar weight at take-off. Lilium represents that its aircraft will have a total sound pressure level at take-off of approximately 60 decibels ("db") (about as loud as a household dishwasher) at a distance of 100 meters, while effectively being inaudible from the ground during cruise flight.

28.     Low noise is crucial for the Lilium Jet to be a commercial success, as it will permit Lilium Jets to land in more locations that have communal noise restrictions than competitor aircraft, increasing their potential network density and market potential. In May 2022 (after the conclusion of the Class Period), the United States Government Accountability Office published a report to congress entitled "Transforming Aviation – Stakeholders Identified Issues to Address for 'Advance Air Mobility'" (the "GAO Report"). This report interviewed thirty-six stakeholders in the Advanced Air Mobility ("AAM") space, including private eVTOL companies, state and local governments, and organizations about the biggest issues facing adoption of eVTOLs. The GAO Report concluded that before widespread adoption of eVTOLs, the industry would need to gain the public's acceptance by demonstrating that the aircraft are "safe, reliable, quiet, and equitable." With planned operations to take place in relatively close proximity to homes, neighborhoods, and businesses than traditional aviation services, many of the stakeholders interviewed identified getting the public to accept the noise produced by eVTOL aircraft as a key obstacle for the AAM industry. The GAO Report notes, "Although AAM companies have stated that the electric motors

used on eVTOL aircraft are significantly quieter than traditional internal combustion engines, these aircraft will still have rapidly spinning propellers, and it is not yet known how much noise they will produce." By representing a quantifiable noise footprint of only 60db, Lilium assured investors of the material fact that noise, a critical barrier to widespread eVTOL adoption, would not be an issue for their Company.

29.     Lilium also claims its unique ducted fan design, when combined with "advanced" batteries capable of an energy density of 330 watt hours per kilogram ("Wh/kg"), will significantly improve its speed and range compared to its competitors. Most of Lilium's competitors in the 2021-2022 timeframe assumed an energy density of 270 Wk/kg, which was already considered "advanced" compared to the batteries used in the automotive industry to power electric cars.

30.     While most eVTOL companies based their business model on connecting intra-city targets — for example, a downtown area to the local airport — Lilium claimed its longer range would allow it to operate a Regional Air Mobility ("RAM") network, connecting cities with other neighboring cities. The Company planned to operate both in Europe and in the United States, beginning with operations in Florida, where Lilium claimed a lack of East-to-West highways would make the market particularly receptive to the concept of quick, affordable eVTOL journeys.

31.     However, early critics pointed out several potential issues with the ducted fan design. First, the ducted fans consume a huge amount of power during the initial "hover" phase of the flight: approximately 2-3 times more power than an aircraft of comparable size with an open-rotor design. With current limitations in battery technology, critics pointed out that this could account for a major portion of the energy budget of the flight, making the potential range much shorter than Lilium claims. The Company responded to these concerns by representing that the power consumption during the hover phase would not significantly hinder their range because

hover time will be very short, less than 60 seconds total for takeoff and landing, and forward flight (or "cruise") will only require about $1/10^{th}$ of the power needed to hover.

32.     After testing several sub-scale prototypes of their design, in 2017, the Company began developing the Phoenix, its fourth-generation demonstrator aircraft. This demonstrator, which was a size that would allow for four passengers and a pilot, completed its first untethered and unmanned test flight at the Special Airport Oberpfaffenhofen in Munich, Germany on May 4, 2019. Lilium released a video of this "flight," which shows presumed Lilium employees laughing and hugging as the Phoenix shakily hovers about six feet in the air for a few seconds before returning to the ground.[4] To date, this video has been viewed 1.2 million times.

33.     While, in some ways, the Phoenix is representative of the flight physics of the 7-Seater Lilium Jet that the Company planned to certify and commercialize, it also has several key differences. First and foremost, the battery used to power the Phoenix is not the 330 Wh/kg battery Lilium claims will power the 7-Seater. Reporters who viewed one of Lilium's Phoenix demonstrators in July 2022 found that it was powered by a forklift battery that took up a large portion of the cockpit. The Phoenix is also unmanned and controlled remotely, where the commercially operating Lilium Jet would have a pilot. The Phoenix also weighs approximately 2.4 times less than a fully loaded 7-Seater Jet would weigh. The lower-weight demonstrator takes less power to operate during the take-off and landing phases and produces lower noise levels than the heavier 7-Seater would.

34.     In February 2020, after about 20 test flights, a fire caused by a thermal runaway (a phenomenon where lithium-ion batteries enter an uncontrollable self-heating state) destroyed the Phoenix, which was a total write-off for the company. Lithium-ion batteries are particularly prone

---

[4] https://www.youtube.com/watch?v=8qotuu8JjQM

to such fires. This safety issue is another critical barrier eVTOL companies must overcome before gaining public acceptance. On July 29, 2022, *Bloomberg* published an article noting that "some of the biggest names in aviation have had accidents during testing," including Lilium, Boeing Co., billionaire Larry Page's Kitty Hawk Corp., and Joby Aviation ("Joby").[5] While no one has died or been injured, the article noted that eVTOLs "use innovative technologies that haven't been tested in routine service, and some safety experts say this means the road to government approval and public acceptance won't be easy."

35.     While Lilium had a second demonstrator (the Phoenix 2), it was not able to resume testing immediately, as it was necessary to significantly redesign the energy system to prevent the issues that led to the loss of the original Phoenix. Eventually, the Phoenix 2 began test flights in July 2021. After conducting approximately 25 flights with the Phoenix 2, to take advantage of more favorable weather (or perhaps to escape the watchful eyes of the critical German media), Lilium opted to move the testing from Germany to Spain. Lilium announced that it had secured a license to begin testing in Spain on March 28, 2022 — after the conclusion of the Class Period — and announced they had resumed testing on April 4, 2022.

36.     As of December 2022, Lilium had not yet begun construction of the full-scale conforming prototype, the Pegasus, which would be used for the testing required for certification. No test flights flown with the Phoenix 2, or any other demonstrator, will be counted by regulators as contributing to the testing phase of the certification process.

37.     To develop its aircraft, Lilium required an enormous amount of capital. Early investors in the Company included Scottish investment management firm Baillie Gifford, an early

---

[5] Alan Levin, *Air Taxis Keep Crashing, Bursting Into Flames in Testing Phase*, BLOOMBERG, July 29, 2022, https://www.bloomberg.com/news/articles/2022-07-29/evtols-keep-crashing-and-bursting-into-flames-during-testing-phase?leadSource=uverify%20wall

investor in companies such as Tesla, Amazon, and Airbnb, Chinese tech giant Tencent, and European venture capital firm Atomico. These investments led to a valuation of over $1 billion, classifying Lilium as a "unicorn."[6] However, this funding alone was not sufficient for Lilium to continue its progress toward certification and commercialization: it would need to go public.

38.     When asked in an interview with German news site *Handelsblatt* whether Lilium could have gotten the funds needed without an IPO, Defendant Wiegand stated:

> We also looked at private funding rounds. But for us, the question was: How do we quickly and efficiently fund an extremely research-intensive company that needs about a billion dollars before the first euros in sales are made? That's why we decided on a SPAC IPO earlier this year, ***because it allows us to obtain sufficient funding***. As a publicly listed company, we now have a wider range of other funding options.[7]

39.     However, Lilium was not the only eVTOL company vying for investors. A 2021 article in the *Financial Times* stated, "[I]nvestors earmarked a record $4.3bn to electric air taxi start-ups this year, as many hope to uncover 'the next Tesla.'"[8] Lilium's primary competitor, Joby, went public in August 2021, also via a merger with a SPAC, raising approximately $1.1 billion.[9] In order to garner investor support for the Merger and secure much-needed funding, Lilium would need to set itself apart from this competition and demonstrate its eVTOL's viability.

---

[6] Jakob Steinschaden, *Lilium: Europe's First Flying Taxi Unicorn And The Much Hyped eVTOL Technology*, Trending Topics, June 10, 2020, https://www.trendingtopics.eu/lilium-europes-first-flying-taxi-unicorn-and-the-much-hyped-evtol-technology/

[7] Jens Koenen and Sebastian Matthes, *"The jet must remain in sight" – The Lilium boss explains what air taxis can really do at the moment*, Handelsblatt, September 29, 2021, https://www.handelsblatt.com/unternehmen/handel-konsumgueter/flugtaxi-hype-der-jet-muss-in-sichtweite-bleiben-der-lilium-chef-erklaert-was-flugtaxis-derzeit-wirklich-koennen/27655602.html (translated from German).

[8] Sylvia Pfeifer and Philip Georgiadis, *Investors pledge a record $4.3bn for air taxi start-ups, Financial Times*, August 23, 2021, https://www.ft.com/content/ec8bab06-9118-4453-b60e-defd32b230a7 .

[9] Jeremy Bogaisky, *Electric Air Taxi Maker Joby Goes Public, Offering Investors Sky-High Potential—And Risk*, Forbes, August 11, 2021, https://www.forbes.com/sites/jeremybogaisky/2021/08/11/joby-stock-spac-nyse/?sh=1ffdd1c47a41.

## II.      Events Leading up to the Merger

40.      In November 2020, with an eye toward fundraising, Lilium GmbH announced that it had hired Defendant Richardson as its new CFO. Richardson was the former CEO of autonomous car company Cruise, where he raised $7 billion in capital. As part of his employment agreement, Lilium agreed to pay Richardson a success fee equal to 0.5% of all financing proceeds secured by Lilium, up to $4,000,000, subject to Richardson's continued employment through completion of the business combination.

41.      In September 2020, before being formally engaged by Lilium, Richardson met with Barry Engle, Chief Executive Officer, Co-Founder and Director of Qell, because of mutual connections at General Motors ("GM"). Qell was a blank check company, also known as a SPAC. SPACs typically raise capital for an acquisition through an Initial Public Offering ("IPO") and that capital is held in trust for a specific period, usually 24 months, until a merger can be completed. If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC often reap significant profits from their ownership of the SPAC's securities, as well as other benefits, such as the ability to nominate board members to the new company. However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved, and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the transaction may be to the detriment of the public shareholders.

42.      The strategy of going public by merging with a SPAC has become increasingly popular in the last few years. SPAC transactions are faster than traditional IPOs, the initial share price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. But SPAC

mergers also have the potential to be rife with fraud, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. SEC officials have expressed concern over the recent surge in SPACS, noting a number of risks to shareholders.[10]

43.     On October 2, 2020, Qell completed its IPO of 37,950,000 units at a price of $10.00 per unit, generating gross proceeds of $379,500,000 before underwriting discounts and expenses. On the same day, Engle reached out to Richardson to share the news regarding the IPO and to discuss Qell's commencement of a search for a business combination.

44.     After formally being engaged by Lilium GmbH, Richardson reached out to Engle to suggest Lilium GmbH as a potential merger target for Qell. Beginning on November 3, 2020, Engle and Richardson, along with other representatives of Qell and Lilium, engaged in a series of meetings to discuss the potential business combination between the two companies.

45.     In late December 2020, Qell management began conducting due diligence on a potential business combination with Lilium GmbH, including a review of non-public information about Lilium's technology, commercial strategy, manufacturing plan, and financial projections model. After just a few weeks of review, Qell submitted a formal non-binding letter of intent regarding a potential business combination on January 14, 2021, which proposed a $2.7 billion valuation for Lilium.

46.     Like most SPACs, Qell and its sponsors did not obtain a third-party valuation or

---

[10] *See* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (John Coates, Acting Director, SEC Division of Corporation Finance: "Concerns include risks from fees, conflicts, and sponsor compensation, from celebrity sponsorship and the potential for retail participation drawn by baseless hype, and the sheer amount of capital pouring into the SPACs, each of which is designed to hunt for a private target to take public."); https://www.sec.gov/news/testimony/gensler-2021-05-26 (SEC Chair Gary Gensler testifies in front of the U.S. House Appropriations Committee: "The surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected?")

fairness opinion when considering the business combination, relying solely on the representations of Lilium GmbH management. According to the Registration Statement, a third-party valuation was not necessary, because "Qell's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds, together with the experience and sector expertise of Qell's advisors, enabled them to make the necessary analyses and determinations regarding the Business Combination."

47.     Lilium delivered a written counterproposal on January 16, 2021, which included revisions to certain material terms. Some of the key terms under negotiation included a request for super-voting rights for Wiegand and early release provisions for the post-transaction lock-up period for existing Lilium shareholders. After considering the importance of a traditional 180-day lock-up on shares to capital raising, Qell declined Lilium's request for the early release provision.

48.     On March 30, 2021, Lilium and Qell entered into the Business Combination Agreement, and the PIPE Investors executed definitive documentation with respect to the PIPE Financing, which provided for binding subscriptions to purchase an aggregate of 45,000,000 Holdco Shares at $10.00 per share, for a value of $450 million.

49.     On the same day, March 30, 2021, the first day of the Class Period, the two companies issued a joint press release announcing the execution of the Business Combination Agreement (the "Merger Announcement"). Qell filed the Merger Announcement with the SEC as a Current Report on Form 8-K, attaching the Business Combination Agreement, the Sponsor Letter Agreement, and the form of the Subscription Agreement for the PIPE Financing as exhibits. Qell also filed an investor presentation providing information on Lilium's business and a number of other documents pursuant to Rule 425 of the Securities Act and Rule 14a-12 of the Exchange Act.

50.     These March 30, 2021 documents publicly announced certain information about Lilium for the first time. Prior to this time, Lilium had communicated that it intended to begin commercial operations in 2025, a year after the targets (at the time) of key competitors like Joby, Archer, and Volocopter.[11] In its March 30, 2021 filings, Lilium (without explanation) moved this target up a year, stating that it now intended to begin commercial operations in 2024, leading to profitability by 2025. Lilium also officially announced that the jet it intended to commercialize would have seven seats (six passengers and a pilot), rather than the five seats previously communicated — and two more seats than its main competitor, Joby. The Investor Presentation also revealed publicly for the first time that Lilium anticipated having access to batteries with an energy density of 330 Wh/kg, which would have been the most advanced batteries commercially available at the time and far more powerful than the batteries relied upon by Lilium's competitors.

51.     One of the Form 425s also attached a paper in the style of a scientific journal article, titled "Architectural performance assessment of an electric vertical take-off and landing (e-VTOL) aircraft based on a ducted vectored thrust concept" (the "White Paper"). The 36-page long White Paper, which was filled with complicated equations purportedly demonstrating the physics behind the Lilium Jet, concluded: "[A]ssuming a battery density of 320kWh/kg, the maximum range of the aircraft is 261km." The White Paper was authored by an engineer employed by Lilium GmbH and stated predominantly at the top of the first page that it had been reviewed by five individuals

---

[11] *See* Adam Satariano, *Inside the High-Stakes Race to Build the World's First Flying Taxi*, THE NEW YORK TIMES, November 5, 2019, https://www.nytimes.com/2019/11/05/technology/flying-taxis-lilium.html ("Lilium has said little publicly beyond releasing a few engineering specifications and declaring that it will be carrying customers by 2025."); Jeremy Bogaisky, *Lilium's New Course: On Verge Of Going Public, It's Working On A Bigger Air Taxi. Can It Deliver?*, FORBES, February 10, 2021, https://www.forbes.com/sites/jeremybogaisky/2021/02/10/lilium-evtol-spac-air-taxi/?sh=3f512da3627c ("Previously the company had publicly said it was aiming for 2025.")

— three professors of engineering from German institutions and two doctors from the Whittle Turbomachinery Laboratory at Cambridge in the United Kingdom.

52.    Over the following months, Qell filed a number of other prospectuses on Form 425 with the SEC, including updates to the investor presentation, press releases, transcripts of analyst presentations and media interviews with Lilium management, and "blog" posts written by Lilium management regarding technical and developmental updates about the Lilium Jet.

53.    Many of these filings contained materially false or misleading statements and/or omissions regarding the Lilium Jet and its timeline to certification and commercialization. Through these documents, Defendants furthered their scheme of convincing investors that their concept was not only viable, but more importantly, also just a few short years from turning a massive profit, thereby garnering support for the SPAC transaction that would provide Lilium the funds it desperately needed to continue operations (while at the same time enriching its founders).

54.    On May 4, 2021, Qell filed a current report on Form 8-K and an amended annual report on Form 10-K, both signed by Barry Engle. The 8-K summarized:

> On April 12, 2021, the staff of the Securities and Exchange Commission (the "SEC Staff") issued a public statement entitled "Staff Statement on Accounting and Reporting Considerations for Warrants issued by Special Purpose Acquisition Companies ("SPACs")" (the "SEC Staff Statement"). In the SEC Staff Statement, the SEC Staff expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity.
>
> ***
>
> As a result of the foregoing, on May 3, 2021, the Audit Committee of the Company, in consultation with its management, concluded that ***its previously issued Financial Statements for the period from August 7, 2020 (inception) through December 31, 2020 (collectively, the "Affected Periods") should be restated*** because of a misapplication in the guidance around accounting for our outstanding warrants to purchase ordinary shares (the "Warrants") and should no longer be relied upon.

In other words, Qell revealed that it had been underreporting its liabilities from Day 1.

### III.      Confidential Witness Statement

55.      During Lead Counsel's investigation on behalf of Plaintiff and the Class, Lead Counsel's investigators contacted Confidential Witness 1 ("CW1"), a former Lilium Loads and Aeroelasticity Engineer based in Munich, Germany, who worked at the Company from March 2020 to December 2020. His role involved developing the aerodynamic loads that the Lilium aircraft needed, which Lilium's design team used as a basis for designing elements and parts of the aircraft that would ultimately be manufactured. Determining the aerodynamic loading that the Lilium aircraft needed to meet was based on the standards of various aviation regulatory agencies, specifically the EASA, that would be necessary for the aircraft to receive certification from those agencies. CW1 was one of a team of three who reported to a Team Lead, who reported to the "Head of Calculation," who reported to the Chief Engineer.

56.      CW1 eventually left Lilium because he did not believe the Company could achieve certification for its aircraft within a "reasonable timeline." In fact, he felt he had been "sold a bill of goods" by the Company's leadership. As CW1 explained, prior to being recruited to join Lilium, he had worked for 15 years at Boeing. Based on his vast experience, it would take Boeing — a company with 100 years of experience and history developing aircraft, as well as tens of thousands of employees — about ten years to develop a brand-new aircraft from "clean design" to that aircraft entering into service. By contrast, Lilium was "a brand-new company," and many of its senior engineers had only two or three years of industry experience. For instance, a lot of the engineering leadership came to Lilium from the automotive industry or had doctorate degrees but no prior aviation experience. As such, CW1 did not believe they knew what it took to get an aircraft certified. Nevertheless, the Company was publicly representing that it would have a commercially viable aircraft within just a couple years.

57.      While Lilium had built a "demonstrator aircraft," the Phoenix, which was capable

19

of flying, CW1 believed Lilium's short timeline for achieving certification was not reasonable. He added that, besides the unrealistic expectations for when certification would be achieved, many decisions he observed reinforced his perception of the incompetence of Lilium's leadership when it came to obtaining regulatory certification. Lilium's leadership maintained that certifying its aircraft would be faster than other commercial aircraft because the Lilium aircraft were simpler and had an overall lower part count compared to Boeing or Airbus aircraft. While CW1 agreed the design had fewer parts, he disagreed that this would translate into quicker certification. For example, Lilium wanted to build its aircraft structures entirely out of carbon fiber. In CW1's experience with the development of the Boeing 787, which was also largely made of carbon fiber, use of this material actually created "more problems than it facilitated" for Boeing when it came to certification.

58.     Another factor contributing to why CW1 believed it would take longer for Lilium to get its aircraft certified was the use of "fly-by-wire" flight controls rather than mechanical flight controls. With mechanical flight controls, the pilot's inputs are conveyed mechanically, whereas the pilot's inputs with fly-by-wire are "interpreted" by a computer that sends directions for particular functions of the aircraft. Based on CW1's prior industry experience, using fly-by-wire controls was "not a dealbreaker" for certification if, say, Lilium was willing to dedicate upwards of ten years to developing the controls, but it was not achievable, in CW1's view, in just two years, as Lilium represented publicly.

59.     Another consideration giving rise to CW1's concerns regarding how soon Lilium could get its aircraft certified by EASA was that, at the time he left the Company, EASA had yet to formally issue documents on how to meet its newly developed requirements for eVTOL aircraft and had not yet agreed with Lilium on exactly what those requirements would be. When working

towards certifying an aircraft, CW1 explained that the aircraft maker and the regulatory agency normally agree on the requirements that need to be met in advance so that the aircraft maker does not build something for which the regulatory agency might subsequently change the requirements. During his employment at Lilium, CW1 believed there was "fairly high likelihood" that EASA would change aspects of the aeroelasticity requirements (and possibly other requirements) for eVTOL, because at that time, eVTOL were a new type of aircraft. As CW1 recalled, EASA had various requirements for small aircraft, fixed-wing transport aircraft, rotary-bladed aircraft (*e.g.*, helicopters), and transport rotary-bladed aircraft. But the "challenging part" for Lilium was eVTOL represented a brand-new class of aircraft that did not fit neatly into any of these categories. Flight-wise, they operated somewhat like helicopters but also like fixed-wing aircraft. As CW1 put it, the Lilium eVTOL was "a mash-up," and at the time of his employment, it was "up in the air" what the final EASA requirements for certification would be. Indeed, CW1 knew there was "a lot of back and forth" between Lilium and EASA "about what made sense" for the certifying requirements, and it was "a fluid time" in that regard.

60.    In his role as a Loads and Aeroelasticity Engineer, CW1 had been "trying to pin down" what the "loading" requirements needed to be. He said that because the Lilium aircraft did not maneuver like a normal aircraft, the certification requirements had not yet been "clearly sketched out" by EASA. To that point, if EASA issued final requirements that differed from the standards that Lilium had used, there was a risk of having to "start over" and even re-design the aircraft, but at a minimum and "without a doubt," there would be "re-work" necessary. In that regard, it was "a potential problem" that EASA would issue final standards that differed from what Lilium previously had been using for its design. Rather than wait to confirm the final certifying standards, CW1 said that his "perception [was] that they [Lilium] were charging ahead, full steam"

with designing and building the aircraft, leading him to conclude that he could "not be part of this."

