**THE WHITEHEAD LAW FIRM, L.L.C.**
C. Mark Whitehead III
(FL Bar Roll #559881)
cmw@whiteheadfirm.com
1330 West Avenue, Suite C402
Miami Beach, FL 33139
Telephone: (337) 740-6006
Facsimile: (337) 205-7754
*Local Counsel for Lead Plaintiff Jonathan Coon*

**KAHN SWICK & FOTI, LLC**
Kim E. Miller (admitted phv)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
*Lead Counsel for Lead Plaintiff Jonathan Coon*
*and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.: 23-CV-80232-ROSENBERG/REINHART**
**Class Action / Jury Trial Demanded**

MANIRAJ ASHIRWAD GNANARAJ,
Individually and on behalf of all others similarly
situated,
      Plaintiff,

    v.

LILIUM N.V. F/K/A QELL ACQUISITION
CORP., BARRY ENGLE, DANIEL
WIEGAND, and GEOFFREY RICHARDSON,

          Defendants.

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**TABLE OF CONTENTS**

Page

I.  PRELIMINARY STATEMENT ...................................................................................................... 1

II. FACTUAL BACKGROUND ........................................................................................................ 2

III. ARGUMENT ............................................................................................................................... 5

    A.  Applicable Pleading Standards ............................................................................................ 5

        1.  Motions to Dismiss ...................................................................................................... 5

        2.  Materials Not Referenced in the Complaint ................................................................. 5

        3.  CW1 is a Credible Witness ......................................................................................... 6

    B.  Plaintiff Adequately Pleads Section 10(b) Claims.............................................................. 7

        1.  Plaintiff Adequately Pleads Materially False or Misleading Statements and Omissions.......................................................................................................... 7

            a.  Defendants' Canned Arguments to Challenge Falsity are Inapplicable ................. 9

                i.   The PSLRA's Safe Harbor Does Not Apply ..................................................... 9

                ii.  The Alleged Material Misrepresentations and Omissions are Not Inactionable Opinion............................................................................. 10

            b.  Defendants' Statements Were Not Forward Looking........................................... 12

            c.  Defendants' Cautionary Language Was Not Meaningful..................................... 13

            d.  Defendants had Actual Knowledge of Falsity ..................................................... 14

        2.  Plaintiff Adequately Pleads Scienter ......................................................................... 16

        3.  Plaintiff Adequately Pleads Loss Causation.............................................................. 17

            a.  Pleading Standard ................................................................................................ 17

            b.  The Iceberg Report is a Corrective Disclosure.................................................... 18

            c.  Disaggregation is Unnecessary at This Stage ..................................................... 19

    C.  Plaintiff has Adequately Pled Scheme Liability ............................................................... 20

    D.  Plaintiff Adequately Pleads Section 14(a) Claims............................................................ 21

        1.  Neither Heightened Pleading Nor Scienter Are Required ........................................... 21

        2.  The Complaint Adequately Pleads Causation for Section 14 Claims......................... 23

    E.  Plaintiff Adequately Pleads Securities Act Claims........................................................... 24

    F.  Control Person Liability Claims ........................................................................................ 25

    G.  Leave to Amend................................................................................................................. 25

IV. CONCLUSION........................................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abramowitz v. Westport Nat'l Bank*,
No. 09-cv-60510, 2009 U.S. Dist. LEXIS 140996 (S.D. Fla. Nov. 4, 2009) ........................... 16

*Alaska v. Ryder Sys.*,
603 F. Supp. 3d 1229 (S.D. Fla. 2022) ................................................................................... 25

*Alphabet Sec. Litig., R.I. v. Alphabet, Inc.*,
1 F.4th 687 (9th Cir. 2021) ...................................................................................................... 20

*Barron v. Lampley*,
No. 15-cv-38, 2015 U.S. Dist. LEXIS 199793 (N.D. Ga. June 21, 2015) ................................ 15

*Baum v. Harman Int'l Indus.*,
575 F. Supp. 3d 289 (D. Conn. 2021) ................................................................................ 22, 23

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) ................................................................................................... 22

*Bellocco v. Curd*,
No. 02-cv-1141, 2005 U.S. Dist. LEXIS 24251 (M.D. Fla. Oct. 20, 2005) ............................. 13

*Biver v. Nicholas Fin., Inc.*,
No. 14-cv-250, 2014 U.S. Dist. LEXIS 73933 (M.D. Fla. May 30, 2014) ............................... 23

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 3d 223 (S.D.N.Y. 2012) ................................................................................ 22, 23

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) .................................................................................................. 5

*Burger King Corp. v. Weaver*,
169 F.3d 1310 (11th Cir. 1999) ................................................................................................ 25

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ..................................................................................................... 19

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) .................................................................................... 11, 12, 13

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
No. 17-cv-10014, 2019 U.S. Dist. LEXIS 26962 (S.D.N.Y. Feb. 19, 2019) ........................... 19

*City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mort. Holdings Inc.*,
No. 15-cv-61170, 2016 U.S. Dist. LEXIS 195953 (S.D. Fla. June 20, 2016) .......................... 24

*City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs.*,
No. 17-cv-2207, 2018 U.S. Dist. LEXIS 147801 (N.D. Ga. May 15, 2018) ............................ 18

*De Vito v. Liquid Holdings Grp., Inc.*,
No. 15-cv-6969, 2018 U.S. Dist. LEXIS 217963 (D.N.J. Dec. 31, 2018) ............................... 19

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................................................... 17

*Einhorn v. Axogen, Inc.*,
  42 F.4th 1218 (11th Cir. 2022) .................................................................................. 11, 12

*Employees' Ret. Sys. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ............................................................................................. 7

*Enzo Biochem, Inc. v. Harbert Discovery, Fund, LP*,
  No. 20-cv-9992, 2021 U.S. Dist. LEXIS 185730 (S.D.N.Y. Sept. 27, 2021) .................... 22, 23

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ......................................................................................................... 22

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ................................................................................... 7, 16

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................. 21, 22, 23

*Gould v. Am.-Haw. S.S. Co.*,
  535 F.2d 761 (3d Cir. 1976) ............................................................................................. 22

*Happy Tax Franchising LLC v. Hill*,
  No. 19-cv-24539, 2023 U.S. Dist. LEXIS 2711 (S.D. Fla. Jan. 5, 2023) ................................ 20

*Harvey M. Jasper Retirement Trust v. Ivax Corp.*,
  920 F. Supp. 1260 (S.D. Fla. 1995) ................................................................................... 22

*Herman & Maclean v. Huddleston*,
  459 U.S. 375 (1983) .................................................................................................. 15, 24

*In re Acuity Brands Sec. Litig.*,
  No. 18-cv-2140, 2019 U.S. Dist. LEXIS 231099 (N.D. Ga. Aug. 12, 2019) .......................... 13

*In re Ambac Fin. Gp.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................................................ 21

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
  No. 17-cv-1545, 2019 U.S. Dist. LEXIS 153297 (S.D.N.Y. Sept. 9, 2019) ........................... 21

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................................................ 24

*In re Downey Sec. Litig.*,
  No. 08-cv-3261, 2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009) ............................ 6

*In re Envision Healthcare Corp.*,
  No. 18-cv-1068, 2019 U.S. Dist. LEXIS 128237 (D. Del. Aug. 1, 2019) .............................. 24

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) .............................................................................. 13

*In re KLX, Inc. Sec. Litig.*,
  232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) ...................................................................... 5

iii

*In re McKesson HBOC, Inc. Secs. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................... 22

*In re Pegasus Wireless Corp. Sec. Litig.*,
  657 F. Supp. 2d 1320 (S.D. Fla. 2009) .................................................................... 16

*In re Refco*, *Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................. 21, 24, 25

*In re Royal Caribbean Cruises Ltd.*,
  No. 11-cv-22855, 2013 U.S. Dist. LEXIS 94156 (S.D. Fla. Apr. 18, 2013) ........................ 6, 17

*In re Smith Gardner Sec. Litig.*,
  214 F. Supp. 2d 1291 (S.D. Fla. 2002) .................................................................... 16

*In re STEC Inc. Sec. Litig.*,
  No. 09-cv-1304, 2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) ............................ 10

*In re Teva Sec. Litig.*,
  No. 17-cv-558, 2023 U.S. Dist. LEXIS 75063 (D. Conn. May 1, 2023)................................ 17

*In re Willis Towers Watson PLC Proxy Litig.*,
  439 F. Supp. 3d 704 (E.D. Va. 2020) ...................................................................... 22

*Jacoby v. Sendtec, Inc.*,
  No. 06-cv-61327, 2007 U.S. Dist. LEXIS 110950 (S.D. Fla. June 12, 2007)......................... 17

*Kiley v. Medfirst Consulting Healthcare Staffing, LLC*,
  No. 17-cv-1756, 2019 U.S. Dist. LEXIS 212313 (N.D. Ala. Dec. 10, 2019) .......................... 25

*Kinnett v. Strayer Educ., Inc.*,
  No. 10-cv-2317, 2012 U.S. Dist. LEXIS 37737 (M.D. Fla. Jan. 3, 2012)............................. 16

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013)............................................................................ 11

*Knollenberg v. Harmonic, Inc.*,
  152 F.App'x 674 (9th Cir. 2005) ......................................................................... 22

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019).................................................................................. 20

*Luczak v. Nat'l Bev. Corp.*,
  812 F. App'x 915 (11th Cir. 2020) .............................................................. 7, 17, 18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................................. 1

*Masel v. Villarreal*,
  924 F.3d 734 (5th Cir. 2019) ............................................................................. 7

