**THE WHITEHEAD LAW FIRM, L.L.C.**
C. Mark Whitehead III
(FL Bar Roll #559881)
cmw@whiteheadfirm.com
1330 West Avenue, Suite C402
Miami Beach, Florida 33139
Telephone: (337) 740-6006
Fax: (337) 205-7754
*Local Counsel for Lead Plaintiff Jonathan Coon*

**KAHN SWICK & FOTI, LLC**
Kim E. Miller (admitted phv)
kim.miller@ksfcounsel.com
250 Park Avenue, 7th Floor
New York, New York 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498
*Lead Counsel for Lead Plaintiff Jonathan Coon
and the Class*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 23-CV-80232-ROSENBERG/REINHART**
**Class Action / Jury Trial Demanded**

MANIRAJ ASHIRWAD GNANARAJ,
Individually and on behalf of all others similarly
situated,

                Plaintiff,

      v.

LILIUM N.V. F/K/A QELL ACQUISITION
CORP., BARRY ENGLE, DANIEL
WIEGAND, and GEOFFREY RICHARDSON,

                Defendants.

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABREVIATIONS ........................................................................................... vi

I. PRELIMINARY STATEMENT ................................................................................. 1

II. FACTUAL BACKGROUND ...................................................................................... 2

III. ARGUMENT ............................................................................................................... 3

    A. Plaintiff Cured the Pleading Deficiencies Identified in the R&R .......................... 3

    B. Defendants' Incorporation of their Prior Motion Is Improper ............................... 4

    C. The Court Should Disregard Defendants' "Background" Section
       in its Entirety ......................................................................................................... 5

    D. CW1 is a Credible Witness ................................................................................... 6

    E. Plaintiff Adequately Pleads Section 10(b) Claims ............................................... 7

       1. Plaintiff Adequately Pleads Material Misstatements and Omissions ............. 7

       2. The PSLRA's Safe Harbor Does Not Apply .................................................. 9

          a. Defendants' Battery and Hover Statements Were Not
            Forward Looking ................................................................................. 10

          b. Defendants' Cautionary Language Was Not Meaningful ..................... 11

          c. Defendants Had Actual Knowledge of Falsity .................................... 12

       3. Defendants' Misrepresentations and Omissions
         Are Not Inactionable Opinion ....................................................................... 13

       4. Plaintiff Adequately Pleads a Strong Inference of Scienter ......................... 14

          a. Defendants Intended to Defraud Investors or Were Severely Reckless ......... 14

          b. Defendants Had Motive and Opportunity to Commit Fraud ................ 15

          c. The Inference of Scienter Is at Least as Compelling as
            Any Competing Inference ................................................................... 16

       5. Plaintiff Adequately Pleads Loss Causation ................................................ 17

       6. Plaintiff Adequately Pleads Scheme Liability .............................................. 18

       7. Plaintiff Adequately Pleads Section 14(a) Claims ....................................... 19

       8. Plaintiff Adequately Pleads Securities Act Claims ...................................... 20

       9. The Control Person Liability Claims Should Not Be Dismissed ................... 20

       10. Leave to Amend ........................................................................................... 20

IV. CONCLUSION .......................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Alaska v. Ryder Sys.*,
603 F. Supp. 3d 1229 (S.D. Fla. 2022) ..................................................................... 21

*Alphabet Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................................ 19

*Bellocco v. Curd*,
2005 U.S. Dist. LEXIS 24251 (M.D. Fla. Oct. 20, 2005) ......................................... 11

Bryant v. Avado Brands, Inc.,
187 F.3d 1271 (11th Cir. 1999) ................................................................................... 5

*Bush v. Blink Charging Co.*,
No. 20-cv-23527, 2023 U.S. Dist. LEXIS 214707 (S.D. Fla. Nov. 27, 2023) .......... 17

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ................................................................................. 13

*City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mort. Holdings Inc.*,
No. 15-cv-61170, 2016 U.S. Dist. LEXIS 195953 (S.D. Fla. June 20, 2016) ........... 20

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
2018 U.S. Dist. LEXIS 45676 (S.D.N.Y. Mar. 20, 2018) ......................................... 18

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
594 F.3d 783 (11th Cir. 2010) ................................................................................... 20

*Einhorn v. Axogen, Inc.*,
42 F.4th 1218 (11th Cir. 2022) ............................................................................ 10, 13

*Employees' Ret. Sys. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)......................................................................................... 7

*Employees' Ret. Sys. v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) ...................................................................................... 14

*Ford v. Shepherd*, No. 18-cv-60732,
2018 U.S. Dist. LEXIS 174415 (S.D. Fla. Oct. 9, 2018).............................................. 4

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................... 20

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ......................................................................................... 7

*Happy Tax Franchising LLC v. Hill*,
No. 19-cv-24539, 2023 U.S. Dist. LEXIS 2711 (S.D. Fla. Jan. 5, 2023)................... 19

*Horsley v. Feldt*,
304 F.3d 1125 (11th Cir. 2002) ................................................................................... 5

*In re Acuity Brands Sec. Litig.*,
   No. 19-cv-0022, 2019 U.S. Dist. LEXIS 231099 (N.D. Ga. Aug. 12, 2019) ........................... 11

*In re Aegean Marine Petroleum Network, Inc.*,
   529 F. Supp. 3d 111 (S.D.N.Y. 2021)..................................................................................... 19

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   620 F. Supp. 3d 1231 (S.D. Fla. 2022) ................................................................................... 11

*In re KLX, Inc. Sec. Litig.*,
   232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) ........................................................................... 5

*In re Pegasus Wireless Corp. Sec. Litig.*,
   657 F. Supp. 2d 1320 (S.D. Fla. 2009) ................................................................................... 15

*In re Philip Morris Int'l Inc.*,
   89 F.4th 408 (2d Cir. 2023) .................................................................................................... 13

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................................... 20

*In re Smith Gardner Sec. Litig.*,
   214 F. Supp. 2d 1291 (S.D. Fla. 2002) ................................................................................... 15

*In re Stable Rd. Acquisition Corp. Sec. Litig.*,
   No. 21-cv-5744, 2022 U.S. Dist. LEXIS 127345 (C.D. Cal. July 13, 2022)........................... 16

*In re STEC Inc. Sec. Litig.*,
   No. 09-cv-1304, 2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) ............................ 10

*In re Tesla Sec. Litig.*,
   477 F. Supp. 3d 903 (N.D. Cal. 2020) ......................................................................... 8, 10, 13

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013)................................................................................................... 13

*Lemen v. Redwire Corp.*,
   No. 21-cv-1254, 2023 U.S. Dist. LEXIS 48833 (M.D. Fla. Mar. 22, 2023) ........................... 16

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)........................................................................................................... 19

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   No. 22-1165, 2024 U.S. LEXIS 1575 (Apr. 12, 2024).............................................................. 9

*Malouf v. SEC*,
   933 F.3d 1248 (10th Cir. 2019) .............................................................................................. 19

*Masel v. Villarreal*,
   924 F.3d 734 (5th Cir. 2019) ................................................................................................... 7

*Metro. Transp. Auth. Defined Ben. Pension Plan Master Tr. v. Welbilt, Inc.*,
   No. 18-cv-3007, 2020 U.S. Dist. LEXIS 33664 (M.D. Fla. Feb. 6, 2020)......................... 17, 18

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .............................................................................................. 17

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ...................................................................................... 6

*Murdeshwar v. Search Media Holdings, Ltd.*,
    No. 11-cv-20549, 2011 U.S. Dist. LEXIS 158193 (S.D. Fla. Aug. 8, 2011) ......................... 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)....................................................................................................... 14

*Pritchard v. Apyx Med. Corp.*,
    No. 19-cv-0919, 2020 U.S. Dist. LEXIS 42627 (M.D. Fla. Mar. 11, 2020) .......................... 11