61.     CW1 recounted that development and design of Pegasus (the prototype of the aircraft that would be tested for certification) were stymied because of a February 2020 fire that had occurred with the Phoenix demonstrator. CW1 understood that this had been "a thermal runaway" event while the aircraft had been on the ground. In other words, the fire had been caused by a battery. According to CW1, this fire, which had occurred just before he joined Lilium, required a lot of resources and personnel, including CW1 himself, to be shifted to working on a new Phoenix demonstrator in order to get back into flight testing. As CW1 explained, the Company originally anticipated that remediating the issues that caused the battery fire would be simple, but it eventually became necessary to change the "structure" of Phoenix, which necessitated getting "structure guys" like CW1 involved, and he began splitting his time working on the two aircraft.

62.     But shifting these resources meant there were not enough personnel to work on Pegasus. Originally, the plan had been to get through the Preliminary Design Review ("PDR") for the Pegasus fuselage in November 2020. A PDR is the "first big review" of the design of aircraft parts that is conducted internally by the company. A PDR involves senior engineering leadership and program management. A timely PDR was necessary to meet the internal target of getting Pegasus "built, tested and certified for commercial flight in 2024 or 2025." To that end, the "program leadership" for Pegasus had indicated they wanted the PDR process for the Pegasus fuselage to be completed by November 2020; however, as of the time of CW1's departure in December 2020, the PDR for the fuselage was not completed, and there had not been a new date committed to for the completion.

63.     After the battery fire, according to CW1, "everything was slow" with regards to the Phoenix demonstrator. The goal had been to get Phoenix back to flight testing by July 2020.

However, design work on Phoenix was still being done as of July 2020 and "continued much longer than expected," which was why more resources had to be allocated to Phoenix. While CW1 acknowledges "is not unusual to have major slides" in the development phase of a new aircraft, Lilium's projections of having its aircraft certified and commercially operating in just two years seemed unlikely to him when the Company was unable to timely do even "relatively minor modifications" without lengthy delays.

64.     Even though the Phoenix could fly, CW1 questioned whether the Pegasus could do everything that has been represented by the Company and its management, especially regarding the flying range. On the one hand, CW1 said Phoenix was "completely different" than Pegasus, but the two aircraft were also "close enough" that Lilium could learn information from Phoenix for developing Pegasus, like how the control systems work and energy consumption. Yet it was impossible for Lilium to say that just because something worked on Phoenix, it would work well enough to get certified on Pegasus.

65.     Based on the flight data for Phoenix that CW1 reviewed, he believed the claims that Pegasus would have a range of 155+ miles were "far-fetched." In essence, Phoenix had only ever flown for three to five minutes at a time. CW1 said "it shocked me how low" the range was, and it never improved while he was employed at Lilium.

66.     CW1 stated that he had voiced his concerns regarding the unrealistic certification timelines to others within the aeroelasticity group, as well as to Defendant Yemsi, the Pegasus Program Manager, but Yemsi disregarded these concerns expressed by CW1 and by others.

67.     During CW1's employment at Lilium, Defendant Wiegand was "super-involved" and "intimately involved" with both Phoenix and Pegasus. As CW1 explained, the aircraft were Wiegand's "baby." "[E]very decision had to be run up to" and approved by Wiegand, which CW1

said was "a big frustration for a lot of us" because it slowed things down. Moreover, CW1 found that Wiegand lacked requisite experience. As such, much time was devoted to "convinc[ing]" Wiegand why things needed to be done, but if Wiegand was not convinced, then those tasks would not be done.

68.     During his time with Lilium, CW1 reported that the Company had been actively trying to implement improved controls because they recognized the need to transition from "the Wild West" to becoming "a real aircraft company," a phrase that was used "all the time" at Lilium. However, CW1 explained, difficulties arose because everything was happening at the same time: the Company was trying to design an aircraft while simultaneously trying to build it. However, many Lilium personnel "didn't know how" to go about designing an aircraft due to their lack of aviation experience. To support his point, CW1 reiterated how, all at the same time, the Company, with a mere 400 employees, was "pushing hard" to have the Pegasus fuselage PDR completed by November 2020, was "re-engineer[ing] Phoenix" after the battery fire to keep it flying "to show investors something," and trying to develop fundamental documentation processes to demonstrate to the regulators that Lilium was a mature Company capable of building a new aircraft. Eventually, these conditions and concerns regarding the certification timeline led CW1 to leave the Company.

69.     Importantly, many of CW1's statements are corroborative of and further confirm statements contained in a series of three reports published by Iceberg Research between March 14, 2022, and August 31, 2022, discussed further herein.

### IV.    Timeline

70.    A timeline of the relevant events in this Action is as follows:



### **DEFENDANTS' SCHEME TO DEFRAUD THE MARKET**

71.    Throughout the Class Period, in violation of Rule 10b-5(a) and (c), Defendant Engle, in his role as CEO of Qell, and Defendants Wiegand, Richardson, Yemsi, and McIntosh, in their roles as executive officers of Lilium, engaged in a scheme and course of conduct to garner the investor support necessary to effectuate the highly lucrative SPAC merger, without which, Defendant Wiegand admitted, the Company likely would not have been able to raise enough capital to continue operations. After the Merger, Defendants continued the scheme, hoping their "fake it till you make it" strategy would maintain the share price and attract future investors for the eventual secondary offering they knew they would need. Indeed, from the start, Defendants searched for unscrupulous ways to attract investors. For example, when Defendant Wiegand's

University offered to help with the design if its eVTOL, he refused. Later, when Lilium and Wiegand subsequently approached the university about some type of partnership, the University criticized the Jet's concept, saying it could not work, and wanted no association with them. Professor Mirko Honung, the head of the University's Department of Aviation Systems, stated, "They [Lilium and Wiegand] only wanted the TU Munich label as a reference to further polish their image, *presumably to attract investors*. We vetoed the idea and insisted there should be no connection between the Lilium and the department. We don't want to have anything to do with such dubious things." Having been rebuffed by the University, Defendants needed something to give them a sense of credibility.

72.     Lilium engaged in a course of conduct to make the Lilium Jet's ducted fan design appear to be scientifically and mathematically sound and its development well under way. For example, Lilium commissioned and disseminated the White Paper, which was written in the style of a scientific journal article, and purportedly reviewed and blessed in its entirety by experts in the aeronautics field. Additionally, Lilium published several "Technical" and "Developmental" blog posts on its website, as well as "Technology FAQs," purportedly answering critics' concerns about the feasibility of the Lilium Jet's design and its timeline to certification. Investors viewed these actions as transparency on the part of the Company, and indeed, many critics were silenced. However, the calculations in the White Paper — and by extension the Technical Blogs — were based on non-industry standard inputs and the assumption that the Lilium Jet would have access to batteries that were still many years from commercial availability. It was later discovered that the experts who "reviewed" the paper actually approved only the calculation methodologies — not the actual numerical inputs.

73.     During and leading up to the Class Period, Lilium also posted videos to its YouTube

channel of "test flights" of the Phoenix and Phoenix 2 demonstrators appearing to soar in the air, further silencing any critics who had previously claimed that the Lilium Jet could not fly.[12] However, at the time, the Lilium demonstrators had not achieved the transition from hover to cruise — meaning, essentially, for these test videos, the Lilium Jet rose in the air and then was dropped, coasting at a downward angle.[13] Additionally, the Phoenix was different from the 7-Seater jet in a several of key ways: it was not powered by Lilium's "advanced" batteries, and it was smaller and far lighter that the 7-Seater would be. As CW1 noted, just because the Phoenix could fly, it did not mean that the Pegasus could do everything that had been represented by the Company and its management, especially regarding the flying range.

74.     In furtherance of the scheme, Defendants also (mis)represented that: 1) the range estimate given for the 7-Seater Lilium Jet was scientifically and mathematically proven to be possible given the state of battery technology at the time and was scalable to a 16-Seater Jet in the near future; 2) the ducted fans would produce less noise than competitor aircraft, allowing the Lilium Jet access to urban areas and warehouses where community noise ordinances would prohibit competitor traffic; and 3) the Lilium Jet was currently on-track to be "first-to-market" to begin commercial operations by 2024 and profits following soon thereafter.

75.     Just months after the Merger with Qell closed, the cracks began to appear in this narrative. Beginning on March 14, 2022, Iceberg Research published a series of damning reports, citing experts and former employees, revealing that the mysterious battery technology Lilium was

---

[12] *See, e.g.*, https://www.youtube.com/watch?v=5ukmS9ZJm40; https://www.youtube.com/watch?v=SqMEFdbuzQY; https://www.youtube.com/watch?v=jqvMXoVZfDw

[13] This downward coasting is reminiscent of the scandalous discovery that, in promotional videos, the hydrogen-powered truck manufactured by Nicola was merely rolling downhill rather than moving under its own power, leading to an SEC investigation of the company. *See Nikola electric lorry just rolling downhill in promo video*, BBC, September 15, 2020, https://www.bbc.com/news/technology-54161343.

planning to rely on was a product of Zenlabs, a company headed by the same individual that had previously started another battery company that went defunct after being accused of misrepresenting the capabilities of its batteries to General Motors — Defendant Engle's previous employer. Lilium later confirmed this to be true. Notably, Lilium concealed Zenlabs' name as the battery technology provider until after being unmasked by Iceberg Research. Based on battery technology commercially available at the time, and in line with the technology Lilium's competitors relied on, the range of the 7-seater Lilium Jet would likely be far shorter than Lilium represented. While experts agreed the Lilium Jet concept was technically feasible, they also agreed it was likely many years from being achievable. Additionally, Iceberg Research found that the Lilium Jet would likely be far louder than Lilium had let on, meaning it could be prohibited from accessing inner-city targets, a key element of its business model. Because of Lilium's conduct, many began referring to Lilium as the Theranos of Europe.[14]

76.    Just a few weeks after the March 14, 2022 Iceberg Report revealed the truth about much of their deceptive conduct and misleading statements, Defendants confirmed their 2024 target was never possible by changing their timeline from commercialization in 2024 to EASA certification in 2025, with commercialization occurring shortly thereafter. Defendant Wiegand, speaking to a German newspaper, blamed the delays on the Covid-19 pandemic; however, it is far more likely, particularly given the factual account of CW1, that Defendants knew their timeline was overly ambitious from the start, but they would have been unable to raise enough investor

---

[14] *See* January 12, 2021 "Struck - An Aerospace Engineering Podcast," *EP42 – Lilium Going Public? Elbit UAVs & Can Agile Engineering Work for the EVTOL Infrastructure?* ("… there's always that sort of Theranos feel to it…"); Comments to *Sustainable Air Transport. Part 30. Lilium Jet VTOL*, BJORN'S CORNER, July 28, 2022 ("I would be willing to bet the vehicle can't lift 7 people, and they know it, so they're trying a bait and switch. It would also not surprise me if the project is a European Theranos."); August 31, 2022 Iceberg Report (Lilium has "chosen to make Hail Mary claims of a miraculous battery cell that would beat anything on the market. Similar to Theranos, this is Lilium's way of 'faking it till you make it.'")

support and sufficient capital without their persistent claims that they would be "first-to-market."

77.     Lilium's stock has declined from $9.31/share on its first day of trading to $0.854/share at closing on the day before the filing of this Complaint, an astonishing **90.8%** decline in value. Due to this decline, Plaintiff and the members of the Class have suffered economic losses.

## I.     Defendants Claimed to have Secret, Advanced Battery Technology Capable of Powering the Lilium Jet

78.     At the heart of Defendants' fraudulent scheme was the claim that Lilium had access to some of the most advanced battery technology in the world — a battery that yielded an energy density of 330 Wh/kg, capable of powering Lilium's 3,175kg, 7-Seater Jet to fly as far as 155 miles in a single trip. These batteries, Defendants claimed, would allow the Lilium Jet to fly further and with a larger payload than any of its competitors when it began commercial operations in 2024.

79.     Early critics questioned how Lilium's expected range could be possible, given the extremely high-power consumption of the Lilium Jet during its hover phase. However, Defendants silenced these critics and reassured the market by repeatedly explaining to journalists that the public were merely not privy to the secret calculations that proved Lilium's concept was viable. Some called this secrecy suspicious in the face of the number of public statements Lilium began making early in its development. (*See, e.g.*, Richard Whittle, *Lilium Goes Its Own Way*, EVTOL NEWS, January 3, 2020 ("the company has been extremely secretive . . . most other secretive eVTOL developers seem to spend less time and effort than Lilium does on marketing, which the company sometimes does with artful statements.")). Lilium even invited representatives from *The New York Times* to fly to Germany to be the first reporters to view the Lilium Jet in late 2019, but the reporters were disappointed to "face restrictions on what they could photograph or see."[15]

---

[15] *See* Adam Satariano, *Inside the High-Stakes Race to Build the World's First Flying Taxi*, THE NEW YORK TIMES, November 5, 2019, https://www.nytimes.com/2019/11/05/technology/flying-taxis-lilium.html

80.     German newspapers *Aerokurier* and *Der Spiegel* both published pieces in late 2019 and early 2020 criticizing the Lilium Jet concept, citing scientists and aeronautical engineers who all agreed that the range, speed, and weight capacity of Lilium's ducted fan design could not be achieved with the energy density of the battery technology that existed at the time. Lilium responded to *Aerokurier* via email, accusing their expert of underestimating the hovering efficiency of the engines.[16]

81.     On February 10, 2021, *Forbes* published an article titled "Lilium's New Course: On Verge Of Going Public, It's Working On A Bigger Air Taxi. Can It Deliver?"[17] The article, which questioned whether Lilium would be able to meet the ambitious flight testing and certification schedule it had conveyed to investors, cited three former Lilium employees, who spoke on the condition of anonymity. The former employees revealed that they, and a number of their colleagues, left Lilium "out of frustration over the management of the company by Wiegand, who they say is overcontrolling and has held to an unrealistic timeline in the face of development delays, pushback from his engineers and a planning process that was throwing up red flags." One former employee stated that Defendant Yemsi's own projections "showed that shooting for certification in 2023 would be extremely difficult," but that Defendant Wiegand was insistent on the timeline, and often "convened meetings to try to find ways to advance the schedule." Two of the employees told *Forbes* that "development of the [Phoenix] was dogged by problems and that the flight test campaign made minimal progress before it was incinerated in a battery fire in February 2020." "All four ex-Lilium employees *Forbes* spoke with said they believe Lilium's

---

[16]     *See* Lars Reinhold, *Lilium's illusory world*, AEROKURIER, January 16, 2020, https://www.aerokurier.de/elektroflug/lilium-jet-dossier/ (translated from German).
[17] https://www.forbes.com/sites/jeremybogaisky/2021/02/10/lilium-evtol-spac-air-taxi/?sh=6aac2c5d627c

design can be made to work–eventually, in some form–but three of them and industry observers say it would be exceedingly difficult for the startup to win safety certification for an aircraft by the end of 2023." One former employee is quoted as saying: "'If you're trying to attract investors, you have to have an ambitious vision, but at which point are you misleading investors with big numbers? . . . I'm not saying Lilium is guilty of investor fraud, but at some point, I just couldn't live with that part anymore."

82.     However, the article also cites Alexander Asseily, an early investor in Lilium who joined the executive team as Chief Strategy Officer, who told *Forbes*, "[T]he startup was confident in its schedule and in the soundness of the development processes it has established following the addition of experienced aerospace executives from the likes of Airbus and Rolls-Royce." Additionally, Asseily told *Forbes* that Lilium's design was made possible by a custom battery cell, which involved "tweaking" a "known cell chemistry," and thus could be manufactured "on current standard scale production lines, in volume, on the timeline Lilium needs to launch mass production." An associate professor of engineering at Carnegie Mellon told *Forbes* that, based on the anticipated weight of the Lilium jet, the specific power needed was beyond what currently available lithium-ion batteries could achieve. Asseily called these calculations a "bit off," but notably declined to discuss the battery specs in detail.

83.     Many also assumed that big name investors like Tencent and Baillie Gifford (an early investor in Tesla) would not have invested in Lilium unless there was some truth to Lilium's claims. When asked how Lilium had persuaded Baillie Gifford to invest despite the criticism of its design, a spokesperson for Lilium answered, "They've seen the aircraft[18] . . . Most of them have

---

[18] As of December 2022, Lilium has still not built a conforming prototype of "the aircraft," so the representative here is presumably referring to the Phoenix demonstrator, which is not powered by the "advanced" batteries that Lilium claims will power its commercial jets.

seen it fly as well, at some point. They see performance data on the aircraft. They understand how it's put together. They do their due diligence. They understand the technologies and the assumptions behind it. They get to speak to all of our experts."

84.     In a blog post published on Lilium's website on August 4, 2021, Defendant McIntosh stated that even he was skeptical of the Lilium Jet's concept before he joined the Company, but after conducting his own "due diligence" on Lilium's technology and architecture, he stated, "I found it to be technically sound and genuinely impressive and now as part of the team, I have seen much of the innovative technology, analysis and, importantly, test data that underwrites the concept." However, this "secret information" proving Lilium's concept was apparently only given to top tier executives — when CW1, an engineer employed at Lilium, expressed concerns to Defendant Yemsi, Yemsi coyly replied that CW1 did not "understand the full situation."

85.     To silence critics, Lilium created the White Paper, which was filled with complicated equations purportedly demonstrating the physics behind the Lilium Jet. The White Paper concluded: "*[A]ssuming a battery density of 320kWh/kg, the maximum range of the aircraft is 261km [~155 miles]*." The White Paper was authored by Patrick Nathen, one of Lilium's co-founders who attended the Technical University of Munich with Defendant Wiegand,[19] and stated prominently at the top of the first page that it had been reviewed by five experts — three professors of engineering from German institutions and two doctors from the Whittle Turbomachinery Laboratory at Cambridge in the United Kingdom. However, these experts later shockingly revealed that, while they reviewed the calculation methodologies, they did not agree with the author's numerical assumptions — a factor that critically undermines the conclusions

---

[19] Patrick Nathen was originally the Head of Calculations and Design at Lilium, then became the VP of Products in 2018. In April 2022, shortly after the Iceberg Report was published, Nathen was demoted to an engineering position in the Flight Mechanics Department (of which he was not the head).

reached in the report. The White Paper was made public on March 30, 2021 — the day Lilium announced its intended merger with Qell. This White Paper silenced many critics who had previously questioned whether the Lilium Jet was technically feasible.

86.     To garner investor support for the merger between Lilium and Qell, Defendants made and disseminated repeated representations that they currently possessed the battery technology necessary to power the Lilium Jet:

- "Lilium has ***successfully developed, tested and refined the underlying technology for electric vertical take-off and landing jets*** – Lilium's proprietary Ducted Electric Vectored Thrust ("DEVT") technology, along with key control systems, aircraft and ***battery architecture***." March 30, 2021 Form 8-K, signed by Engle.

- "We have secured a battery technology that allows us to achieve our launch range of 150 miles. And this technology has been proven on our own test benches." Wiegand, March 30, 2021 Investor Presentation.

- "The performance of battery cell development has rapidly improved over the past decades and today cells are available with energy densities of >300Wh/kg and power density of >3kW/kg. This will lead to a battery system design for the serial aircraft with >300kWh of total stored energy of which we can access 85-90% for our mission profile to reach a maximum physical range of 250+ km including reserves." McIntosh, August 4, 2021 Technology Blog.

- "The Lilium Jet's engines are designed to be powered by a proprietary battery system which is being developed by Lilium in collaboration with third parties based on large format Lithium-ion pouch batteries . . . We have invested in a leading battery technology supplier, securing exclusive rights for the eVTOL market for this chemistry. Supplier and in-house measurements of the pouch cells have yielded nominal energy density levels of 330 watt-hour per kilogram, which is projected to enable a physical aircraft range of 155 miles (our target for entry into service)." August 5, 2021 Registration Statement, signed by Engle.

87.     Defendants Wiegand, Richardson, McIntosh, and Yemsi each participated in the June 16, 2021 Analyst Day presentation and the August 2, 2021 Capital Markets Day presentation, both of which were accompanied by slide decks that included the following graphic:



(highlight added).

The Analyst Day and Capital Markets Day slide decks were also filed with the SEC on Form 425 by Qell, under Defendant Engle's supervision.

88.    Based on these fraudulent representations, Defendants accomplished their goal of going public via a SPAC transaction, providing Lilium with the necessary cash to continue operating. However, not long after the Company went public, it was revealed that Lilium's claims about its access to "advanced" batteries were highly misleading.

89.    First, as of December 2022, Lilium has not built a full-scale 7-seater prototype jet. Instead, it is conducting testing using a 5-seater demonstrator, the Phoenix. After about 20 flights, none longer than a few minutes, Lilium's first Phoenix demonstrator caught fire due to a thermal runaway event caused by the batteries. Lilium then built a second demonstrator. In July 2022, German newspaper *Handelsblatt* was able to witness a test flight of the Phoenix 2 in Spain. It reported: "A look through the darkened windows shows: Lilium's demonstrator is still flying with a forklift battery, which takes up a large part of the cockpit. A four-minute test flight lowers the charge level to just 66 percent." In other words, Lilium has never built and flown a jet powered by its "advanced" batteries, much less a jet that weighs 2.4 times as much as the Phoenix demonstrator. According to CW1, the claims that the 7-Seater Lilium Jet could fly 155+ miles

were "far-fetched," as the Phoenix demonstrator had only ever been able to fly for three to five minutes at a time.

90.      In a series of reports, Iceberg Research revealed that Lilium's magical, advanced batteries were no more than sleight of hand. The March 14, 2022, Iceberg Report revealed that the likely source of Lilium's battery IP was a company called Zenlabs Energy (a claim Lilium later confirmed). Zenlabs' CEO, Sujeet Kumar, had been the CTO of Envia Systems, a defunct company that had been accused of misleading investors and customers about the capabilities of its batteries in 2013. As described in detail in a December 20, 2013 article in *Business Insider*,[20] Envia was the brainchild of Kumar and his acquaintance, Atul Kapadia. Kumar developed a battery that he claimed "could deliver 400 watt-hours per kg of energy density—enough for a 300 mile battery at half the current cost." This breakthrough attracted the attention of General Motors, which invested $17 million in Envia in 2012 and granted the company a $2 million per quarter contract. However, "GM found it couldn't replicate the high energy density," and an external report showed that the cells could only hit the high energy density for three charging cycles, after which performance plunged.[21] Kapadia then discovered that the cell "used anode material bought in from Japanese firm Shin-Etsu, not disclosed to customers and passed off as Envia's own." In August

---

[20] Antony Ingram, *How A Promising Electric Car Battery Startup Completely Self-Destructed*, BUSINESS INSIDER, December 20, 2013, https://www.businessinsider.com/how-a-promising-battery-startup-completely-self-destructed-2013-12; *see also* Steve LeVine, *The mysterious story of the battery startup that promised GM a 200-mile electric car*, QUARTZ, December 19, 2013, https://qz.com/158373/envia-the-mysterious-story-of-the-battery-startup-that-promised-gm-a-200-mile-electric-car.