*Mazzeo v. Nature's Bounty, Inc.*,
  No. 14-cv-60580, 2014 U.S. Dist. LEXIS 159345 (S.D. Fla. Nov. 10, 2014) ......................... 24

*Metro. Transp. Auth. Defined Ben. Pension Plan Master Tr. v. Welbilt, Inc.*,
  No. 18-cv-3007, 2020 U.S. Dist. LEXIS 33664 (M.D. Fla. Feb. 6, 2020).............................. 19

iv

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...................................................................................... 18

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ........................................................................................ 6

*Murdeshwar v. Search Media Holdings, Ltd.*,
  No. 11-cv-20549, 2011 U.S. Dist. LEXIS 158193 (S.D. Fla. Aug. 8, 2011) ........................... 22

*NJ v. Sprint Corp.*,
  531 F. Supp. 2d 1273 (D. Kan. 2008) ............................................................................... 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ....................................................................................................... 11

*Pritchard v. Apyx Med. Corp.*,
  No. 19-cv-919, 2020 U.S. Dist. LEXIS 42627 (M.D. Fla. Mar. 11, 2020) ............................. 14

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................................ 24

*Rombach v. Chang*,
  No. 00-cv-0958, 2002 U.S. Dist. LEXIS 15754 (E.D.N.Y. June 7, 2002) ............................... 25

*RYH Props., LLC v. West*,
  No. 08-cv-172, 2009 U.S. Dist. LEXIS 142349 (E.D. Tex. Aug. 3, 2009) .............................. 10

*Saltzberg v. TM Sterling/Austin Assocs.*,
  45 F.3d 399 (11th Cir. 1995) ........................................................................................... 13

*Sapssov v. Health Mgmt. Assocs.*,
  608 F. App'x 855 (11th Cir. 2015) ................................................................................... 19

*Schultz v. Applica*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007) ............................................................................. 12

*SEC v. Complete Bus. Sols. Grp.*,
  538 F. Supp. 3d 1309 (S.D. Fla. 2021) ........................................................................ 20, 25

*SEC v. K.W. Brown & Co.*,
  555 F. Supp. 2d 1275 (S.D. Fla. 2007) ............................................................................. 16

*SEC v. Revolutionary Concepts, Inc.*,
  No. 21-10984, 2022 U.S. App. LEXIS 3591 (11th Cir. 2022) .............................................. 14

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) .............................................................................................. 13

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d. Cir. 2010) ........................................................................................... 10

*Sony Music Ent'mt v. Vital Pharms., Inc.*,
  No. 21-cv-22825, 2022 U.S. Dist. LEXIS 183358 (S.D. Fla. Sept. 14, 2022) ........................ 24

*Stone v. Ritter*,
  911 A.2d 362 (Del. 2006) ............................................................................................... 16

v

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................... 16, 23

*Theodore v. Purecycle Techs., Inc.*,
    No. 21-cv-809, 2022 U.S. Dist. LEXIS (M.D. Fla. August 4, 2022) ................................ 17, 18

*Todd v. STAAR Surgical Co.*,
    No. 14-cv-5263, 2016 U.S. Dist. LEXIS 186511 (C.D. Cal. Apr. 12, 2016) ............................ 7

*Wagner v. First Horizon Pharm. Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ................................................................................... 24

*Waterford Twp. Gen. Emples. Ret. Sys. v. BankUnited Fin. Corp.*,
    No. 18-cv-22572, 2010 U.S. Dist. LEXIS 30955 (S.D. Fla. Mar. 30, 2010) ........................... 17

*Wiand v. EFG Bank*,
    No. 10-cv-241, 2012 U.S. Dist. LEXIS 30323 (M.D. Fla. Feb. 8, 2012) ................................ 15

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988) ........................................................................................ 22

**Statutes**

15 U.S.C. § 78u-4 ........................................................................................... 7, 16, 22

15 U.S.C. § 78u-5 ................................................................................................. 9, 10

**Rules**

Fed. R. Civ. P. 12(d) .................................................................................................. 5

Fed. R. Civ. P. 8(a)(3) .............................................................................................. 15

Fed. R. Civ. P. 8(d)(2) ............................................................................................. 15

**Other Authorities**

John Coates, *SPAC Law and Myths*, 78 Bus. Law. 371 (Spring 2023) ....................................... 10

John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, April 8, 2021 ............ 10

Sec. Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44722 (Aug. 3, 2005).... 10

## I.    PRELIMINARY STATEMENT[1]

The core premise of this Action is simple: in their public statements, Defendants differentiated Lilium in the nascent eVTOL industry (think flying taxi) by misrepresenting, among other things, that the Lilium Jet had superior battery technology and that it was closer to commercialization than its numerous peers, both of which would provide better and quicker returns for investors. This wasn't true. Nor do Defendants really argue that it was. Incredibly, Defendants readily admit in their Brief that they had no basis whatsoever for moving up their Jet's commercialization timeline from 2025 to 2024, conceding, "There is no possible way that Plaintiff—or Defendants, or the Court—could know how difficult it would be to certify the Lilium Jet, because EASA and FAA themselves have not yet finalized regulations." Def. Br. at 15.

Instead, Defendants spin their own, more favorable narrative of Plaintiff's claims, written with various extraneous materials, complete with purportedly alleged misrepresentations not even appearing in the Complaint. In Defendants' tale, Plaintiff alleges that the entire project was hopeless, a fraud from the get-go, because Lilium could never build an airworthy vehicle. Then, after constructing this straw man pleading, they attack it with a series of arguments inapplicable to the Complaint that Plaintiff actually filed.

First, Defendants argue at length about successes in recent test flights. Yet, not once does Plaintiff ever allege that the Lilium Jet could never fly. Instead, Plaintiff's central allegation is that Lilium could not commence commercial operations when Defendants said they could, in large part because they did not have the battery technology they said they had. That the Lilium Jet might have flown in a test run two days ago has no relevance to Plaintiff's Class Period allegations. In essence, Defendants were faking it until they made it, which "is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

Second, Defendants spill much ink recasting themselves as bio-scientists engaged in clinical drug trials to convince the Court to apply more favorable caselaw. But this case has nothing to do with second-guessing Defendants' interpretations of clinical trial data (or any data for that matter). Here, Defendants unequivocally told the market they had "secured" battery technology

---

[1] All "¶__" references in this memorandum refer to paragraphs in the Amended Complaint for Violation of Federal Securities Law (the "Complaint") (ECF No. 74). All undefined terms have the meaning ascribed to them in the Complaint.

1

that did not yet exist, and failed to disclose the identity of their battery manufacturer, a company with a known history of lying about its technology, until after Iceberg Research revealed it.

Third, Defendants lean heavily into the PSLRA Safe Harbor without carrying their burden of explaining how it covers them in the first place. And even if it did (which it doesn't, because it excludes statements made in connection with an initial public offering), the Safe Harbor only protects forward-looking statements, not statements like, "We have secured battery technology that allows us to achieve our launch range of 150 miles," which is firmly rooted in historical fact.

After thoroughly complicating Plaintiff's allegations with an assortment of twisted characterizations, newly (and inappropriately) introduced "facts" from outside the Complaint, and inapposite case law, Defendants then attempt avoid liability by simply arguing the Complaint fails to plead loss causation. But their principal argument, that a short seller report can never reveal the truth underlying false statements, has been rejected time and again by federal courts across the country, including this Circuit.

## II.     FACTUAL BACKGROUND

Defendant Lilium is in the business of developing electric vertical takeoff and landing ("eVTOL") aircraft. ¶25. The eVTOL space is fiercely competitive, but in order to secure shareholder support leading up to a merger with a SPAC, Defendants repeatedly asserted that the Lilium Jet has several massive advantages over its competitors. In a series of investor presentations, Defendants explained that, rather than open rotors, the Lilium Jet relies on ducted fans embedded in the wings and front canards. ¶26. According to Defendants, these fans will produce less noise than competitor aircraft, allowing the Lilium Jet access to areas where noise ordinances would prohibit competitor traffic. ¶¶27-28. Additionally, Defendants claim the Lilium Jet will fly 155+ miles in a single trip (farther than any of Lilium's competitors) and seat six passengers and a pilot (two more than category frontrunner Joby). ¶¶50, 78. Importantly, Defendants also claimed that the Lilium Jet was on track to be first to market, with commercialization in 2024, leading to the Company becoming profitable by 2025. ¶¶50, 141.

Due to its ducted fan design, especially when coupled with the long range and high weight capacity promised by Defendants, the Lilium Jet requires a massive amount of power during the "hover" stage of the flight. ¶31. However, Defendants assured the public that this would not be a problem. First, Defendants represented that hover time would be very short: less than 60 seconds combined for takeoff and landing. ¶31. Second, Defendants repeatedly told investors that Lilium

had "secured" access to "advanced" batteries capable of 330 Wh/kg, 60 Wh/kg more than Lilium's competitors. ¶¶29, 86, 175-177. To support these claims, Lilium commissioned and disseminated a "White Paper" full of complex mathematical equations, authored by Patrick Nathen, one of Lilium's co-founders who attended university with Defendant Wiegand. ¶85. The White Paper prominently stated that it had been reviewed by five experts. ¶85. A key assumption in the White Paper was that the jet would be powered by batteries capable of more than 320 Wh/kg. ¶95.