*Rosky v. Farha*,
    No. 07-cv-1952, 2009 U.S. Dist. LEXIS 107531 (M.D. Fla. Mar. 30, 2009) ........................ 15

*Saltzberg v. TM Sterling/Austin Assocs.*,
    45 F.3d 399 (11th Cir. 1995) ......................................................................................... 11

*Schultz v. Applica*,
    488 F. Supp. 2d 1219 (S.D. Fla. 2007) ........................................................................... 10

*SEC v. Kokorich*,
    663 F. Supp. 3d 63, 81 (D.D.C. 2023) ........................................................................... 16

*SEC v. Revolutionary Concepts, Inc.*,
    No. 21-10984, 2022 U.S. App. LEXIS 3591 (11th Cir. Feb. 9, 2022) ................................... 12

*Set Capital LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)............................................................................................. 16

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d. Cir. 2010)........................................................................................... 10

*Smykla v. Molinaroli*,
    85 F.4th 1228 (7th Cir. 2023) ......................................................................................... 4

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ............................................................................................... 15

*Swanson v. U.S. Forest Serv.*,
    87 F.3d 339 (9th Cir. 1996) ............................................................................................. 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................................................... 14

*Theodore v. Purecycle Techs., Inc.*,
    No. 21-cv-809, 2022 U.S. Dist. LEXIS 243150 (M.D. Fla. Aug. 4, 2022) ................. 15, 17, 20

*Vargas v. Citrix Sys.*,
    No. 22-cv-62327, 2024 U.S. Dist. LEXIS 20044 (S.D. Fla. Feb. 3, 2024) ............................ 20

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ....................................................................................... 3

**Statutes**

15 U.S.C. § 78u-5 ................................................................................................................ 10

**Other Authorities**

Charles Cao et al.,
  *Does Insider Trading Impair Market Liquidity? Evidence from IPO Lockup Expirations*,
  39 J. FIN. & QUANTITATIVE ANALYSIS 25 (2004) ...................................................................... 18

James C. Brau *et al*.,
  *Market Reaction to the Expiration of IPO Lockup Provisions*,
  30 J. MANAGERIAL FINANCE 87 (2004) ................................................................................... 18

Michael Klausner *et al*.,
  *A Sober Look at SPACs*,
  39 YALE J. ON REG. 228 (2022) ............................................................................................. 16

Molk & Partnoy,
  *The Long-Term Effects of Short Selling and Negative Activism*,
  2022 U. ILL. L. REV. 53 (2022) ............................................................................................. 18

Peter Alleston,
  *IPO Lock-up Agreements: Perspectives from the US and China*,
  IHS Markit 1 (July 31, 2017) ................................................................................................ 18

**Rules**

Fed. R. Civ. P. 12(d) ...................................................................................................................... 5

**TABLE OF ABREVIATIONS[1]**

| | |
|---|---|
| ¶-- | Paragraph number within the SAC |
| Def. Br. | Defendants' Memorandum of Law in Support of Their Motion to Dismiss the SAC (ECF No. 114) |
| Def. Ex. | Exhibits to the Declarations of Doru Gavril (ECF Nos. 90, 98) |
| Def. Orig. Br. | Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint (ECF No. 89) |
| ECF | Docket entries from *Gnanaraj v. Lilium N.V.*, Docket No. 9:23-cv-80232 (S.D. Fla. Feb 13, 2023) |
| FAC | Plaintiffs' First Amended Complaint (ECF No. 74) |
| Orig. Reply | Defendants' Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint (ECF No. 97) |
| R&R | Report and Recommendation (ECF No. 105) |
| SAC | Plaintiffs' Second Amended Complaint (ECF No. 110) |

---

[1] All other undefined terms have the meaning ascribed to them in the SAC.

## I.      **PRELIMINARY STATEMENT**

Plaintiff's central allegation is that Lilium could not commence commercial operations when Defendants told investors they could. And Defendants have already conceded the plausibility of Plaintiff's allegation. In their prior brief (and notably excised from their current brief), Defendants admitted "[t]here [was] no possible way that Plaintiff—*or Defendants*, or the Court—could know how difficult it would be to certify the Lilium Jet, because EASA and FAA themselves have not yet finalized regulations." Def. Orig. Br. at 15 (emphasis added). Yet that known impossibility never stopped Defendants—on the same day they announced the potential SPAC merger—from publicly moving up their timeline to commercialization from 2025 to 2024, or from repeatedly assuring prospective investors that Lilium would meet that timeline, with profits to follow by 2025. Defendants also misrepresented the state of Lilium's supposedly then-existing, secret battery technology. Combined, these statements (and others) were designed to, and did, give investors the impression that Lilium *currently* possessed the requisite technology and ability to build and commercialize a superior eVTOL faster than its numerous peers, providing better and quicker returns for investors. Consequently, Defendants were able to complete the SPAC combination, raising approximately $584 million, and conferring significant personal benefits on the Individual Defendants, while simultaneously buying themselves more time by gambling that technology and innovation would eventually catch up to their fraudulent scheme and representations.

But their gamble didn't pay off. Instead, their plans were foiled by a research report published by Iceberg Research, and corroborated by other sources, including Lilium's own chief program officer, which revealed that Lilium's timeline to commercialization was never feasible. When the price of Lilium stock plummeted approximately 34% on this news, investors were left holding the bag. Then, just two weeks after the publication of the Iceberg Report, and after Defendants had already raised more than a half billion dollars from unsuspecting investors and had locked in substantial financial benefits for themselves, Lilium quietly tucked into its annual report an admission that it had changed the timeline to commercialization back to 2025, effectively confirming the veracity of the SAC's allegations.

Unable to grapple with these allegations, Defendants mischaracterize the SAC, improperly laud their Jet's current technological progress (which is still nowhere close to commercialization) and continue to hang their hats on a loss causation argument, ignoring controlling Eleventh Circuit

law. As discussed further below, Defendants' motion to dismiss should be denied in full.

## II.        FACTUAL BACKGROUND

Lilium is in the business of developing electric vertical take-off and landing aircraft ("eVTOL"). ¶25. The eVTOL space is fiercely competitive, and in order to secure shareholder support leading up to a merger with a SPAC, Defendants repeatedly told investors that the Lilium Jet could fly 155+ miles in a single trip (farther than any of Lilium's competitors), spend less than 60 seconds per flight in the "hover" phase (reserving sufficient power for this claimed range), seat seven people (two more than category frontrunner Joby), and was on track to be first to market, with commercialization in 2024, leading to the Company becoming profitable by 2025. ¶¶50, 78, 141. Defendants also touted Lilium's access to "advanced" batteries capable of 330 Wh/kg, 60 Wh/kg more than Lilium's competitors. ¶¶86, 175-77. To support these claims, Lilium commissioned and disseminated a "White Paper" full of complex equations, which stated it had been reviewed by five experts. ¶85. Based on these claims, which were repeated numerous times in Lilium's Registration Statement, shareholders approved the merger, raising approximately $584 million for Lilium and conferring significant personal benefits on the Individual Defendants. ¶3.

Soon thereafter, a report published by Iceberg Research revealed that many of Lilium's claims were not scientifically accurate. ¶75. The Iceberg Report revealed for the first time that the source of Lilium's "advanced" batteries was Zenlabs, whose CEO had previously been the founder and CTO of Envia—a company which touted batteries with an exceptionally high energy density but lost a major contract with GM when it was discovered that the batteries could only hit this high energy density for three cycles, after which performance rapidly decreased. ¶90. Additionally, Iceberg spoke to experts who questioned Lilium's claims about the timeline to certification. ¶¶132, 252. The Iceberg Report further revealed that Wiegand's alma mater wanted no association with the Company. ¶71. After the Iceberg Report was issued, Lilium's stock price dropped approximately 34%, on unusually high trading volume. ¶252.