[21] Holding a charge over hundreds of charge cycles is essential for batteries in any commercial application. Imagine a company marketed a cell phone where the battery lasted a very long time — say, over a week — longer than any of its competition. But customers who bought the phones discovered that, after charging them for three times, the battery started lasting less and less time, and after charging the phone 25 times, the charge lasted only about one day (less than most other phones currently commercially available). Customers who had purchased the phone after having been promised a week between charges would feel misled and likely demand a refund.

2013, GM terminated its contract with Envia, on the grounds that it was "predicated on a number of statements and representations made by Envia and Envia's representatives that, in retrospect and in light of more recent statements by Envia, appear to have been inaccurate and misleading." Defendant Engle began working at GM as an Executive Vice President in 2015, just a few short years after this massive misstep. In fact, Defendants Engle and Richardson met through mutual contacts at GM, which eventually led to Qell selecting Lilium as its merger target.

91.     On May 31, 2022, embedded in a blog post, Lilium shared a report from third party Energy Assurance, which purportedly confirmed Zenlabs' claims about the capabilities of its batteries. However, Energy Assurance tested the batteries for only ***two charging cycles***. In other words, there is no evidence, like the batteries Kumar developed for GM, that Lilium's "advanced" batteries will be able to hold the same levels over the hundreds of charging cycles required to make them commercially viable. As Iceberg Research explained in its follow-up report published on August 31, 2022: "It's easy to claim exceptional properties if durability is not tested."

92.     Further, even if Zenlabs was able to achieve levels of over 300 Wh/kg in a laboratory setting, such breakthroughs rarely manifest in the real world. An article from *The Wall Street Journal* titled, "Why All Those EV-Battery 'Breakthroughs' You Hear About Aren't Breaking Through"[22] cites Marc Tarpenning, a co-founder of Tesla, who notes that, despite numerous companies working to achieve the next "breakthrough," advances in battery technology steadily improve at only about 7-8% per year. Tarpenning explained, "Many approaches that in theory could double or triple the capacity of existing batteries haven't been made to work beyond a few charge cycles. A prime example are lithium-sulfur batteries, which on paper could have

---

[22] Christopher Mims, *Why All Those EV-Battery 'Breakthroughs' You Hear About Aren't Breaking Through*, THE WALL STREET JOURNAL, February 26, 2022, Why All Those EV-Battery 'Breakthroughs' You Hear About Aren't Breaking Through - WSJ.

nearly 10 times the capacity of current cells. The only problem: If you make one the same way you make current batteries, it breaks down almost completely after just one or two charge cycles."

93.     Additionally, when Iceberg Research asked Volker Gollnick, Professor of aeronautics at the Institut fur Lufttransportsysteme of Hamburg, to review the claims in the White Paper, he discovered some serious discrepancies. First, Iceberg revealed, when Professor Gollnick spoke to the aeronautics professors cited as "reviewers" by the White Paper, they explained that they had reviewed the calculation methodologies, but that they *did not agree with the paper's numerical assumptions* (*e.g.*, that the batteries would be capable of 330 Wh/kg).

94.     Batteries capable of 330 Wh/kg, Professor Gollnick explained, are still years away from becoming commercially available. Commercially available batteries at the time Professor Gollnick wrote his report (August 2022) were only about 270 Wh/kg at most — which was the value that Lilium's competitors relied on for their calculations.

95.     Based on the assumption that Lilium would have access to batteries capable of over 300 Wh/kg, the White Paper determined that the Lilium Jet would have a range of approximately 155 miles. Defendants echoed this "scientific" finding about the Lilium Jet's potential range numerous times leading up to the Merger:

- "The Lilium 7-Seater Jet has a projected cruise speed of 175 mph at 10,000 feet and *a range of 155+ miles*, including reserves." March 30, 2021 Form 8-K, signed by Engle.

- "The aircraft has an average cruise speed of 175 miles an hour and comes with *155 miles range at launch*." Wiegand, March 30, 2021 Investor Presentation.

- "Initially, we will have *a range of around 150 miles* and that enables us also to unlock regional connections." Wiegand, June 16, 2021 Analyst Day Presentation.

- "[A] *range of around 150 miles* [will] unlock [] regional connections." Wiegand, August 2, 2021 Capital Market Day presentation

- "By making use of our custom cells and chemistry with our aerospace grade supplier, we will be able to expand the range of the Lilium Jet to approximately 250km [~155 miles] at entry into service in 2024." McIntosh, August 4, 2021 Technology Blog.

- "The specifications for the Lilium Jet under development call for the aircraft to be able to cruise at 175 mph at 10,000 feet for **up to 155 miles** and to have 7 seats (one for the pilot) or 210 cubic feet of cargo space representing 50% more (passenger) capacity than an open propeller eVTOL architecture would have." August 5, 2021 Registration Statement, signed by Engle.

Both the Analyst Day and Capital Markets Day presentations also contained slides with graphics touting the Lilium Jet's 155-mile range.

96.     While Defendants admitted that, due to the small footprint of their ducted fans, the Lilium Jet would "consume roughly twice the power in hover flight than the standard propellor based electric VTOL aircraft," they claimed this would not greatly decrease the range "because we spend less than 60 seconds per mission in the hover phase and 30 to 60 minutes in cruise flight." Wiegand, March 30, 2021 Transcript of Investor Film; *see also* Transcript of June 16, 2021 Analyst Day presentation (McIntosh: "during the hover phase, they consume more power than you expect to see on a comparable open rotor . . . However, when we look at a typical mission, as you can see laid out here, we spend very little time in hover phase. In reality for a typical mission of a 30 minute cruise segment, we only spend about 30 seconds in hover."); August 4, 2021 Technology Blog by McIntosh ("[D]espite 2x higher power consumption in hover than an equivalent open rotor concept, this increased power demand is compensated by optimising cruise flight performance, which only requires 1/10th of hover power and also makes up to more around 90-95% of the flight time.").

97.     The Gollnick Report made a number of other findings that seriously impugned Defendants' statements about, and conduct surrounding, the Lilium Jet's purported range. First, Professor Gollnick observed: "The mass breakdown as shown in the White Paper, is roughly

performed following a top-down, instead of a well established bottom-up approach, implying a lot of uncertainties about the real empty mass and the net battery mass." He explained that the Lilium Jet's availability for battery mass and energy storage will actually be significantly lower than the 953kg estimated by Lilium. In simpler terms, the White Paper assumes that the whole allotted 953kg will be energy-producing battery cells, ignoring that some of that weight will need to be devoted to the components surrounding the cells, like casings and wiring. Additional weight would be required for the installation of safety systems and power reserves. Professor Gollnick estimated that "15% of the overall battery package mass must be provided for these measures [] which are not operationally available for power calculations." With the maximum takeoff mass of 3,175kg predetermined by EASA, this means that Lilium will either need to allow less mass for the actual cells (compromising the available power) or devote more mass to batteries to make up for the deficit (compromising the available mass for passengers or cargo).

98.     Therefore, Professor Gollnick found that Lilium's estimated stored power of 305 Wh/kg to be "too optimistic," and a power density of 400 Wh/kg to be more realistic. Assuming a 7% density increase per year of technology improvement, as had been previously demonstrated by the industry, Professor Gollnick estimated that such technology would be available in 6-7 years (in 2028 or 2029).

99.     The White Paper describes the various flight states of the Lilium Jet as hover, transition hover to cruise and back, cruise, climb, and descent. However, the Professor Gollnick Report described two phases of flight that the White Paper does not consider at all — vertical climb and vertical descent. These stages are necessary for obstacle clearance, especially as Lilium plans to operate from vertiports in urban locations which could be surrounded by tall buildings. Professor Gollnick estimated that "a thrust reserve of about 20% for vertical climb out of obstacle

area must be considered for safety reasons, which either will increase the need for power or reduce the cruise range." The White Paper accounted for neither. Based "practical flight experience," Professor Gollnick stated, "an overall hover flight time of approximately 2-3 minutes is more realistic for one mission."

100.    Professor Gollnick also concluded that the "power estimation for the transition phase is underestimated." He explained that, during the 21 seconds where the ducted fans tilt from the vertical to the horizonal position, the initial vertical thrust is reduced, and "more power must be provided until sufficient forward speed is developed to create sufficient aerodynamic lift carrying the vehicle." The White Paper did not account for this extra power.

101.    Additionally, the Gollnick Report stated that the White Paper assumed a minimum de-charging level of 10%; however, "for Lithium based batteries a minimum charge level of 20% is required, to prevent the batteries from damage." Similarly, "[t]he maximum battery aging loss due to re-charging cycles must be considered, which for Lithium batteries is often set to 80%." Taking these facts into account, Professor Gollnick concluded that "either a significantly higher battery mass or a clear reduction in mission range will result, which is confirmed by own calculations based on the methodology presented by Lilium." The Gollnick Report included a table showing that, with these considerations, the Lilium Jet's range was likely much shorter than represented by the White Paper. An abridged version of this table is reproduced below:

| | Power density [Wh/kg] | Hover time [sec] | Minimum de-charge [%] | Minimum max-charge due operat. reserves [%] | Resulting Range [km] |
|---|---|---|---|---|---|
| Lilium DVTC-2 (Reference) | 250 (7 Seater) | 60 | 0.1 | 0 | 181 |
| Lilium DVTC-2 with 90 sec Hover | 250 (7 Seater) | 90 | 0.1 | 0 | 153 |
| Lilium DVTC-2 with 180 sec Hover | 250 (7 Seater) | 180 | 0.1 | 0 | 67 |

| Lilium DVTC-2 with increased hover time, decharge level and power reserve | 250 (7 Seater) | 90 | 0.2 | 0.2 | 57 |
|---|---|---|---|---|---|
| Lilium DVTC-2 with current energy density | 270 (7 Seater) | 120 | 0.2 | 0.2 | 44 |
| Lilium DVTC-5 with packaging losses and reduced battery mass due to battery power management electronics | 196 (330x0,7x0,85) (5 Seater) | 60 | 0.1 | 0 | 167 |
| Lilium DVTC-5 with 3 years improved energy density extended battery mass with packaging losses and reduced battery mass due to battery power management electronics | 196 (330x0,7x0,85) (5 Seater) | 120 | 0.2 | 0.2 | 19 |

102.     As this table shows, accounting for the reduced battery mass due to components, a two minute hover time (the minimum likely to be required by regulators[23]), a minimum de-charge level of 20%, and a maximum recharge level of 80% due to battery aging, with the battery technology that will likely be available in 2025, a 5-Seater Lilium Jet (which he estimates to be approximately 1153kg lighter than the 7-seater, though he noted that "[t]he real takeoff mass for both intended versions is essential to know for the entire performance calculation.") would only have a range of about 11.8 miles. Obviously, at this range — a short drive, even in the most congested cities — the Lilium Jet would be completely uneconomical.

103.     On February 28, 2022, in a letter to shareholders signed by Defendants Wiegand and Richardson, Lilium announced that its aircraft design would "allow for" a premium four-passenger "club cabin" configuration. While this change was billed as a luxury option for private or fractional owners, in truth, Lilium was merely reducing the capacity of its aircraft back to five

---

[23] In the June 6, 2022 Earnings Call, Defendant Yemsi admitted that EASA had not yet clarified "exactly what the requirements will be for holding reserves."

seats — likely because the batteries capable of powering a seven-seat cabin were still years from commercial availability.

104.    Based on these facts, as the first Iceberg Report concluded, "Lilium voluntarily misrepresented its access to batteries to raise SPAC money, despite not having the battery technology."

**II.    Defendants Claim the "Low Noise" of their Jet Will Be a Commercial Advantage**

105.    One of the "mission critical" aspects of the Lilium Jet that Defendants repeated over and over was that the Lilium Jet was "low noise." Specifically, Defendants claimed that the Jet's sound footprint would be approximately 60 db at 100 meters away during the hover phase (about as loud as a household dishwasher) and "inaudible during cruise from the ground." Since Lilium's business plan relied on taking off and landing at urban targets, which may have noise ordinances, the low noise was essential to Lilium's commercial success. In fact, Defendants claimed, "the main reason we chose ducted fans from the very beginning is noise." June 16, 2021 Analyst Day Transcript.

106.    Lilium mentioned the low noise of its Jet over a dozen times in its August 5, 2021 Registration Statement, as well as in nearly every other interview, analyst call, blog post, and press release Defendants issued prior to going public. In an investor film, the transcript of which Qell filed on Form 425 on March 30, 2021, Defendant Wiegand explained that the Lilium Jet's ducted fans would have acoustic liners that "capture and dissipate the noise before it propagates into the environment," which would allow Lilium "to achieve market leading low noise levels."

107.    The following graphic was included in a slide deck that accompanied a presentation given by Defendants Richardson, Engle, and Wiegand, which was also filed by Qell on Form 425 on March 30, 2021:



108.     The Gollnick Report also discussed the noise levels that Lilium had referred to as a "mission critical" element of their design:

> Concerning the achievable noise level the authors calculate about 96m/s (351 km/h) exhaust speed, which is as much as 3 times higher than the flow speed of a 3 tons helicopter rotor and also in the same order of magnitude as a A320/B737 short range aircraft at takeoff full power. Therefore, ***it is not understandable, why Lilium states 60dB perceived noise level being achievable***. The a.m. exhaust speed of an aircraft engine is more in the range of 85 dB noise level.

109.     As the U.S. Center for Disease Control has explained, prolonged exposure to noise levels above 85bd can cause permanent hearing damage.[24]

110.     Professor Gollnick explained that the demonstrators used in the flight test videos posted on Lilium's website "indicate a much lower vehicle mass, otherwise the noticeable exhaust noise would be much higher."

111.     The author of the White Paper "introduces the ducted fan as an appropriate technology to reduce propeller engine noise by shielding the propeller with a duct and acoustic liners." Professor Gollnick conceded: "This conclusion is correct, if only the propeller is

---

[24] https://www.cdc.gov/vitalsigns/hearingloss/index.html

considered." However, he noted that the exhaust diameter of the engine fan and the rotor is much larger than the exhaust diameter of a single ducted fan:

> The estimated very high exhaust speed of the Lilium ducted fans compared to typical aircraft and rotorcraft exhaust speeds *raises severe concerns about the noise impact and general ground operations*, because the high speed will create a lot of turbulence close to the ground. For jet VTOL systems like VJ101, VAK191 or DO31 ground erosion and heating became a critical issue, because the ground could be destroyed.

112.    In July 2022, after witnessing a test flight of the Phoenix 2 in Spain, a reporter from *Handelsblatt* confirmed that the demonstrator was actually quite loud: "When the 36 rotors start, it sounds as if someone had started a huge industrial vacuum cleaner." As the demonstrator weighs at least 2.4 times less than the 7-seater Lilium Jet will at full capacity, the conforming aircraft will likely be even louder — a significant hindrance to Lilium's commercial operations.

### III.    Defendants Repeatedly Confirm the Impossible Target of Commercialization in 2024

113.    Another crucial element of Defendants' fraudulent scheme was representing that Lilium would be one of the first — if not the first — eVTOL to begin commercial operations, and repeatedly implying and representing that *present* progress was adequate to meet their timelines.

114.    Before its announced potential merger with Qell, Lilium had communicated that it intended to begin commercial operations by 2025, a year after the targets (at the time) of competitors like Joby, Archer, and Volocopter.[25] Due to the constraints of this overly ambitious timeline, which Defendant Yemsi referred to as "extremely difficult," CW1 and several other engineers cited in the *Forbes* article left the Company.

---

[25] *See* Peggy Hollinger, "*Flying taxi start-up raises $240m from existing investors led by Tencent,*" FINANCIAL TIMES, March 22, 2020, https://www.ft.com/content/9eb5fcfe-6bda-11ea-89df-41bea055720b ("The group was planning to launch an on-demand taxi service in 2025 in two or three regions."); Jeremy Bogaisky, "*Lilium's New Course: On Verge Of Going Public, It's Working On A Bigger Air Taxi. Can It Deliver?,*" FORBES, February 10, 2021, https://www.forbes.com/sites/jeremybogaisky/2021/02/10/lilium-evtol-spac-air-taxi/?sh=3f512da3627c ("Previously the company had publicly said it was aiming for 2025.")

115.     However, from the day the potential merger was announced, Defendants actually *shortened* their timeline, beginning a scheme and course of conduct to convince the market that commercial operations would begin in 2024, and profits would quickly follow: "[W]e're actually very close to this kind of vertical takeoff and landing electric jet aircraft going on the market." Defendant Wiegand confidently told an interviewer in an August 6, 2021 interview on CNBC, "For us, it'll be 2024." In furtherance of the scheme, Defendants represented numerous other times that they anticipated beginning commercial operations in 2024, and that present progress was adequate to meet that timeline. Lilium even published a blog, co-authored by Defendant Yemsi, that delved in detail into the certification process, making it seem as if the Company was well on its way to achieving the certification necessary to begin operations.

116.     However, as explained in detail below, achieving certification and beginning commercial operations by 2024 was always extremely unlikely, if not entirely impossible. To garner investor support for the Merger, Lilium had to appear to be on the cusp of being one of the first (if not *the* first) eVTOL companies to begin commercial operations, in just a few short years from the Company's going public date. Therefore, Defendants engaged in a fraudulent scheme to mislead investors about their true timeline.

A.     **Defendants' Fraudulent Narrative Regarding Lilium's Certification Timeline**

117.     Before beginning commercial operations, aircraft must achieve certification by regulators, such as EASA in Europe or the FAA in the United States. Being based in Germany, Lilium began by seeking EASA certification, though it told investors it was pursuing concurrent certification with the FAA, which would be necessary before it could begin operating its proposed RAM network in Florida.

118.    Leading up to the Merger, Defendants repeatedly claimed that Lilium was on track to achieve certification in time for its planned 2024 commercial launch. For example, the March 30, 2021 press release announcing the merger between Lilium and Qell, published on Lilium's website and filed by Qell on Form 425, stated:

> Lilium applied for concurrent type certification for a high-capacity aircraft with EASA and the FAA in 2018. Development of the 7-Seater Lilium Jet began in stealth mode following this milestone. In 2020 the 7-Seater Lilium Jet received CRI-A01 certification basis from EASA . . . The proceeds from the transaction are intended to fund the launch of commercial operations, ***planned for 2024***. This includes the finalization of serial production facilities in Germany, launch of serial production aircraft and ***completion of type certification***.

119.    On June 11, 2021, a "Developmental Blog" co-authored by Defendant Yemsi titled "Path to certification of Lilium 7-Seater Jet" was published on Lilium's website and filed by Qell on Form 425. In the introduction, the article stated, "We are aiming to achieve Entry Into Service ("EIS" in industry parlance) ***in 2024***, which is a fairly ambitious goal. At first glance, we recognize that our timeline may appear challenging, but ***we are confident in our program timelines***, as explained below." This blog contained numerous glossy photos, graphs, visual timelines all purportedly supporting Lilium's claims about its timeline. It also uses industry jargon and information directly from EASA's website to make the findings appear more legitimate and "official." The Lilium Jet, the article explains:

> has been designed using substantially fewer parts that the average commercial airliner (~ 30x fewer). This lower number of components and systems, when considered in comparison to a large commercial aircraft, means reduced timelines associated with detailed drawing, production and assembly integration of these components and systems. *Furthermore, fewer components imply fewer layers to validate and verify, which in turn means a reduced risk of major program delay*.

(emphasis in original).

120.    In conclusion, the article states, ***"We are on track for the first flight of a certified aircraft and welcoming you on board in 2024.*** "

121.    Lilium created a fraudulent narrative that the Lilium Jet had achieved substantial progress in the certification process and was currently on track to achieving certification in time to begin commercial operations in 2024. In truth, at the time of the Merger, Lilium's progress toward EASA certification had only just begun, and the "longest phase" of the certification process was still years away from commencing. As of the filing of this Complaint, Lilium has not even achieved the first step toward FAA certification, which would be required before Lilium could begin operations in Florida.

122.    According to EASA's website, the path to certification has four steps:

- Technical Familiarisation and Certification Basis: The aircraft manufacturer presents the project to EASA when it is considered to have reached a sufficient degree of maturity. The EASA certification team and the set of rules that will apply for the certification of this specific aircraft type are being established (Certification Basis).

- Establishment of the Certification Programme: EASA and the manufacturer need to define and agree on the means to demonstrate compliance of the aircraft type with each requirement of the Certification Basis. This goes hand in hand with the identification of EASA's "level of involvement" during the certification process.

- Compliance Demonstration: The aircraft manufacturer must demonstrate compliance of its product with regulatory requirements: the structure, engines, control systems, electrical systems and flight performance are analysed against the Certification Basis. This compliance demonstration is done by analysis during ground testing (such as tests on the structure to withstand bird strikes, fatigue tests and tests in simulators) but also by means of tests during flight. EASA experts perform a detailed examination of this compliance demonstration, by means of document reviews in their offices in Cologne and by attending some of these compliance demonstrations (test witnessing). ***This is the longest phase of the type-certification process***. In the case of large aircraft, the period to complete the compliance demonstration is ***set at five years*** and may be extended, if necessary.

- Technical closure and issue of approval: If technically satisfied with the compliance demonstration by the manufacturer, EASA closes the investigation and issues the certificate. EASA delivers the primary certification for European aircraft models which are also being validated in parallel by foreign authorities for operation in their airspaces, *e.g.* the FAA for the US or TCCA for Canada.[26]

---

[26] https://www.easa.europa.eu/en/domains/aircraft-products/aircraft-certification

123.    Defendants repeatedly touted that Lilium had achieved the first step, certification basis, in 2020. In the August 5, 2021 Capital Markets Day presentation, Defendant Yemsi stated:

> we have achieved *a very significant milestone* by establishing and agreeing on our certification basis with EASA. Now, we have obtained the CRI-A01 Certification review item A01 from EASA, which is the equivalent of the G01 issue paper from FAA. So, now we have full clarity of those requirements. And that is fundamental.