Based on these claims, which were each repeated numerous times in Lilium's Registration Statement, the merger was approved by shareholders and effectuated, raising approximately $584 million in much-needed cash for the Company and conferring significant personal benefits, not available to ordinary investors, on the Individual Defendants. ¶3. In the week after Lilium stock began trading on the NASDAQ, the stock reached closing prices as high as $10.85/share. ¶251.

Soon after the merger, a research report published by Iceberg revealed that many of Lilium's claims were not true. ¶75. The report revealed for the first time that the source of Lilium's "advanced" batteries was Zenlabs Energy. As the Iceberg Report explained, Zenlabs' CEO, Sujeet Kumar, had been the CTO of Envia Systems, a defunct company that had been accused of misleading investors and customers about the capabilities of its batteries in 2013. ¶90. Envia had claimed to have a battery capable of delivering 400 Wh/kg of energy density, which attracted big name investors like General Motors (Defendant Engle's previous employer). *Id*. It was later revealed, however, that the cells could only hit this high energy density for three cycles, after which performance rapidly decreased, meaning the batteries had no value for use in electric vehicles, causing GM to end its contract with Envia, calling its statements "inaccurate and misleading." *Id*. Notably, Defendants do not mention Zenlabs or its CEO's history in their Brief.

Additionally, Iceberg spoke to experts who questioned Lilium's claims that the simplicity of their design would lead to a shorter than usual certification process. An aerospace engineering professor from the University of Michigan cited in the Iceberg Report noted that the ducted fan design was actually quite complicated, and that it would be very difficult to write software to account for the different levels of wear and tear across each of the ducted fans. ¶132. As such, combined with the fact that batteries capable of 330 Wh/kg were still many years from availability, Iceberg explained that the timeline to certification "is likely to stretch beyond 2024."

The Iceberg Report further revealed that Wiegand's alma matter, the Technical University of Munich, wanted no association with the Company: "They [Lilium and Wiegand] only wanted

3

the TU Munich label as a reference to further polish their image, presumably to attract investors. We vetoed the idea and insisted there should be no connection between the Lilium and the department. We don't want to have anything to do with such dubious things." ¶71.

After the Iceberg Report was filed, the price of Lilium Stock dropped approximately 34%, on unusually high trading volume. ¶252.

In a follow up report, Iceberg delved even further into the flaws with Lilium's narrative. First, it revealed that the five experts cited prominently on the first page of the White Paper had only reviewed the calculation *methodologies*; they did not agree with the author's numerical assumptions, critically undermining the conclusions in the paper (another fact left unaddressed in Defendants' Brief). ¶93. Iceberg also included a report written by Aeronautics Professor Volker Gollnick, which contained numerous findings seriously impugning the validity of the White Paper. ¶¶93, 97.[2] Professor Gollnick explained that batteries capable of 330 Wh/kg are still many years from availability for use in commercial applications.[3] ¶¶92, 94. Professor Gollnick found that, even if Lilium had access to batteries capable of 330 Wh/kg, the aircraft's range would likely not be anywhere near 155 miles. The White Paper used non-industry standards for calculating the weight of the battery package and the maximum and minimum charge of the batteries. ¶¶97, 101. Professor Gollnick also explained that the White Paper only assumed 60 seconds of time spent in the hover phase, which would not be enough for obstacle clearance in the urban areas in which Lilium planned to operate. ¶99. Based on "practical flight experience," Professor Gollnick stated, "[A]n overall hover flight time of approximately 2-3 minutes is more realistic for one mission." *Id*. Taking all these factors into consideration, even assuming batteries capable of 330 Wh/kg, a 5-seater Lilium Jet (which Professor Gollnick estimates would be approximately 1,153kg lighter than the 7-seater) would only have a range of about 11.8 miles. ¶102.

---

[2] Defendants claim that Professor Gollnick "changed his opinion on the Lilium Jet." Def. Br. at 9. While judicial notice of the article cited by Defendants is not appropriate (*see* § III.A.2), the opinions in the article are not incongruent with the allegations in the Complaint, which argues that commercialization of the Lilium Jet was not possible by 2024. *See* Defs. Ex. 10 ("The project still has ***quite a way to go***…"; "The maximum energy density ***possible today and in the near future*** is below what Lilium needed to achieve the specified range of 300 kilometers.") (emphasis added).

[3] Defendants claim that the use of the term "commercially available" is a concession by Plaintiff that Lilium had access to *proprietary* battery technology capable of powering the Lilium Jet. Def. Br. at 6-7. But as Plaintiff explains in the Complaint, while it may be possible to achieve levels of over 300 Wh/kg in a laboratory setting, such breakthroughs rarely manifest in the real world, as the high levels do not last beyond a few charging cycles. ¶92.

Post-class period statements by Lilium later confirmed much of the information in the Iceberg Report. First, in its annual report filed on March 30, 2022 (two weeks after the Iceberg Report was published), Lilium quietly revealed that it had changed its timeline back to 2025, essentially admitting that the 2024 timeline was never feasible. ¶276. This change in timeline was not mentioned in Lilium's earnings call for the same period, which took place on March 1, 2022. *Id*. Additionally, in a May 31, 2022 blog post, Lilium revealed that it had added traditional landing gear to its Jet to "giv[e] pilots a backup option of a short running landing," revealing a lack of confidence by Lilium that that 60 seconds of hover time would be enough to accomplish a vertical landing. ¶277. In the same blog post, Defendants confirmed that the source of its "advanced" batteries was Zenlabs. It also embedded a link to a report by third party reviewer, Energy Assurances, purportedly confirming that the Zenlabs battery was capable of over 300 Wh/kg. ¶278. However, this report revealed that Energy Assurances had tested the batteries for only two charging cycles, seriously calling into question whether the batteries would be similar to the ones developed for GM and would be able to maintain the same performance after repeated use. ¶91.

## III.   ARGUMENT

### A.   Applicable Pleading Standards

#### 1.   Motions to Dismiss

"Under Rule 12(b)(6), the Court accepts Plaintiffs' factual allegations as true and draws inferences from the Amended Complaint in the light most favorable to Plaintiffs." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) (Rosenberg, J.).

#### 2.   Materials Not Referenced in the Complaint

"In analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference into the complaint and other documents as to which the Court may take judicial notice." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d at 1275 (citation omitted). "[A] court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and ***not to prove the truth of the documents' contents***) of relevant public documents required to be filed with the SEC, and actually filed." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (emphasis added). If the court considers matters outside the complaint, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

In their Brief, Defendants rely heavily on documents not referenced in the Complaint and

not subject to judicial notice. These documents include Defendants' Exhibit 10 (November 26, 2022 *Der Spiegel* article); a March 31, 2023 LinkedIn post published *after* the Complaint was filed (Def. Br. at 9-10); articles cited by Defendants regarding short seller reports (Def. Br. at 5); and other articles not mentioned in the Complaint (Def. Br. at 2, 3). Defendants also cite a YouTube video that was not posted until after the Complaint was filed. Def. Br. at 2. Consideration of these materials is not appropriate.

### 3.      CW1 is a Credible Witness

In the Eleventh Circuit, "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008). However, "[c]onfidentiality [] should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id*.

Here, the Complaint readily meets such foundation requirements by specifying numerous details about CW1's position, including his title, job responsibilities, location, who he/she reported to, and the time period CW1 worked at the Company. ¶¶55-56. Far from "a junior employee without insight into the broader workings of the Company," Def. Br. at 16, CW1 had 15 years engineering experience at Boeing, one of the largest aircraft manufacturers in the world, before joining Lilium. ¶56. At the time of employment, CW1 worked at Lilium's headquarters in Munich, Germany, was just two steps removed from the Chief Engineer, and describes personally meeting and sharing his/her concerns with Defendant Yemsi. ¶¶55, 56, 66.

The cases cited by Defendants do not support a different outcome. *See* Def. Br. at 11, 16. For example, unlike in *In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 83443, at *32-33 (C.D. Cal. Aug. 21, 2009), where the court disregarded confidential witness statements because they "lack[ed] corroboration, and, in fact, contradict[ed] one another[,]" CW1's statements are based on personal knowledge and many years of industry experience, and are corroborated by other sources, including a *Forbes* article and Lilium itself. *See* ¶¶62, 133, 136. And in *In re Royal Caribbean Cruises Ltd.*, 2013 U.S. Dist. LEXIS 94156 (S.D. Fla. Apr. 18, 2013), the court did not adopt a hard-line rule that witnesses who depart a company before the class period are not credible. Def. Br. at 16. To the contrary, that court noted that the Eleventh Circuit "did not adopt a *per se*

6

rule" regarding the consideration of confidential witness testimony and found the witness statements were unreliable because they did not "give the Court any specific facts" contributing to falsity or scienter. *Id*. at \*47-49. Plaintiff here supplies that very information: CW1 stated that he expressed his concerns regarding the unrealistic certification timeline directly to Defendant Yemsi. Indeed, courts routinely find that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).[4] As such, CW1's allegations are entirely credible, and should be given appropriate weight by the Court.