In a follow up report, Iceberg delved even further into the flaws with Lilium's narrative. First, it revealed that the five experts cited prominently on the first page of the White Paper had only reviewed the calculation *methodologies*, not the author's numerical assumptions, critically undermining the conclusions in the paper (¶93), a fact left unaddressed in Defendants' briefing. Iceberg also included a report written by Aeronautics Professor Gollnick, which contained numerous findings seriously impugning the validity of the White Paper. ¶¶93, 97. Gollnick

2

explained batteries capable of 330 Wh/kg are still many years from commercial availability, and, even if Lilium had access to such batteries, the Jet's range would likely not be anywhere near 155 miles. ¶¶92, 94, 97, 101. Gollnick also explained that 60 seconds of "hover" time would not be enough for obstacle clearance in urban areas, and that a hover time of 2-3 minutes was "more realistic." ¶99. Taking these factors into consideration, even assuming 330 Wh/kg batteries, a 5-seater Lilium Jet (much lighter than the 7-seater) would only have a range of 11.8 miles. ¶102.

Post-class period statements by Lilium confirmed much of the information in the Iceberg Report. First, in its annual report filed on March 30, 2022 (just two weeks after the Iceberg Report was published), Lilium revealed it had moved its timeline back to 2025, essentially admitting that the 2024 timeline was never feasible. ¶276. This change in timeline was not mentioned in Lilium's earnings call for the same period, which took place on March 1, 2022. *Id.* On May 31, 2022, Lilium revealed it had added a traditional landing gear to its Jet, revealing a lack of confidence by Lilium that that 60 seconds of hover time would be enough to accomplish a vertical landing. ¶277. In the same statement, Lilium confirmed the source of its "advanced" batteries was Zenlabs. It cited a report purportedly confirming the battery was capable of over 300 Wh/kg; however, the report revealed the battery had only been tested for two charging cycles, seriously calling into question whether they would be able to maintain the same performance after repeated use. ¶¶91, 278.

## III.  ARGUMENT[2]

### A.  Plaintiff Cured the Pleading Deficiencies Identified in the R&R

The R&R found the FAC to suffer from a handful of technical flaws. *See* ECF No. 105.[3] Recognizing that they could be easily remedied, Plaintiff did not object to the R&R (*see* ECF No. 106) and submitted the SAC addressing each of the issues cited in the R&R. *See* ECF No. 110. The R&R found the FAC to be a "shotgun pleading" because Counts II-VII "repeat[ed] and reallege[ed] each and every allegation contained in the foregoing paragraphs as if fully set forth herein." R&R at 14. Heeding the instruction from the R&R's citation to *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015), Plaintiff replaced the "repeats and realleges" language with specific paragraphs containing the facts relevant to each count. *See* ¶¶307, 316, 325, 333, 338, 343, 348, 357, 364, 369, 374. Plaintiff also complied with the R&R's

---

[2] Unless otherwise noted, all internal citations and quotation marks are omitted.
[3] Because the R&R was silent on the merits of Plaintiff's claims, Plaintiff had no reason to believe edits to the merits were necessary. As such, Defendants' statement that Plaintiff "squandered" his chance to amend by not making "substantive" edits is baseless. Def. Br. at 2.

instruction that Count I be divided into separate counts for liability under Rule 10b-5(a) and 10b-5(c) and that Section 20(a) be separately alleged for each predicate violation (*see* R&R at 14-15). *See* ¶¶307-24, 333-47. Furthermore, the R&R stated that "entire sections [of the AC] read more like an advocate's brief than a statement of the factual and legal basis for relief." R&R at 16. To comply with this admonition, the "entire" cited sections were eliminated from the SAC. Lastly, Plaintiff attempted to eliminate all "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." R&R at 16.[4]

In response to these revisions, Defendants seek to exploit them as concessions that Plaintiff's claims are "intrinsically flawed." Def. Br. at 4, 5. Not so. Plaintiff conceded nothing by complying with the R&R's instructions, and regardless, any differences between the FAC and SAC are irrelevant, as "'[a second] amended complaint supersedes the [amended complaint] in its entirety, making the [amended complaint] as if it never existed.'" *Ford v. Shepherd*, No. 18-cv-60732, 2018 U.S. Dist. LEXIS 174415, at *5 (S.D. Fla. Oct. 9, 2018), *Report & Recommendation adopted sub nom. Ford v. Love*, No. 18-cv-60732, 2019 U.S. Dist. LEXIS 19236 (S.D. Fla. Feb. 5, 2019). Nor does the deletion of the "The Presumption of Reliance" section mean "Plaintiff concedes that this case may not proceed as a class action," Def. Br. at 5-6, because Plaintiff invokes the *Basic* presumption elsewhere in the SAC. *See*, *e.g.*, ¶329 ("Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Lilium securities during the Class Period in purchasing Lilium securities that were artificially inflated as a result of Defendants' false and misleading statements."); ¶¶301-06 ("Class Action Allegations"); ¶¶308, 317; "Prayer for Relief."

**B.    Defendants' Incorporation of their Prior Motion Is Improper**

After the Court dismissed the FAC as a "shotgun pleading," Defendants moved to dismiss the SAC with, ironically, their own puzzle-like motion. Throughout their current brief, Defendants attempt to incorporate all the arguments made in support of their prior motion. *See, e.g.*, Def. Br. at 1. This tactic not only circumvents the spirit of Local Rule 7.1(c)(2) by incorporating up to an additional 40 pages of prior briefing into their current 20-page brief, but it also violates Fed. R.

---

[4] While Defendants criticize the SAC for being prolix, in this class action securities case—which contains 11 claims against four defendants over a 12-month period—the heightened pleading standard of the PSLRA makes brevity difficult. *See Smykla v. Molinaroli*, 85 F.4th 1228, 1235 (7th Cir. 2023) ("We recognize that the PSLRA can make it difficult for plaintiffs to assert their claims using a 'short and plain' statement.").

Civ. P. 10(c), which only allows incorporation by reference of statements made in *pleadings*, not in *motions*. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (stating that Rule 10(c) applies to "pleadings" and not "motions"). This tactic also unnecessarily creates ambiguities regarding which specific arguments Defendants are currently making, muddies the record, and saddles Plaintiff (and the Court) with the tedious task of oscillating between three briefs to construct and address arguments supposedly being raised in the current motion. As such, Defendants' incorporation attempts should be disregarded. *See Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996) (holding under Rules 7(b)(2) and 10(c) that "the incorporation of substantive material by reference is not sanctioned by the federal rules at issue").[5]

### C.   The Court Should Disregard Defendants' "Background" Section in its Entirety

"In analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference into the complaint." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1275 (S.D. Fla. 2017) (Rosenberg, J.). The court may take judicial notice of "relevant public documents required to be filed with the SEC, and actually filed," but only "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

In the "Background" section of their Brief, Defendants ask the Court to accept as true numerous "facts" that appear nowhere in the SAC (which is not cited once). *See* Def. Br. at 2-4. For example, Defendants improperly tout their recent so-called "milestone" of "shifting from the design to industrialization phase" (Def. Br. at 2), even though, according to their Class Period statements, they should be shifting to the "commercialization" phase, and soon the "monetization" phase, which do not appear on the projected horizon. And many of their "facts" are directly contrary to the facts alleged in the SAC (*e.g.*, the Iceberg Report was an "attack" and based on "subjective interpretation of public information") and/or contain disputed legal argument ("after a substantial number of employee shares entered the market…Lilium's stock declined"). Some of them are even plainly incorrect, including their citation to an article for which judicial notice is not appropriate to claim Professor Gollnick "wholly reversed his opinion as to the Jet's feasibility" after a visit to a Lilium production facility. Def. Br. at 4 n.2. But the opinions in the article are

---

[5] If the Court does incorporate Defendants' prior briefs, Plaintiff refers to and incorporates his previous opposition (ECF No. 96), in which he fully briefed his responses to that motion.

actually very similar to those he espoused in the Iceberg Report. *Compare* Def. Ex. 10 ("The maximum energy density possible today and in the near future is below what Lilium needed to achieve the specified range") *to* ¶94 ("Batteries capable of 330 Wh/kg … are still years away from becoming commercially available.").