*See also, e.g.*, March 30, 2021 Form 8-K, signed by Engle ("In 2020 the 7-Seater Lilium Jet received CRI-A01 certification basis from EASA."); June 11, 2021 Development Blog, co-authored by Yemsi ("[W]e have received the CRI-A01 certification basis from EASA, which puts us on a firm trajectory towards achieving Type-Certification."); August 5, 2021 Registration Statement, signed by Engle ("In December 2020, we received from EASA the CRI-A01, the certification basis, for the 7-seater Lilium Jet . . . The CRI-A01 an important milestone in the certification process and confirms EASA's agreement on the certification basis of our serial aircraft design.").

124.    Despite Defendants' statements to the contrary, achieving the CRI-A01 certification is not actually a "significant" or "important" milestone. Normally, the first stage (certification basis) is fairly straightforward; it merely categorized an aircraft (large plane, small plane, helicopter, etc.) and sets the rules the aircraft must meet to achieve certification. However, in the case of eVTOLs, this first stage has proven to be a bit more complicated than with other aircraft. eVTOLs have properties of both airplanes and helicopters, and thus do not fit neatly into either certification category. As a result, both EASA and the FAA have been developing new certification bases, which are still evolving. In the Spring of 2022, the FAA made the shift from certifying eVTOL as small airplanes to certifying them as a special class of powered-lift aircraft. Lilium competitor Joby had already received its G-1 but was forced to revise its certification basis after the FAA made this switch, setting its timeline to begin commercial operations back a full

year. Joby's experience affirms that, in the face of rapidly evolving changes to regulations, such early milestones for eVTOLs are not especially meaningful.

125.    CW1 explained that this lack of set requirements affected his work at Lilium. He had been "trying to pin down" what the loading requirements needed to be, but the certification requirements had not yet been "clearly sketched out" by EASA. He noted that if EASA issued final requirements that differed from Lilium's assumptions, there was a risk of having to "start over" and even re-design the entire aircraft, but at a minimum and "without a doubt" there would be "re-work" necessary. The fact that Lilium was "charging ahead, full steam" without even knowing what the requirements was one factor that led CW1 to conclude he "could not be a part of this."

126.    Representing to investors that commercial operations were a mere three years away, when the most basic requirements for certification had not even been set, is highly misleading.

127.    Additionally, EASA's website explains that, of the four steps, Compliance Demonstration is "*the longest phase* of the type-certification process" and, in the case of large aircraft, takes *at least five years* to complete.

128.    As of December 2022, Lilium has yet to build the full-scale 7-seater conforming prototype that will be used for this Compliance Demonstration phase. At the beginning of the Class Period — March 30, 2021 — Lilium did not even have a functioning demonstrator. After the Phoenix had been destroyed in a battery fire in February 2020 (after only completing approximately 20 test flights), it required changes to aircraft floor and the battery casing to prevent and contain any such fires that would occur in the future. The Phoenix 2 did not resume test flights until July 2021, and then only completed about 25 test flights before Lilium decided to move the

testing program to Spain. Due to difficulties in obtaining a permit, the testing in Spain did not start until April 4, 2022 — after the conclusion of the Class Period.

129.    At the time the Class Period concluded, the Phoenix had still not accomplished a crucial maneuver: the transition from vertical mode to horizontal, wing-borne forward flight. The transition requires the aircraft to gather speed and rotate the four flaps bearing its fans, which point straight down at launch, 90 degrees so that the fans are pointing backward. In comparison, competitor eVTOLs with open rotors typically make the transition to forward flight within a few months of the first hover flight. Without knowing if transition was possible, Lilium had no idea if its concept was actually viable.[27]

130.    CW1 explained that he had originally been hired to work on the conforming prototype, which would be used for regulator testing, but he had to split his time between the prototype and redesigning the Phoenix after the battery fire. According to CW1, Lilium's projections of having its aircraft certified and commercially operating by 2025 seemed unlikely if the company was unable "to do relatively minor modifications" without extensive delays, as was the case with the Phoenix redesign. When CW1 and others expressed their concerns regarding the timeline to Defendant Yemsi, Yemsi replied that they did not "understand the full situation."

131.    Long after the Merger, Lilium executives communicated that they estimated it would only take approximately 15-18 months from the completion of the conforming prototype build to the receipt of its type certification — a mere fraction of the five years estimated by EASA for large aircraft. Defendants claimed that the compliance demonstration phase of EASA's

---

[27] *See* Bjorn Fehrm, *Bjorn's Corner: Sustainable Air Transport. Part 30. Lilium Jet VTOL*, LEEHAM NEWS, July 28, 2022, https://leehamnews.com/2022/07/29/bjorns-corner-sustainable-air-transport-part-30-lilium-jet-vtol/ ("The Lilium project is in its seventh year, yet it has not transitioned from hover to forward flight during this period . . . transition is a major technological challenge for the Lilium design."

certification would not take nearly as long for the Lilium Jet because it had fewer parts than a normal airplane. While this is true, CW1 explained, there were other factors that would make certification take longer. For example, Lilium intended to construct its aircraft structures entirely out of carbon fiber, which, based on his experience at Boeing, "caused more problems than it facilitated." Additionally, Lilium intended to use "fly-by-wire" controls, which CW1 believed would not be "a dealbreaker" for certification if, say, Lilium was willing to dedicate upwards of 10 years to them, but it was not achievable, in his view, in just two years.

132.    Ella Atkins, an aerospace engineering professor from the University of Michigan cited in the Iceberg Report, also noted that the complicated nature of Lilium's design would likely lead to challenges with certification. She stated: "Each of the motors will induce vibrations in the wings, and the fans may not all spin with the same efficiencies as wear and tear set in. It will be complicated to write software to reliably control all that."

133.    CW1 stated that he left Lilium because he did not believe the company could achieve certification for its aircraft within a "reasonable timeline." He was not alone; three former employees cited in a February 10, 2021 *Forbes* article all claimed to have left Lilium due to concerns over the timeline Lilium had communicated to the public. One former employee stated that even Defendant Yemsi's projections "showed that shooting for certification in 2023 would be extremely difficult," but that Defendant Wiegand was insistent on the timeline. Another former employee is quoted by *Forbes* as saying: "If you're trying to attract investors, you have to have an ambitious vision, but at which point are you misleading investors with big numbers? . . . I'm not saying Lilium is guilty of investor fraud, but at some point, I just couldn't live with that part anymore."

134.     Lilium concealed the concerns of its employees, including Defendant Yemsi himself, regarding the certification timeline. In fact, after CW1 left the company, Lilium actually *shortened* its timeline, while trying to drum up investor support, from beginning commercial operations in 2025 to beginning in 2024.

**B.     The Design of the Lilium Jet was Not Yet Complete**

135.     In order to mislead investors into believing the Lilium Jet would be ready for commercial operations in 2024, certain aspects of the Lilium Jet were mentioned over and over again, giving the appearance that they were set in stone — for example, that the Lilium Jet would have seven seats (more than any of Lilium's competitors), would have fixed landing gear, and would be powered by 36 ducted fans. On March 30, 2021, Defendant Yemsi even referred to the Lilium Jet's design as "frozen."

136.     In truth, at the time of the Merger, Lilium had not even begun the first step in an arduous design review process: the preliminary design review. In fact, the Company did not announce the completion of its PDR until *June 6, 2022*, more than a year after Lilium announced its pending merger with Qell.

137.     After completing the PDR, Lilium made significant changes to its design. For example, it changed the shape of the fuselage and reduced the number of ducted fans from 36 to 30. In his review of Lilium's White Paper, Professor Gollnick noted that the reduction in the number of ducted fans from 36 to 30 was "a significant change compared to the baseline of the White Paper." By changing one of the basic assumptions on which the White Paper was based, Defendants further confirmed that the purported scientific analysis underlying the Lilium Jet's design was never intended to be truly credible.

138.     After the PDR, Lilium also added a traditional landing gear. Previously, Defendant Yemsi had explained that the use of a fixed landing gear with no hydraulics simplified the design

and was one of the factors that allowed Lilium to "compress the timeline" to certification and commercialization. *See, e.g.,* March 30, 2021 transcript of investor film, filed by Qell on Form 425, *see also* August 4, 2021 Technology Blog by McIntosh, "Simple by design . . . [t]he landing gear is fixed and there are no hydraulics." As a June 6, 2022 Shareholder Letter signed by Wiegand and Richardson explained, this landing gear was meant to be a "backup option": if the jet was running out of battery and a "higher power vertical landing" was not possible, it could "divert to an alternate landing site" where it could perform a "short running landing." McIntosh repeated these statements in an Earnings Call the next day, on June 7, 2022. When asked by an analyst in the June 7, 2022 Earnings Call if the landing gear was something Lilium had "planned on adding all along," Defendant Yemsi admitted, "I mean, it's something that's *always* been a potential."

139.    Defendants knew or recklessly disregarded the truth that it was likely that significant design changes would result from the PDR, which did not conclude until June 2022 — over a year after Defendants began communicating their fraudulent target of beginning commercial operations in 2024.

140.    Additionally, it is possible the Lilium Jet design will change even further in the future. PDR is only the first step in the design review process. As Defendant Yemsi described in a November 15, 2021 Development Blog, several phases still stood between PDR and entry into service, as demonstrated by the graphic below (circle around PDR added):



**C.      Defendants' Fraudulent Pathway to Profitability**

141.    Based on the fraudulent 2024 target date for commercialization, Defendants represented that their Company would become profitable by 2025, and by 2027, would be pulling in revenue of almost $6 billion. For example, a March 31, 2021 CNBC article quoted Defendants Wiegand and Engle as stating, "Lilium expects to begin generating revenue in 2024 and achieve a pretax adjusted profit in 2025 . . . The company expects revenue of $3.3 billion by 2026, followed by nearly $5.9 billion in 2027."

142.    The Company included the following chart in its August 5, 2021 Registration Statement:

| | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|
| | | | | (numbers in millions)[1] | | | |
| Production volume (number of aircraft)[2] | — | — | — | 90 | 325 | 600 | 950 |
| Revenue[3] | — | — | — | $ 246 | $1,314 | $3,306 | $ 5,867 |
| Adjusted EBITDA[4] | (173) | (182) | (197) | (180) | 70 | 708 | 1,440 |
| Operating cash flows | (173) | (182) | (197) | (197) | 39 | 521 | 1,060 |

143.    A similar chart appeared in the Analyst Day and Capital Markets Day slide decks.

144.    The prospect that Lilium would become profitable in just a few years was a highly material factor that drew investor support for the Company. Analysts also echoed these sentiments. For example, when setting its $24/share price target, an analyst report from Oppenheimer stated, "We expect Lilium to begin generating meaningful revenue in FY24E $141M . . . By FY27E, we estimate Lilium can deliver $4.8B in total revenues."

145.    Additionally, the projections were based on Lilium's plan to begin operating its "People Network" (Lilium's internal operation of its jets for regional route service available to the public) the same year as it began commercial operations, with Lilium's first two years' production split 50/50 between the People Network and Enterprise Solutions (*i.e.*, selling jets to other parties). The People Network brought in significantly more revenue for Lilium than its Enterprise

Solutions: Lilium conservatively estimated that if it filled an average of 4.5 out of 6 seats per flight, a jet on its people network would generate about $5 million in revenue per year over an eight-to-ten-year service life. However, it would sell enterprise jets for $4 million (just $1.5 million more than the estimated cost to make the jets), with a $1 million per year service contract for the years following the purchase.

146.    The People Network was also essential for Lilium's image: "We're not intending to make it a luxury product that only the rich can afford. We want to make it a service that everyone can use," said Remo Gerber, Lilium's former chief commercial officer, in a March 14, 2019, interview with the *Financial Times*.[28] "It has to be affordable — it shouldn't be just for the select few. We want it to be truly accessible." Based on the vision of affordable green transportation for the masses, the *Financial Times* granted Lilium its 2019 "Boldness in Business" award.[29] The GAO Report noted that, since traditionally underserved communities will "bear[] the brunt of proximity and dislocation" necessary for eVTOLs to begin commercial operations, it was essential "to avoid a public perception of AAM services as a luxury item for the wealthy" and "ensure equitable access to services."

147.    However, soon after going public, Defendants all but abandoned their strategy to build the "People Network" in favor of catering to the premium segment. On March 8, 2022, Lilium announced it had signed a memorandum of understanding ("MoU") with NetJets, a company that operates "the world's largest fleet of private jets," for the right to purchase up to 150 of the first Lilium Jets produced. Lilium also announced a four-passenger "club" configuration of its cabin, a more spacious option than the six-passenger shuttle configuration it had marketed for

---

[28] Maija Palmer, *Lilium hopes to soar with launch of electric air taxis*, FINANCIAL TIMES, March 14, 2019, https://www.ft.com/content/e0b66e56-1364-11e9-a168-d45595ad076d

[29] https://www.ft.com/content/bd30c5ec-20a9-11e9-a46f-08f9738d6b2b

its regional service. Soon after, Lilium announced similar MoUs with private jet operators, such as eVolare in the UK, and airlines, such as SAUDIA in Saudi Arabia. In a December 2022 Earnings Call, when asked if Lilium still planned to build its own network, Klaus Roewe (who replaced Defendant Wiegand as CEO) responded that the first two years after Lilium began production would be "largely serving the premium segment," followed by honoring its other MoUs, and that a Lilium Network had "been really pushed behind" those first two steps.

148.    Roewe also explained that constructing the infrastructure for the People Network in places like Florida was proving challenging, as "it takes some time to get some of the permitting to get some of the land agreement in place." However, for private individuals, this was not much of a concern: "You're looking at private estates, you're looking at luxury resorts, golf clubs . . . luxury industry players that have existing helipads . . . it's much easier to go from a private general segment than it is to go from a commercialization segment."

149.    In other words, Lilium pulled a "bait and switch" on its shareholders — marketing the business as affordable, green transportation for the masses when trying to garner support for the Merger, then quickly shifting to providing a luxury service available only to the wealthy. This change also meant that Lilium significantly overrepresented its revenue in the chart in ¶ 142, because, after the initial sale, enterprise jets would only bring in $1 million per year from service contracts, rather than the projected $5 million per year for jets operating on the People Network.

**D.    Post-Merger, Defendants Become Silent about the 2024 Target Date**

150.    After Lilium accomplished its goal of going public on September 14, 2021, Defendants largely stopped mentioning the 2024 target it had so often repeated in the previous months. For example, in the above referenced November 15, 2021, Development Blog, discussing the various phases remaining before Lilium could commence commercial operations, Defendant Yemsi did not mention any dates or even an approximation of how long any of the phases would

take to accomplish. The only place the 2024 commercialization target date was mentioned was in the boilerplate "About Lilium" section at the end of the document, where it stated, "commercial operations are projected to begin in 2024."[30] The sudden change from loudly trumpeting the 2024 date at every opportunity to barely mentioning the date at all is further evidence that Defendants communicated this date as part of a fraudulent scheme to accomplish the Merger, which granted Lilium the breathing room it needed to continue operations, not to mention significant personal benefits to the Individual Defendants.

151.     Lilium's first SEC filing as a public company was an Annual and Transition Report on Form 20-F filed on September 20, 2021. The Form 20-F, which was signed by Defendant Wiegand, was nearly devoid of any of the information repeatedly relayed in the Registration Statement and the 425 prospectuses filed by Qell leading up to the Merger. Nowhere did it mention the proposed commercialization date of 2024 or the associated revenue projections. In fact, under Item 2 of the form, "Offer Statistics and Expected Timetable," Lilium wrote, "*Not applicable*." (Emphasis in original).

152.     On November 16, 2021, Lilium held an investor call discussing Lilium's earnings results for the third quarter 2021. As with Defendant Yemsi's blog post and the September 20, 2021 Form 20-F, this earnings call was notably devoid of previously touted specific information, such as the expected speed and range of the Lilium Jet and the timeline to certification. In fact, when questioned about Defendant Yemsi's blog post, and whether there were any expected risks regarding the design of the jet, Defendant McIntosh responded cryptically, "[L]ike any program, there will be findings and issues that come out."

---

[30] Supporting the notion that this language was templated and boilerplate, Lilium left the 2024 date in its "About Lilium" section long after it revealed its timeline of certification by 2025. *See, e.g.*, its May 31, 2022 technical blog "Lilium's Battery Strategy: Performance at Scale," https://lilium.com/newsroom-detail/liliums-battery-strategy

153.    This lack of information was taken as a positive by analysts, who interpreted the vagueness in a "no news is good news" manner. For example, an analyst report from Piper Sandler published on November 16, 2021, noted:

> In its first earnings call since going public, Overweight-rated LILM offered a **steady-as-she-goes narrative**; the company made no changes to its spending plans, and reported continued progress toward developing the Lilium Jet, an electric vertical takeoff and landing (eVTOL) aircraft. As the jet won't be entering service until the mid-2020s, and since no major changes were made to the financial outlook, our DCF-based price target remains unchanged at $17.

154.    On March 1, 2022, Defendants held a call with investors to discuss their full-year 2021 results. However, since this was 30 days before they published their financial results for the year, once again Defendants statements were vague and surface-level. Nowhere were the expected range or speed of the Lilium Jet mentioned. Analyst Alex Potter of Piper Sandler asked, "You mentioned that a fair amount of the engineering spend has been focused on batteries . . . I'd be interested in hearing about any progress there." Defendants Wiegand vaguely responded, "[A]s you know, we have started selecting and testing the silicon-anode better results in 2020. Since then, we have made a big progress in testing those cells over two years . . . So we are fully on schedule with respect to the batteries." However, he did not describe the nature of the "big progress," nor did he mention anything about the "advanced" battery technology, capable of 330 Wh/kg, that Lilium had touted in its pre-Merger statements.

155.    Prior to the March 1, 2022, Earnings Call, Defendants "crowdsource[d]" retail investor questions to be reviewed by Lilium's management team.[31] Out of dozens of submitted questions, many of which asked about the timeline to certification, Defendants answered only one, which asked for "an update on the progress of key flight tests." Wiegand simply responded with

---

[31] Press Release, "Lilium to Crowdsource Retail Investor Questions for its Full Year '21 Business Update Webcast," February 21, 2022, https://investors.lilium.com/news-releases/news-release-details/lilium-crowdsource-retail-investor-questions-its-full-year-21.

information that he had already mentioned earlier in the call: that Lilium had recently brought the Phoenix 2 demonstrator to Spain and would begin test flights shortly.

156.    As a result, the analyst report published by Piper Sandler on March 1, 2021, echoed its language from the previous November:

> We are reiterating our Overweight rating following this morning's Q4 earnings call . . . **with no deviation from financial or operational targets** - and with a commercial MOU in a new segment (private jets) - we see no compelling fundamental reason to abandon our favorable stance.

**E.    The Truth About the 2024 Target Date Emerges**

157.    On March 14, 2022, the Iceberg Report revealed to the public that the 2024 timeline communicated by Defendants was always, most likely, impossible. It noted that Lilium expected to achieve certification the same year as its competitor Joby; however, Joby was much further ahead in terms of progress, having completed approximately 1,000 test flights with its demonstrators, including the longest eVTOL flight to date — over 150 miles. By comparison, Lilium's demonstrators had completed only about 45 unmanned flights, 20 with the Phoenix and about 25 with the Phoenix 2, none of which had lasted more than a few minutes.

158.    The Iceberg Report also explained that the battery technology Lilium purportedly relied on was not yet commercially available, citing an article which explained that improvements in the energy density of batteries steadily increases at approximately 7% per year. A subsequent Iceberg Report attached a scientific analysis by aeronautics Professor Gollnick, who explained that the battery technology Lilium needed to successfully operate its jet was, indeed, many years away. In fact, he posited that, with the battery technology that will likely be available in 2028 or 2029, a 5-Seater Lilium Jet will only be able to accomplish a range of 36 miles.

159.    A few weeks later, on March 30, 2022, while the stock price was still depressed from the first Iceberg Report, Lilium filed a Form 20-F for the year ending December 31, 2021,

signed by Daniel Wiegand.

160.    Under the heading "Risks Related to Our Business and Financial Position," the Form 20-F stated, "We expect the rate at which we incur losses will be significantly higher for 2022 *though at least 2025* as we engage in the following activities . . . continue to design, certify and produce our Lilium Jet aircraft."

161.    This was the first time Lilium disclosed that their target for commercialization was no longer 2024. As previously noted, the Earnings Call to discuss the annual results took place on March 1, 2022 — approximately a month earlier — and there had been no mention whatsoever of a change in target date. In fact, an analyst from Piper Sandler had confirmed his high price target for Lilium based primarily on the fact that Lilium's operational targets had not changed.

162.    The new date was confirmed several other times in the Form 20-F:

- "Our Lilium eVTOL jet remains in development, and we do not expect to launch commercial services *until 2025*, if at all."

- "we do not expect to launch commercial services *until 2025*, if at all."

- "we expect to commence commercial operations *in 2025*, if at all, after receipt of Type Certification."

163.    Neither the fact that Lilium had changed its previously communicated target date nor the reasons for the change were communicated in the Form 20-F.

164.    On the same day, March 30, 2022, Defendant Wiegand published a blog post on Lilium's website, in which he said:

> [W]e plan to start building our first handful of conforming aircraft – the only type of aircraft that can be used for certification – next year (2023). Upon completion of the conforming aircraft build process we will then spend the following 15-18 months running our final test campaign with *the aim of receiving our initial Type Certification in 2025*, with scale production of our aircraft set to begin immediately upon certification.

165.    Once again, this blog post made no mention of the fact that the Company had

previously represented commercial operations would begin in 2024 or the reasons for the change.

166.     On April 3, 2022, Defendant Wiegand spoke to German newspaper *Welt Am Sonntag* about the delay. When asked about the new timeline, Wiegand stated the reasons included "slight delays in the design of the model, the Covid pandemic and detailed discussions with the regulatory authorities." Wiegand continued, "'It is a highly complex program and we cannot and do not want to make any compromises in terms of safety.'"

167.     These reasons, however, are unconvincing. Engineers like CW1 had been warning Lilium management for years that the design and certification could not be accomplished in Wiegand's timeline, some of them even quitting their positions when these words fell on deaf ears. It is especially inappropriate for Wiegand to blame Covid-19 for the delays, as the pandemic had been causing shortages for over a year before Qell and Lilium announced their intent to merge. Indeed, when asked about supply chain issues in the March 1, 2022 Earnings Call, Defendant Richardson stated, "We're very aware of the disruptions . . . the team has been very focused since last year and aware of it." The *Welt Am Sonntag* article also noted that Wiegand had publicly announced the slippage "almost hidden in a blog entry." "Neither in the shareholder letter published at the end of February nor at a press conference [the March 1 Earnings Call] had the management indicated the possibility of a postponement."