### B.       Plaintiff Adequately Pleads Section 10(b) Claims

#### 1.       Plaintiff Adequately Pleads Materially False or Misleading Statements and Omissions

For Section 10(b) claims, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citing 15 U.S.C. § 78u-4). "A statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Luczak v. Nat'l Bev. Corp.*, 812 F. App'x 915, 923 (11th Cir. 2020) (citation omitted). Plaintiff readily satisfies these standards, alleging several interrelated categories of misstatements/omissions.[5]

First, Plaintiff alleges that Defendants made numerous materially false or misleading statements and omissions regarding their access to batteries capable of 330 Wh/kg. *See, e.g.,* ¶¶ 175-177. To start, Lilium's purportedly "advanced" batteries would allow the Lilium Jet to fly farther and hold more weight, giving the Company a massive advantage over its competitors, and as such, these statements were highly material to investors. ¶29. Defendants critically omitted (until after it was revealed by Iceberg) that the source of these "advanced" batteries was Zenlabs,

---

[4] *See also, e.g., Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019) ("[E]vidence of later events can provide useful circumstantial evidence that a given representation was false when made."); *Todd v. STAAR Surgical Co.*, 2016 U.S. Dist. LEXIS 186511, at \*23 (C.D. Cal. Apr. 12, 2016) ("it simply does not follow that the Court must completely shut its eyes to [pre-Class Period witnesses] when examining the overall context in which the statements at issue were made.").

[5] Plaintiff alleged the date, speaker, and circumstances of each statement with particularity in the Complaint, *see* ¶¶ 171-250, but uses general categories here for ease of analysis.

a company whose founder and CEO had been accused of misrepresenting that batteries developed by his former company were capable of a high energy density when they could only produce this result for three charging cycles. ¶90. When Lilium later revealed data from an external source purportedly verifying the performance of their batteries, the data showed that they had only been tested for two cycles—fewer than the GM batteries that landed the Zenlabs CEO in hot water. ¶91. Defendants don't address this vital omission in their Brief.

Second, and relatedly, Defendants repeatedly represented that the Lilium Jet would be capable of a range of 155+ miles in a single trip. *See, e.g.,* ¶¶ 175-177. Based on this range, Defendants explained that Lilium would be able to create a regional air network, connecting cities to neighboring cities, where competitors would only be able to take intra-city trips. ¶95. As explained in the White Paper, the range calculation was based on a number of assumptions, including access to batteries capable of >320 Wh/kg and spending less than 60 seconds in the "hover" phase, which Defendants insisted would be sufficient. ¶¶95-96. However, as Iceberg later revealed, this short hover time assumes perfect weather conditions and an area free of obstacles like tall buildings. ¶186. As Professor Gollnick explained, regulators are unlikely to certify the aircraft unless it can spend at least twice as much time in hover, drastically cutting down on the potential range. *Id*. Later, Lilium implicitly confirmed this fact by adding landing gear, so the aircraft can divert to an airport and land on a runway if it does not have enough power to land vertically. ¶187. The Lilium Jet's lack of traditional landing gear was a key feature mentioned repeatedly to investors in advance of the merger, as Defendants insisted one of the reasons they were confident in achieving certification in time for a 2024 commercial launch was because the design was simple and did not have features such as traditional landing gear. ¶138.

Third, on the day Defendants announced the potential merger between Lilium and Qell, they accelerated their timeline from certification in 2025 to beginning commercial operations in 2024. ¶267. Leading up to the merger, Defendants repeatedly assured investors that they were on track to achieving this timeline. *See, e.g.,* ¶¶ 202-214. Commercialization by 2024 "would position [Lilium] as one of the first companies to enter the eVTOL market." ¶228. In response to those who questioned whether this date was possible, Defendant Yemsi answered: "[W]e don't have the complexity that you would expect on a commercial, typical aircraft . . . there is a fixed landing gear . . . That [lack of] complexity enables us to compress the timeline." ¶204. Based on this timeline, Defendants claimed they would be profitable by 2025. ¶¶144, 221-224, 230, 233. The

8

prospect that Lilium was well on its way to certifying and commercializing its aircraft, not at some theoretical time in the distant future, but by 2024, with profits following soon thereafter, was highly material to investors. ¶3.

However, Defendants had no basis to accelerate their timeline to achieve commercialization in 2024. Critically, Defendants concede this point in their brief by stating, "There is no possible way that Plaintiff—*or Defendants*, or the Court—could know how difficult it would be to certify the Lilium Jet, because the EASA and FAA themselves have not yet finalized regulations." Def. Br. at 15 (emphasis added). Because, as Defendants admit, there was "no possible way" to determine whether and when regulators would certify the Lilium Jet, there could be no reasonable basis for moving the schedule up an entire year.

Furthermore, as CW1 explained, it took his former company Boeing about ten years to develop a brand-new aircraft. ¶56. Lilium, a much smaller start-up, represented that it would be able to build, test, certify, and begin operating its novel new aircraft in less than two years. *See* ¶36 (as of December 2022, Lilium had not begun construction on its full-scale prototype). While Lilium claimed its timeline would be "compressed" due to the lack of complexity, CW1 disputed that rationale, explaining that elements of the design were quite complicated. ¶¶57-58. Moreover, Lilium's Phoenix demonstrator had flown only about 45 test flights at the time of the IPO, none more than a few minutes, none using Lilium's purported "advanced" batteries, and none manned (Joby, which also targeted a 2024 launch date, had flown over 1,000 test flights at the time). ¶157. The fact that Lilium was "charging ahead, with full steam" with designing and building their aircraft, without any idea what the regulatory requirements would be, dismantles their 2024 timeline, and, in fact, led CW1 and three other employees to quit. ¶¶60, 81.

### a.     Defendants' Canned Arguments to Challenge Falsity are Inapplicable

Defendants' efforts to dispose of all the alleged material misrepresentations and omissions by blanketly regarding them as opinion and protected by the PSLRA Safe Harbor, fail.

### i.     The PSLRA's Safe Harbor Does Not Apply

The PSLRA's Safe Harbor provision protects certain issuers (and others acting on their behalf) from liability for making a forward-looking statement if it is "accompanied by meaningful cautionary statements"; "immaterial," or "the plaintiff fails to prove that the forward-looking statement…was made with actual knowledge…." 15 U.S.C. § 78u-5(a); (c)(1). "Defendants bear the burden of demonstrating that their statements are protected by the safe harbor." *In re STEC*

*Inc. Sec. Litig.*, No. 09-cv-1304, 2011 U.S. Dist. LEXIS 75093, at \*26 (C.D. Cal. June 17, 2011) (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d. Cir. 2010)); *RYH Props., LLC v. West*, No. 08-cv-172, 2009 U.S. Dist. LEXIS 142349, at \*34 n.3 (E.D. Tex. Aug. 3, 2009) (same).

As an initial matter, Defendants have not established that the PSLRA Safe Harbor applies to them or their statements. Defendants have not demonstrated, nor can they, that the Safe Harbor would apply to Lilium and its management prior to Lilium going public, as Lilium was not "an issuer [] at the time the statement [wa]s made…." 15 U.S.C. § 78u-5(a); *see also RYH Props.*, 2009 U.S. Dist. LEXIS 142349, at \*34 ("Defendants have not shown that it is 'an issuer' as contemplated by Section 78u-5(a).").

Next, as strongly stated by former SEC Director John Coates, "It is simply a legal myth to assert that the PSLRA's safe harbor clearly shields de-SPACs." John Coates, *SPAC Law and Myths*, 78 Bus. Law. 371 (Spring 2023). The Safe Harbor plainly excludes statements "made in connection with an initial public offering." 15 U.S.C. § 78u-5(b)(2)(D). The SEC explained that it adopted this rule because companies engaging in IPOs are "generally untested" and as such "there [is] limited basis to assess the reasonableness of assumptions underlying the projections about the issuer's business." Sec. Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005). All of the alleged misstatements and omissions in this matter were made in the context of a de-SPAC transaction. Coates explained that it is "commonly understood that it is the de-SPAC—and not the initial offering by the SPAC—that is the transaction in which a private operating company itself 'goes public,' *i.e.*, engages in its initial public offering."[6] In other words, "the de-SPAC transaction as the 'real IPO'" for securities law purposes. *Id*. The legislative history behind the PSLRA supports this notion as well, noting that Congress intended the Safe Harbor to apply to "seasoned issuers" with an "established track record." *See Id*. at n. 16.

### ii. The Alleged Material Misrepresentations and Omissions are Not Inactionable Opinion

Despite the objective, historical nature of Defendants' misrepresentations regarding batteries and hover time, Defendants erroneously maintain that these statements are inactionable opinion. As the Eleventh Circuit has explained, "words like 'believe' and 'think,' or phrases like 'In my opinion,' trigger the listener or reader to be aware that the speaker is giving a statement of

---

[6] John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, April 8, 2021, https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

opinion." *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1228 (11th Cir. 2022) (citing *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019)).[7] However, Defendants' misstatements regarding batteries and hover time contain none of this hallmark opinion language, and instead convey historical, objective fact. With regard to hover time, for example, Defendant McIntosh stated, "[W]e only spend about 30 seconds in hover." ¶181; *see also* ¶184 ("overall total hover time (on a typical mission) of <60 seconds in the most power-hungry flight phase.").

As for Defendants' battery misrepresentations, such as that they had "secured battery technology that allows us to achieve our launch range of 150 miles," ¶175, Defendants attempt to argue that these too are inactionable opinions, because they were merely "interpret[ing]" test data. Def. Br. at 7. Frankly, this argument, which relies solely on out-of-circuit cases involving pharmaceutical companies interpreting clinical test data, has no application to the facts of this case. No reasonable investor would ever contemplate that Defendants were merely "interpreting" battery test data when they firmly (and erroneously) stated that they had "secured" the requisite battery technology to fly 150 miles. And even applying this line of pharmaceutical cases here, the "interpretation of data" must "itself [be] reasonable," *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013), and it was patently unreasonable to state that Lilium had "secured" this when the batteries were not proven to maintain their capabilities beyond two charging cycles, which would render the batteries useless for their intended purpose. ¶91.