Defendants also rely on numerous documents for which judicial notice is not appropriate[6] and improperly cite documents Plaintiff alleges contain misleading statements for the truth of the matters asserted therein, such as the August 21, 2021 Proxy Statement. Some of these documents do not support the statement for which they are cited. *See* Def. Br at 2 (citing Proxy Statement for the fact that Lilium has 950 employees, but document says it has a "600-strong team." Def. Ex. 1 at 39), Def. Br. at 3 (stating "legacy stockholders agreed not to trade their shares for a period of 180 days," citing Def. Ex. 4 (which merely defines the term "lock-up period")). And finally, some statements are not supported by any citation at all. *See*, *e.g.*, Def. Br. at 2-3 ("Lilium has also made strides towards attaining regulatory certification"). On a motion to dismiss, these statements and documents should not be considered by the Court.

### D.    CW1 is a Credible Witness

"Confidentiality [] should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008). Here, the SAC readily meets such requirements by specifying numerous details about CW1's position, including his title, job responsibilities, location, who s/he reported to, and the time period s/he worked at Lilium. ¶¶55-56. While Defendants claim that CW1 is not credible because s/he was a "junior employee" (Def. Br. at 17), CW1 worked at Lilium's headquarters in Germany, was just two steps removed from the Chief Engineer, and describes personally meeting and sharing his/her concerns about the certification timeline with Defendant Yemsi. ¶¶55, 56, 66. CW1's knowledge is also based on 15 years of engineering experience at Boeing before joining Lilium. ¶56. Importantly, CW1's statements are corroborated by other sources, including a *Forbes* article and Lilium itself. ¶¶62, 133, 136.

Defendants also argue CW1 is not credible because s/he left the company before the Class

---

[6] These documents include: (i) a December 2023 "Year in Review" published by Lilium; (ii) Company press releases; (iii) a March 2023 YouTube video published by Lilium; (iv) several articles, including one published by defense firm Foley & Lardner LLP; and (v) Lilium's website as of March 8, 2024 (months after the SAC was filed).

Period. But many courts agree "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Emps' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015); *see, e.g.*, *Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019) ("[E]vidence of later events can provide useful circumstantial evidence that a [ ] representation was false when made."). Citing no cases, Defendants also summarily state that "it is irrelevant that CW1 held a different opinion from management." Def. Br. at 17. Yet CW1's opinion was based on many verifiable facts, and therefore warrants consideration by the Court. *See, e.g.*, *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (rejecting "Defendants' argument that Plaintiffs 'simply juxtapose [the] CWs' subjective assessments of deals with managers' conflicting business judgments'" and finding, based on "the level of detail of the CW statements…and the consistency between the CW's statements of subjective opinion and those of verifiable fact" that "the CWs tell a reasonably plausible story").

**E.      Plaintiff Adequately Pleads Section 10(b) Claims**

Here, the SAC adequately alleges falsity for purposes of Section 10(b) and Rule 10b-5 by alleging each materially false or misleading statement, its maker, the date on which it was made, how it was disseminated, and an explanation of why each statement or omission is alleged to be misleading. ¶¶171-250.

1.      Plaintiff Adequately Pleads Material Misstatements and Omissions

**Timeline**: On the day Defendants announced the potential merger between Lilium and Qell, they accelerated their timeline, without explanation, from certification in 2025 to beginning commercial operations in 2024. ¶267. Leading up to the merger, Defendants repeatedly assured investors they were on track to achieving this timeline. ¶¶202-14. Commercialization by 2024 "would position [Lilium] as one of the first companies to enter the eVTOL market." ¶228. In response to questions about the date's viability, Defendant Yemsi reassured: "[W]e don't have the complexity that you would expect on a commercial, typical aircraft…there is a fixed landing gear….That [lack of] complexity enables us to compress the timeline." ¶204. Based on this timeline, Defendants claimed they would be profitable by 2025. ¶¶144, 221-24, 230, 233. The prospect that Lilium was well on its way to certifying and commercializing its aircraft, not at some time in the distant future, but by 2024, with profits following soon thereafter, was highly material to investors. ¶3. Yet, the SAC plausibly alleges Defendants had no reasonable basis to accelerate their timeline. ¶229. In fact, Defendants conceded this very point in their prior brief: "There is no

possible way that Plaintiff—or Defendants, or the Court—could know how difficult it would be to certify the Lilium Jet." Def. Orig. Br. at 15. Because there was "no possible way" to determine whether and when regulators would certify the Jet, there could be no reasonable basis for moving the schedule up an entire year.

Furthermore, as CW1 explained, it took his/her former company Boeing about ten years to develop a brand-new aircraft. ¶56. Lilium, a much smaller start-up, represented it would be able to build, test, certify, and begin operating its novel new aircraft in less than two years. ¶36 (as of December 2022, Lilium had not begun construction on its full-scale prototype). While Lilium claimed its timeline would be "compressed" due to the Jet's lack of complexity, CW1 disputed that rationale, explaining that elements of the design were quite complicated. ¶¶57-58. Moreover, Lilium's Phoenix demonstrator had flown only about 45 test flights at the time of the IPO, none more than a few minutes, none using Lilium's purported "advanced" batteries, and none manned. By comparison, Joby, which also targeted a 2024 launch date, had flown over 1,000 test flights at the time. ¶157. That Lilium was "charging ahead, with full steam" with designing and building its aircraft, without any idea what the regulatory requirements would be, dismantles their 2024 timeline, and, in fact, led CW1 and three other employees to quit. ¶¶60, 81.

**Batteries**: Plaintiff alleges Defendants made numerous materially false or misleading statements and omissions regarding their access to batteries capable of 330 Wh/kg and a range of 150 miles. ¶¶175-77. According to Defendants, Lilium's "advanced" batteries would allow the Lilium Jet to fly farther and hold more weight, giving the Company a massive advantage over its competitors, and as such, these statements were highly material to investors. ¶29. Defendants critically omitted (until after Iceberg revealed it) that the source of these "advanced" batteries was Zenlabs, whose founder and CEO had been accused of misrepresenting that batteries developed by his former company were capable of a high energy density when they could only produce this result for three charging cycles. ¶90. In fact, when Lilium later revealed data from an external source purportedly verifying the performance of their batteries, the data showed that they had only been tested for two cycles—even fewer than the GM batteries. ¶91. Furthermore, Defendant Wiegand unequivocally represented, "We have secured battery technology that allows us to achieve our launch range of 150 miles." ¶175. A reasonable investor could read this statement to mean these batteries were unconditionally secured, and capable of use in a commercial application, at the time the statement was made. *See In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 922 (N.D.

8

Cal. 2020) ("The statement ["funding secured"] could be read by a reasonable investor to mean complete funding for the transaction was unconditionally secured."). But such batteries were not secured. Thus, the SAC plausibly alleges literal falsity as to these statements.

Nevertheless, Defendants previously argued their statements are not actionable because they are literally true. *See* Def. Orig. Br. at 6-7. But a unanimous Supreme Court recently held "representations that state the truth only so far as it goes, while omitting critical qualifying information," are just as actionable under Rule 10b-5(b) as literally false statements. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, No. 22-1165, 2024 U.S. LEXIS 1575, at *9-10 (Apr. 12, 2024). And here, Defendants' omissions of critical qualifying information, such as the fact that their batteries could maintain 330 Wh/kg for only two charging cycles, is no less a half-truth than "a child not telling his parents he ate a whole cake and telling them he had dessert." *Id.* at *10.