168.     Further, the article points out, delays in the schedule mean delays in the Company becoming profitable. When asked about this, Wiegand responded, "'If approval is postponed, sales will also be postponed.'" And sales being postponed would, of course, mean less investor enthusiasm for the merger and surrounding the Company thereafter.

169.     On June 1, 2022, Lilium announced that Daniel Wiegand was being demoted to "Chief Engineer for Innovation and Future Programs." Lilium further expanded on Defendant

Wiegand's new role in a "Letter to Shareholders," published on Lilium's website on June 6, 2022:

"Daniel Wiegand, who co-founded the company, invented the Lilium Jet architecture and led us to this important juncture, will continue to lead the company's activities in innovation, new products and technologies, serving as Chief Engineer for Innovation & Future Programs and as a Board Director."

170.    Previously, Defendant Wiegand had staunchly advocated Lilium's fraudulent timeline, even over Defendant Yemsi's initial objections, to the point of driving engineers away from the Company. This demotion is further evidence that this timeline was not merely ambitious, it was a farce.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### I.    Materially False or Misleading Statements and Omissions in the Pre-Registration Statement Filings

171.    On March 30, 2021, the first day of the Class Period, the Company filed with the SEC a current report on Form 8-K signed by Defendant Engle. The 8-K included a press release dated March 30, 2021, which announced the business combination of Qell Acquisition Corp. and Lilium GmbH (the "Merger Announcement Press Release"). On the same day, March 30, 2021, Qell filed several documents on SEC Form 425, including the transcript of a March 30, 2021, conference call to discuss the Merger (the "Investor Presentation"), a slide deck which accompanied the Investor Presentation, transcripts of several investor-oriented short films produced by Lilium, and a "fact sheet" listing bullet-pointed "facts" about the Lilium Jet. One of the Form 425s also attached the White Paper, allowing the public to see for the first time the calculations, which purportedly proved the feasibility of Lilium's design.

172.    In the months following the Merger Announcement, Defendants continued making materially false or misleading statements or omissions that were substantially similar to many of

the March 30, 2021, statements. These statements were made in a variety of formats — formal presentations to investors, media interviews, press releases and "blog" posts on Lilium's website, etc. — but each was filed by Qell on Form 425. Defendants also held an Analyst Day presentation on June 16, 2021 (the "Analyst Day") and a Capital Markets Day presentation on August 2, 2021 (the "Capital Markets Day"). For each of these presentations, Qell filed the transcript of the presentation and the slide deck, which accompanied the presentation on Form 425.

173.    A caption on each of the Form 425s stated that the document was filed by Qell pursuant to Rule 425 of the Securities Act and Rule 14a-12 of the Exchange Act, about the subject company Lilium GmbH.

### A.    False or Misleading Statements about the Lilium Jet's Batteries

174.    In these Form 425 filings, Defendants made a number of materially false or misleading statements or omissions regarding Lilium's access to "advanced" batteries.

175.    The Investor Presentation slide deck, filed by Qell on Form 425 on March 30, 2021, contained a slide titled, "Advanced battery cell technology secured with exclusivity for the eVTOL market." On the left side of the slide, under the heading, "Chosen cell chemistry requirements," the slide stated "*>330 Wh/kg*." On the right side of the slide was a bar graph showing energy density compared to projected physical range. A rectangle was drawn around the middle bar, which showed an energy density of 330-350 Wh/kg and a range of ~155 miles, and below it stated, "Target for entry into service." In the Investor Presentation, the transcript of which was filed by Qell on March 30, 2021, Defendant Wiegand states, "We have *secured battery technology that allows us to achieve our launch range of 150 miles*."

176.    The June 15, 2021, Analyst Day slide deck, which Qell filed the same day on Form 425, contained a slide depicting "Lilium progress" with regards to batteries, stating that Lilium had "*secured exclusively*" technology which would provide "*>330Wh/kg*, enabling ~155mi

range." (Emphasis in original). The Capital Markets Day slide deck, also filed by Qell on Form

425, contained this same graphic. With this slide, in the Capital Markets Day Presentation, the

transcript of which was filed by Qell on Form 425, Defendant Yemsi stated, "after many years,

and after having scouted, and testing more than 50 different cell suppliers, our engineering teams

are now converging on the technology that will meet the safety and performance requirements."

177.    On August 4, 2021, Lilium published on its website a "Blog" post by its Chief

Technology Officer, Defendant McIntosh, titled "Technology behind the Lilium Jet." On this same

day, Qell filed this blog on Form 425 with the SEC. In the blog, McIntosh discussed the energy

system of the Lilium Jet:

> The performance of battery cell development has rapidly improved over the past decades and **today cells** are available with energy densities **of >300Wh/kg** and power density of >3kW/kg.

* * *

> By making use of our custom cells and chemistry with our aerospace grade supplier, **we will be able to expand the range of the Lilium Jet to approximately 250km [~155 miles] at entry into service in 2024**.

178.    The statements in ¶¶ 175-177 above were materially false or misleading because

they represented that, at the time each statement was made, Lilium had access to batteries capable

an energy density of greater than 300 or 330 Wh/kg. But, as of March 2022 (nearly a year after

these statements were made), commercially available batteries were generally capable of an energy

density of approximately 260 Wh/kg, and industry trends indicate that improvements in batteries

steadily progresses at about 7% per year. While higher energy densities had been shown in

laboratory testing, as Iceberg Research noted, citing *The Wall Street Journal*, such

"breakthroughs" rarely translated to real world successes capable of the durability necessary for

commercialization. Indeed, Lilium's competitors based their calculations on batteries with an

64

energy density of approximately 270 Wh/kg — far less than the batteries Lilium claims to have "secured exclusively."

179.    The Iceberg Report later revealed the source of Lilium's battery technology was Zenlabs, a company which Lilium owned 34.8% of, which Lilium later confirmed to be true. The CEO of Zenlabs had been accused of misrepresenting the capacity of batteries at his previous company, Envia. After investing millions in Envia, General Motors (Defendant Engle's previous employer) discovered that the extremely high energy density represented by Envia could be reproduced for only three charging cycles, after which it rapidly declined — making the batteries impossible to use in a commercial application. Lilium eventually revealed that the third party who had verified Zenlabs' results had tested the batteries for only two cycles — making it impossible to verify the batteries' durability over multiple charge cycles. Even if the batteries were capable of over 330 Wh/kg for two charging cycles, they would be useless in the commercial production of the Lilium Jet unless they could hold that level for over 1,000 charging cycles.

**B.    False or Misleading Statements about the Lilium Jet's Hover Time**

180.    Defendants also made a number of materially false or misleading statements or omissions regarding the Lilium Jet's hover phase.

181.    The June 15, 2021, Analyst Day slide deck, which was filed by Qell on Form 425, contained the following a slide depicting the Lilium Jet's hover phase, showing that hover would last approximately 10 seconds for takeoff and 30 seconds for landing for a 30-minute flight. The transcript of the Analyst Day presentation (which Qell filed on Form 425 on June 16, 2021) shows that Defendant McIntosh stated, "*[W]e spend very little time in hover phase.* In reality for a typical mission of a 30 minute cruise segment, we only spend about 30 seconds in hover."

182.    The same slide appeared in the slide deck of Lilium's August 2, 2021, Capital Markets Day Presentation, which was filed by Qell on Form 425. The transcript of the Capital

Markets Day Presentation, which was filed by Qell on Form 425 on August 5, 2021, shows that Defendant McIntosh stated, "across a total, in this case, a typical mission profile with a 30 minute cruise segment, we almost spend ***30 seconds in hover***. So it's a very, very small amount of time indeed."

183.    On August 4, 2021, Lilium published on its website a "Blog" post by Defendant McIntosh, titled "Technology behind the Lilium Jet." On this same day, Qell filed this blog on Form 425 with the SEC.

184.    McIntosh's Blog discussed the hover phase:

*Take-off and landing*: during take-off we are only hovering approximately ~10-25 seconds and we also assume approximately ~20 seconds during a standard landing phase, whilst keeping approximately ~ 60 seconds as reserve. ***This leads to an overall total hover time (on a typical mission) of <60 seconds in the most power-hungry flight phase***. The Lilium Jet demands approximately 2x more power during this phase compared to an open rotor concept on the market at equal weight . . . However, since this phase is quite short, it represents approximately 5% of the mission energy budget.

* * *

We intentionally spend only a very short time in takeoff and landing so we can optimise the aircraft design for the dominant period of a flight, which is cruise. So despite 2x higher power consumption in hover than an equivalent open rotor concept, this increased power demand is compensated by optimising cruise flight performance, which only requires 1/10th of hover power and also makes up to more around 90-95% of the flight time.

185.    Each of these representations in ¶¶ 181-184 above regarding the amount of power required for the "hover" phase was materially false or misleading.

186.    Lilium's projected 30-second hover time assumed perfect conditions and did not account for challenges (such as bad weather and obstacle avoidance) that would likely increase the amount of hover time needed. Professor Gollnick, the aeronautics expert consulted by *Iceberg Research*, stated that he believed regulators would require Lilium to reserve enough power for at least 2-3 minutes of hover time, to account for these factors.

187.    Lilium seemingly confirmed that it had been overestimating the amount of hover required for landing by announcing, in June 2022, that it was adding traditional landing gear to its design, which, if sufficient reserves did not exist for a vertical landing, would allow the pilot to divert course and land on a runway.

188.    Additionally, in the August 4, 2021, blog post, Defendant McIntosh misleadingly stated that his calculations involved "keeping approximately ~ 60 seconds as reserve." The White Paper, however, states that it did not account for any reserves in its calculations, making it unclear how McIntosh came to his conclusion that the total hover time, including these reserves, would only account for approximately 5% of the mission energy budget.

189.    All of the statements in ¶¶ 181-184 were also materially false or misleading because each statement is predicated on the Lilium Jet being powered by batteries capable of an energy density of approximately 330 Wh/kg. As discussed in ¶¶ 178-179 above, such batteries were not commercially available at the time these statements were made and would not become commercially available for years to come.

###    C.    False or Misleading Statements about the Lilium Jet's Range

190.    Defendants represented many times in the pre-Registration Statement filings that the Lilium Jet would have a range of approximately 155 miles.

191.    In the March 30, 2021, Merger Announcement, filed by Qell on Form 8-K, signed by Defendant Engle, it stated, "The Lilium 7-Seater Jet has a projected cruise speed of 175 mph at 10,000 feet and *a range of 155+ miles*, including reserves." In the March 30, 2021 Investor Presentation, Defendant Wiegand stated, "*The aircraft . . . comes with 155 miles range at launch*." This statement was accompanied by a slide with a glossy photo depicting the Lilium Jet at sunrise surrounded by serene water, with the words "Best projected market access" over "*155+ miles leading range*."

192.     On the same day, March 30, 2021, Qell filed a Form 425 with a copy of the White Paper. The White Paper concluded, "*assuming a battery density of 320kWh/kg, the maximum range of the aircraft is 261km [~155 miles].*" The complicated calculations and scientific language of the White Paper — which Lilium claimed was reviewed by five aeronautics experts — gave Lilium an immense amount of credibility. Indeed, critics of the design were repeatedly pointed to the White Paper to silence any doubts.

193.     The bullet-pointed "Fact Sheet," also filed by Qell on March 30, 2021, stated, "*Range of 155+ miles* / 250+ km including reserves."

194.     The slide deck that accompanied Lilium's June 15, 2021, Analyst Day presentation, which was filed by Qell the same day on Form 425, contained a graphic of the Lilium Jet facing into a brilliant sunrise, with the text "*~155 mile range* > Access to urban & regional routes." As per the transcript of the presentation, which was filed by Qell on Form 425 on June 16, 2021, when discussing this slide, Defendant Wiegand stated, "*Initially, we will have a range of around 150 miles and that enables us also to unlock regional connections*."

195.     Similarly, the slide deck which accompanied Lilium's August 2, 2021, Capital Markets Day presentation (which was also filed by Qell on Form 425) contained a graphic which stated "~155 mi range > Access to short-and long distance routes." Along with this slide, the transcript of the presentation (which was filed by Qell on Form 425 on August 5, 2021) quotes Defendant Wiegand on the issue of range as stating that the Lilium Jet would "*initially [have] a range of around 150 miles to unlock also regional connections*."

196.     Each of the statements in ¶¶ 191-195 were materially false or misleading. First, the statements were based on the underlying assumptions that Lilium would have access to batteries capable of over 330 Wh/kg and would only remain in the hover phase for less than a minute, which

were materially false or misleading for the same reasons discussed in the previous Sections I.A. and I.B.

197.    CW1 stated that he found claims that the Lilium Jet would be able to fly over 155 miles to be "far-fetched." In fact, CW1 stated that "it shocked [him] how low" the range of the Phoenix demonstrator was.

198.    Further, the calculations in the White Paper, which Lilium purportedly relied on for the statements regarding the Lilium Jet's range, were, themselves, materially misleading. As later revealed by Iceberg Research, who asked aeronautics expert Professor Gollnick to review the White Paper: 1) the calculations accounted for a minimum charge level of 10% when the industry standard is 20% to prevent damage to the batteries; 2) the calculations did not take battery aging into account, assuming an ongoing 100% battery capacity where the industry standard is to only assume 80% maximum capacity; and 3) the calculations assumed the mass dedicated to batteries would be wholly composed of cells, not accounting for the weight of components (such as battery casings and wiring), safety systems, or power reserves. Additionally, the White Paper's range calculations assumed a 60 second hover time — which, as discussed above in ¶¶ 186-189, was not sufficient, as regulators would likely require a minimum of 2-3 minutes of hover time.

199.    Further, Lilium claimed the White Paper had been reviewed by five aeronautics experts. Any reasonable investor reviewing the White Paper would have believed that not only were the calculations accurate (*i.e.*, A + B = C), but also that the inputs utilized in those equations were viable and blessed in both respects by the five aeronautics experts who purportedly reviewed the paper. Yet Defendants omitted an extremely significant fact later discovered by Professor Gollnick and revealed by Iceberg Research: that the five experts who reviewed the White Paper

had reviewed the calculations but ***did not agree*** with the numerical assumptions used by Lilium**.** This fact strongly undermines the White Paper's conclusions.

200.    After reviewing the White Paper, Professor Gollnick determined that Lilium's representations about the energy density necessary to power its jet were "too optimistic," and a power density of 400 Wh/kg would be more realistic. Confirming the falsity of Defendants' prior representations, Professor Gollnick found the likely range of a lighter, 5-seater Lilium Jet with the battery technology that will probably be available in 2025 is approximately 11.8 miles, and with the battery technology that will likely be available in 2028 or 2029, the range would be approximately 36 miles for a 5-seater: nowhere close to the 155 miles represented by Defendants.

### D.    False or Misleading Statements and Omissions about Lilium's Timeline to Certification and Commercialization

201.    Over and over again in the pre-Registration Statement filings, Defendants represented that Lilium was "on track" to receive regulator certification and would commence commercial operations by 2024, thus implying and representing that *present* progress was adequate to meet their timeline. And, in at least one instance, definitively stated commercial operations *would* begin by 2024.

202.    The March 30, 2021, Merger Announcement, filed by Qell on Form 8-K, signed by Defendant Engle, stated, "The proceeds from the transaction are intended to fund the launch of commercial operations, ***planned for 2024***." The Lilium "Fact Sheet," also filed by Qell on March 30, 2021, contained a bullet point which stated, "Targeting ***commercial launch in 2024*** and ***operating in multiple regions in 2025***."

203.    In the March 30, 2021, Investor Presentation, Defendant Wiegand stated, "[W]e received a CRI-A01 certification basis for our 7 seater jet at the end of 2020. This puts us into the

front line of eVTOL players to **_certify and enter the market in 2024_**." Defendant Richardson

stated, "2024 is when we target our launch of flight operations."

204.    The same day, March 30, 2021, Qell filed a Form 425 attaching the transcript of a

short film, in which Defendant Yemsi discussed the timeline to certification:

> You could look at this as being a four-and-a-half-year program, and that is very
> aggressive. But please remember . . . **_we don't have the complexity that you would
> expect on a commercial, typical aircraft_**. There are no hydraulics, no pressurised
> cabin, no oxygen, there is a fixed landing gear and obviously there is no fuel system.
> That complexity enables us to **_compress the timeline_** in the phase of detailed design
> and production and assembly. Less components, less drawings, less parts to
> assemble.

205.    On May 6, 2021, Qell filed a Press Release on Form 425 titled, "Qell Acquisition

Corp and Lilium announce filing of F-4 Registration Statement." The May 6, 2021 Press Release

stated, "commercial operations are **_planned to launch in 2024_**."

206.    On June 11, 2021, Qell filed a Form 425 attaching an article titled "Path to

certification of Lilium 7-Seater Jet," co-written by Defendant Yemsi and Bhavesh Mandalia,

Lilium's Head of Airworthiness. This article was also published on Lilium's website as a "Blog."

The article stated:

> We are aiming to achieve **_Entry Into Service ("EIS" in industry parlance) in 2024_**,
> which is a fairly ambitious goal. At first glance, we recognize that our timeline may
> appear challenging, but **_<u>we are confident in our program timelines</u>_**, as explained
> below.

207.    The article went on to explain:

> [O]ur 7-seater Jet [] has been designed using substantially fewer parts that the
> average commercial airliner (~ 30x fewer). This lower number of components and
> systems, when considered in comparison to a large commercial aircraft, means
> reduced timelines associated with detailed drawing, production and assembly
> integration of these components and systems. _Furthermore, fewer components
> imply fewer layers to validate and verify, which in turn means a reduced risk of
> major program delay._

(emphasis in original).

208.    The article concluded by stating, "***We are on track for the first flight of a certified aircraft and welcoming you on board in 2024***."

209.    The slide deck which Defendants used for the June 15, 2021 Analyst Day Presentation, which Qell filed a Form 425 on the same day, contained the following slide:



210.    Regarding this timeline, Defendant Yemsi stated that "we have applied for concurrent certification with both EASA and FAA," but, rather than "dwelling on the topic of certification, which can be a bit arduous," Defendant Yemsi referred analysts to his June 11, 2021 "Path to Certification" blog.

211.    On June 21, 2021, Qell filed the transcript of a Bloomberg interview with Defendant Wiegand on Form 425. The interviewer asked: "So, how far away are we from actually, or are you from first of all, getting it certified and then building the infrastructure around it, but actually making it commercially viable?" Wiegand responded: "So we're now about ***three years away from the certification***." Similarly, in an interview Defendant Wiegand gave for the Seeking Alpha CEO Interviews series, the transcript of which Qell flied on July 27, 2021, the interviewer asked: "When will this be, you know, commercially available? To me, sometimes this stuff is sort

of like the Jetsons, exciting but when is this commercially viable?" Wiegand replied, "We have plans to have **commercial operations in 2024**." When the interviewer asked for an update on Lilium's flight testing and certification, Wiegand replied:

> What's going to happen **in the next two years** is that we are at the moment flying with demonstrator airplanes. These can demonstrate that the technology works and in **two years from now** we will have a very exciting moment where the first serial aircraft that is fully aerospace-conforming will come off our production line and go into final flight test campaign for the certification for the serial operation of the aircraft in service.

Along the same lines, in an August 6, 2021, interview with CNBC Street Signs, the transcript of which was filed by Qell on Form 425, the interviewer asked: "How close are we to a world where this is actually another leg of our transportation options in a meaningful way?" Defendant Wiegand responded, "So Lilium [expects to] go **on the market in 2024**, which means we're very close . . . So we're actually very close to this kind of vertical takeoff and landing electric jet aircraft going on the market. **_For us, it'll be 2024_**."

212. On August 2, 2021, Lilium published a press release on its website titled: "Lilium holds Capital Markets Day, announces plan for $1 billion commercial deal & strategic alliance with leading Brazil airline Azul and the appointment of new board members following business combination with Qell." This press release was also filed with the SEC by Qell on Form 425.

213. As the title suggests, the press release announced that Lilium "intends to enter into a $1 billion commercial deal and strategic alliance with leading Brazilian airline Azul S.A." "As part of the commercial arrangement," the press release represented, "Lilium would intend to sell 220 aircraft for Azul to operate across the network expected to **start in 2025** for an aggregate value of up to $1 billion." The press release also stated, "Lilium **plans to be in operation in multiple regions in 2025**."

214.     The slide deck that accompanied Lilium's Capital Markets Day presentation, which was filed by Qell on Form 425 on August 2, 2021, contained the same graphic reproduced in ¶ 209 above. According to the transcript of this presentation, which was filed by Qell on Form 425 on August 5, 2021, Defendant Yemsi stated, while discussing this slide:

> [W]e have achieved a very significant milestone by establishing and agreeing on our certification basis with EASA . . . we are driving the same process now with FAA to obtain our G01 issue paper. And we are in the process of doing that with both EASA and FAA. Having certification basis established means that we are now able to design against known requirements. And that is fundamental in order to reduce the risk of the program timeline. That's something that we have achieved without [sic] very strong and regular collaboration with both EASA and FAA.

215.     Each of the statements in ¶¶ 202-214 above were materially false or misleading because Defendants knew, or recklessly disregarded the truth, that the target of achieving commercial operations in 2024, and certification prior to that, was not achievable.

216.     At the time each of these statements were made, Lilium had only completed the first of four steps required for EASA certification (and none of the steps required by the FAA). Far from being a "very significant milestone," Defendant Yemsi stated that completing this step merely meant that EASA had figured out what kind of aircraft Lilium sought to certify, and thus, which regulations would apply to it. Lilium had yet to begin what EASA describes as the "longest phase" of the certification process, compliance demonstration. In fact, Lilium had not even finalized the design (much less started building) the conforming prototype aircraft it would need to begin the compliance demonstration phase. While the graphics described in in ¶¶ 209 and 214 above show the design phase as being over halfway complete, Lilium did not complete its Preliminary Design Review — the first milestone in the design process, during which Lilium made substantial changes to its aircraft design — until June 2022. Additionally, CW1 stated that, in his experience, elements of the Lilium Jet, such as the use of a carbon-fiber structure and "fly-by-

wire" controls would likely lead to challenges when certifying the aircraft, meaning the process would take much longer than Defendants represented in the statements above.