Even if the hover and battery statements were statements of opinion, in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, the Supreme Court held that opinion statements are nonetheless actionable, even when "sincerely held," if (1) the supporting facts underlying the opinion are untrue, or (2) the statement "omits material facts . . . [that] conflict with what a reasonable investor would take from it." 575 U.S. 175, 185-89 (2015). A reasonable investor, when reading the statements in the context of the White Paper and McIntosh's technical blog, would assume there was some reasonable, factual basis for Defendants' use of the 30-60 second hover figure, either scientific or regulatory, and certainly would not have thought the figure assumed perfect weather and did not account for obstacle clearance, as those would be clear barriers to regulatory approval. ¶99. Similarly, regarding the battery statements, the omitted facts

---

[7] "Of course, simply because a statement is couched as opinion—'I believe,' 'I think,' or even 'In my opinion'—doesn't foreclose a finding that it constitutes an express or implied misrepresentation of fact." *Carvelli*, 934 F.3d at 1322.

that Zenlabs was the source of the battery technology, and that those batteries had not yet been proven to keep charge for more than two cycles, materially conflict with what a reasonable investor would understand from the words, "we secured" the battery technology. ¶¶90-91.

### b. Defendants' Statements Were Not Forward Looking

"[T]he safe harbor of the PSLRA only applies to forward-looking statements and not misstatements or omissions of historical or contemporaneous facts." *Schultz v. Applica*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007). "A forward-looking statement is what it sounds like—a prediction, projection, or plan." *Carvelli*, 934 F.3d at 1324. "The key characteristic of a forward-looking statement is that its 'truth or falsity is discernible only after it is made.'" *Axogen*, 42 F.4th at 1223 (citation omitted). "[A] statement that depends in part on present-tense observations is due safe-harbor protection so long as the conclusion it supports is forward looking." *Id*. However, "if a statement includes a 'distinct present-tense…component' that is 'readily severable' from the forward-looking portion of the statement, the safe harbor protects only the forward-looking part." *Id*. (quoting *Carvelli,* 934 F.3d at 1329). Thus, even if the Safe Harbor applies, Defendants cannot establish that many of their statements are forward-looking.

Defendants' battery misrepresentations and omissions were not forward-looking. For example, Defendants stated, "We ***have secured*** battery technology that allows us to achieve our launch range of 150 miles"; "Advanced battery cell technology ***secured***…"; "***today*** cells ***are available*** with energy densities of >300Wh/kg…" ¶¶175-177 (emphasis added). These statements explicitly stated that Lilium had batteries capable of powering the Lilium Jet *at the time the statements were made*. Defendants have no answer to this, so they scour their filings for *other* statements about batteries, not alleged in the Complaint, that they claim are forward-looking. *See* Def. Br. at 7. Whether Defendants' straw men are covered by the Safe Harbor is irrelevant.

Defendants' arguments regarding the hover time misrepresentations fare no better. Again, the alleged misrepresentations speak in plain contemporaneous or historical terms as to how long the Lilium Jet spends in hover phase: "[W]e spend very little time in hover phase"; "a typical mission profile with a 30 minute cruise segment, we almost spend 30 seconds in hover"; "during take-off we are only hovering approximately ~10-25 seconds…"; "We intentionally spend only a very short time in takeoff and landing…" ¶¶81-84. Unable to grapple with this, Defendants resort to cherry-picking *Plaintiff's* language, where the Complaint mentions a "projected 30-second hover time." Def. Br. at 10. Putting aside that Defendants bear the burden of demonstrating *their*

12

statements are forward-looking, Defendants ignore that the fundamental context of the Complaint's allegations is that Defendants gave investors the impression "that Lilium *currently* possessed the requisite technology," when, in fact, Defendants had no such current capabilities, was using prototypes that bore little resemblance to the planned vehicle, and were working in unrealistic hypotheticals unsupported by industry standards. *See* ¶3.

### c.      Defendants' Cautionary Language Was Not Meaningful

Defendants' statements were also not accompanied by meaningful cautionary language. "'A disclaimer does not provide per se immunity, precisely because the disclaimer must be meaningful and tailored to the risks the business faces…. The cautionary language must be meaningful: boilerplate will not suffice.'" *In re Acuity Brands Sec. Litig.*, 2019 U.S. Dist. LEXIS 231099, at *58 (N.D. Ga. Aug. 12, 2019) (citation omitted); *Bellocco v. Curd*, 2005 U.S. Dist. LEXIS 24251, at *12 (M.D. Fla. Oct. 20, 2005) (holding cautionary language may not be "'buried among too many other things', but rather, should be 'explicit, repetitive and linked to the projections about which the plaintiff complains.'") (quoting *Saltzberg v. TM Sterling/Austin Assocs.,* 45 F.3d 399, 400 (11th Cir. 1995)).

Defendants proudly tout the "Registration Statement's 37 pages of risk factors," though they are far-more reticent when it comes to identifying disclosed risks with specificity. Def. Br. at 25; *see In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342 (N.D. Ga. 2018). This is likely because many of these statements are meaningless, as they were nothing more than "a front for present problems." *Carvelli*, 934 F.3d at 1327; *see also Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 n.92 (2d Cir. 2021) (a "warning that identifies a potential risk, but implies that no such problems were on the horizon even if a precipice was in sight, would not qualify as a 'meaningful cautionary statement' for purposes of safe harbor.") (internal citation omitted). For example, for Defendants' range misrepresentations such as, "Initially, we will have a range of around 150 miles and that enables us also to unlock regional connections," Defendants "warned" that "we might not achieve all of our performance targets." Def. Br. at 10-11. Stated another way, Defendants argue that their statement that "we will have a range of around 150 miles," is rendered immaterial by a boilerplate disclosure saying "well, the jet might not do all the things we say." Indeed, in the laundry list of bullets discussing more specific "risks and significant challenges" that it asks the reader to consider in the next sentence, not even one bears on the range of the aircraft, much less the specific risk highlighted in Plaintiff's Complaint, which is that Lilium's

13

batteries could not do what they said. ECF No. 90-3 at 63. Separately, where Defendants do generally discuss if "technologies fail to perform as expected," Defendants fail to disclose that their batteries had not been sufficiently tested, as that would have undercut their statements that they "secured" battery technology. ECF No. 90-3 at 66; *Pritchard v. Apyx Med. Corp.*, 2020 U.S. Dist. LEXIS 42627, at *21 (M.D. Fla. Mar. 11, 2020) ("cautioning that 'there can be no assurance that [product] will be successful or that such future revenues and profitability will be realized' . . . is not narrowly-tailored to the existing known risk.").[8]

With regard to Lilium's timeline to certification and commercialization, Defendants' purported risk disclosure simply doubles-down on their misrepresentations. The statement "we do not expect to launch commercial services until 2024, at the earliest, if at all" merely reinforces the possibility for Lilium to launch commercial operations in 2024, when the Complaint's allegations, supported by CW1, adequately plead otherwise. Def. Br. at 8. Additionally, the risk statement itself underscores Defendants' misrepresentations: "Based on our current testing and projections, we believe that we can achieve our business plan and forecasted performance model targets in terms of aircraft range, speed, energy system capacity, payload and noise." Def. Ex. 3 at 63.

### d.    Defendants had Actual Knowledge of Falsity

Numerous facts support that Defendants had actual knowledge that the Lilium Jet's range was not 150 miles, and that it would not be certified and begin commercial operations by 2024. First, Defendants readily admit that "[t]here is no possible way that Plaintiff—*or Defendants*, or the Court—could know how difficult it would be to certify the Lilium Jet, because the EASA and FAA themselves have not yet finalized regulations." Def. Br. at 15. If Defendants had no idea how long it would take to certify the jet, and even worse, what those regulations would look like, Defendants had actual knowledge that there was no basis to move the commercialization timeline up to 2024 from 2025. *See SEC v. Revolutionary Concepts*, *Inc.*, 2022 U.S. App. LEXIS 3591, at *25 (11th Cir. Feb. 9, 2022) (affirming lower court grant of summary judgment against Defendant in a securities case where "[Defendant] knew that his projections were not supported by any documentary evidence. He didn't disclose that.").

Moreover, at the time of the merger announcement, batteries capable of powering the

---

[8] Other statements such as "third-party suppliers" may not be "able to timely meet their obligations" (*see* Def. Br. at 8) are not narrowly tailored because it could be said of any company who relies on third-party suppliers. Likewise, the statement "we may not achieve or maintain profitability" is not narrowly tailored enough to be meaningful.

Lilium Jet were at least 7-8 years from availability (¶158); the CEO of the company which Lilium retained to design a battery capable of powering their jet had previously been accused of fraudulently representing the capacity of batteries to GM (¶238); the certification bases for both the FAA and EASA were still in development, a fact that CW1 stated interfered with his work at Lilium (¶¶124-125); Lilium's progress toward EASA certification had only just begun, and the "longest phase" of the certification process (set at five years for large aircraft) was still years away (¶¶121-122); features like the use of carbon fiber and fly-by-wire controls, as well as the novel design of the Lilium Jet, made the design far more complicated than Defendants represented (¶¶132-133); Defendants had yet to even begin construction on their full-scale prototype, had only conducted about 20 flights with their demonstrator before it caught fire, and had yet to achieve the transition from hover to forward flight (¶¶128-129); Defendants had not completed the preliminary design review (¶¶135-140); at least four former Lilium employees, including CW1, left Lilium over concerns about the unrealistic timeline (¶133); CW1 personally communicated his concerns about the timeline to Defendant Yemsi (¶84); Defendant Yemsi's own projections had showed that certification in 2023 would be "extremely difficult," but Defendant Wiegand insisted on retaining the timeline (¶133); Defendant Wiegand was a founder of Lilium and designed the jet as a school project, despite having no real-world aeronautics experience (¶258); Defendant Wiegand was "intimately involved" in the Jet's development; and the aircraft was Wiegand's "baby" and "every decision had to be run up to" and approved by Wiegand (¶281). At this stage of the litigation, these facts are more than sufficient to demonstrate actual knowledge of falsity. *See Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983) ("circumstantial evidence can be more than sufficient" to prove mental state.).