**Range and Hover**: Relatedly, Defendants repeatedly represented that the Lilium Jet would be capable of a range of 155+ miles per trip. ¶¶175-77. Based on this range, Defendants claimed that Lilium would be able to create a regional air network, connecting neighboring cities, where competitors would only be able to take intra-city trips. ¶95. As explained in the White Paper, the range calculation was based on, among other assumptions, access to batteries capable of >320 Wh/kg and spending less than 60 seconds in the "hover" phase (which requires much more power than the flight stage). ¶¶95-96. As Iceberg later revealed, however, this short hover time assumes perfect weather and an area free of obstacles like tall buildings. ¶186. As Professor Gollnick explained, regulators are unlikely to certify the aircraft unless it can spend at least twice as much time in hover, drastically cutting down on the potential range. *Id*. Later, Lilium implicitly confirmed this fact by adding a landing gear so the Jet can divert to an airport and land on a runway if it does not have enough power to land vertically. ¶187. The Lilium Jet's lack of a traditional landing gear was a key feature mentioned to investors in advance of the merger, as Defendants insisted it was one of the reasons that they were confident in achieving certification in time for a 2024 commercial launch. ¶138.

### 2.     The PSLRA's Safe Harbor Does Not Apply

The PSLRA's Safe Harbor protects certain issuers (and others acting on their behalf) from liability for making a forward-looking statement if it is "accompanied by meaningful cautionary statements"; "immaterial," or "the plaintiff fails to prove that the forward-looking statement…was made with actual knowledge…" 15 U.S.C. §78u-5(a); (c)(1). "Defendants bear the burden of

9

demonstrating that their statements are protected by the safe harbor." *In re STEC Inc. Sec. Litig.*, No. 09-cv-1304, 2011 U.S. Dist. LEXIS 75093, at \*26 (C.D. Cal. June 17, 2011) (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d. Cir. 2010)). Defendants fail to meet their burden.

### a.   Defendants' Battery and Hover Statements Were Not Forward Looking

The Safe Harbor "only applies to forward-looking statements and not misstatements or omissions of historical or contemporaneous facts." *Schultz v. Applica*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007). "A forward-looking statement is what it sounds like—a prediction, projection, or plan." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1324 (11th Cir. 2019). "The key characteristic of a forward-looking statement is that its 'truth or falsity is discernible only after it is made.'" *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1223 (11th Cir. 2022). "[I]f a statement includes a 'distinct present-tense…component' that is 'readily severable' from the forward-looking portion of the statement, the safe harbor protects only the forward-looking part." *Id.* (quoting *Carvelli,* 934 F.3d at 1329).

Defendants' battery misrepresentations and omissions were not forward-looking. For example, Defendants stated, "[w]e ***have secured*** battery technology that allows us to achieve our launch range of 150 miles" and "***today*** cells ***are available*** with energy densities of >300Wh/kg…." ¶¶175-77 (emphasis added). The truth or falsity of these statements are not discernible only after they are made; either Defendants had secured battery technology that allowed Lilium to achieve a launch range of 150 miles at the time the statement was made, or they did not. *See Tesla*, 477 F. Supp. 3d at 924 ("[A] reasonable investor would have interpreted ["funding secured"] as something more than a speculative amorphous opinion about future possibilities."). Defendants have no answer to this, so they scour their own filings (not the SAC) for *other* statements about batteries they claim are forward-looking. *See* Def. Br. at 3. But whether Defendants' straw men are covered by the Safe Harbor is not relevant here.

Likewise, Defendants' arguments regarding the hover time misrepresentations fare no better. Again, the alleged statements speak in plain contemporaneous or historical terms: "[W]e ***spend*** very little time in hover phase"; "we almost ***spend*** 30 seconds in hover"; "during take-off we ***are only hovering*** approximately ~10-25 seconds…." ¶¶181-84 (emphasis added). These statements falsely gave investors the impression that Lilium *currently* possessed the requisite technology, when, in fact, Defendants had no such current capabilities, were using prototypes that

10

bore little resemblance to the proposed Jet, and were working in unrealistic hypotheticals. ¶3.[7]

### b.  Defendants' Cautionary Language Was Not Meaningful

"A disclaimer does not provide per se immunity, precisely because the disclaimer must be meaningful and tailored to the risks the business faces." *In re Acuity Brands Sec. Litig.*, No. 19-cv-0022, 2019 U.S. Dist. LEXIS 231099, at *58 (N.D. Ga. Aug. 12, 2019) (internal quotations omitted); *Bellocco v. Curd*, No. 02-cv-1141, 2005 U.S. Dist. LEXIS 24251, at *12 (M.D. Fla. Oct. 20, 2005) (cautionary language may not be "'buried among too many other things', but rather, should be 'explicit, repetitive and linked to the projections about which the plaintiff complains'") (quoting *Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 400 (11th Cir. 1995)). Further, "even if the terms are fully disclosed, 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1263 (S.D. Fla. 2022).

Defendants proudly tout the Registration Statement's "37 pages of risk factors," though they are far-more reticent when it comes to specifically identifying disclosed risks. Def. Br. at 2. This is because many of these statements are meaningless, as they were nothing more than "a front for present problems." *Carvelli*, 934 F.3d at 1327. For example, for Defendants' misrepresentations such as, "we will have a range of around 150 miles," Defendants warned "we might not achieve all of our performance targets." Def. Br. at 13. Thus, Defendants essentially argue their statement "we will have a range of around 150 miles" is rendered immaterial by a boilerplate disclosure saying "the Jet might not do all the things we say." It is not. Indeed, in the laundry list of more specific "risks and significant challenges" in the next sentence, not a single one bears on the Jet's range, much less the specific risk highlighted in the SAC: that Lilium's batteries could not do what Lilium promised. ECF No. 90-3 at 63. Separately, where Defendants do generally discuss if their "technologies fail to perform as expected," they fail to disclose their batteries had not been sufficiently tested, as that would have undercut their statements that they had "secured" battery technology. ECF No. 90-3 at 66; *Pritchard v. Apyx Med. Corp.*, No. 19-cv-0919, 2020 U.S. Dist. LEXIS 42627, at *21 (M.D. Fla. Mar. 11, 2020) ("[C]autioning that 'there

---

[7] Defendants argue certain edits to Plaintiff's allegations are attempts to "evade" the PSLRA. Def. Br. at 4-5. Unable to make an argument regarding the actual statements, Defendants cherry-picked language from Plaintiff's previous *characterization* of those statements. Def. Orig. Br. at 10. To keep the focus on the actual statements made, Plaintiff edited the language with which Defendants previously took issue. ¶¶186-87.

can be no assurance that [product] will be successful or that such future revenues and profitability will be realized'…is not narrowly-tailored to the existing known risk."). With regard to Lilium's timeline to certification and commercialization, Defendants' risk disclosure simply doubles-down on their misrepresentations. The statement "we do not expect to launch commercial services until 2024, at the earliest, if at all" (Def. Orig. Br. at 8) merely reinforces the possibility for Lilium to launch commercial operations in 2024, when the SAC's allegations adequately plead otherwise.

### c.      *Defendants Had Actual Knowledge of Falsity*

Numerous facts support Defendants' actual knowledge that the Lilium Jet's range was not 150 miles, and that it would not be certified and begin commercial operations by 2024. First, Defendants previously admitted "[t]here is no possible way that Plaintiff—or Defendants, or the Court—could know how difficult it would be to certify the Lilium Jet, because the EASA and FAA themselves have not yet finalized regulations." Def. Orig. Br. at 15. If Defendants had no idea how long it would take to certify the jet, and even worse, what those regulations would look like, Defendants had actual knowledge there was no basis to move the commercialization timeline up to 2024 from 2025. *See SEC v. Revolutionary Concepts*, *Inc.*, No. 21-10984, 2022 U.S. App. LEXIS 3591, at *25 (11th Cir. Feb. 9, 2022) (affirming summary judgment where "[Defendant] knew that his projections were not supported by any documentary evidence").