217.    Notably, CW1, along with his colleagues, had also expressed their frustrations about the unrealistic timeline directly to Defendant Yemsi, who had merely responded at the time that the engineers did not "understand the full situation." Both CW1 and three former employees cited in the *Forbes* article quit their jobs at Lilium due to concerns over the "unrealistic timeline."

218.    Far from being "confident" in Lilium's "timelines," Defendant Yemsi himself believed that the target of achieving certification in this time frame would be "extremely difficult," but Defendant Wiegand had been insistent on the timeline. Nevertheless, Yemsi allowed his name to be used to bolster the viability of this impossible timeline.

219.    Shortly after going public, Lilium's timeline was quietly pushed back, confirming the veracity of these allegations in ¶¶ 215-218 above.

**E.    False or Misleading Statements and Omissions about Lilium's Financial Projections**

220.    Defendants also made materially false or misleading statements or omitted facts necessary to make their statements not misleading about Lilium's projected financials.

221.    The March 30, 2021, Investor Presentation slide deck contained a slide titled, "Financial Profile" with the following graphic:

| $M | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|
| Production volume | 90 | 325 | 600 | 950 |
| **Profit & Loss items** | | | | |
| Revenue | 246 | 1,314 | 3,306 | 5,867 |
| % Growth | nm | 435% | 152% | 77% |
| EBITDA | (180) | 70 | 708 | 1,440 |
| % Margin | nm | 5% | 21% | 25% |

To the left of the chart, it stated that the figures assumed 50/50 "Lilium Network and Turnkey Enterprise Solution." The transcript of the Investor Presentation shows that, accompanying the slide, Defendant Richardson stated "2024 is when we target our launch of flight operations and primarily focused on enterprise 2025 is about expansion operational excellence. And 2026, we hit our run rate."

222.    The "Fact Sheet" filed by Qell on Form 425 on March 30, 2021, contained bullet points which stated, "Targeting profitability by end of year 2025" and "Projected 1,000 jets in operation by 2027 with 30,000 tickets sold per jet per year."

223.    The June 15, 2021, Analyst Day Presentation slide deck, which was filed by Qell on Form 425, included a slide with the same information in ¶ 221 above, showing that Lilium would produce 90 aircraft in 2024, 325 in 2025, and so forth, that Lilium would have a positive EBITDA by 2025, and that, by 2027, Lilium would be bringing in revenue of approximately $5.8 billion. In the transcript of the Analyst Day presentation, which was filed by Qell on Form 425 on June 16, 2021, Defendant Richardson stated, regarding this chart:

> So the numbers I presented on previous pages are the 2026 numbers, and 2024 and 2025, are more conservative. So you'll see we really lean on the turnkey enterprise solution in the early years. But then in the later years, the network effect and as the fleet grows, really starts kicking in. So *if you start looking at 2027, the network side becomes larger and that trend continues*.

224.    Lilium's August 2, 2021 Capital Markets Day presentation slide deck, a copy of which Qell filed on Form 425, contained a substantially similar slide to those described in the previous paragraphs. Discussing the slide Defendant Richardson stated:

> [Y]ou'll see that we've assumed with our production volume, which is the top number, that 50% of the production goes to the people network and 50% of the production goes to the turnkey enterprise solutions . . . but you'll see that over time, *if you look at 2027*, the network effect starts kicking in and the revenue from the network becomes higher than the turnkey.

225.    Each of the statements in ¶¶ 221-224 were materially false or misleading. First, each of the statements is predicated on Lilium becoming certified and beginning commercial operations by 2024. As discussed above in ¶¶ 215-218 above, this target was not achievable.

226.    Second, each of the statements were based on Lilium's plan to begin operating its People Network the same year as it began commercial operations; however, due in part to difficulty in getting the permits to build the infrastructure necessary for its internal operations, soon after going public, Lilium largely abandoned its plans to build the People Network, instead focusing on providing private luxury jets for the wealthy. The timing of the switch implies this was likely Lilium's plan all along. Moreover, the revenue from selling the jets to third parties — $4 million up front and a $1 million service contract in the following years — was far lower than the projected revenue of $5 million per jet per year on the People Network (or potentially higher if more than an average of 4.5 seats per flight were filled). Therefore, the projections in the charts shown in the Investor Presentation, Analyst Day Presentation, and Capital Markets Day Presentation, and Defendant Richardson's comments accompanying them, were all materially false or misleading.

## II.    Materially False or Misleading Statements and Omissions in the August 5, 2021, Registration Statement[32]

227.    On August 5, 2021, Lilium B.V. filed a 624-page amended Registration Statement on Form F-4. This Registration Statement became effective on August 9, 2021. This Registration Statement contained numerous false or misleading statements, which, for ease of analysis, have been grouped into categories below.

---

[32] Lilium B.V. filed an initial registration statement on Form F-4 on May 5, 2021, and an amended registration statement on Form 4 on June 10, 2021. Neither of these registration statements became effective. Both documents, in pertinent part, were substantially similar to the Registration Statement, which became effective on August 5, 2021, and the statements therein are materially false or misleading, or omit material information, for the same reasons discussed in ¶¶ 227-250 below.

### A.    Timeline to Launch and Production

228.    Defendants repeated numerous times in the Registration Statement that Lilium was expecting to launch commercial operations in 2024, which would position Lilium as one of the first eVTOL companies to launch commercial services:

- Working with world-leading aerospace, technology and infrastructure providers, commercial operations are **planned to launch in 2024**. (p. 26).

- We expect to commence commercial operations in **2024** with a single model of eVTOL jet. (p. 66).

- We are progressing towards a targeted Type Certification in **2024**, which would position us as **one of the first companies to enter the eVTOL market**. (p. 180, 202).

- These relationships [with Ferrovial and Tavistock] are aimed at putting us in a position to have viable vertiport operations in at least two strategic markets in time for our targeted commercial launch in **2024**. (p. 185).

- Three years ahead of our targeted commercial launch in **2024**, we have developed a vertiport roll-out plan for the People Network (B2C) in Florida and Germany and entered into arrangements with leading infrastructure players to progress these plans. (p. 187).

- We plan to start an extensive ground and flight test campaign during 2022, which will continue until the Type Certification of our Lilium Jet, which we expect to receive in **2024**. (p. 194).

- We are targeting **2024** for the commercial launch of our 7-seater Lilium Jet. (p. 202).

229.    These statements were materially false or misleading because, as discussed above in ¶¶ 215-219, it was not possible (or at least was extremely unlikely) that Lilium would achieve type-certification to begin commercial operations by 2024. At the time, Lilium had only completed the first of four steps required for EASA certification (and none of the steps required by the FAA) and had yet to begin what EASA describes as the longest phase, compliance demonstration. Lilium had not even finalized the design (much less started building) the conforming prototype aircraft it would need for the compliance demonstration phase. Additionally, elements of the Lilium Jet, such as the use of a carbon-fiber structure and "fly-by-wire" controls would likely lead to challenges when certifying the aircraft, meaning the process would take much longer than the 2 ½ years

Lilium represented. Several Lilium engineers, including CW1, quit the Company because of their concerns about the unrealistic timeline, but those concerns were dismissed by Defendants Yemsi and Wiegand, even though Yemsi had previously expressed that achieving the timeline would be "extremely difficult." Further, the battery technology necessary for Lilium to begin operating commercially was still many years away from general availability and would certainly not be available for mass production by 2024.

### B. Lilium's Financial Projections

230.    Despite stating that "Lilium . . . does not prepare or publicly disclose, as a matter of course, long-term forecasts or internal projections as to future revenues, earnings, Adjusted EBITDA, funds from operations, or other results," (pp. 112-113), under the heading "The Updated Projections," the Registration Statement provided the following financial projections:

|  | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|---|---|
|  |  |  |  | (numbers in millions)[1] |  |  |  |
| Production volume (number of aircraft)[2] | — | — | — | 90 | 325 | 600 | 950 |
| Revenue[3] | — | — | — | $ 246 | $1,314 | $3,306 | $ 5,867 |
| Adjusted EBITDA[4] | (173) | (182) | (197) | (180) | 70 | 708 | 1,440 |

p. 115.

231.    The Registration Statement explained that the term "Updated Projections" was used because Lilium had provided initial projections to Qell in which it had "assumed proposed spending on operating expenses and capital expenditures of approximately $980 million prior to commercial launch of operations, as compared to approximately $810 million in the Updated Projections." (p. 116). Based on feedback from Qell management, Lilium revised the projections to remove $40 million from the budget for its go-to-market strategy. Lilium had also planned to equip its factory in 2022 and 2023 to be capable of producing 400 aircraft despite a projected

demand for 90 aircraft in 2024 and 325 aircraft in 2025. Accordingly, $110 million in spending on production expenses was delayed until 2024-2025.

232.    With regards to the projections, the Registration Statement stated: "The Lilium Projections included in this proxy statement/prospectus **have been prepared by, and are the responsibility of, Lilium's management**."

233.    As the Registration Statement stated, the Updated Projections were predicated on Lilium beginning commercialization in 2024:

> Lilium's management prepared the Lilium Projections for the fiscal years 2021 through 2027 based upon, among other considerations, **Lilium's expectation to commence commercial operations in 2024** at the earliest, if at all.

* * *

> The projections also assume . . . that Lilium will be able to obtain the necessary approvals from regulatory authorities and agencies (e.g., the FAA and EASA) to allow Lilium to initiate its operations as expected . . . **Lilium's management believes such assumptions to be reasonable** based on its interactions with regulatory authorities to date.

(pp. 113-114).

234.    As discussed above, such assumptions were not reasonable: it was highly unlikely, at best, and not possible, at worst, for Lilium to begin commercial operations by 2024. Since the projections were admittedly based on this unreasonable or unrealistic assumption, they were materially false or misleading. Additionally, the projections were overstated because they were based on Lilium beginning the operation of its People Network (which was projected to bring in $5 million per jet per year rather than the $1 million per jet per year from service contracts after the $4 million initial sale brought in by enterprise jets) the same year it began commercial operations. However, soon after going public, Lilium largely abandoned its People Network in favor of enterprise sales.

C.      **The Capacity of Lilium's Batteries: Implications for Range, Speed, and Hover**

235.    The Registration Statement also contained materially false or misleading statements regarding Lilium's "advanced" battery technology:

> The Lilium Jet's engines are designed to be powered by a proprietary battery system which is being developed by Lilium in collaboration with third parties based on large format Lithium-ion pouch batteries . . . We have invested in a leading battery technology supplier, securing exclusive rights for the eVTOL market for this chemistry.

> Supplier and in-house measurements of the pouch cells have yielded nominal energy density levels of 330 watt-hour per kilogram, which is projected to enable a physical aircraft range of 155 miles (our target for entry into service). This prediction is based on our testing and simulation of engine efficiency as well as on well-known and standard prediction methods for aircraft design for batteries, engines, motors, and other components of the aircraft. We anticipate energy density levels and power levels at low SoC to further improve which will improve the operating range of our Lilium Jet as these improvements occur.

p. 190.

236.    The Registration Statement contained several other similar statements regarding the range of the Lilium Jet, for example:

- The specifications for the Lilium Jet under development call for the aircraft to be able to cruise at 175 mph at 10,000 feet for up to 155 miles and to have 7 seats (one for the pilot) or 210 cubic feet of cargo space representing 50% more (passenger) capacity than an open propeller eVTOL architecture would have at comparable noise levels. We believe the combination of longer average trip lengths and higher passenger capacity per jet (thus a higher load factor) will provide greater time savings to customers, more competitive pricing, and superior unit economics as compared to open propeller eVTOL architecture. (p. 178).

- The specifications for the Lilium Jet under development call for the aircraft to be able to cruise at 175 mph in 10,000 feet for up to 155 miles and to have 7 seats (one for the pilot) or 210 cubic feet of cargo space representing 50% more (passenger) capacity than an open propeller eVTOL architecture would have at comparable noise levels. (p. 201).

237.    These statements were materially false or misleading. Defendants had no credible evidence to support their claims that the Lilium Jet would be able to fly 155+ miles. Lilium had never built a full-scale conforming prototype of the 7-Seater Jet; it had only tested a smaller, 5-

Seater demonstrator that was approximately 2.4x lighter than the 7-Seater would be. The Phoenix demonstrator had never flown for more than a few minutes and had not achieved many key milestones for demonstrating that the Lilium design was viable, such as the transition between vertical lift and cruise. It was also not powered by the same batteries Lilium claimed would enable their market-leading range.

238.    The Lilium Jet's design, which relied on 36 ducted fans to take off and land vertically, required batteries capable of an extremely high energy density. As was later revealed, batteries capable of the energy density Lilium had used to calculate its range estimate did not yet exist. In fact, they are still years away from existing. Defendants claimed that Lilium had access to "advanced" batteries capable of such high energy densities; however, these batteries were being developed by Zenlabs, a company whose CEO had previously defrauded GM (Defendant Engle's previous employer) about the performance of its proprietary batteries. Zenlabs claimed to have a battery far more advanced than any of Lilium's competitors had access to, but these claims were totally unsubstantiated. A third party who purportedly confirmed the energy density claimed by Zenlabs, tested the batteries for only two charging cycles. High energy density readings for a few charge cycles in a laboratory environment does not translate into real world success, as it is crucial for commercialization that batteries also be durable and hold their high levels of charge over thousands of charging cycles.

239.    Additionally, Lilium's range calculations suffered from other defects. First, the calculations assumed the Lilium Jet would require only approximately 60 seconds of hover time; however, it was likely that regulators would require Lilium to account for 2-3 minutes of hover time in case of bad weather or to clear obstacles at take-off. Second, the calculations assumed a minimum de-charging level of 10% despite the industry standard being 20%. Third, the

calculations assumed a 100% maximum state of charge throughout the life of the battery, where the industry standard for lithium batteries is to only assume 80% maximum to account for ageing across cycles. Finally, the calculations assumed the full mass dedicated to the batteries would be taken up by cells and did not account for the mass of the battery components, such as the power control, housing, and wiring, which would take up approximately 15% of the allotted mass. Taking all these factors into account, Professor Gollnick estimated that with battery technology available in 2025, the range would be approximately 11.8 miles for a Lilium 5-Seater jet (weighing far less than the planned 3,175kg of the 7-seater). With the battery technology available in 2028 or 2029, the range would be approximately 36 miles for a 5-seater — still a far cry shorter than the 155+ mile range represented by Defendants in this statement.

240. Furthermore, Iceberg Research later revealed that Lilium was likely underestimating the amount of hover time that would be required by regulators.

241. With regards to the hover phase, the Registration Statement stated:

The disadvantage of the ducted fans' small footprint is that the Lilium Jet is expected to consume roughly twice the power in hover flight than an eVTOL propeller based aircraft of a similar weight.

However, since we plan to operate a regional shuttle service, we aim for *less than 60 seconds per mission in the pure hover phase* and 30 – 60 minutes in cruise flight. As a result, we estimate that the associated increase in energy consumption in hover flight is around 5% of the overall mission energy budget.

pp. 188-189.

242. These statements were materially false or misleading because Lilium underestimated the power reserves regulators would likely require for additional hover time to account for poor weather conditions and obstacle clearance. In fact, using currently available

battery technology and considering proper reserves for hover time, Professor Gollnick indicated

the actual range of the 7-Seater Lilium Jet may be as low as 41 miles.[33]

243.    Further, in the section of the Registration Statement discussing the risks of Lilium's

business, it states:

> **Our Lilium Jets will make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame.**
>
> The battery packs within our Lilium Jets will use lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the battery pack is designed to contain any single cell's release of energy without spreading to neighboring cells, a failure of battery packs in our jets could occur or batteries could catch fire during production or testing, which could result in bodily injury or death and could subject us to lawsuits, regulatory challenges or redesign efforts, all of which would be time consuming and expensive and could harm our brand image.

p. 70, (emphasis in original). This statement omitted the material fact that this was more than a

hypothetical risk for Lilium. In February 2020, a fire caused by a thermal runaway event — the

very same kind of battery fire discussed in this risk statement — destroyed Lilium's Phoenix

demonstrator.

### D.    The Registration Statement Misrepresented Lilium's Partnerships with Palantir and Azul

244.    In the Registration Statement, Defendants misrepresented Lilium's relationship

with two of its partners, Palantir and Azul.

245.    The Registration Statement stated in multiple places that Palantir was part of a

"**Strong Shareholder Base**" (emphasis in original), contributing $41 million to the PIPE financing.

*See* pp. 33, 110, 163. The Registration Statement also stated that Lilium had entered into a $50

---

[33] This estimate is calculated using a minimum de-charge level of 10% rather than the industry standard 20% and a max charge of 100% (80% is the industry standard due to battery aging), and assumes 100% of the Lilium Jet mass dedicated to batteries will be used by cells (not accounting for components such as wiring and casings).

million non-cancellable subscription agreement for Palantir's cloud services, due in annual installments over five years.

246. On August 3, 2021, after reviewing a previous draft of the Registration Statement, the SEC Division of Corporation Finance sent letter to Defendant Engle with the comment:

> We note your disclosure Palantir Technologies Inc. entered into a subscription agreement on March 30, 2021, and has committed to purchasing $41 million of Holdco Class A Shares in the PIPE transaction. We also note your disclosure that on March 28, 2021, Lilium entered into a non-cancelable purchase obligation for a Palantir Foundry cloud subscription for $50 million payable over five years. ***Please revise your disclosure to clarify whether Lilium's purchase obligation is contingent upon Palantir's PIPE commitment***. Please also disclose whether the funds from the Trust and PIPE will be used to pay any of Lilium's $50 million purchase commitment. Please consider including any appropriate risk factor disclosure related to your agreement with Palantir. ***Please also disclose the material terms of your agreement with Palantir and file it as an exhibit***.

The Registration Statement did not attach the terms of Lilium's agreement with Palantir as an exhibit. Rather, in response, the Company added language to the Registration Statement that read: "This agreement was entered into by Lilium in the ordinary course of its business and is not contingent upon Palantir funding its PIPE Financing commitment." p. 163.

247. A November 28, 2022, *Bloomberg* article titled "Palantir Failed to Spot Pattern in SPAC Debacle" suggests that this is not true.[34] According to the article, "Palantir has spent $450 million since 2021 acquiring shares in about two dozen early-stage companies, nearly all ex-SPACs. ***The quid pro quo***: The startups ***promised to purchase Palantir software and services***, typically of a value that was equal or greater than its investment." The article notes that "[b]y contributing money to the private investment in public equity (PIPE) deals that typically backstop SPAC transactions, [Palantir] was able to quickly expand the commercial side of its business,

---

[34] Chris Bryant, *Palantir Failed to Spot Pattern in SPAC Debacle*, BLOOMBERG, November 28, 2022, https://www.bloomberg.com/opinion/articles/2022-11-29/palantir-failed-to-spot-pattern-in-spac-debacle#xj4y7vzkg

reducing its reliance on state contracts." As this article suggests, Lilium likely agreed to pay Palantir $50 million in exchange for $41 million in PIPE financing, a deal Lilium tried to conceal from investors.

248.    Palantir was not the only questionable investor discussed in the Registration Statement. On August 2, 2021, just days before the Registration Statement became effective, Lilium announced a "strategic alliance" (*i.e.*, a loose, non-binding agreement) with leading Brazilian airline Azul, for the sale of 220 aircraft, valued up to $1 billion, for Azul to operate in Brazil starting in 2025. The Registration Statement echoed the language of this announcement. *See* pp. 195-196. As discussed previously in ¶¶ 215-219, Lilium's timeline to certification and commercialization was unachievable, and thus, the statement that Lilium would be able to provide Azul with 220 aircraft starting in 2025 was materially false or misleading or omitted information necessary to make the statement not misleading.

249.    The Registration Statement also revealed for the first time:

> [W]e agreed to use all efforts to cause Holdco to grant to Azul warrants to purchase up to 8,000,000 Holdco Class A Shares at a nominal value of EUR 0.12 a share, consisting of (i) warrants to purchase 1,800,000 HoldCo Class A Shares granted on a fully vested basis on or prior to October 31, 2021 (with a cash payment of $18 million due to Azul if such warrants are not issued, subject to certain modifications or increases to up to $25 million depending on timing and the occurrence or non-occurrence of certain other conditions), and (ii) subject to the execution of definitive agreements, warrants to purchase up to 6,200,000 HoldCo Class A Shares, which are expected to vest in three tranches.

250.    As a report from Iceberg Research later pointed out, far from a vote-of-faith contract whereby Azul agreed to purchase $1 billion in Lilium Jets before the design was even finalized, "Lilium, more likely than not, offered its shares as payment for the right to market an established company as a partner." Such "marketing agreements," the report stated, "rarely lead to real business."

## LOSS CAUSATION

251.    Defendants' wrongful conduct, as alleged herein, directly and proximately, caused the economic loss suffered by Plaintiff and the Class. Throughout the Class Period, Lilium's stock price was artificially inflated by materially false and misleading statements and omissions, deceptive devices, and a fraudulent scheme that created the false impression that Lilium *currently* possessed the requisite technology and ability, and indeed was well on its way, to building and commercializing a superior eVTOL — not at some theoretical time in the distant future, but by 2024, with profits following soon thereafter. Defendants repeated their statements and wrongful conduct over and over again in investor presentations, interviews, articles, and, eventually, Lilium's Registration Statement, soliciting investor support for the Merger (and continuing thereafter). Accordingly, shareholders approved the Merger, and Lilium became a public company, commencing trading on the NASDAQ on September 14, 2021. In the week after Lilium stock began trading on the NASDAQ, the stock reached closing prices as high as $10.85/share. As a result, the market price of Lilium common stock was inflated by the materially false and misleading statements and omissions, deceptive devices, and fraudulent scheme made by Lilium, Qell, and the Individual Defendants, as identified above, and Plaintiff and the Class purchased Lilium common stock at artificially inflated prices during the Class Period.