Citing two district court cases from the Second Circuit, Defendants say Plaintiff cannot plead actual knowledge and recklessness in the alternative; however, in this circuit, "alternative pleading is permitted by the Federal Rules of Civil Procedure." *Wiand v. EFG Bank*, 2012 U.S. Dist. LEXIS 30323, at \*28 (M.D. Fla. Feb. 8, 2012) (citing FED. R. CIV. P. 8(a)(3)); *Barron v. Lampley*, 2015 U.S. Dist. LEXIS 199793, at \*45-46 (N.D. Ga. June 21, 2015) ("the Court rejects Defendant Justman's argument that either the PSLRA precludes alternative pleading or that alternative pleading weakens the strength and specificity of the allegations. Plaintiffs have the right to plead in the alternative…. If either alternative theory is sufficient, then the pleading is sufficient. Fed. R. Civ. P. 8(d)(2).") (internal citation omitted).

## 2.      Plaintiff Adequately Pleads Scienter

To plead scienter, a plaintiff must allege particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "In this Circuit, 'scienter consists of intent to defraud or severe recklessness on the part of the defendant.'" *FindWhat*, 658 F.3d at 1299 (citation omitted). The inference that the defendant acted with scienter need not be "of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id*. Rather, it need only be "at least as compelling" as any opposing inference of scienter. *Id*. (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Examined collectively, as per *Tellabs*, Plaintiff more than adequately pleads scienter.

In addition to the various facts alleged to support actual knowledge (*see* § III.B.1.d, *supra*), Plaintiff alleges numerous red flags that contribute to a strong inference of scienter. ¶283. "'Red flags' are 'those facts which come to the attention of a [defendant] which would place a reasonable [defendant] on notice that the . . . company was engaged in wrongdoing to the detriment of its investors.'" *In re Pegasus Wireless Corp. Sec. Litig.*, 657 F. Supp. 2d 1320, 1327 n. 3 (S.D. Fla. 2009). Defendants argue that "red flags" are insufficient to prove scienter. Def. Br. at 16-17. However, the very case Defendants cite states that "ignoring 'red flags' or warning signs of improprieties," when coupled with other evidence, "can be sufficient to state a claim of securities fraud." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1304 (S.D. Fla. 2002);[9] *see also* *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1306 (S.D. Fla. 2007). In fact, courts in this circuit have cited a *lack* of "red flags" as a reason for dismissal. *Kinnett v. Strayer Educ.*, No. 10-cv-2317, 2012 U.S. Dist. LEXIS 37737, at *41 (M.D. Fla. Jan. 3, 2012); *Abramowitz v. Westport Nat'l Bank*, No. 09-cv-60510, 2009 U.S. Dist. LEXIS 140996, at *19 (S.D. Fla. Nov. 4, 2009).

Plaintiff also alleges that Defendants had motive and opportunity to misrepresent Lilium's business. ¶¶258-266. Defendants claim, "Courts in this District have consistently held that allegations of motive and opportunity are insufficient for scienter." Def. Br. at 14. However, this is not what any of the cases cited by Defendants say; rather, while motive and opportunity ***alone***

---

[9] This case also contradicts Defendants' unusual claim that the red flags theory is exclusive to Delaware corporate governance law and only applies to "defendant auditors, not companies." *Id.* at 1294, Def. Br. at 17. The litany of derivative cases from Delaware cited by Defendants, when dozens of securities cases *in this circuit* discuss red flags, are not persuasive. Additionally, Defendants misquote *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006), which states that "a claim that directors are subject to personal liability for employee failures" —not red flags—is "possibly the most difficult theory in corporation law."

16

do not constitute a strong inference of scienter, "motive and opportunity are specific kinds of evidence, which **along with other evidence** might contribute to an inference of recklessness or willfulness." *Bryant*, 187 F.3d at 1286 (emphasis added).[10] And, as stated above, Plaintiffs allege numerous other factors in addition to motive and opportunity to support a strong inference of scienter. Similarly, the case that Defendants cite with regards to the core operations theory states, "Allegations that a director or officer . . . was involved in the company's daily operations, **standing alone**, will not satisfy the pleading requirements of the PSLRA or Rule 9(b)." *SendTec*, 2007 U.S. Dist. LEXIS 110950, at *15 (emphasis added). Defendants creatively replaced "standing alone" with "…" in their quotation. Def. Br. at 17. Defendants' high-level positions and intimate involvement in day-to-day Company operations were one of many factors pled in the Complaint (*see* ¶¶285-290), when examined collectively, strongly support the inference of scienter here.

### 3. Plaintiff Adequately Pleads Loss Causation

#### a. Pleading Standard

Loss causation is adequately pled when plaintiffs "give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). The Eleventh Circuit "has never taken a position on whether the PSLRA's heightened pleading standards apply to allegations of loss causation." *Luczak*, 812 F. App'x at 920, 923 (reversing a finding of no loss causation where complaint alleged "a series of partial disclosures, causing a drop in the stock price."). Yet, "many district courts in the Circuit have applied the pleading standard under Rule(8)(a)(2) for loss causation." *Theodore v. Purecycle Techs., Inc.*, No. 21-cv-809, 2022 U.S. Dist. LEXIS, at *43 n.21 (M.D. Fla. August 4, 2022) (collecting cases and applying Rule 8). Regardless of the standard, at this stage, loss causation is a simple showing: "Under either standard [] the securities fraud plaintiff's burden is not a heavy one. She must only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Teva Sec. Litig.*, No. 17-cv-558, 2023 U.S. Dist. LEXIS 75063, at *97 (D. Conn. May 1, 2023).

Here, Plaintiff alleged that the price of Lilium's stock was artificially inflated by

---

[10] *See also In re Royal Caribbean*, 2013 U.S. Dist. LEXIS 94156, at *27 (motive or opportunity "**without more**, is not sufficient to establish scienter.") (emphasis added); *Waterford Twp. Gen. Emples. Ret. Sys. v. BankUnited Fin. Corp.*, 18-cv-22572, 2010 U.S. Dist. LEXIS 30955, at *40 (S.D. Fla. Mar. 30, 2010) (same); *Jacoby v. SendTec, Inc.*, No. 06-cv-61327, 2007 U.S. Dist. LEXIS 110950, at *6 (S.D. Fla. June 12, 2007) (same).

Defendants' materially false or misleading statements and omissions. This artificial inflation was removed from the stock when the truth underlying those misrepresentations and omissions was revealed via a corrective disclosure, the March 14, 2022 Iceberg Report, resulting in damages to Lead Plaintiff and the Class. No more is required at this early stage of the litigation.

### b. The Iceberg Report is a Corrective Disclosure

While Defendants proclaim that short seller reports cannot form a basis for alleging securities fraud (*see* Def. Br. at 1), this conclusory statement misstates the law in this Circuit. In *Meyer v. Greene*, the Court actually found: "the mere *repackaging of already-public information* by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." 710 F.3d 1189, 1199 (11th Cir. 2013). Indeed, the Eleventh Circuit recently reversed a district court's holding that a *Wall Street Journal* article could not act as a corrective disclosure, finding that defendants' argument that the article was a "mere[] summar[y] of the earlier correspondence between the Company and the SEC staff" was "not a fair reading of the article, nor of [Plaintiff's] allegations." *Luczak*, 812 F. App'x at 923. In other words, an analyst or short seller report *can* be a corrective disclosure if it "released new information to the market." *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs.*, No. 17-cv-2207, 2018 U.S. Dist. LEXIS 147801, at *37 (N.D. Ga. May 15, 2018). Indeed, the *FleetCor* court rejected Defendants' same argument that a report came from "a short seller whose entire story should be discounted as it has an interest in decreasing stock prices," reasoning that "because this is a motion to dismiss, the Court will only consider the Amended Complaint's allegations – not outside evidence – and will not resolve any factual or credibility disputes in this procedural posture." *Id*. at *10 n.4.

The recent opinion in *Purecycle,* from the Middle District of Florida, is also directly on point. There, plaintiff alleged that a short seller report, which contained quotes of interviews with various people including former employees and an industry expert "as evidence that there was information not previously available on the market," revealed the truth concealed by defendants' misrepresentations. *Purecycle,* 2022 U.S. Dist. LEXIS 243150, at *46-48. The court rejected defendants' arguments that the report "merely 'repackages' already-public information," and found it "meets the standard for a corrective disclosure at this stage in the litigation." *Id*.