Moreover, at the time of the merger announcement, batteries capable of powering the Lilium Jet were at least 7-8 years from availability (¶158); the CEO of the company Lilium retained to design a battery capable of powering its jet had previously been accused of misrepresenting the capacity of batteries to GM (¶238); the certification bases for both the FAA and EASA were still in development, a fact that CW1 stated interfered with his work at Lilium (¶¶124-25); Lilium's progress toward EASA certification had only just begun and the "longest phase" of the certification process (set at five years for large aircraft) was still years away (¶¶121-22); the design of the Lilium Jet was far more complicated than Defendants represented (¶¶132-33); Defendants had not even begun construction on their full-scale prototype, had only conducted about 20 flights with their demonstrator, and had yet to achieve the transition from hover to forward flight (¶¶128-29); Defendants had not completed the preliminary design review stage (¶¶135-40); at least four former employees, including CW1, left Lilium over concerns about the unrealistic timeline (¶133); CW1 personally communicated his concerns about the timeline to Defendant Yemsi (¶84); Defendant Yemsi's own projections showed that certification in 2024 would be "extremely difficult," but

Defendant Wiegand insisted on retaining the timeline (¶133); Defendant Wiegand was a founder of Lilium and designed the jet as a school project, despite having no real-world aeronautics experience (¶258); and Defendant Wiegand was "intimately involved" in the Jet's development and "every decision had to be run up to" and approved by him (¶281). At this stage, these facts are more than sufficient to infer actual knowledge of falsity.

3. <u>Defendants' Misrepresentations and Omissions Are Not Inactionable Opinion</u>

As the Eleventh Circuit has explained, "words like 'believe' and 'think,' or phrases like 'In my opinion,' trigger the listener or reader to be aware that the speaker is giving a statement of opinion." *Einhorn*, 42 F.4th at 1228 (citing *Carvelli*, 934 F.3d at 1322). Defendants' misstatements regarding batteries and hover time, however, contain none of this hallmark opinion language and instead convey historical, objective fact. *See, e.g.*, ¶181 ("[W]e only spend about 30 seconds in hover…."); ¶175 (Lilium had "secured battery technology that allows us to achieve our launch range of 150 miles"). And, for example, a reasonable investor could have interpreted "[w]e have secured battery technology" as "something more than a speculative amorphous opinion about future possibilities. Instead, it can be read as implying a more concrete state of affair." *Tesla*, 477 F. Supp. 3d at 924 (rejecting argument that the statement "funding secured" was an opinion).

Defendants also argue that any statements relying on "estimates" are opinions, yet the data in the White Paper (upon which the statements rely) is presented as expert-reviewed mathematical calculations, not mere opinion. ¶72; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 n.8 (2015) (contrasting the statements "I believe we have 1.3 million TVs in our warehouse" with "I believe we have enough supply on hand," finding "a reasonable person would think that a more detailed investigation lay behind the former statement").[8] Additionally, the "interpretation of data" must "itself [be] reasonable," *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013), and it was patently unreasonable to state Lilium had "secured" battery technology when the batteries were not proven to maintain their capacity beyond two charging cycles, which would render them useless for their intended purpose. ¶91.[9]

---

[8] The vague statements alleged in *In re Philip Morris Int'l Inc.*, namely that studies were "very advanced," "the best science," and "conducted according to Good Clinical Practice," are more akin to the second category of statements, unlike the statements in this case, which contain a number of specific numerical values. 89 F.4th 408, 418 (2d Cir. 2023).

[9] This differentiates the case at hand from *Employees' Ret. Sys. v. MacroGenics, Inc.*, where the claims were based on mere "disagreements" about "the parameters of clinical trials." 61 F.4th 369, 388 (4th Cir. 2023).

13

Even if the statements were opinions, opinion statements are still actionable, even if "sincerely held," when (1) the supporting facts underlying the opinion are untrue, or (2) the statement "omits material facts…[that] conflict with what a reasonable investor would take from it." *Omnicare*, 575 U.S. at 185-89. A reasonable investor, when reading Defendants' statements regarding hover time in the context of the White Paper, would assume there was a reasonable, factual basis for Defendants' use of the 30-60 second hover, and certainly would not have thought the figure assumed perfect weather and did not account for obstacle clearance, as those would be clear barriers to regulatory approval. ¶99. Regarding the battery statements, the omitted facts that (1) Zenlabs was the source of the battery technology, and (2) the batteries had not yet been proven to keep charge for more than two cycles, stand in stark contrast with what a reasonable investor would understand from the words, "we secured" the battery technology. ¶¶90-91. And Defendants' claim that they disclosed these omissions as risk factors, Def. Br. at 15, is unavailing because the risk disclosures were inadequate. *See supra* at § III.E.2.b.

### 4.      Plaintiff Adequately Pleads a Strong Inference of Scienter

To plead scienter, the PSLRA requires plaintiffs to allege particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). When analyzing scienter allegations, courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The inference that the defendant acted with scienter need not be "the most plausible of competing inferences"; rather, it need only be "at least as compelling" as any opposing inference of scienter. *Id.* at 324. "In this Circuit, 'scienter consists of intent to defraud or severe recklessness on the part of the defendant.'" *FindWhat*, 658 F.3d at 1299 (internal citation omitted).

#### a.   Defendants Intended to Defraud Investors or Were Severely Reckless

In addition to the various facts alleged to support actual knowledge (§ III.E.2.c, *supra*), Plaintiff also alleges numerous red flags that "would place a reasonable [defendant] on notice that the…company was engaged in wrongdoing to the detriment of its investors.'" *In re Pegasus Wireless Corp. Sec. Litig.*, 657 F. Supp. 2d 1320, 1327 n. 3 (S.D. Fla. 2009); *see also* ¶283. Defendants argue "red flags" are insufficient to prove scienter. Def. Br. at 17. A case previously cited by Defendants, however, states that "ignoring 'red flags' or warning signs of improprieties," when coupled with other evidence, "can be sufficient to state a claim of securities fraud." *In re*

14

*Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1304 (S.D. Fla. 2002); *see also Rosky v. Farha*, No. 07-cv-1952, 2009 U.S. Dist. LEXIS 107531, at *24-25 (M.D. Fla. Mar. 30, 2009) (discussing "red flags" in securities context, denying MTD). In fact, courts in this circuit have cited a *lack* of alleged "red flags" as a reason for dismissal. *See Mizzaro*, 544 F.3d at 1251-52. The derivative cases cited by Defendants are inapplicable and do not hold that "red flags…are insufficient to infer scienter." Def. Br. at 17. Rather, they construe whether directors acted in "bad faith," thereby violating their duty of loyalty to the corporation.[10] "Bad faith" is not an element in this case.

Plaintiff also alleges other circumstantial evidence that collectively contributes to a strong inference of scienter, including the statements of CW1 and other former employees (¶¶280-82); the critical nature of the Jet and Defendants' high-level positions and intimate involvement in daily Company operations (¶¶285-90)[11]; denials in the face of contrary evidence and purported access to "secret" information" (¶¶269-73); later contradictory statements and remedial measures (¶¶274-79); and the terminations of Wiegand and Richardson (¶¶291-92).