252.    The ensuing disclosure on these topics (*i.e.*, the Iceberg Report), as described above at ¶¶5, 75, 90, 157-57, revealed to the market the fraudulent nature of Defendants' statements and conduct and the extent of the conduct and misrepresentations contained in Lilium's public filings, press releases, conference call statements, and presentations that form the primary basis of this action. The Iceberg Report revealed, among other things, that batteries capable of the energy density Lilium had used to calculate its 155+ mile range estimate were not commercially available

at the time, and are, to this day, still years away from being commercially available. It also revealed that Lilium was unlikely to meet its timeline of certification in 2023 (which would allow for commercialization by 2024) — a fact later quietly confirmed by Lilium itself. When the truth about Lilium was revealed to the market, the price of Lilium common stock declined in response, as the artificial inflation caused by Defendants' material omissions and false and misleading statements, deceptive devices, and fraudulent scheme was removed from the price of Lilium common stock, thereby causing substantial damage to Plaintiff and other members of the Class. Indeed, on this news, the price of Lilium Stock fell from $3.69 per share at closing on Friday, March 11, 2022, to $2.44 per share on Monday, March 14, 2022, an approximately 34% drop, on unusually high trading volume.

253.    It was entirely foreseeable to Defendants that concealing the truth about the Lilium Jet would artificially inflate the price of Lilium common stock. It was similarly foreseeable to Defendants that the revelation of that misconduct, as well as the Company's true operations, financial condition, and prospects, would cause the price of Lilium common stock to drop significantly as the inflation caused by their misstatements and omissions, deceptive devices, and fraudulent scheme was corrected. Accordingly, the conduct of Defendants, as alleged herein, proximately caused foreseeable damages to Plaintiff and members of the Class.

254.    The same day, March 14, 2022, investing advice website Motley Fool published an article titled, "Why Lilium Shares Are Losing Altitude Today," noting "Shares of German aerospace start-up Lilium [] fell as much as 25% on Monday after the company was the subject of a new short report. Iceberg Research is raising questions about the company's prospects, and investors aren't sticking around to hear the answers. As of 10:46a.m. ET, shares were down

24.66%."[35] Similarly, an article on investor research website Seeking Alpha stated, "Lilium, [] an electric vertical takeoff and landing company, dropped 25% amid an Iceberg Research new short report. Iceberg Research expresses doubts about Lilium's claims that its vehicle can fly 155 miles and the report estimates the company has about 18 months before the company runs out of cash."[36] While both articles noted that the end on the post-Merger 180-day lockup period also may have contributed to the decline in the stock price, the articles primarily contributed the losses to the revelations in the Iceberg Report.

255.     On April 28, 2022, J.P. Morgan initiated analyst coverage of Lilium, specifically noting the ongoing material impact that the revelations in the Iceberg Report had on Lilium's stock price: "A recent short report from Iceberg Research could weigh on Lilium's stock in the near term at least and could potentially impact the company's market opportunities if customers and partners question ability to execute." "Based on precedent from companies previously targeted by short-seller reports, such as Hyzon, Nikola, Lordstown, and QuantumScape," the J.P. Morgan report continued, "an SEC subpoena is likely to follow within a 2-3 month time frame to investigate the report's claims, which is likely to be another overhang on the stock."

**DEFENDANTS ACTED WITH SCIENTER**

256.     Defendants had significant motive and opportunity to misrepresent the viability of their technology and the timeline to certification and commercialization, so that they could, first, raise crucially needed money through a public offering, and then, raise additional capital to continue to fund Lilium's business operations and pay their salaries. Defendants were also motivated to consummate the Merger to ensure that Qell and Engle received their highly lucrative

---

[35] https://www.fool.com/investing/2022/03/14/why-lilium-shares-are-losing-altitude-today/
[36] https://seekingalpha.com/news/3813151-evtol-player-lilium-plunges-amid-lock-up-expiration-short-report-from-iceberg-research

SPAC benefits. In addition, Defendants stood to personally profit from their misrepresentations and scheme in the form of incentives tied to the achievement of various performance targets.

257.    Defendants also either intended to defraud investors or were severely reckless in making their statements regarding the Jet's design capabilities, timeline to certification and commercialization, and the Company's business and prospects. Defendants repeatedly touted the purported advantages of Lilium's technology over that of its competitors — including its "advanced" battery technology — claiming that its Jet would be certified in 2023, commercialized in 2024, and turning a profit soon thereafter. Defendants made these bold claims even though they had completed only a small number of short test flights; they had not completed PDR, so design changes were likely (and, in fact, significant design changes were made); they had not begun constructing the full-scale conforming prototype; and the battery technology necessary to begin operating commercially was years way from commercial availability. Indeed, according to CW1 and other former employees and Defendant Yemsi himself, Defendants Yemsi and Wiegand knew that certification by 2024 was, at best, extremely unlikely.

## I.    Defendants Had Significant Motive and Opportunity to Misrepresent Lilium's Business

### A.    The Merger

258.    Defendant Wiegand was a founder of Lilium and one of the people that came up with the idea for the Jet despite having no real-world aerospace experience. Indeed, the Lilium Jet was designed as a school project. According to the Iceberg Report, Wiegand's alma mater, Technical University of Munich, offered to help him with the design of the Jet, but he refused. Later, the University criticized the Jet's concept, saying it could not work, and wanted no association with it. Specifically, Professor Mirko Honung, the head of the University's Department of Aviation Systems, stated, "They [Lilium and Wiegand] only wanted the TU Munich label as a reference to further polish their image, ***presumably to attract investors***. We vetoed the idea and

insisted there should be no connection between the Lilium and the department. We don't want to have anything to do with such dubious things."

259.    From its inception, Lilium has always required an enormous amount of capital to operate. The Merger was crucial for Lilium to get the cash infusion it needed to continue operations. When asked in an interview whether Lilium could have gotten the funds needed without an IPO, Defendant Wiegand stated: "We also looked at private funding rounds. But for us, the question was: How do we quickly and efficiently fund an extremely research-intensive company that needs about a billion dollars before the first euros in sales are made? That's why we decided on a SPAC IPO earlier this year, because it allows us to obtain sufficient funding. As a publicly listed company, we now have a wider range of other funding options."[37]

260.    Lilium was not the only eVTOL company vying for investors. An article in the *Financial Times* stated, in the first 8 months of 2021 alone, "investors earmarked a record $4.3bn to electric air taxi start-ups this year, as many hope to uncover 'the next Tesla.'"[38] Lilium's primary competitor, Joby, went public in August 2021, also via a merger with a SPAC, raising approximately $1.1 billion.[39]

261.    Defendants were motivated to misrepresent that their Jet was closer to realization than it actually was to convince investors to invest in the SPAC transaction that Lilium desperately

---

[37] Jens Koenen and Sebastian Matthes, *"The jet must remain in sight" – The Lilium boss explains what air taxis can really do at the moment*, Handelsblatt, September 29, 2021, https://www.handelsblatt.com/unternehmen/handel-konsumgueter/flugtaxi-hype-der-jet-muss-in-sichtweite-bleiben-der-lilium-chef-erklaert-was-flugtaxis-derzeit-wirklich-koennen/27655602.html (translated from German).

[38] Sylvia Pfeifer and Philip Georgiadis, *Investors pledge a record $4.3bn for air taxi start-ups*, *Financial Times*, August 23, 2021, https://www.ft.com/content/ec8bab06-9118-4453-b60e-defd32b230a7 .

[39] Jeremy Bogaisky, *Electric Air Taxi Maker Joby Goes Public, Offering Investors Sky-High Potential—And Risk*, Forbes, August 11, 2021, https://www.forbes.com/sites/jeremybogaisky/2021/08/11/joby-stock-spac-nyse/?sh=1ffdd1c47a41 .

needed; the prospect that Lilium would be "first-to-market" and would become profitable in just a few years were key factors that drew investor support for the Company.

262.   Moreover, had Qell not completed an acquisition by its deadline, a number of negative consequences would have resulted for Defendant Engle, CEO of the Sponsor Qell Partners LLP: (i) the Sponsor would have had to dissolve and liquidate the Trust Account and return the money to its investors; (ii) the Sponsor's Founder Shares (for which it paid $25,000 but would be worth approximately $75.585 million upon the completion of the Merger) would have been worthless; (iii) the Sponsor's 7,060,000 Private Placement Warrants (for which it paid $10.59 million and which had an aggregate fair market value of $11.29 million as of June 30, 2021) would expire worthless; and (iv) the Sponsor and Qell's officers and directors would lose their entire investment in Qell and would not be reimbursed for any out-of-pocket expenses (estimated at approximately $6 million).

263.   The consummation of the Merger avoided these negative consequences and conferred significant personal financial benefits on Defendants. Defendant Engle received 6,796,055 Class A shares of Lilium stock, valued at $63,950,877. [40] Defendant Wiegand received 24,413,065 Class B shares of Lilium stock, valued at $231,191,726. [41] This conferred more than just a financial benefit on Wiegand; was the sole beneficiary of the special Class B shares — which were worth the same as Class A shares but entitled Wiegand to three times the voting rights. As a result, Wiegand he was able to maintain control over nearly one-third of the voting power for the post-merger Company. And as part of his employment agreement, Lilium agreed to pay Defendant

---

[40] As of June 30, 2022, Engle had 4,216,144 Class A shares of Lilium stock, consisting of (i) 915,928 Class A Shares held of record, (ii) 3,298,232 Private Warrants, including 3,298,232 Class A Shares issuable upon exercise of such Private Warrants, and (iii) 1,984 Class A Shares issuable upon settlement of restricted stock units vesting within 60 days following June 8, 2022.
[41] As of June 30, 2022, Wiegand held all of these shares.

Richardson a "success fee" equal to 0.5% of all financing proceeds secured by Lilium, up to $4 million, including in connection with the Merger, subject to Richardson's continued employment through completion of the Merger. Richardson was paid the Success Fee on November 29, 2021, in the form of 293,230 fully vested Class A shares of Lilium, valued at approximately $2.12 million.[42]

264.    Defendants also made a highly unusual request of Qell during the Merger negotiations: they attempted to get Qell to agree a provision that would allow them to sell 25% of their shares before the lock-up period expired, but Qell refused the request. If Defendants really had confidence in their Company, they would not have sought an early end to the lock-up period. Their desire to sell their shares sooner suggests they knew or thought there would likely be developments within the lockup period that would make their shares lose value.

## B.    Performance Incentives

265.    Defendants were further motivated by their desire for concrete, personal financial gain following the Merger.

266.    In connection with the Merger, Lilium adopted a Compensation Policy on September 10, 2021, amended on December 21, 2022, pursuant to which the Company would grant performance-based cash, equity, and equity-linked awards to executive board members upon the achievement of targets "that are aligned with Lilium's long-term strategy," including financial, operations, and or strategic objectives, as set forth in the 2021 Equity Incentive Plan (the "Plan"). The Performance Goals enumerated in the Plan include: revenue; income; cash flow; raising of

---

[42] As of June 30, 2022, Richardson owned 469,110 Class A shares of Lilium, consisting of 259,144 Class A Shares held of record, 181,396 Class A Shares issuable upon the exercise of stock options that were vested as of, or within 60 days following, June 8, 2022, and 28,570 Class A Shares issuable upon settlement of restricted stock units vested as of, or within 60 days following, June 8, 2022.

financing or fundraising; revenue backlog; stock price; strategic business criteria; and objective goals relating to projects, including project completion, timing and/or achievement of milestones and technical progress against work plans. Thus, there was a direct correlation between Lilium's performance and potential monetary and equity awards for the Individual Defendants.

## II.     Defendants Intended to Deceive Investors or Were Severely Reckless

### A.      The Original Timeline for Certification of the Lilium Jet

267.    Per a March 23, 2020 press release announcing the completion of an internal funding round of more than $240 million, the Company was originally aiming to launch its commercial services by 2025 — a year after its competitors (like Joby) were planning. In the March 30, 2021 Merger Announcement, Defendants moved up this target to 2024, without explanation. That the initial target was 2025 indicates that Defendants knew that 2024 wasn't feasible.

268.    Further, the original plan for the Lilium Jet was for a 5-seater jet. This, again, was changed without explanation in the March 30, 2021 Merger Announcement to a larger, 7-seater aircraft. That Defendants shifted the design to a larger aircraft made it even more unlikely that it could meet its ambitious certification timeline.

### B.      Defendants' Denials in the Face of Contrary Evidence and Purported Access to "Secret" Information Support a Strong Inference of Scienter

269.    In response to the criticism of the design of the Lilium Jet in the German press in 2019 and 2020, and in furtherance of the scheme to defraud, Lilium commissioned and disseminated the White Paper, which it made public on March 30, 2021, the day it announced the intended Merger. The White Paper, which was styled in the form of a scientific journal article and authored by an engineer employed by a Lilium subsidiary, purportedly demonstrated, with complex calculations, the feasibility of the Lilium Jet design. Notably, on its first page, the White

Paper prominently displayed that it had been reviewed by five aeronautics experts, thereby giving Lilium an immense amount of credibility — credibility it had previously attempted (but failed) to gain via an association with Wiegand's University. Because Defendants retained these five aeronautics experts to review the White Paper, which was authored by one of Wiegand's good friends and co-founders of the Company, Defendants would have known that these experts did not agree with numerical assumptions in the White Paper, or, at the very least, would have known their scope of review did not include opining on the viability of Lilium's assumptions contained therein. Either way, Defendants knowingly omitted the material fact that these five experts did not agree with numerical assumptions in the White Paper.

270.    Lilium also issued multiple blog posts to defend itself against the criticisms and to reassure investors. For example, in an August 4, 2021, Technology Blog published on Lilium's website, Defendant McIntosh stated that while he was skeptical of the Jet concept before joining Lilium, he was now fully on board: "I reviewed this technology and architecture in detail as part of my due diligence. I found it to be technically sound and genuinely impressive and now as part of the team, I have seen much of the innovative technology, analysis and, importantly, test data that underwrites the concept." On May 31, 2022, Lilium published a blog regarding its "battery strategy" in which it published data from a third-party test of Zenlabs' battery cells that purported to support it claims regarding the expected performance and range of the Jet.

271.    The FAQs and blog posts thus continued Defendants' narrative that there was some sort of secret information to which only Lilium is privy. This narrative was echoed by a spokesperson for Lilium who, when asked how Lilium had persuaded Baillie Gifford to invest despite the criticism of its design, answered: "They've seen the aircraft . . . Most of them have seen it fly as well at some point. They see performance data on the aircraft. They understand how

it's put together. They do their due diligence. They understand the technologies and the assumptions behind it. They get to speak to all of our experts."[43]

272.    That Defendants repeatedly denied the public criticisms and continued to assure investors about the efficacy of the Lilium Jet design and its timeline to certification, and insisted they were in possession of secret information regarding the Lilium Jet, constitute strong circumstantial evidence of scienter.

273.    Further, because Defendants claimed they were in possession of data supporting their assumptions that the market did not have, either they did not have secret data to begin with, or the data did not actually support their assumptions.

### C.    Later Contradictory Statements and Remedial Measures Taken by Defendants Support a Strong Inference of Scienter

274.    As a result of the PDR process, the Company announced significant changes to the specifications and design of the Lilium Jet and pushed back its timeline for certification.

275.    First, in a letter to shareholders on February 28, 2022, Lilium announced that it was reducing the capacity of its aircraft back down to five seats (from seven) — tacitly admitting that the batteries capable of powering a seven-seat cabin were still years from commercial availability.

276.    Then, on March 30, 2022, the Company quietly revealed, via Form 20-F, that the market launch of the Lilium Jet would not take place until 2025, instead of 2024 as previously touted. As recently as March 1, 2022, when the Company held its Earnings Call to discuss its 2021 results, no mention was made by Defendants of any change in the previously announced target date of 2024. The temporal proximity of this statement to the previous statements gives rise to a strong inference of scienter.

---

[43] https://evtol.news/news/lilium-draws-searing-publicity-then-soaring-investment

277.    On May 31, 2022, Lilium also revealed in a blog post that it was changing its design to add conventional landing gear to its jet design. Defendants had previously represented that, as part of its simplified design, the Jet would not need landing gear because it would land vertically. Defendant McIntosh explained during the June 7, 2022 earnings call that the change was made to "giv[e] pilots a backup option of a short running landing," which has a "lower power demand." Thus, this design change revealed a lack of confidence by Lilium that its batteries would have the necessary reserves to achieve a vertical landing.

278.    In the same May 31, 2022 blog post, Lilium embedded a link to a report by third party reviewer, Energy Assurances, purportedly confirming that the Zenlabs battery was capable of over 300 Wh/kg. This report inconspicuously revealed that Energy Assurances had tested the batteries for only two charging cycles — calling into question whether the batteries could maintain the same performance over time, as would be critical for a commercial eVTOL.

279.    In June 2022, the Company also announced that it was reducing the number of ducted fans from 36 to 30 — tacitly conceding that the Company's prior design did not work. Around the same time, the Company also revealed a new, lower expected range for its batteries (108 miles).

**D.    CW1 and Other Anonymous Former Employees Support a Strong Inference of Scienter**

280.    CW1, who worked at Lilium as a Loads and Aeroelasticity Engineer, voiced his concerns regarding the unrealistic certification timelines to others within the aeroelasticity group, as well as directly to Defendant Yemsi, who disregarded these concerns, despite himself believing that the timelines would be extremely difficult.

281.    A former employee interviewed in the *Forbes* article stated that Yemsi's own projections "showed that shooting for certification in 2023 would be extremely difficult," but that

Defendant Wiegand was insistent on the timeline and often "convened meetings to try to find ways to advance the schedule." According to CW1, Defendant Wiegand was "intimately involved" in the Jet's development; the aircraft were Wiegand's "baby" and "every decision had to be run up to" and approved by Wiegand.

282.    Ultimately, CW1 left the Company because of his concerns about the certification timeline. The former employees interviewed in the *Forbes* article, along with a number of their colleagues, also left Lilium "out of frustration over the management of the company by Wiegand, who they say is overcontrolling and has held to an unrealistic timeline in the face of development delays, pushback from his engineers and a planning process that was throwing up red flags."

### E.    Red Flags Known to the Individual Defendants Support a Strong Inference of Scienter

283.    Even if the Individual Defendants were not aware of the false and misleading nature of the scheme and statements and omissions outlined above, they were certainly aware of the following overwhelming "red flags," such that they had a duty to investigate and should have known that their statements were materially false and misleading:

a) The low number of actual test flights completed, the short duration of those test flights (none for more than a few minutes), and the fact that the prototype never accomplished a crucial maneuver (transitioning from vertical to forward) which — according to CW1 and one ex-employee quoted in the *Forbes* article — meant that it would be "impossible" to achieve certification in 2023;

b) The battery fire that destroyed the Phoenix prototype in February of 2020;

c) The length and complexity of the aircraft certification process (according to the *Forbes* article, three former employees said it would be exceedingly difficult for Lilium to win safety certification by end of 2023 as a small conventional airplane can take from one to five years).

d) The FAA has not finalized the basis it will use to certify eVTOLs;

e) At the time of the Merger, Lilium had only achieved the first of four steps toward EASA certification and no steps towards FAA certification;

f)   At the time the Company began communicating its target of certification by 2024, it had not completed PDR, so design changes were likely (and, in fact, were made), thus delaying the timeline to certification;

g)   Lilium had not yet begun construction of the full-scale conforming prototype, the Pegasus, which would be used for the testing required for certification (the longest phase of the certification process), and no test flights flown with the Phoenix 2, or any other demonstrator, would be counted by regulators as contributing to the testing phase of the certification process;

h)   Lilium's competitor, Joby, which also predicts certification by 2024, was significantly further along in the process, having completed approximately 1,000 test flights, including one over 150 miles;

i)   The ducted fans consume a huge amount of power during the initial "hover" phase of the flight — approximately 2-3 times more power than an aircraft of comparable size with an open-rotor design;

j)   As revealed in the Iceberg Report (but concealed by Defendants), Lilium's secret battery cell provider, Zenlabs, is 35%-associated with Lilium. Lilium had previously misrepresented that its "proprietary battery system . . . [was] being developed by Lilium in collaboration with third parties….";[44]

k)   Zenlabs' CEO Sujeet Kumar, while at his previous (now-defunct) company Envia Systems, was accused by investors and its customer General Motors of misrepresenting the quality of its battery technology and defrauding it of millions of dollars. Defendant Engle worked for five years as an Executive Vice President at GM, and Defendants Richardson and Engle met through mutual contacts at GM;

l)   The third-party report cited in the FAQs regarding Zenlabs' battery capabilities had tested the cells for only two cycles;

m)   The battery technology necessary for Lilium to begin operating commercially (let alone, power a 16-seat jet) was many years away from commercial availability, and would certainly not be available for mass production by 2024; and

n)   At all relevant times, Lilium was flying test flights with a forklift battery.

---

[44] Aug. 5, 2021 Registration Statement at 190.

284.     *All* of the Individual Defendants were directly involved in Lilium's day-to-day operations and had access to this information, and Defendants Wiegand, Richardson, and Engle signed, certified, and/or assisted in the preparation of the relevant SEC filings and other relevant documents, such that they had a duty to inquire about these issues.

F.     **The Critical Nature of the Lilium Jet, Defendants' High-Level Positions and Involvement, and Their Access to, and Knowledge of, Contradictory Information**

285.     The Lilium Jet is the Company's only product. To that end, the Company's "development efforts are focused on [the] ongoing certification process for the Lilium Jet with EASA and the FAA and building out [its] manufacturing capacity."[45] As Defendants regularly acknowledged, the certification and commercialization of the Lilium Jet were crucial to the Company's success. That the alleged scheme and misrepresentations go to the core of Lilium's business and viability bolster the inference of scienter.

286.     Further, Defendants were intimately involved in the Lilium Jet's design, testing, and certification processes and purported to, and did, have access to extensive knowledge regarding the same — information that directly contradicted their claims.

287.     In a July 14, 2020 blog published on Lilium's Website, Defendant Yemsi stated: "As Chief Program Officer at Lilium I have a responsibility for ensuring we have the procedures and policies in place to deliver an aircraft that meets the requirements for certification." Yet, according to an ex-employee quoted in the *Forbes* article, Defendant Yemsi's own projections showed that shooting for certification by 2024 would be extremely difficult. Further, CW1 told Defendant Yemsi that the certification timeline was unrealistic, but his concerns were dismissed.

---

[45] Aug. 5, 2021 Registration Statement at 178,

288.    According to the employees interviewed in the *Forbes* article, as well as CW1, Defendant Wiegand was extremely involved with the design of the Lilium Jet and had to approve every decision.

289.    In addition, according to CW1, the PDR process would have involved senior engineering leadership and program management. These individuals would have been privy to any reports or findings issued because of that process.