Like in *Purecycle*, the Iceberg Report revealed several pieces of new information. First, after speaking to a former Lilium employee, it revealed, for the first time, that the source of Lilium's batteries was Zenlabs. As access to batteries capable of 330 Wh/kg was essential to the

18

Lilium Jet's design, this news seriously impugned Defendants' claims that they were on track to certification and commercialization by 2024. Additionally, the report newly revealed that Wiegand's alma matter did not want any association with Lilium. Further, Iceberg quoted experts stating, for the first time, that: 1) the amount of hover time Lilium assumed required perfect conditions and no obstacles, and regulators were unlikely to certify the aircraft unless it had sufficient power reserves to hover twice as long; and 2) Defendants' representations that its simple design would lead to a shorter timeline to certification were incorrect. As the Eleventh Circuit has explained, "'data understandable only through expert analysis may not be readily digestible by the marketplace' and analysis of that data may not be merely confirmatory." *Sapssov v. Health Mgmt. Assocs.*, 608 F. App'x 855, 863 (11th Cir. 2015) (citation omitted). This new information, combined with the drop in Lilium's stock price, amply qualifies the Iceberg Report to be a corrective disclosure.[11]

### c.     Disaggregation is Unnecessary at This Stage

Defendants' arguments that Plaintiff has not adequately pled loss causation because the decline in stock price was partially due to the lock-up period ending (*see* Def. Br. at 19) are premature. Courts routinely hold that such disaggregation is not required at the pleading stage. *See Metro. Transp. Auth. Defined Ben. Pension Plan Master Tr. v. Welbilt, Inc.*, No. 18-cv-3007, 2020 U.S. Dist. LEXIS 33664, at *20-21 (M.D. Fla. Feb. 6, 2020).[12] This is especially true here where several articles attributed the drop in share price, at least partially, to the Iceberg Report's revelations. ¶254.[13]

---

[11] Defendants also claim, citing articles outside the Complaint, "Plaintiff fails to mention the widespread credibility issues associated with the short-seller industry." Def. Br. at 5. However, Iceberg's research is routinely substantiated and relied upon, for example, by later governmental investigations. ¶¶300-303. Indeed, short sellers serve a vital role in maintaining the efficiency of the market, uncovering historic frauds including Enron and Valeant Pharmaceuticals. ¶¶304-305. "If you want to detect fraud, forget the accountants and contact your local short sellers; they are the real detectives today." ¶305.

[12] *See also City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17-cv-10014, 2019 U.S. Dist. LEXIS 26962, at *27 (S.D.N.Y. Feb. 19, 2019); *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-cv-6969, 2018 U.S. Dist. LEXIS 217963, at *109 (D.N.J. Dec. 31, 2018); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014).

[13] Defendants implicitly accuse Plaintiff of misleading this Court by "conveniently cutting" or "abridging" facts harmful to his theory, Def. Br. at 19, but Plaintiff alleged the very facts Defendants claim were intentionally omitted: "both articles noted that the end [of] the post-Merger 180-day lockup period also may have contributed to the decline in the stock price." ¶254.

### C.        Plaintiff has Adequately Pled Scheme Liability

The Complaint clearly alleges claims under Rule 10b-5(a) and (c), commonly referred to as "scheme liability," in addition to claims arising under Rule 10b-5(b). *See* ¶¶71-170; ¶¶320-28.[14] Specifically, the Complaint adequately details how each Defendant engaged in a scheme and course of conduct or acts, which, among other conduct, included disseminating false or misleading statements, with scienter, "to garner the investor support necessary to effectuate the highly lucrative SPAC merger," ¶71, and to give investors the impression that "that Lilium *currently* possessed the requisite technology and ability, and indeed was well on its way, to building and commercializing a superior eVTOL — not at some theoretical time in the distant future, but by 2024, with profits following soon thereafter." ¶3. By disseminating false or misleading material (and through other actions described below), Defendants "employ[ed]" a "device," "scheme," and "artifice to defraud" within the meaning of Rule 10b-5(a). By that same conduct, they "engage[d] in a[n] act, practice, or course of business" that "operate[d] . . . as a fraud or deceit" under Rule 10b-5(c). "Under the circumstances, it is difficult to see how [Defendants'] actions could escape the reach of those provisions." *Lorenzo*, 139 S. Ct. at 1101.

Nevertheless, relying on pre-*Lorenzo* cases, Defendants argue that "scheme liability cannot exist independently of a misrepresentation or omission claim when a plaintiff alleges no 'conduct beyond those misrepresentations or omissions.'" Def. Br. at 20. That position, however, is no longer tenable after *Lorenzo*. "In *Lorenzo*, the Supreme Court held that Rule 10b-5(a) and (c) 'capture a wide range of conduct,' including 'the dissemination of false or misleading statements with intent to defraud . . . even if the disseminator did not "make" the statements and consequently falls outside subsection (b) of the Rule.'" *SEC v. Complete Bus. Sols. Grp.*, 538 F. Supp. 3d 1309, 1340 (S.D. Fla. 2021) (quoting *Lorenzo*, 139 S. Ct. at 1101-02); *see also Happy Tax Franchising LLC v. Hill*, No. 19-cv-24539, 2023 U.S. Dist. LEXIS 2711, at *34-35 (S.D. Fla. Jan. 5, 2023); *Alphabet Sec. Litig., R.I. v. Alphabet, Inc.*, 1 F.4th 687, 709 (9th Cir. 2021) (noting *Lorenzo* rejected that scheme liability claims exist "only when conduct other than misstatements is involved"). Thus, Defendants' legal arguments concerning scheme liability fail to take flight.

---

[14] Under Rule 10-b5(a), "[a] 'device,' we have observed, is simply '[t]hat which is devised, or formed by design'; a 'scheme' is a 'project,' 'plan[,] or program of something to be done'; and an 'artifice' is 'an artful stratagem or trick.' … The words 'act' and 'practice' in subsection (c) are similarly expansive. Webster's Second 25 (defining 'act' as 'a doing' or a 'thing done'); *id.*, at 1937 (defining 'practice' as an 'action' or 'deed')[.]" *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019) (cleaned up) (citation omitted).

20

In any event, as Defendants' Brief implicitly acknowledges with the heading "The *Conduct* Challenged as Part of the Alleged 'Scheme,'" Def. Br. at 20 (emphasis added), the Complaint plainly alleges *conduct* beyond misrepresentations or omissions. For example, Defendant Wiegand attempted to utilize his university, not to prove that Lilium's eVTOL's design was viable, but rather to misleadingly "further polish their image, presumably to attract investors." ¶71. Having been rebuffed by the University, Defendants then *commissioned* (and ultimately disseminated) the White Paper with the intent to falsely convince the market that Lilium's design and assumptions were *currently* viable. ¶¶3, 72, 85. Defendants also concealed—until Iceberg discovered the truth—the fact that Lilium had partnered with Zenlabs. ¶90. Accordingly, even accepting Defendants' mistaken view that disseminating misstatements or omissions alone cannot constitute scheme liability, their argument still fails.

### D.       Plaintiff Adequately Pleads Section 14(a) Claims

### 1.       Neither Heightened Pleading Nor Scienter Are Required

Defendants are wrong that Rule 9(b) applies to Plaintiff's 14(a) claims. Even when, as here, "it is clear that plaintiffs believe [defendants] were engaged in a massive fraud[,] [t]his fact…does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *In re Ambac Fin. Gp.*, 693 F. Supp. 2d 241, 263 (S.D.N.Y. 2010). Thus, "when the same course of conduct supports both a claim of fraud under the Exchange Act and a claim under Section 11 or 12(a)(2) of the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) *unless the complaint identifies clearly an alternate basis, i.e., negligence, for the claim*." *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545, 2019 U.S. Dist. LEXIS 153297, at *31 (S.D.N.Y. Sept. 9, 2019) (emphasis added).[15] Plaintiff does so here. *See* ¶363.[16] Plaintiff has "done more than disclaim fraud; they have specifically pled alternate theories of fraud and negligence." *In re Refco*, *Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007) (denying motion to dismiss). Indeed, the Section 14(a) count explicitly contains only negligence language. *See id.* at ¶¶364, 368. Thus, Rule 9(b) does not apply. *See Refco*, 503 F. Supp. 2d at 633.

---

[15] Courts employ the same analysis for Section 14(a). *See Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557-58 (S.D.N.Y. 2017).

[16] Out of an abundance of caution, Plaintiff also avers: "In the alternative, if the Court finds fraudulent intent to be an element of this claim, Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein." ¶ 363.

21

Defendants also incorrectly argue that scienter is required "[w]hen Section 14(a) allegations sound in fraud." ECF No. 89 at 32. In fact, the majority of circuits that have considered this issue (four) have held that scienter is not required. *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Posner, J.); *Knollenberg v. Harmonic, Inc.*, 152 F.App'x 674, 682-83 (9th Cir. 2005); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *Gould v. Am.-Haw. S.S. Co.*, 535 F.2d 761, 777 (3d Cir. 1976). The language of Section 14(a) "lack[s] any reference to a 'manipulative or deceptive device or contrivance,' [which is] the language used in Section 10(b) . . . to indicate a requirement of scienter." *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1263 (N.D. Cal. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)). While the Eleventh Circuit has not yet addressed this issue, courts within this District have held that scienter is not required. *See Murdeshwar v. Search Media Holdings, Ltd.*, No. 11-cv-20549, 2011 U.S. Dist. LEXIS 158193, at *58-59 (S.D. Fla. Aug. 8, 2011); *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1266 (S.D. Fla. 1995). Thus, even assuming *arguendo* that Plaintiff's Section 14(a) allegations sound in fraud, only a showing of negligence is required.