Nevertheless, Defendants argue, with no support, that the design changes are not indicative of fraud because they "are a predictable outcome of the R&D process[.]" Def. Br. at 9. But this supports Plaintiff's argument: Defendants should not have touted features to investors before the Company conducted a design review to confirm the feasibility of the features. With respect to the inclusion of a backup landing gear, Defendants aver they simply "opted to provide an added safety feature." Def. Br. at 9-10. But Defendant McIntosh expressly stated the landing gear was added because it has "a lower power demand." ¶277. Considering that Defendants insisted one reason they were confident in achieving certification in time for a 2024 commercial launch was because the design was simple and did not have features such as a traditional landing gear (¶138), it is equally plausible Defendants added a landing gear because they acknowledged the Jet might not have sufficient battery reserves to achieve a vertical landing.

b. *Defendants Had Motive and Opportunity to Commit Fraud*

Plaintiff also alleges Defendants had strong motives to misrepresent Lilium's business. ¶¶258-66. Defendants' attempt to dismiss Plaintiff's allegations as "generalized business motives,"

---

[10] Defendants also (again) misquote *Stone v. Ritter*, which states "a claim that directors are subject to personal liability for employee failures"—*not* red flags—is "possibly the most difficult theory in corporation law." 911 A.2d 362, 372 (Del. 2006).

[11] *See Theodore v. Purecycle Techs., Inc.*, No. 21-cv-809, 2022 U.S. Dist. LEXIS 243150, at *40 (M.D. Fla. Aug. 4, 2022) (holding the "core operations theory" may "bolster an inference of scienter")

Def. Br. at 15-16, is wholly unconvincing. First, Defendants desperately needed shareholders to invest in the SPAC transaction to provide the cash necessary for Lilium—a company with no revenues and high cash needs—to continue to operate. ¶¶260-61. Moreover, had Qell not completed an acquisition by its deadline, a number of negative consequences would have resulted for Defendant Engle, including that the Sponsor would have had to return all its investors' money; the Sponsor's Founder Shares (which would be worth approximately $75.585 million upon completion of the Merger) and Private Placement Warrants (worth over $11 million as of June 30, 2021) would be worthless; and the Sponsor and Qell's officers and directors would have lost their entire investment in Qell. ¶262.[12] Defendants also received significant personal financial benefits because of the Merger: Defendants Engle and Wiegand received shares of Lilium stock valued at, respectively, approximately $63.95 million and $231 million, and Defendant Richardson received a "success fee" in the form of stock valued at approximately $2.12 million. ¶263. Wiegand also received Class B shares with triple the voting rights as Class A shares. ¶263. These benefits were "concrete" and "personal," "go beyond 'ordinary profit motive'," and "transcend a generic corporate desire." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 80-81 & n.67 (2d Cir. 2021). Courts have recognized such concrete motives specifically in the SPAC context. *See, e.g.*, *Lemen v. Redwire Corp.*, No. 21-cv-1254, 2023 U.S. Dist. LEXIS 48833, at *12-13 (M.D. Fla. Mar. 22, 2023).[13]

   c.   *The Inference of Scienter Is at Least as Compelling as Any Competing Inference*

Taken collectively, and with all reasonable inferences drawn in Plaintiff's favor, Plaintiff's allegations of actual knowledge, red flags, Defendants' personal financial motives to misleadingly hype the Company and conceal negative aspects of the business, and numerous indicia of circumstantial evidence, support a strong inference that Defendants knowingly, or at least recklessly, misled investors. Put differently, a reasonable person would deem the inference of scienter as least as compelling as Defendants' unconvincing alternative explanations. Def. Br. at 16.

---

[12] This feature of SPACs gives rise to conflicts of interest and "overwhelming" incentives on the part of SPAC management to engage in transactions, even if not in the best interest of shareholders. Michael Klausner *et al.*, *A Sober Look at SPACs*, 39 YALE J. ON REG. 228, 234 (2022).

[13] *See also SEC v. Kokorich*, 663 F. Supp. 3d 63, 81 (D.D.C. 2023) (scienter adequately pled where defendant CEO "stood to benefit financially from a successful mission and merger with [SPAC]"); *In re Stable Rd. Acquisition Corp. Sec. Litig.*, No. 21-cv-5744, 2022 U.S. Dist. LEXIS 127345, at *32-33 (C.D. Cal. July 13, 2022) (defendants "had strong financial motives to…complete the merger with [SPAC]; scienter allegations sufficient).

16

5.      Plaintiff Adequately Pleads Loss Causation

"Loss causation is not subject to the PSLRA's heightened pleading standard." *Metro. Transp. Auth. Defined Ben. Pension Plan Master Tr. v. Welbilt, Inc.*, No. 18-cv-3007, 2020 U.S. Dist. LEXIS 33664, at *18 (M.D. Fla. Feb. 6, 2020). Accordingly, a "plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause' of his injury;" rather, at this stage, a plaintiff need only allege that defendants' conduct "was a 'substantial' or 'significant contributing cause.'" *Id*. In this case, the SAC easily clears this low hurdle by identifying a "corrective disclosure" and by showing that Lilium's stock price dropped by 34% soon after the corrective disclosure. Nothing more is required at this stage. *See id.* at *20-21.

In response, Defendants argue that the Iceberg Report cannot serve as a corrective disclosure and that Plaintiff did not plausibly allege that the Iceberg Report caused the price drop instead of a supposed influx of Lilium shares due to the expiration of a lockup period. *See* Def. Br. at 18. Both arguments fail. First, a short-seller report can serve as a corrective disclosure in the Eleventh Circuit, so long as it does not merely repackage already-public information. *See, e.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013); *Bush v. Blink Charging Co.*, No. 20-cv-23527, 2023 U.S. Dist. LEXIS 214707, at *27-30 (S.D. Fla. Nov. 27, 2023); *Purecycle*, 2022 U.S. Dist. LEXIS 243150, at *43-48. Here, the Iceberg Report revealed new, corrective information to the market: (1) Lilium's battery source was Zenlabs; (2) Wiegand's alma matter did not want any association with Lilium; (3) the amount of hover time Lilium assumed required perfect conditions and no obstacles, and regulators were unlikely to certify the aircraft unless it had sufficient power reserves to hover twice as long; and (4) Defendants' representations that its simple design would lead to a shorter certification timeline were incorrect. ¶252. This new information, combined with the drop in Lilium's stock price, amply qualifies the Iceberg Report to be a corrective disclosure.[14]

Second, at the pleading stage, Plaintiff is not required to disaggregate other potential causes for the drop in stock price. *See Welbilt*, 2020 U.S. Dist. LEXIS 33664, at *20-21; *see also Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 U.S. Dist. LEXIS 45676, at *18 (S.D.N.Y. Mar. 20, 2018) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses

---

[14] Unable to point to credibility issues with Iceberg, Defendants generally claim there are "widespread credibility issues associated with the short-seller industry." Def. Br. at 5. To the contrary, "[s]hort selling, and negative activism, are associated with informational efficiency," and "negative activists play a more important role than has previously been understood." *See, e.g.*, Molk & Partnoy, *The Long-Term Effects of Short Selling and Negative Activism*, 2022 U. ILL. L. REV. 53, 63 (2022). Regardless, credibility determinations are not proper at this procedural stage.

17

or that rule out other causes."). Here, Plaintiff vastly exceeds this low hurdle by not only alleging that Lilium's stock price cratered soon after the release of the Iceberg Report (¶252), but also by alleging that news articles primarily attributed Lilium's stock price decline to the revelations in the Iceberg Report. ¶254; *see also* ¶255 (analyst noting the impact on the stock of the report).