290.    Finally, the Individual Defendants were all high-level corporate insiders, each of whom — by virtue of his high-level position — directly participated in the management of the Company, was directly involved in the day-to-day operations of Lilium at the highest levels, was directly or indirectly involved in the oversight or implementation of the Company's internal controls, and was privy to confidential information concerning the Company and its business, operations, practices, financial statements, and financial condition, including the misstatements alleged herein. Because of the Individual Defendants' positions, they possessed the power and authority to, and did, control and monitor the contents of Lilium's SEC filings, press releases, presentations, and other public statements during the Class Period made and disseminated to investors, securities analysts, money and portfolio managers and institutional investors (*i.e.*, the market), and/or approved or ratified these statements. Many of them signed and/or certified the Company's Class Period 10-Qs and 10-K, and also regularly issued releases and spoke about the Lilium Jet's capabilities and the Company's progress toward certification. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is primarily liable for the false and misleading statements and omissions and wrongful conduct pleaded herein.

### G.      Terminations of Wiegand and Richardson Support Scienter

291.    Not long after Defendants revealed the significant design changes being made to the Lilium Jet, as well as the push back of projected certification, on June 1, 2022, Defendant Wiegand — the founder of the Company — was replaced as CEO by Klaus Roewe.

292.    Further, on January 15, 2023, the Company announced that Defendant Richardson, who had just joined the Company in November 2020, primarily to assist with fundraising, had "stepped down" to "pursue another opportunity."

### H.      Corporate Scienter

293.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, because all of the wrongful acts complained of herein were carried out within the scope of their employment.

294.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

### PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

295.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the scheme or any of the allegedly materially false and misleading statements pleaded herein. Many of the statements were regarding present or past events, or were mixed statements of past/present and future conditions — and thus were not forward-looking. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. The SEC has also suggested that the safe harbor provision of the PSLRA does not apply to statements made in the context of a de-SPAC

business combination, just as the provision does not apply to a traditional IPO (*see* 15 U.S.C. § 77z-2(b)(2)(D)).[46]

296.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

### THE PRESUMPTION OF RELIANCE

297.     Plaintiff and other members of the Class are entitled to a presumption of reliance on Defendants' material misrepresentations, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The misrepresentations and omissions were material;

(c) Lilium's securities were actively traded in an efficient market on the NASDAQ;

(d) Lilium's securities were liquid and traded with moderate to high weekly volumes;

(e) As a regulated issuer, Lilium filed periodic public reports with the SEC;

(f) Lilium was eligible to file registration statements with the SEC on Form S-3 or F-3;

(g) Lilium regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(h) The market reacted promptly to public information disseminated by Lilium;

---

[46] https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws

(i) Lilium was covered by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(j) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Lilium common stock; and

(k) Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased or acquired Lilium securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

298.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

299.    Alternatively, Defendants corrupted the market for Lilium securities through a course of conduct that misled the market as to the value of Lilium securities. To the extent that these Defendants disrupted the integrity of the market for Lilium securities, Plaintiff and members of the Class are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972).

## SHORT SELLERS SERVE A VITAL ROLE IN THE PUBLIC MARKETS

300.    Plaintiff's allegations that Lilium Jet and its battery technology were not viable at all relevant times, and that Lilium was incapable of achieving certification of the Lilium Jet for flight within two years (as it claimed), are well supported. Lead Counsel conducted its own extensive research and investigation with the assistance of outside investigators. The investigation, which included an interview of a well-placed former employee, independently confirms and corroborates certain facts set forth in the Iceberg Reports.

301.     Iceberg Research is a financial-analysis and investment firm that uses in-depth research to identify under- and over-valued investments. While Iceberg takes both long and short positions, it specializes in identifying corporate fraud.[47]

302.     Iceberg's research is routinely substantiated and relied upon by later governmental investigations, fines, or sanctions; earnings revisions; officer resignations; and bankruptcies. In February 2015, Iceberg published a report exposing the commodities-trading enterprise Noble Group's overvaluation of long-term contracts by more than $3.8 billion. Iceberg's founder Arnaud Vagner did not hold a short position in Noble and published his research for free. Following the publication of Iceberg's report, Noble's CEO Yusuf Alireza resigned in May 2016. Noble was forced to restructure $3.5 billion in debt in January 2018. Noble filed for bankruptcy protection in July 2020, and in August 2022, the Monetary Authority of Singapore imposed a civil penalty of approximately $9.1 million on Noble's successor "for publishing misleading information in its financial statements" relating to the overvalued contracts first identified by Iceberg.[48]

303.     Additional examples of Iceberg's published reports corroborated by later developments include: Iceberg's publication of a report in April 2022 regarding Rockley Photonics Holdings Ltd. ("Rockley"), detailing its technological roadblocks, cash crunch, and heavy dilution. In January 2023, Rockley filed for Chapter 11 bankruptcy protection; Iceberg published a report in April 2021 regarding Eqonex Ltd., detailing the crypto firm's dubious transaction history and corporate governance red flags. Thereafter, Equonex closed its primary crypto-exchange and filed for judicial management in Singapore in November 2022; In November 2021, Iceberg published

---

[47] *See, e.g.*, https://iceberg-research.com/about/,
https://twitter.com/IcebergResear/status/1452976503755472910?s=20.

[48] *See* https://www.mas.gov.sg/regulation/enforcement/enforcement-actions/2022/singapore-authorities-take-actions-against-noble-group-limited-and-former-directors-of-noble-resources-international-pte-ltd.

a report regarding Hyzon Motors Inc, detailing dubious transactions with customer Shanghai HongYun. Thereafter, in January 2022, Hyzon received a subpoena from the SEC. *See* 01/12/22 Hyzon Form 8-K.

304.    Short sellers like Iceberg serve a vital role in maintaining the efficiency of the public debt and equity markets. Ample empirical evidence shows "short sellers are informed traders who are able to anticipate changes in future aggregate cash flows and associated changes in future market returns." David E. Rapach, Matthew C. Ringgenberg & Guofo Zhou, *Short Interest and Aggregate Stock Returns*, 21 J. Fin. Econ. 46 (2016); *id.* at 47 (finding short interest "substantially outperforms all of the popular predictors at quarterly, semi-annual, and annual horizons" and that "forecasts based on [short interest] have superior information content relative to forecasts based on popular predictors"). Indeed, a recent study found strong evidence that "[s]hort selling, and negative activism, are associated with informational efficiency through long-term share price declines; long-term decreases in company operational performance; class action lawsuits; regulatory actions; and executive turnover, financial restatements, and auditor changes. Strong normative arguments can be made in support of each of these outcomes, stressing the real benefits that short selling can provide." Peter Molk & Frank Partnoy, *The Long-Term Effects of Short Selling and Negative Activism*, 2022 U. Ill. L. Rev. 1, 53 (2022); *id.* at 63 ("Our analysis suggests that negative activists play a more important role than has previously been understood."); *see also* Barbara A. Bliss, Peter Molk & Frank Partnoy, *Negative Activism*, 97 Wash. U. L. Rev. 1333, 1335 (2020) ("[I]nformational negative activism occurs in a variety of ways, with different types of allegations, but is consistently associated with long-run negative returns.")

305.    Columbia Law School Professor John C. Coffee, Jr., a prominent securities law scholar (and a proponent of increased short-seller disclosure requirements), has acknowledged that

"[i]f you want to detect fraud, forget the accountants and contact your local short sellers; they are the real detectives today…." John C. Coffee, Jr., *Activist Short Selling Today: The Two Sides of the Coin*, CLS Blue Sky Blog (July 7, 2020). Examples of historic frauds uncovered by short sellers include Enron Corp. ("Enron") and Valeant Pharmaceuticals International, Inc. ("Valeant"), which eventually resulted in, respectively, the largest and tenth largest securities class action settlements to date.

306.    The Iceberg Reports in this case embody all the touchstones of reliability that courts typically look to when assessing the sufficiency of allegations. First, the Iceberg Reports are not anonymous. They were published on Iceberg's website and attributed to Iceberg. Vagner revealed himself to be the founder and principal of Iceberg and has been its public face for years. Second, the Iceberg Reports do not predominantly rely on confidential or anonymous sources. While the March 14, 2022, Iceberg Report references two unnamed experts, "an aerospace specialist and former Lilium employee," in order "to get a sense of the problems with Lilium's aircraft," it does name expert Ella Atkins an aerospace engineering professor from the University of Michigan, who expressed doubt in Lilium's ability to certify its complicated jet design in the timeline it communicated. The follow-up August 31, 2022, Iceberg Report names its primary expert source, German aeronautics expert Professor Volker Gollnick, to corroborate Iceberg's findings and analyze Lilium's White Paper. According to the August 31, 2022 Report, Professor Gollnick spoke to the aeronautics professors named in Lilium's White Paper and learned, first-hand, that those professors did not agree with Lilium's numerical assumptions with respect to battery capacity, hover time, and range.

307.    Plaintiff's independent investigation is corroborative of the Iceberg Reports, moreover, as CW1, a well-placed former Lilium employee with first-and knowledge, was both

"shocked" at "how low" the range of the prototype Phoenix was and also confirmed Lilium was incapable of achieving flight certification within two years. In fact, CW1 stated that he did not believe Defendants even knew what was required to achieve flight certification.

### CONTROL PERSON ALLEGATIONS

308.     The Individual Defendants, by virtue of their high-level and controlling positions at Qell and Lilium, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the actions, individually and in concert, of these individuals.

309.     Defendant Engle, in his role as CEO of Qell and subsequently as a Board Member of Lilium N.V., and Defendants Wiegand, Richardson, Yemsi, and McIntosh, as executives of Lilium GmbH and subsequently executives of Lilium N.V., were participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased or otherwise acquired Lilium common stock during the Class Period. The scheme/course of conduct deceived the investing public regarding Lilium's business, operations, financial condition, and the intrinsic value of Lilium's common stock, and caused Plaintiff and other members of the Class to purchase or otherwise acquire Lilium common stock at artificially inflated prices.

310.     Defendants Engle, Wiegand, Richardson, Yemsi, and McIntosh each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, and financial condition, so that the market price of Lilium's publicly traded common stock would be based on accurate information. The Individual Defendants

each violated these requirements and obligations during the Class Period. Defendants were also under a continuing duty to update and/or correct any false or misleading statements alleged herein.

311.    The Individual Defendants, because of their positions of control and authority, were able to and did control the content of the Company's SEC filings, press releases, and other public statements issued by or on behalf of Lilium and/or Qell during the Class Period. Each would have been provided with copies of at least some of the statements made in the SEC filings other public statements at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

312.    Each of the Individual Defendants similarly made materially false or misleading statements, or omitted material facts necessary to make their statements not misleading, in proxy documents filed with the SEC. Because of their positions of control and authority, the Individual Defendants were able to and did control the content of these proxy documents. Accordingly, the Individual Defendants are responsible for the accuracy of the statements in the proxy documents.

313.    Defendant Engle, in his role as CEO of Qell and prospective Director of Lilium N.V., and as the signatory to the Registration Statement, and Defendant Wiegand, who was named in the Registration Statement as a prospective Director of Lilium N.V., had a duty to make a reasonable investigation into the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading.

## CLASS ACTION ALLEGATIONS

314.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who: (i) purchased or

otherwise acquired publicly traded Lilium securities between March 30, 2021 and March 14, 2022, inclusive; (ii) were shareholders of Qell as of the July 16, 2021 Record Date who were entitled to vote on Qell's proposed merger with Lilium; and/or (iii) purchased or otherwise acquired Lilium securities pursuant or traceable to the Registration Statement and the SEC filings incorporated therein by reference. Excluded from the Class are Defendants, the officers and directors of Lilium and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

315.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lilium securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. As of December 31, 2021, Lilium had approximately $261 million shares of common stock outstanding. Record owners and the other Class Members may be identified from records maintained by Lilium and/or its transfer agents and may be notified on the pendency of this Action by using a form of notice similar to that customarily used in securities class actions.

316.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' misrepresentations and wrongful conduct in violation of federal law that is complained of herein.

317.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

318.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act and the Securities Act were violated by Defendants' misrepresentations and omissions, acts, deceptive devices, and fraudulent scheme as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants caused the Company to issue materially false and misleading filings during the Class Period;

(d) whether Defendants acted knowingly, recklessly, or negligently in issuing materially false and misleading filings;

(e) whether the prices of Lilium securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

319.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### For Violations of §10(b) of the Exchange Act and
### Rule 10b-5(a) and (c) Promulgated Thereunder
### Against All Defendants

320.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

321.     As alleged above, throughout the Class Period, Defendants, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of any national securities exchange, carried out a plan, scheme, and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate, and maintain the market for, and market prices of, Lilium securities; and (iii) cause Plaintiff and the other members of the Class to purchase Lilium securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants took the actions alleged above in contravention of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated by the SEC.

322.     Defendants employed manipulative or deceptive devices and contrivances, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Plaintiff and Class members as to the success and viability of Lilium's business and its eVTOL, and to garner the investor support necessary to effectuate the highly lucrative SPAC merger by, in particular, (i) participating, directly and indirectly, in the preparation, approval, issuance, and dissemination of the false and misleading statements and documents referred to above, including in filings with the SEC, conference calls, and investor presentations; and (ii) engaging in a scheme to misrepresent the operations and results of Lilium, and to maintain and inflate the prices of Lilium securities.

323.     As described above, Defendants engaged in the fraudulent activity described herein knowingly and intentionally, or in such a severely reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased Lilium securities during the Class Period. Thus, Defendants acted with scienter and are liable under Section 10(b) and Rule 10b-5(a) and (c).

324.     Defendants' fraudulent activities occurred in connection with the purchase or sale of Lilium securities.

325.     In ignorance of Defendants' fraudulent conduct and relying directly or indirectly on the integrity of the market price for Lilium securities, Plaintiff and the other members of the Class purchased or acquired Lilium securities at artificially inflated prices during the Class Period.

326.     But for Defendants' fraud, Plaintiff and Class members would not have purchased or acquired Lilium securities at artificially inflated prices, or at all.

327.     The market prices for Lilium securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by Defendants, as described above.

328.     As a direct and proximate cause of Defendants' wrongful conduct as set forth in this Count, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Lilium securities during the Class Period.

### COUNT II
**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder
<u>Against All Defendants</u>**

329.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

330.     During the Class Period, Defendants, individually and in concert, directly or indirectly, violated Rule 10b-5(b) in that they made or approved the false statements specified above, which they knew or were severely reckless in not knowing were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

331.     Defendants acted with scienter in that they knew or were severely reckless in not knowing that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew that such statements or documents would be issued or made to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Lilium's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning the Company, participated in the fraudulent conduct alleged herein.

332.   Individual Defendants, who are or were the senior officers and/or directors of the Company and/or the SPAC with which it merged, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with severe reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Lilium personnel to members of the investing public, including Plaintiff and the Class.

333.   As a result of the foregoing, the market price of Lilium securities was artificially inflated during the Class Period. Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Lilium securities during the Class Period in purchasing Lilium securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

334.   Had Plaintiff and the other members of the Class been aware that the market price of Lilium's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Lilium's securities at such artificially inflated prices, if at all.

335.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

336.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Lilium's securities during the Class Period.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**<u>Against Defendants Engle, Wiegand, Richardson, Yemsi, and McIntosh</u>**

337.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

338.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Lilium's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

339.     As officers of a publicly owned company, Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lilium's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

340.     Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases, statements to the media, and public filings which Lilium disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Individual Defendants, therefore, were "controlling persons"

of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lilium securities.

341.    Due to the above conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT IV**
**For Violation of Section 11 of the Securities Act**
**Against Defendants Lilium N.V. (f/k/a Lilium B.V.), Qell Acquisition Corp., Engle and Wiegand**

342.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiff or members of the Class. In the alternative, if the Court finds fraudulent intent to be an element of this claim, Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

343.    This count is asserted against Defendants Lilium, Qell, Engle, and Wiegand for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiff and all members of the Class who purchased or otherwise acquired Lilium securities pursuant or traceable to the Registration Statement.

344.    The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

345.     Lilium N.V., f/k/a Lilium B.V. (a holding company owned by Qell), was the issuer of the stock issued via the Registration Statement. As such, Lilium is strictly liable for each false and misleading statement contained therein.

346.     Alternatively, Defendant Qell Acquisition Corp. was the issuer of the stock issued via the Registration Statement. As such, Qell is strictly liable for each false and misleading statement contained therein.

347.     Defendants Lilium, Qell, Engle, and Wiegand were responsible for the contents and dissemination of the Registration Statement. Defendant Engle was the signatory to the Registration Statement, and Defendant Wiegand was named in the Registration Statement as a Director of the post-Merger company. Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading. As such, each of these Defendants are liable to Plaintiff and the Class.

348.     By reason of the conduct alleged herein, Defendants violated § 11 of the Securities Act. Plaintiff and the Class members purchased common stock pursuant or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations. At the time of their purchases, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

349.     Because of the foregoing, Plaintiff and the members of the Class are entitled to damages under Section 11 of the Securities Act.

350.     This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

**COUNT V**
**For Violation of Section 12(a)(2) of the Securities Act**
**Against Lilium N.V. (f/k/a Lilium B.V.) and Qell Acquisition Corp.**

351.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiff or members of the Class. In the alternative, if the Court finds fraudulent intent to be an element of this claim, Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

352.     This count is asserted against Defendants Lilium and Qell, for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l.

353.     By means of the defective Prospectus, Lilium and Qell promoted and sold Lilium/Qell securities to Plaintiff and the Class.

354.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants Lilium and Qell owed Plaintiff and the other members of the Class who purchased Lilium/Qell securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation into the statements contained in the

Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

355.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs purchased or otherwise acquired Lilium/Qell securities.

356.     By reason of the conduct alleged herein, Defendants Lilium and Qell violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Lilium/Qell securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the securities.

357.     Plaintiff and members of the Class hereby tender their securities to the sellers and seek rescission to the extent that they continue to own such securities. Class members who have sold their Lilium/Qell securities seek damages to the extent permitted by law.

**COUNT VI**
**For Violation of Section 15 of the Securities Act**
**Against Defendants Engle and Wiegand**

358.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiff or members of the Class. In the alternative, if the Court finds fraudulent intent to be an element of this claim, Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

359.     This count is asserted against the Defendants Engle and Wiegand and is based upon Section 15 of the Securities Act. As alleged herein, a primary violation of the Securities Act occurred, in that Defendants engaged in conduct in violation of Section 11 of the Securities Act.

360.     Defendants Engle and Wiegand, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, Controlling Persons of Lilium/Qell within the meaning of Section 15 of the Securities Act. Defendants had the power and influence and exercised the same to cause Lilium/Qell to engage in the acts described herein. Defendants Engle and Wiegand were culpable participants in the violations of §§ 11 of the Securities Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Registration Statement, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

361.     Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact and omissions of material facts in the Registration Statement when they purchased or acquired Lilium/Qell securities.

362.     By virtue of the conduct alleged herein, Defendants Engle and Wiegand are liable for the wrongful conduct alleged herein and are liable to Plaintiff and the Class for damages.

**COUNT VII**
**For Violations of §14(a) of the Exchange Act and**
**Rule 14a-9 Promulgated Thereunder**
**Against Defendants Lilium N.V. (formerly Lilium B.V.), Qell Acquisition Corp., Engle,**
**Wiegand, Richardson, Yemsi, and McIntosh**

363.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count. To the extent that these allegations incorporate factual

allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiff or members of the Class. In the alternative, if the Court finds fraudulent intent to be an element of this claim, Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

364.   Defendants had a legal obligation not to solicit a proxy with false or misleading statements or omissions nor to associate themselves with a proxy containing false or misleading statements or omissions.

365.   The Proxy and documents attached thereto, incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

366.   Defendants solicited and/or permitted use of their names in solicitations contained in the Proxy documents described above.

367.   By means of the Proxy and documents attached thereto, incorporated by reference therein, and other solicitations described above, Defendants sought to secure Plaintiff's and other Class members' approval of the Business Combination and solicited proxies from Plaintiff and other members of the Class.

368.   Each Defendant named in this Count acted at least negligently by associating himself with a false or misleading Proxy and/or in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by additional material

information which arose after the dissemination of these statements and before the vote on the Business Combination.

369. The solicitations described herein were essential links in the accomplishment of the Business Combination.

370. Plaintiff and the Class members purchased or acquired Lilium securities pursuant or traceable to the Registration Statement/Proxy/Prospectus and have sustained damages as a result. Additionally, without access to complete material information, Plaintiff and the Class Members voted to approve the Merger between Lilium GmbH and Qell based on the August 5, 2021 Proxy and the Proxy Documents — thereby impairing their redemption rights, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein. The value of the stock has declined substantially subsequently due to Defendants' violations. These injuries were exclusive to shareholders and not inflicted on the Company.

371. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action,

including counsel fees and expert fees; and

       (d) awarding Plaintiff and other members of the Class such other and further relief as the

Court may deem just and proper.

## **JURY TRIAL DEMANDED**

       Plaintiff hereby demands a trial by jury.

Dated: March 10, 2023                  Respectfully submitted,

                                  **THE WHITEHEAD LAW FIRM, L.L.C.**

                                  */s/ C. Mark Whitehead III*
                                  C. Mark Whitehead III
                                  (FL Bar Roll #559881)
                                  1330 West Avenue, Suite C402
                                  Miami Beach, FL 33139
                                  Telephone: (337) 740-6006
                                  Facsimile: (337) 205-7754
                                  cmw@whiteheadfirm.com

                                  *Local Counsel for Lead Plaintiff Jonathan Coon*

                                  **KAHN SWICK & FOTI, LLC**

                                  Kim E. Miller
                                  250 Park Ave., 7th Floor
                                  New York, NY 10177
                                  Telephone: (504) 455-1400
                                  Facsimile: (504) 455-1498
                                  kim.miller@ksfcounsel.com

                                  -and-

                                  Lewis S. Kahn
                                  Craig J. Geraci, Jr.
                                  1100 Poydras Street, Suite 960
                                  New Orleans, Louisiana 70163
                                  Telephone: (504) 455-1400
                                  Facsimile: (504) 455-1498
                                  lewis.kahn@ksfcounsel.com
                                  craig.geraci@ksfcounsel.com

                                  *Lead Counsel for Lead Plaintiff Jonathan Coon and the Class*

123

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 10, 2023, I authorized the electronic filing of the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ C. Mark Whitehead III*
C. Mark Whitehead III