Nor does heightened pleading apply to Plaintiff's showing of negligence. The PSLRA provides that in any action where plaintiff must prove "the defendant acted *with a particular state of mind*, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). While the Eleventh Circuit has not addressed this issue, the Seventh Circuit has held that it cannot because "negligence is not a state of mind; it is a failure . . . to come up to the specified standard of care." *Beck*, 559 F.3d at 682 (citations omitted).[17] Thus, Plaintiffs do not have to prove "subjective intent or level of diligence or care." *Willis Towers*, 439 F. Supp. 3d at 715. Rather, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [ ] negligence standard." *comScore*, 268 F. Supp. 3d at 560 (citation omitted).[18]

---

[17] *See also Baum v. Harman Int'l Indus.*, 575 F. Supp. 3d 289, 301 (D. Conn. 2021); *Enzo Biochem, Inc. v. Harbert Discovery, Fund, LP*, No. 20-cv-9992, 2021 U.S. Dist. LEXIS 185730, at *19-20 (S.D.N.Y. Sept. 27, 2021); *In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 715 (E.D. Va. 2020); *comScore*, 268 F. Supp. 3d at 559; *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 3d 223, 240 (S.D.N.Y. 2012); (all following *Beck* and holding particularized allegations of negligence not required for 14(a) claims).

[18] In this regard, the negligence standard of 14(a) is akin to strict liability. *See Willis Towers*, 439 F. Supp. 3d. at 715 n.7; *see also Beck*, 559 F.3d at 682.

Plaintiff alleges that "Defendants had a legal obligation not to solicit a proxy with false or misleading statements or omissions"; the Proxy contained misstatements and omissions of material facts; Defendants solicited and/or permitted the use of their names in solicitations of the Proxy; and Defendants acted negligently by doing so. ¶¶364-68. These allegations are more than "sufficient to meet th[e] low bar for pleading negligence in the Section 14(a) context." *comScore*, 268 F. Supp. 3d at 560; *see also Baum*, 575 F. Supp. 3d at 301 ("plaintiff's allegations that the directors prepared and disseminated a proxy containing a misleading statement are sufficient"). In the alternative, if the Court finds that heightened pleading applies here, Plaintiff readily meets that standard, as the allegations are "sufficient to permit a reasonable person to draw an inference of negligence that is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *NJ v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1287 (D. Kan. 2008) (citing *Tellabs*, 127 S. Ct. at 2510); *see also Biver v. Nicholas Fin., Inc.*, No. 14-cv-250, 2014 U.S. Dist. LEXIS 73933, at *12-13 (M.D. Fla. May 30, 2014) (denying motion to dismiss "irrespective of whether the heightened pleadings standards apply").

### 2.      The Complaint Adequately Pleads Causation for Section 14 Claims

To plausibly allege loss causation under § 14(a), a plaintiff must only satisfy "Rule 8 notice pleading standards, which requires 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Enzo Biochem*, 2021 U.S. Dist. LEXIS 185730, at *23 (citing *Bricklayers*, 866 F. Supp. 2d at 245). For the reasons set forth in § III.B.3 *supra*, Plaintiff has done so here.

Defendants also argue—citing no legal authority—that the Proxy was not an "essential link" and, therefore, Plaintiff fails to plead transaction causation. Not so. Plaintiff alleges that Defendants made false and misleading statements regarding the Lilium Jet's timeline to certification and commercialization and its battery technology to "garner support" from investors for the Business Combination, that Lilium's purported imminent profitability was a "highly material factor that drew investor support," that by means of the Proxy, Defendants "sought to secure Plaintiff's and other Class members' approval of the Business Combination," that these solicitations "were essential links in the accomplishment of the Business Combination," that as a result of the misrepresentations, shareholders voted to approve the Merger "without access to complete material information," and that "Defendants accomplished their goal of going public via a SPAC transaction." ¶¶53, 86, 88, 116, 144, 251, 261, 367, 369, 370. Similar allegations have been found sufficient to allege transaction causation. *See*, *e.g.*, *In re Envision Healthcare Corp.*,

No. 18-cv-1068, 2019 U.S. Dist. LEXIS 128237, at *23 (D. Del. Aug. 1, 2019); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 292 n.3 (S.D.N.Y. 2010).

### E.     Plaintiff Adequately Pleads Securities Act Claims

As with Plaintiff's Section 14(a) claims, Defendants attempt to impose a higher pleading standard as well as a scienter requirement. But "[a] Section 11 plaintiff is not required to prove that the defendant acted with scienter." *City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mort. Holdings Inc.*, No. 15-cv-61170, 2016 U.S. Dist. LEXIS 195953, at *20 (S.D. Fla. June 20, 2016) (citing *Huddleston*, 459 U.S. at 381-82). Rather, plaintiff must simply "allege that he purchased a security issued pursuant to a registration statement that contained a material misstatement or omission." *Id*. Indeed, "Section 11 liability against the issuer of a security 'is virtually absolute, even for innocent misstatements.'" *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (citing *Huddleston*, 459 U.S. at 382). The same is true of Section 12.[19] *See Nationstar*, 2016 U.S. Dist. LEXIS 195965, at *21 (citation omitted). Moreover, Rule 9(b) does not apply here because Plaintiff carefully disclaims any fraud allegations at the outset of its Securities Act claims (*see* ¶¶341, 352, 358), and the claims allege only negligence. *See id.* at ¶¶347, 354;[20] *see Refco*, 503 F. Supp. 2d at 632 (Rule 9(b) did not apply; allegations that defendants "did not conduct a reasonable investigation" and "did not possess reasonable grounds for believing that the statements . . . were true and not misleading" were "carefully couched in the language of negligence" and there were "no allegations in the Securities Act section of the complaint that contain even a hint of fraud").[21]

---

[19] Because Defendants' request to dismiss Plaintiff's Section 12 claims appears only in a footnote (ECF No. 89 at 23 n.8), it should not be considered by the Court. *See Sony Music Ent'mt v. Vital Pharms., Inc.*, No. 21-cv-22825, 2022 U.S. Dist. LEXIS 183358, at *32 (S.D. Fla. Sept. 14, 2022) ("addressing legal arguments in footnotes is an incorrect method to present substantive arguments on the merits or otherwise request relief from the Court") (citations omitted); *Mazzeo v. Nature's Bounty, Inc.*, No. 14-cv-60580, 2014 U.S. Dist. LEXIS 159345, at *4 n.1 (S.D. Fla. Nov. 10, 2014) (same).

[20] *See also* ¶ 313 (alleging defendants had a "duty to make a reasonable investigation into the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission. . . .").

[21] The use of the words "concealed" and "misrepresented" does not, as Defendants suggest, change this conclusion. *See* ECF No. 89 at 24 n.9 (citing *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)). Rather, "the court's conclusion that the particular language in *Rombach* was indicative of fraud should be read in the context of the pleadings at issue in that case, in which [unlike here] the plaintiffs 'did not assert any claim of negligence on the part of the Individual Defendants, nor [did]

Here, Plaintiff alleges that the "Registration Statement . . . contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein"; that Lilium and/or Qell was the issuer; that Defendants were responsible for the contents and dissemination; and that Plaintiff purchased common stock pursuant or traceable to the Registration Statement. These allegations are sufficient to state a Securities Act claim.

Finally, the Complaint is not a "shotgun pleading," as Defendants claim. *See* ECF No. 89 at 24. Here, contrary to the "essence of shotgun pleading," "[t]he factual allegations against each Defendant are clear – [Plaintiff] separately describes each alleged misrepresentation that forms the basis for its claims . . . and indicates exactly which Defendants made each representation." *Complete Bus. Sols.*, 538 F. Supp. 3d at 1341. Further—as evidenced by Defendants' lengthy and detailed motion to dismiss—the Complaint "identifies claims with sufficient clarity for Defendants to frame a responsive pleading." *Id*.

### F.    Control Person Liability Claims

When plaintiffs adequately plead a primary violation of Section 10(b), Section 11, or Section 12(a), and defendants do not contest that they are control persons (which they do not in this case), Section 20(a) claims and Section 15 claims, respectively, are adequately pled. *See Alaska v. Ryder Sys.*, 603 F. Supp. 3d 1229, 1241 (S.D. Fla. 2022). Thus, Defendants' motion to dismiss these claims should be denied.

### G.    Leave to Amend

In the event of a dismissal, Plaintiff requests leave to further amend the Complaint. "'Leave to amend should be liberally granted when necessary in the interest of justice. [U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.'" *Kiley v. Medfirst Consulting Healthcare Staffing, LLC*, No. 17-cv-1756, 2019 U.S. Dist. LEXIS 212313, at *7 (N.D. Ala. Dec. 10, 2019) (citing *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999)).

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Amended Complaint should be denied in full.

---

they specify any basis for such a claim.'" *Refco*, 503 F. Supp. 2d at 632 (citing *Rombach v. Chang*, No. 00-cv-0958, 2002 U.S. Dist. LEXIS 15754, at *10 (E.D.N.Y. June 7, 2002)).

Dated: July 12, 2023

Respectfully submitted,

**THE WHITEHEAD LAW FIRM, L.L.C.**

*/s/ C. Mark Whitehead III*
C. Mark Whitehead III
(FL Bar Roll #559881)
1330 West Avenue, Suite C402
Miami Beach, FL 33139
Telephone: (337) 740-6006
Facsimile: (337) 205-7754
cmw@whiteheadfirm.com

*Local Counsel for Lead Plaintiff Jonathan Coon*

**KAHN SWICK & FOTI, LLC**

Kim E. Miller
250 Park Ave., 7th Floor
New York, NY 10177
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
1100 Poydras Street, Suite 960
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Jonathan Coon*
*and the Class*

26

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 12, 2023, I authorized the electronic filing of the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ C. Mark Whitehead III*
C. Mark Whitehead III