Nevertheless, Defendants' argument—even if appropriate at this stage—that "the massive infusion of Lilium shares that hit the market earlier the same day due to the expiration of a lock-up period," instead could have caused the 34% stock drop, rests on two faulty assumptions. Def. Br. at 18. As recognized by Defendants' own source, share prices often decline "***a few days or more prior to the expiration date***[.]" Def. Br. at 18 n.7 (citing Peter Alleston, *IPO Lock-up Agreements: Perspectives from the US and China*, IHS Markit 1, 2 (July 31, 2017)) (emphasis added).[15] Moreover, Defendants' implication that lockup expirations necessarily cause a "massive infusion of [the company's] shares" is also flawed. Indeed, in one study, researchers found insiders in 128 of 216 firms "[hung] on to virtually all of their shares until at least the first proxy date after the expiration window, typically about a year after the IPO." Charles Cao et al., *Does Insider Trading Impair Market Liquidity? Evidence from IPO Lockup Expirations*, 39 J. FIN. & QUANTITATIVE ANALYSIS 25, 43 (2004).

### 6.    Plaintiff Adequately Pleads Scheme Liability

Claims of scheme liability under Rule 10b-5(a) and (c) "need not comport with Subsection (b)(1) of the PSLRA," which is specific to misstatements and omissions, but must comply with Rule 9(b), which requires a complaint to "state with particularity what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *In re Aegean Marine Petroleum Network, Inc.*, 529 F. Supp. 3d 111, 148 (S.D.N.Y. 2021). The SAC easily satisfies each of these elements (¶¶71-170, 307-24), adequately detailing how each Defendant engaged in a scheme and course of conduct, including disseminating misrepresentations with scienter "to garner the investor support necessary to effectuate the highly lucrative SPAC merger." ¶71. By disseminating false or misleading material (and through other acts described below), Defendants "employ[ed]" a "device" or "scheme" within the meaning of Rule 10b-5(a) and "engage[d] in a[n] act, practice, or

---

[15] *See also* James C. Brau *et al.*, *Market Reaction to the Expiration of IPO Lockup Provisions*, 30 J. MANAGERIAL FINANCE 87, 94, 101 (2004) (a study analyzing market reaction to lockup expirations found statistically significant negative abnormal returns for each of the *preceding four days*, meaning "the price declines cannot be attributed to new shares entering the market").

course of business" that "operate[d]…as a fraud or deceit" under Rule 10b-5(c).

Defendants argue "scheme liability cannot exist independently of a misrepresentation or omission claim when a plaintiff alleges no 'conduct beyond those misrepresentations or omissions.'" Def. Br. at 18. But that position is no longer tenable. *See Alphabet Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) and *Malouf v. SEC*, 933 F.3d 1248, 1259-60 (10th Cir. 2019). As the R&R clearly confirms, "'dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5….'" R&R at 8 (citing *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-01 (2019)); *see also SEC v. Complete Bus. Sols. Grp.*, 538 F. Supp. 3d 1309, 1340 (S.D. Fla. 2021); *Happy Tax Franchising LLC v. Hill*, No. 19-cv-24539, 2023 U.S. Dist. LEXIS 2711, at *34-35 (S.D. Fla. Jan. 5, 2023). In any event, the SAC plainly alleges *conduct* beyond misrepresentations. For example, Defendant Wiegand attempted to utilize his university, not to prove that Lilium's eVTOL's design was viable, but rather to misleadingly "further polish their image, presumably to attract investors." ¶71. Having been rebuffed by the University, Defendants *commissioned* (and ultimately disseminated) the White Paper with the intent to falsely convince the market that Lilium's design was *currently* viable. ¶¶3, 72, 85. Defendants also concealed—until Iceberg discovered the truth—that Lilium had partnered with Zenlabs. ¶90. Accordingly, Defendants' argument fails regardless of whether scheme liability can exist independently of a misrepresentation or omission.

### 7.    Plaintiff Adequately Pleads Section 14(a) Claims

Defendants argue Plaintiff has neither sufficiently pled "scienter [n]or negligence." Def. Br. at 19. But Plaintiff's Section 14(a) claim is *not* subject to Rule 9(b)'s heightened pleading requirements, nor is scienter required, and he *has* adequately alleged negligence. *See, e.g.*, *Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017); *Murdeshwar v. Search Media Holdings, Ltd.*, No. 11-cv-20549, 2011 U.S. Dist. LEXIS 158193, at *58-59 (S.D. Fla. Aug. 8, 2011) (scienter not required for Section 14(a) claims). Very simply, Plaintiff adequately alleged that "Defendants had a legal obligation not to solicit a proxy with false or misleading statements or omissions"; that the Proxy contained materially misleading statements and omissions; and, therefore, that Defendants acted negligently. ¶¶374-82.

Defendants' reliance on *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.* for the proposition that the Proxy here did not constitute an "essential link" to Plaintiff's loss (Def. Br. at 20) is unavailing. *Jabil* concerned proxy materials soliciting shareholder approval of an employee

19

compensation plan—*not* the approval of a de-SPAC merger. 594 F.3d 783, 788 (11th Cir. 2010). The *Jabil* court held "[t]he adoption of a compensation scheme and reelection of directors was not an essential link to the losses of which the shareholders complain" because "the damages suffered by the shareholders were caused not by the policies that they approved via proxy, but by management's failure to follow those policies." *Id.* at 797. Conversely, where (as here) plaintiffs assert Section 14(a) claims predicated on misstatements contained in proxy materials soliciting merger approvals, courts within this Circuit have found the "essential link" sufficient to satisfy the minimal loss causation pleading standards of Rule 8. *See, e.g.*, *Vargas v. Citrix Sys.*, No. 22-cv-62327, 2024 U.S. Dist. LEXIS 20044, at *28 (S.D. Fla. Feb. 3, 2024); *see also Purecycle*, 2023 U.S. Dist. LEXIS 105789, at *33.

### 8.    Plaintiff Adequately Pleads Securities Act Claims

Defendants assert Plaintiff has not alleged valid Securities Act claims because "the same allegations support Plaintiff's Exchange Act and Securities Act claims." Def. Br. at 20. As an initial matter, Defendants ignore that a Securities Act "plaintiff is not required to prove that the defendant acted with scienter." *City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mort. Holdings Inc.*, No. 15-cv-61170, 2016 U.S. Dist. LEXIS 195953, at *20 (S.D. Fla. June 20, 2016). Further, Rule 9(b) does not apply to plaintiffs' Securities Act claims because they are "carefully couched in the language of negligence…." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007); *see, e.g.*, ¶¶348, 357, 364, 369, 374. Even assuming Rule 9(b) applies, Plaintiff's allegations meet that standard for the reasons discussed above.

### 9.    The Control Person Liability Claims Should Not Be Dismissed

When plaintiffs adequately plead primary violations of Sections 10(b), 11, or 12(a), and defendants do not contest, as here, that they are control persons, Sections 20(a) and 15 claims are adequately pled. *See Alaska v. Ryder Sys.*, 603 F. Supp. 3d 1229, 1241 (S.D. Fla. 2022).

### 10.    Leave to Amend

In the event of a dismissal, Plaintiff respectfully requests leave to further amend the SAC.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in full.

20

Dated: April 25, 2024                    Respectfully submitted,


**THE WHITEHEAD LAW FIRM, L.L.C.**

*/s/ C. Mark Whitehead III*
C. Mark Whitehead III
(FL Bar Roll #559881)
1330 West Avenue, Suite C402
Miami Beach, Florida 33139
Telephone: (337) 740-6006
Fax: (337) 205-7754
cmw@whiteheadfirm.com

*Local Counsel for Lead Plaintiff Jonathan Coon*

**KAHN SWICK & FOTI, LLC**

Kim E. Miller
250 Park Avenue, 7th Floor
New York, New York 10177
Telephone: (504) 455-1400
Fax: (504) 455-1498
kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
1100 Poydras Street, Suite 960
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498
lewis.kahn@ksfcounsel.com
craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Jonathan Coon
and the Class*

21

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 25, 2024, I authorized the electronic filing of the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to non-CM/ECF participants indicated on the attached Manual Notice List.

*/s/ C. Mark Whitehead III*
C. Mark Whitehead III