## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-CV-80232-RLR

MANIRAJ ASHIRWAD GNANARAJ,
*Individually and on behalf of all others
similarly situated*,

      Plaintiffs,

v.

LILIUM N.V.; BARRY ENGLE; DANIEL
WIEGAND; GEOFFREY RICHARDSON;
YVES YEMSI; ALASTIR McINTOSH; and
QELL ACQUISITION CORP.,

      Defendants.

_____/

### <u>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS</u>

**THIS MATTER** is before the Court on Defendants' Second Motion to Dismiss [DE 114]

Plaintiff's Second Amended Complaint ("SAC") [DE 110].  For the reasons discussed below, the

Second Motion to Dismiss is **GRANTED** without leave to amend.  The Clerk is ordered to

**CLOSE** the case.

### I.  PROCEDURAL BACKGROUND

Lead Plaintiff[1] ("Plaintiff") filed this class action lawsuit against Defendants Lilium N.V.

("Lilium") and its predecessor Qell Acquisition Corporation ("Qell").  *See* SAC ¶¶ 12, 15.  Plaintiff

also named five individual Defendants:  Barry Engle, the former CEO of Qell and current member

---

[1] At the start of this litigation, the Lead Plaintiff was Maniraj Ashirwad Gnanaraj. *See* DE 1 at 1.
On June 17, 2022, Jonathan Coon filed a motion seeking to replace Gnanaraj as Lead Plaintiff. *See*
DE 29.  The Court granted that motion on February 15, 2023. *See* DE 55.

of Lilium's board of directors; Daniel Wiegand, Lilium's former CEO (through August 1, 2022) and current Chief Engineer; Geoffrey Richardson, Lilium's former CFO (through January 16, 2023); Yves Yemsi, Lilium's Chief Program Officer; and Alastair McIntosh, Lilium's Chief Technology Officer (collectively, the "Individual Defendants," and together with Qell and Lilium, "Defendants"). *See* SAC ¶¶ 17–21. Plaintiff brought this action on behalf of himself and a putative class of others who purchased Lilium's securities between March 30, 2021, and March 14, 2022 (the "Class Period") or held Qell securities as of July 16, 2021 (the "Record Date"). *Id.* ¶ 2.

Plaintiff filed the First Amended Complaint on March 10, 2023. *See* DE 74. Defendants filed a Motion to Dismiss (the "First MTD") challenging the First Amended Complaint on both substantive and procedural grounds. *See* DE 89. The presiding Magistrate Judge issued a Report & Recommendation ("R&R") that recommended dismissing the First Amended Complaint because it was an improper shotgun pleading. *See* DE 105 at 14–16. The Court adopted the R&R, dismissed the First Amended Complaint, and granted Plaintiff leave to amend. *See* DE 107. Plaintiff filed the Second Amended Complaint ("SAC") [DE 110] on January 24, 2024, and Defendants filed a Second Motion to Dismiss ("Second MTD") [DE 114]. Defendants' Second MTD raises the same substantive arguments, and many of the same procedural arguments, as the First MTD.[2]

---

[2] Defendants' Second MTD incorporates their First MTD by reference. *See* DE 114 at 1. The Court agrees with Plaintiff that Defendants are effectively bypassing Local Rule 7(c)(1)'s page limit by incorporating and heavily citing their prior briefing. *See* DE 115 at 4–5. Defendants use their Second MTD as a supplemental brief, and they admit that their new motion merely "summarize[s] the salient points" from the First MTD and "provide[s] updated legal authorities." DE 114 at 1. Defendants' approach is understandable since Plaintiff admits that the Second Amended Complaint is substantively the same as the First Amended Complaint. *See* DE 115 at 3 n.3. Plaintiff says he had "no reason to believe edits to the merits were necessary" because the Court dismissed the First Amended Complaint because of procedural defects (improper shotgun pleading). *Id.* Because the parties agree that the underlying factual allegations were largely unaltered—and to spare the parties and this Court the burden of a third round of briefing—the

The Second Amended Complaint states eleven counts:   Counts I through IV allege securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") for violations of SEC Rule 10b-5(a)–(c); Counts VII and IX allege misrepresentations and omissions in Lilium's registration statement in violation of §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"); Counts VIII and X allege misrepresentations and omissions in Lilium's prospectuses in violation of §§ 12(a) and 15 of the Securities Act; and Count XI alleges misrepresentations and omissions in Lilium's proxy materials in violation of § 14(a) of the Exchange Act. *See* SAC ¶¶ 307–81.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. §78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

## II.   FACTUAL BACKGROUND[3]

### 1.      The Lilium Jet

Over the past decade, several companies began developing small electric planes (called "eVTOLs") as an alternative form of local and regional transportation. *See* SAC ¶¶ 25, 30. Proponents of eVTOLs say they offer the convenience of helicopters with less noise and

---

Court will construe Defendants' incorporation of their First MTD as a motion to exceed the page limit and grant that motion *nunc pro tunc*.   The Court has reviewed all briefing on the First and Second MTDs, and will consider the parties' arguments on the First MTD to the extent they apply equally to the Second Amended Complaint.

[3] In analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference into the complaint and other documents as to which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).   In particular, the Court may consider the full text of securities filings that allegedly contain misstatements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999) (noticing SEC filings).   Documents incorporated by reference may be considered if they are central to plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).   Here, the Court considers the full contents of Qell and Lilium's securities filings, press releases, and other items referenced in the Second Amended Complaint.

greenhouse gas emissions. *Id.* ¶ 25.  In 2015, Defendant Wiegand founded Lilium with a plan to design and commercialize a unique style of eVOTL (the "Lilium Jet" or "Jet"). *Id.* ¶ 26.  Initially, Lilium aimed to certify and commercialize an eVOTL that could transport five passengers at a time. *Id.* ¶ 50.  In May 2019, Lilium began unmanned test flights on a 4-seater prototype called the Phoenix. *Id.* ¶¶ 32–33.  That prototype was destroyed in a battery fire in February 2020 after completing around 20 test flights. *Id.* ¶ 34.  Lilium then built a second prototype, the Phoenix 2, and began test flights with that prototype in July 2021. *Id.* ¶ 35.  Neither of these prototypes matched the specs of the jet that Lilium ultimately planned to certify and commercialize. *Id.* ¶ 36. Prior to March 2021, Lilium's public statements said it planned to launch commercial operations of the 5-seater Lilium Jet in 2025. *Id.* ¶ 50.  Around that same time, Lilium's leading competitor Joby Aviation ("Joby"), was planning to commercially launch its 5-seater eVOTL a year earlier in 2024.[4] *Id.* ¶¶ 34, 39, 50, 114.

Like other commercial aircrafts, the Lilium Jet must go through a certification process through the U.S. Federal Aviation Agency ("FAA") and the European Union Aviation Safety Agency ("EASA"). *Id.* ¶ 117.  However, because eVOTLs use technology unlike other commercial aircrafts (including passenger jets and helicopters), the agencies had to develop new certification criteria. *Id.* ¶ 124.  These new certification requirements were "still evolving" as of spring 2022.[5] *Id.*  Until the agencies issued final certification requirements, Lilium could not finalize the design

---

[4] Based on the pleadings and filings, it appears none of these companies have successfully taken an eVOTL to market. *See* DE 114 at 2.

[5] The Second Amended Complaint does not clearly state when the EASA and the FAA issued final regulations for eVOTLs.  Although certain allegations, like the one cited here, suggest the regulations were still in flux in 2022, Plaintiff also acknowledges that Lilium's design for a 7-seater jet was approved by the EASA in 2020 and had moved on to the test flight stage (although no working prototype existed at that time, so test flights had not yet begun). *See* SAC ¶¶ 26, 123–24.

for the Lilium Jet. *Id.* ¶ 125.  Once a company designs an eVOTL that (on paper) complies with the regulations, the eVOTL begins the "longest phase" of the certification process—involving test flights of a regulatory compliant prototype. *Id.* ¶ 122.  By the fall of 2021, Lilium had not begun this phase of the certification process. *Id.* ¶ 121.

## 2. Merger & SPAC IPO

On March 30, 2021, Qell and Lilium announced a merger agreement. *Id.* ¶¶ 48–49.  Qell was a special purpose acquisition company ("SPAC"), and its shares were publicly traded on the NASDAQ. *Id.* ¶ 15.  Lilium was a private company at the time. *See id.* ¶ 37.  The merger was a "SPAC IPO," meaning the purpose of the deal was to take Lilium public (and raise capital) by merging it with a company that was already publicly traded. *Id.* ¶¶ 3, 38, 41–43.  On September 15, 2021, after a shareholder vote, Qell merged with Lilium.  *Id.* ¶¶ 11, 14–16, 70.  Lilium raised approximately $584 million in capital through this SPAC IPO. *Id.* ¶ 3.

Plaintiff alleges that Lilium needed this cash infusion to continue operations, *id.* ¶ 259, and therefore "Defendants were motivated to misrepresent that their Jet was closer to realization than it actually was to convince investors to invest in the SPAC transaction that Lilium desperately needed," *id.* ¶ 261.  Most of the Individual Defendants stood to benefit from the SPAC IPO, either through substantial voting powers or financial benefits. *Id.* ¶¶ 263, 266.

## 3. Public Statements & SEC Filings

This litigation revolves around Lilium's statements[6] about the Lilium Jet in the lead up to the SPAC IPO.  After Qell and Lilium announced the merger on March 30, 2021, the companies

---

[6] For ease of reference, the Court generally attributes each statement to Lilium.  However, the Second Amended Complaint identifies whether each statement appeared in Qell or Lilium's SEC filings, and, if applicable, identifies the Individual Defendant who made each statement. *E.g.*, SAC ¶ 307 (identifying which Defendant "made" each statement). The parties do not dispute that the statements can be attributed to Lilium. *See* DE 89 at 3 n.1 (explaining that Qell and Lilium became

issued several press releases and published blog posts, research papers, and investor and analyst presentations.  Plaintiff alleges that many of these statements were false or misleading and/or omitted material information.  Plaintiff challenges Lilium's statements about: (1) the battery technology it planned to use in the Lilium Jet; (2) the amount of time the Jet spent hovering during takeoff and landing; (3) the Jet's projected range; and (4) the timeline to certification and commercialization.  The alleged misrepresentations appear in multiple SEC filings between March 30, 2021, and September 15, 2021.

Merger Announcement.  Qell and Lilium announced the merger agreement in a Form 8-K on March 30, 2021. SAC ¶ 49.  The same day, both companies filed a slew of documents with the SEC.  Those documents included a Fact Sheet,[7] Investor Day Slides,[8] Investor Day Transcript,[9] and a research paper about the viability of the Lilium Jet (the "White Paper").[10] *See* SAC ¶ 172. The Fact Sheet listed bullet points about "Lilium's 7-seater Jet" and stated "[r]ange of 155+ miles," "[t]argeting commercial launch in 2024 and operating in multiple regions in 2025." SAC ¶¶ 171,

---

one after the merger such that the only proper entity Defendant is the post-merger Lilium). Because this nuance does not impact the Court's analysis, the Court will generally refer to Lilium's statements.

[7] Available at https://www.sec.gov/Archives/edgar/data/1821171/000110465921043703/tm2111 158d8_425.htm.  Plaintiff did not attach these documents to the Second Amended Complaint. Defendants selectively attached some, but not all, as exhibits to their Opposition to the First MTD. *See* DEs 90-1 to 90-13.  Plaintiff then attached a few more to his Reply brief. *See* DEs 98-1 to 98-6.  When available, the Court refers to the Docket Entry citation.  If the document was not filed on the docket, the Court refers to the publicly available SEC filings accessed through the EDGAR database.  The Court includes a link to those filings when citing each document for the first time.

[8] DE 90-7.  Also available at https://www.sec.gov/Archives/edgar/data/1821171/0001104659210 43701/tm2111158d3_425.htm.

[9] DE 98-4.  Also available at https://www.sec.gov/Archives/edgar/data/1821171/0001104659210 43735/tm2111158d10_425.htm.

[10] DE 90-11.  Also available at https://www.sec.gov/Archives/edgar/data/1821171/000110465921 043700/tm2111158d7_425.htm.

193, 202, 222.  The Fact Sheet included a disclaimer about forward-looking statements and listed

several risk factors.  The Investor Day Slides included the following slide about the Lilium Jet's

battery technology and range:



DE 90-7 at 27; *see also* SAC ¶ 175.  The Investor Day Slides included disclaimers for "forward-

looking statements" and listed several risk factors including "the [Lilium Jet] not performing as

expected, delays in producing the [Lilium Jet] or delays in seeking full certification of all aspects

of the [Lilium Jet]" and the risk that "the technology necessary to successfully operate the [Lilium

Jet] . . . is delayed, unavailable, not available at commercially anticipated prices, not sufficiently

tested, not certified for passenger use or otherwise unavailable." DE 90-7 at 3.  The accompanying

Investor Day Transcript stated: "We have secured a battery technology that allows us to achieve

our launch range of 150 miles."  DE 98-4 at 6; *see also* SAC ¶ 176.  It further stated that Lilium's

"7-seater electric . . . has been in development over several years," and it "comes with 155 miles

range at launch." DE 98-4 at 4; *see also* SAC ¶ 191.

The White Paper—authored by a Lilium engineer and purportedly reviewed by five

independent experts—concluded that Lilium's 7-seater Jet would have a range of 155 miles

"assuming a battery energy density of 320Wh/kg." DE 90-11 at 3; *see also* SAC ¶ 192.  The White Paper disclosed that the highest density battery that was commercially available at that time was 250Wh/kg, but it cited to other studies suggesting that higher densities were possible. *See* DE 90-10 at 25.  The White Paper then calculated projected ranges assuming a higher battery density than what was commercially available. *See id.*  Many of the March 30, 2021, filings said Lilium planned to launch commercial operations in 2024. *See* SAC ¶¶ 202–03; DE 98-4 at 9 ("2024 is when we target our launch of flight operations."); DE 90-7 at 8 ("Planned service launch 2024").

<u>Analyst Day</u>.  Lilium held an Analyst Day on June 16, 2021, and it filed the Slide Deck[11] and Transcript[12] with the SEC. *See* SAC ¶ 172.  The Analyst Day Slides included the following statements about hover time, range, and certification timeline:



[11] DE 90-8.  Also available at https://www.sec.gov/Archives/edgar/data/1821171/000110465921081279/tm2111158d24_425.htm.

[12] DE 90-9.  Also available at https://www.sec.gov/Archives/edgar/data/1821171/000110465921082044/tm2111158d27_425.htm.



DE 90-8 at 23, 27, 30; *see also* SAC ¶¶ 181, 194, 209, 223.  The Analyst Day Slides included the same disclaimers for "forward-looking statements" and listed many of the same risk factors as the Investor Day Slides.  *See* DE 90-8 at 3.  The Analyst Day Transcript, which accompanied these slides, stated that "when we look at a typical mission, . . . we spend very little time in a hover phase." DE 90-9 at 6; SAC ¶ 194.  It also stated that "[i]nitially, [the Lilium Jet] will have a range of around 150 miles." DE 90-9 at 3; SAC ¶ 194.

_Press Releases & Blog Posts_.  After the merger announcement, Lilium issued several other statements discussing the Jet's hover time, range, battery technology, and commercialization timeline.  On June 11, 2021, Lilium published a blog post[13] stating: "We are aiming to achieve Entry Into Service . . . in 2024, which is a fairly ambitious goal." SAC ¶ 206.  The blog post said that while this "timeline may appear challenging," Lilium was "confident in [its] program timelines." _Id._  On August 4, 2021, the Chief Technology Officer (Defendant McIntosh) posted on Lilium's Technology Blog. _See_ DE 90-12; SAC ¶ 177.  The post discussed Lilium's battery technology, and it said that "today cells are available with energy densities of >300Wh/kg." DE 90-12 at 17; SAC ¶ 177.  According to the blog post, with this battery technology, Lilium "will be able to expand the range of the Lilium jet to approximately 250km [155 miles] at entry of service in 2024." DE 90-12 at 18; SAC ¶ 177. It also stated that the Lilium Jet has "an overall total hover time (on a typical mission) of <60 seconds." DE 90-12 at 8; SAC ¶ 184.

_Registration Statement_. Lilium's August 5, 2021, Registration Statement included many similar statements about battery technology, range, hover time, and timeline for certification and commercialization.  _See_ SAC ¶ 228 ("commercial operations are planned to launch in 2024"); _id._ ¶ 235 ("the [battery] pouch cells have yielded nominal energy density levels of 330 watt-hour per kilogram, which is projected to enable a physical aircraft range of 155 miles"); _id._ ¶ 241 ("we aim for less than 60 seconds per mission in the pure hover phase"); _see also_ DE 90-3 at 41, 204–05. The Registration Statement included 37 pages of risk factors, including that:

> No eVTOL aircraft have passed certification by EASA or the FAA for commercial operations . . ., and there is no assurance that our current serial prototype for the Lilium Jet will receive government

---

[13] Available at https://www.sec.gov/Archives/edgar/data/1821171/000110465921079990/tm2111 158d23_425.htm.

certification in a way that is market-viable or commercially successful, in a timely manner or at all. . . . [and]

Our Lilium Jets require complex software, battery technology and other technology systems that remain in development and need to be commercialized in coordination with our vendors and suppliers to complete serial production.

DE 90-3 at 77, 84.

### 4.   The Iceberg Reports & Confidential Witness

Plaintiff relies heavily on three sources in support of his allegations that the statements described above were false or misleading. *First*, Plaintiff alleges that "the market learned the true material facts . . . through a research report published by Iceberg Research on March 14, 2022." SAC ¶ 4.[14]  Iceberg published another report about the Lilium Jet on August 31, 2022. SAC ¶¶ 69, 94.[15]  Plaintiff claims that these Iceberg Reports made five significant revelations:  (1) the batteries needed to achieve a 155+ mile range on the Lilium Jet were "still years away from being commercially available"; (2) Lilium was "unlikely to meet its timeline . . . for commercialization by 2024"; (3) the White Paper made unreasonable assumptions, was not properly reviewed, and failed to account for variables like battery aging; (4) Lilium's battery supplier may have been[16]

---

[14] Plaintiff did not attach a copy of the March 14, 2022, Iceberg Report, however, by relying heavily on that document, Plaintiff has incorporated it by reference. *See supra* n.3.  The full report is available at https://iceberg-research.com/2022/03/14/stronglilium-nv-the-losing-horse-in-the-evtol-racenbsp-strong/ ("Mar. 14, 2022, Iceberg Report").

[15]  Available at https://iceberg-research.com/2022/08/31/liliums-misrepresentations-over-its-technology-keep-mounting/ ("Aug. 31, 2022, Iceberg Report").

[16] While the Court accepts all allegations in the Second Amended Complaint as true, Plaintiff often misrepresents the Iceberg Report's conclusions. *Compare* SAC ¶ 75 (claiming that Iceberg Report "reveal[ed] that the mysterious battery technology Lilium was planning to rely on *was a product of Zenlabs*" (emphasis added)) *and* SAC ¶ 179 ("The Iceberg Report later revealed the source of Lilium's battery technology *was Zenlabs*." (emphasis added)), *with* Mar. 14, 2022, Iceberg Report (noting that Lilium's White Paper cited a study by Zenlabs and *inferring* that "Lilium's mysterious battery cell supplier *may be Zenlabs*, although Lilium *does not clarify* the source of its battery technology" (emphasis added)).  Because Plaintiff incorporated the Iceberg Reports by reference,

11

Zenlabs, the CEO of which previously founded "another battery company that went defunct after being accused of misrepresenting the capabilities of its batteries to General Motors"; and (5) Lilium's statements about the Jet's 30 to 60-second hover time "assumed perfect conditions," but other experts "believed regulators would require Lilium to reserve enough power for at least 2-3 minutes of hover time." SAC ¶¶ 5, 75, 186, 198; *see also* Mar. 14, 2022, Iceberg Report; Aug. 31, 2022, Iceberg Report.  The Iceberg Reports contained numerous disclaimers at the end, including that the reports "express[ed] [Iceberg's] opinions, which [were] based upon generally available public information" and that readers "should assume that . . . Iceberg may have a short position in the securities . . . covered herein, and therefore may stand to realize gains in the event that the price of the covered securities declines." Mar. 14, 2022, Iceberg Report; Aug. 31, 2022, Iceberg Report. Plaintiff claims that the March 14, 2022, Iceberg Report caused Lilium's stock price to plummet because the report disclosed information "previously concealed by Defendants' scheme and misrepresentations." SAC ¶ 4.

*Second*, Plaintiff relies on information from a Confidential Witness to bolster the allegations in the Second Amended Complaint. *Id.* ¶¶ 55–68.  The Confidential Witness was an engineer at Lilium from March to December of 2020. *Id.* ¶ 55.  He believed the projected range of 155+ miles was "far-fetched." *Id.* ¶ 65.  Based on a decade of experience at Boeing, the Confidential Witness "did not believe [Lilium] could achieve certification for its aircraft within a 'reasonable timeline.'" *Id.* ¶ 56.  He thought the timeline was too tight because the certification requirements from the EASA and the FAA were still changing, the Lilium Jet had features that made the certification process lengthier, and progress on the regulatory-compliant prototype was

---

the Court uses the Second Amended Complaint as a starting point, but it refers to the reports directly when describing the contents and conclusions therein.

delayed after the Phoenix's battery fire. *Id.* ¶¶ 57–63.   He expressed concerns about the certification timeline to Defendant Yemsi, "but Yemsi disregarded these concerns," *id.* ¶ 66, and Yemsi told the Confidential Witness that he "did not 'understand the full situation,'" *id.* ¶ 84. According to Plaintiff, this shows "that Defendants knew their timeline was overly ambitious from the start." *Id.* ¶ 76.  The Confidential Witness ultimately left Lilium because he did not believe the certification timeline was feasible. *Id.* ¶ 56.

      *Finally*, Plaintiff relies on Lilium's post-merger statements and SEC filings. *See id.* ¶¶ 274–79.  For example, on February 28, 2022—after the merger but before the first Iceberg Report—Lilium announced that it was going back to a 5-seater Jet design rather than the 7-seater described in the 2021 SEC filings and statements. *Id.* ¶ 275.  On March 30, 2022—after the first Iceberg Report—Lilium pushed back its projected certification and commercial launch timeline to 2025. *Id.* ¶ 276.  Plaintiff alleges that, by changing the projected timeline, Defendants "confirmed" that the "2024 target was never possible." *Id.* ¶ 76; *see also id.* ¶¶ 159–67.  On May 31, 2022, Lilium disclosed that it had been working with Zenlabs for the past two years to develop high density battery technology, but that the technology had only been tested for two charging cycles. *Id.* ¶ 278. Finally, in June 2022 Lilium announced that it was adding a landing gear to its design, which allegedly "confirmed that [Lilium] had been overstating the amount of hover required for landing." *Id.* ¶ 187.

      The Iceberg Reports and the Confidential Witness were not the first to voice doubts about eVOTLs or Lilium's go-to-market timeline for its Jet. *Id.* ¶¶ 80–81.  German newspapers published pieces in late 2019 and early 2020 "criticizing the Lilium Jet concept, citing scientists and aeronautical engineers who all agreed that the range, speed, and weight capacity . . . could not be achieved with . . . the battery technology that existed at the time." *Id.* ¶ 80.  On February 10, 2021,

Forbes published an article questioning Lilium's certification timeline. *Id.* ¶ 81.  That article relied on three former Lilium employees as sources. *Id.* According to one former employee, Yemsi admitted Lilium's certification timeline "would be extremely difficult." *Id.*  These articles came out *before* Lilium announced the merger with Qell, *see id.* ¶¶ 48–49, 80–81, meaning these critiques were generally known before Lilium's alleged misrepresentations and before the start of the Class Period.

### III. LEGAL STANDARD

Under Rule 12(b)(6), the Court accepts Plaintiff's factual allegations as true and draws inferences from the Second Amended Complaint in the light most favorable to Plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009).  However, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (citing *S. Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 406 (11th Cir. 1996)).

For claims sounding in fraud, the plaintiff must satisfy the heightened pleading standards under Federal Rule of Civil Procedure 9(b). *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019).  A plaintiff alleging fraud must state "with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b).  When a complaint alleges misrepresentations or omissions in violation of securities laws, the Eleventh Circuit has held that the complaint must say "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence

of the fraud." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)).

The Private Securities Litigation Reform Act ("PSLRA") imposes even higher pleading requirements for securities class action claims brought under the Exchange Act. *See* 15 U.S.C. § 78u-4(a)(1); *Carvelli*, 934 F.3d at 1317–18. *First*, where the plaintiff alleges either an untrue statement of material fact or the omission of a material fact, the complaint must set forth with particularity "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). *Second*, the plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *Id.* § 78u–4(b)(2)(A). The complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)). *Finally*, the plaintiff must plead that the defendant's misrepresentation or omission "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Because Rule 9(b) and the PSLRA's heightened pleading standards are claim-specific, the Court will address the applicable standards on a claim-by-claim basis below.

## IV. ANALYSIS

As a threshold matter, Defendants argue that the Second Amended Complaint suffers the same shotgun pleading defects as the First Amended Complaint. *See* DE 114 at 6–9. The R&R concluded that the First Amended Complaint failed to separate each cause of action into different counts, and failed to specifically identify which alleged misstatements and/or omissions supported

each claim. *See* DE 105 at 14–15; *see also Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). The Second Amended Complaint cured these deficiencies by adding citations to specific misrepresentations and omissions in support of each cause of action, and by adding separate counts for violations of different rules (*i.e.*, there are now three causes of action under § 10(b), each one relying on a different subsection of Rule 10b-5). *See* SAC ¶¶ 307–32. The Court therefore turns to the merits.

### 1.      Section 10(b) of the Exchange Act

Plaintiff brings three claims under § 10(b) of the Exchange Act. *See* SAC ¶¶ 307–32. Section 10(b) prohibits "any manipulative or deceptive device" in violation of SEC rules or regulations. 15 U.S.C. § 78j(b). Plaintiff claims that Defendants violated SEC Rule 10b-5. *See* SAC ¶¶ 308, 317, 326. That Rule has three subsections, each of which prohibits a different kind of manipulative or deceptive conduct. However, there is considerable overlap between the subsections. *See Lorenzo v. SEC*, 587 U.S. 71, 80 (2019). Subsection (a) "makes it unlawful to 'employ any device, scheme, or artifice to defraud.'" *Id.* at 77 (quoting 17 C.F.R. § 240.10b-5(a)). "Subsection (b) makes it unlawful to 'make any untrue statement of a material fact.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "And subsection (c) makes it unlawful to 'engage in any act, practice, or course of business' that 'operates . . . as a fraud or deceit.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(c)). Subsections (a) and (c) are often jointly called "scheme liability" claims, while subsection (b) is a "misrepresentations" claim. *See IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016). Regardless of the type of violation (scheme or misrepresentation), a plaintiff must plead scienter and loss causation to state a claim under § 10(b). *Carvelli*, 934 F.3d at 1317 (quoting *Mizzaro*, 544 F.3d at 1236–37). Plaintiff's § 10(b) claims are subject to Rule 9(b) and the PSLRA's heightened pleading standards. *See id.* at 1317–

18; *supra* Part III.  The Court will address Rule 10b-5(b) misrepresentations before turning to the alleged scheme under Rule 10b-5(a) and (c).

a)   <u>Rule 10b-5(b):  Material Misrepresentations & Omissions</u>

A plaintiff alleging securities fraud in violation of Rule 10b-5(b) must plead "a material misrepresentation or omission."  *Carvelli*, 934 F.3d at 1317 (quoting *Mizzaro*, 544 F.3d at 1236–37).  Rule 9(b) and the PSLRA's heightened pleading standards apply, including the heightened pleading standard for alleged misrepresentations. *Id.*  Therefore, Plaintiff must identify each materially false statement and/or misleading omission and identify how it was false or misleading. *Id.*  "A statement is misleading if 'in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it.'" *FindWhat*, 658 F.3d at 1305 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968)).  A misrepresentation is material if there is a substantial likelihood that a reasonable investor "would have viewed a misrepresentation or omission as 'significantly alter[ing] the "total mix" of information made available.'" *Carvelli*, 934 F.3d at 1317 (quoting *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012)).  "When it comes to omissions specifically, the Supreme Court has clarified that '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5.'" *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  "[A]bsent a duty, material information needn't be disclosed unless its omission would render misleading other information that an issuer *has* disclosed." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)) (emphasis in original).

Several doctrines limit the scope of actionable misrepresentations and omissions under Rule 10b-5(b).  As relevant here, Rule 10b-5(b) generally does not impose liability for statements of opinion or forward-looking statements. *See id.* at 1322, 1324.  *First*, opinion statements usually

do not violate Rule 10b-5(b).  *See id.* at 1322 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 182 (2015)).  In *Omnicare*, the Supreme Court held "that statements of opinion are generally nonactionable because liability attaches only in the case of an 'untrue statement of a material *fact*.'" *Carvelli*, 934 F.3d at 1322 (quoting *Omnicare*, 575 U.S. at 182) (emphasis in original).[17]  A statement of opinion (often including language like "I think" or "I believe") is only actionable if (1) the speaker does not actually hold the opinion he or she is espousing, or (2) the statement of opinion "contain[s] an embedded statement of fact" that is false. *Id.* (citing *Omnicare*, 575 U.S. at 183–86).  *Second*, the PSLRA includes a safe harbor provision "that immunizes certain 'forward-looking' statements from liability." *Id.* at 1324.  "A forward-looking statement is what it sounds like—a prediction, projection, or plan." *Id.*  The safe harbor inoculates a forward-looking statement under three circumstances:  (1) the statement is identified as forward-looking and accompanied by "meaningful cautionary language"; (2) the statement is immaterial; *or* (3) the speaker lacked "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1).  The safe harbor is "disjunctive—it provides three independent, alternative means of inoculating forward-looking statements." *Carvelli*, 934 F.3d at 1326.

Plaintiff's Second Amended Complaint identifies dozens of alleged misstatements and a handful of misleading omissions.  The statements fall into four categories:  (1) Lilium's battery technology; (2) the Lilium Jet's hover time; (3) the Lilium Jet's range; (4) Lilium's timeline for

---

[17] Although *Omnicare* involved a claim under § 11 of the Securities Act, the Eleventh Circuit has applied the analysis to claims alleging violations of Rule 10b-5(b) like these. *See Carvelli*, 934 F.3d at 1322 n.7.

certification and commercialization.[18] *See* SAC ¶¶ 175–77, 181–82, 184, 191–95, 202–211, 213–14, 221–24, 228, 233, 235–36, 243; DE 115 at 7–9.  After carefully considering each of these statements, the Court concludes that none rise to the level of actionable misrepresentations or omissions.

<u>Batteries</u>.  Plaintiff argues that Lilium made material misrepresentations and omissions about its battery technology.  The Second Amended Complaint alleges that Lilium's Investor and Analyst Day Slides falsely stated that Lilium had "secured" "[a]dvanced battery cell technology" capable of providing ">330 Wh/kg." SAC ¶¶ 175–76.  A Lilium blog post similarly represented that "today [battery] cells are available with energy densities of >300Wh/kg." *Id.* ¶ 177.  Citing to the Iceberg Reports, Plaintiff states that "commercially available batteries" were far less powerful (with energy densities of only 260 Wh/kg), making Lilium's projections of a ~155-mile range based on high-density batteries impossible at the time. *Id.* ¶¶ 94, 178, 189.  According to Plaintiff, these statements were false or misleading because a "reasonable investor could read th[ese] statement[s] to mean these batteries were unconditionally secured, and capable of use in commercial application, at the time the statement was made." DE 115 at 8.

Plaintiff's logic unravels when considering the statements as part of the "total mix of [available] information." *Carvelli*, 934 F.3d at 1320 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200–01 (3d Cir. 1990)); *see also Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1223

---

[18] In the Second Amended Complaint, Plaintiff also identified certain statements about Lilium's business dealings with tech giant Palantir and Brazilian airline Azul. *See* SAC ¶¶ 244–50.  Plaintiff does not address these statements in response to Defendants' Second MTD. *See generally* DE 115. The Court agrees with Defendants that Plaintiff has waived any § 10(b) claims based on misrepresentations about Lilium's relationships with Palantir and Azul. *See* DE 114 at 5; *see also Carter v. BPCL Mgmt.*, No. 19-CV-60887, 2021 WL 7502562, at *1 (S.D. Fla. Sept. 22, 2021) (failure to refute opposing arguments "operates as a waiver of those arguments and is akin to a failure to respond"); Local Rule 7.1(c) (permitting a court to grant a motion by default when a respondent fails to respond).

(11th Cir. 2022) (relying "on the context in which the statement appears" when analyzing allegations of false or misleading statements). Lilium never said it was using "commercially available" batteries. *See* DE 90-7 at 27 (Investor Day Transcript stating that Lilium had "exclusively" secured battery technology through a "[t]hird party battery supplier"); *see also* DE 115 at 9; SAC ¶ 176. Lilium's statements suggest the exact opposite—that it was aiming to develop proprietary battery technology *precisely because* higher density batteries were not yet commercially available. The White Paper—issued the same day as the Investor Day Slides—acknowledged that the highest density battery that was commercially available at that time was 250Wh/kg. DE 90-10 at 25. The White Paper assumed Lilium would develop a higher density battery and relied on studies finding that higher density batteries were possible, even if not commercially available yet. *Id.* And Plaintiff admits that Lilium *did* have high-density battery technology capable of generating >330 Wh/kg. *See* SAC ¶¶ 175–79; DE 115 at 9 ("[Lilium's] batteries could maintain 330 Wh/kg for only two charging cycles."). Viewing the "total mix" of available information at the time, these statements were neither false nor misleading. *See FindWhat*, 658 F.3d at 1305–06 (dismissing allegations based on "a factually accurate report" that "did not create a false impression" and "therefore, was not misleading under the circumstances").

Moreover, many of these statements were (or were accompanied by) forward-looking statements that, when viewed together, clarified that the battery technology was still in development and the range projections were just that—projections. *See* DE 90-7 at 27 (disclosing that "[b]attery cell technology [was] still under development" and "design [was] not yet finalized"; and disclosing assumptions about battery power used to calculate "*[p]rojected* physical range" (emphasis added)); SAC ¶ 177 (Lilium blog post stating its "custom cells and chemistry" "*will be able* to expand the range of the Lilium Jet" (emphasis added)). These forward-looking statements

fall within the safe harbor because Plaintiff does not allege facts to support a "strong inference of actual knowledge." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 530 (S.D.N.Y. 2015); *see also* 15 U.S.C. § 77z-2(c)(1)(B)(i).  The Second Amended Complaint includes a conclusory allegation that Defendants *either* had "actual knowledge of the material omissions and/or the falsity of the material statements" *or* they "acted with severe reckless disregard for the truth." SAC ¶ 328.  But it does not contain any allegations that Defendants knew that *each* of the statements about battery technology was actually false.  *See generally* SAC ¶¶ 267–94. The safe harbor therefore inoculates these forward-looking statements about Lilium's battery technology.

Plaintiff also alleges that Lilium omitted material information about its battery technology in its 2021 filings and statements.  According to Plaintiff, Lilium omitted two key facts:  (1) Lilium's battery supplier was Zenlabs—a company whose CEO had a history of overpromising and underdelivering when it came to its battery technology; and (2) Lilium's high-density battery technology (330 Wh/kg) was only tested for two charging cycles, so Lilium did not know how it would perform over many years of use. *See* DE 115 at 8–9; SAC ¶ 179.  These omissions do not render the statements addressed above materially misleading. *See Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264–65 (2024) ("Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (quoting *Matrixx*, 563 U.S. at 44)).  Plaintiff alleges that "Lilium concealed Zenlabs' name as the battery technology provider until after being unmasked by Iceberg Research." SAC ¶ 75.  In the documents with the alleged misrepresentations, Lilium disclosed that it was working with a third-party battery supplier and that the technology was still under development. *See id.* ¶ 177; DE 90-7 at 27; DE 90-9 at 8.  In fact, rather than concealing Lilium's ties to Zenlabs, the White Paper affirmatively cited studies by Zenlabs. DE

90-11 at 25.  Almost a year later, Iceberg put two and two together and *assumed* that Lilium *might be* working with Zenlabs.  *See* Mar. 14, 2022, Iceberg Report (inferring from the White Paper's citations to Zenlabs' studies that "Lilium's mysterious battery cell supplier *may be* Zenlabs" (emphasis added)).  Lilium eventually revealed that Zenlabs was its battery supplier, *see* SAC ¶ 91,[19] but failing to disclose this fact earlier was not misleading given the total mix of information in the earlier statements.  Similarly, the omission of two-cycle battery test data was not misleading because that testing occurred *after* the alleged misstatements. *See* SAC ¶ 278 (citing May 31, 2022, blog post disclosing test data dated April 11, 2022).  Even assuming Lilium had a duty to disclose those test results, that data did not exist at the time of the allegedly misleading statements.

Range & Hover Time.  The Second Amended Complaint alleges that Lilium's statements about "the amount of power required for the 'hover' phase w[ere] materially false or misleading." SAC ¶ 185.  Plaintiff says Lilium misrepresented "that the Lilium Jet would have a range of approximately 155 miles." *Id.* ¶ 190.  These statements fall within the safe harbor for forward-looking statements.  The PSLRA's definition of forward-looking statement includes "a statement of the . . . plans and objectives relating to the products or services." 15 U.S.C. § 78u-5(i)(1)(B). Lilium's projections about the Jet's range and hover time fall within this definition.  *See* SAC ¶ 177 (Lilium "will be able to expand the range of the Lilium Jet to approximately 250km [155 miles]"); *id.* ¶ 95 ("projected . . . range of 155+ miles"); DE 90-8 at 23 (showing graph representing Lilium's "mission" which was "not to hover" and calculating hover time around 30 seconds).  Beyond the plainly forward-looking language ("projected," "will be able," "mission"), it was no secret that Lilium did not have a final prototype of the 7-seater Jet at that time, *see id.*

---

[19] Citing a May 31, 2022, Lilium blog post, available at: https://lilium.com/newsroom-detail/liliums-battery-strategy.

¶¶ 36, 83 n.18, further demonstrating that each of the statements about the Jet's range and hover time was a forward-looking projection.  These statements are protected by the safe harbor as long as Defendants lacked actual knowledge of falsity, the statements were accompanied by sufficient cautionary language, *or* the statements were immaterial. *See Carvelli*, 934 F.3d at 1326.  As with the statements about batteries, Plaintiff has not pled actual knowledge of falsity. *See In re Sanofi*, 87 F. Supp. 3d at 530; *see also* SAC ¶¶ 326–28 (alleging knowledge *or* reckless disregard).  Additionally, these statements were accompanied by sufficient cautionary language. *See* DE 90-7 at 3 (disclosing risk that "the technology necessary to successfully operate the [Lilium Jet] . . . is delayed, unavailable, not available at commercially anticipated prices, not sufficiently tested, not certified for passenger use or otherwise unavailable"); DE 90-8 at 3 (same).  These statements fall within the safe harbor.[20]

Timeline Projections.  The last group of alleged misrepresentations are statements about Lilium's projected timelines for regulatory certification and commercialization. *See* SAC ¶¶ 202–14.  Plaintiff claims many of these statements were false or misleading "because Defendants knew, or recklessly disregarded the truth, that the target of achieving commercial operations in 2024, and certification prior to that, was not achievable." *Id.* ¶ 215.  Defendants claim that each of these statements is forward-looking.  *See* DE 114 at 14.  Plaintiff does not address this argument; instead, he restates the allegations that the 2024 commercialization timeline was not feasible, and Lilium most likely never believed it was possible. DE 115 at 7–8, 9–11.  Like many of the other

---

[20] Estimates and projections—like those in the White Paper and many of the graphics about range and hover time—are also statements of opinion which are not actionable under Rule 10b-5(b).  *See Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("Estimates, in particular, constitute a well-established species of opinion," because estimates "'will vary depending on the particular methodology and assumptions used,' rendering them 'subjective.'" (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011)).

statements, the safe harbor for forward-looking statements applies here.  "Statements about the likelihood of regulatory approval are 'classically forward-looking, as they address what defendants expect[] to occur in the future.'" *In re AstraZeneca PLC Sec. Litig.*, No. 21-CV-722 (JPO), 2022 WL 4133258, at *9 (S.D.N.Y. Sept. 12, 2022) (quoting *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 585 (S.D.N.Y. 2016)).  Again, Plaintiff does not allege facts supporting a strong inference that Defendants had actual knowledge of the falsity when making these statements. *See In re Sanofi*, 87 F. Supp. 3d at 530; *see also* SAC ¶ 215 (alleging knowledge *or* reckless disregard).  Additionally, the projections about certification and commercialization were accompanied by ample cautionary language. *See* DE 90-7 at 3; DE 90-8 at 3.

Plaintiff has failed to plead actionable misrepresentations or omissions in violation of Rule 10b-5(b), and the Court therefore dismisses Count III.

    b)  <u>Rule 10b-5(a) and (c):  Scheme Liability</u>

Plaintiff also alleges that Defendants violated Rule 10b-5(a) and (c).  As explained above, Rule 10b-5(a) and (c) prohibit fraudulent schemes and practices. *See* 17 C.F.R. § 240.10b-5(a), (c).  To allege a violation of Rule 10b-5(a) and (c), a plaintiff must plausibly allege that (1) the defendant committed a deceptive or manipulative act (2) in furtherance of the alleged scheme to defraud (3) with scienter. *See SEC v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309, 1339 (S.D. Fla. 2021).  "The main difference between a 10b-5(b) misrepresentation claim and a 10b-5(a) and (c) scheme liability claim is that, while 10b-5(b) involves 'deceptive statements,' 10b-5(a) and (c) scheme liability involves 'deceptive conduct.'" *SEC v. Arbitrade Ltd.*, No. 22-CV-23171, 2023 WL 2785015, at *7 (S.D. Fla. Apr. 5, 2023).  A plaintiff alleging violations of Rule 10b-5(a) and (c) is typically not subject to the PSLRA's heightened pleading standard for alleged misrepresentations, unlike claims under Rule 10b-5(b). *See SEC v. Rio Tinto PLC*, 41 F.4th 47, 52

(2d Cir. 2022).  However, a plaintiff cannot evade the PSLRA's pleading standard by repackaging its misrepresentations claim as a "scheme." *Id.* at 54–55.  That is precisely what Plaintiff does here.

Plaintiff alleges that Defendants engaged in a fraudulent "scheme" by making "materially false and misleading statements." SAC ¶¶ 307, 316.  The Second Amended Complaint contains *identical* factual allegations in support of each alleged Rule 10b-5 violation. *Id.* ¶¶ 307, 316, 325. Defendants argue that Plaintiff cannot bring three separate claims, one under each subsection of Rule 10b-5, based on the same alleged misrepresentations. *See* DE 114 at 18–19.  They argue that Plaintiff is trying to bypass the heightened pleading standards for misrepresentations claims under Rule 10b-5(b). *See* DE 89 at 20.

Under these circumstances, Plaintiff's § 10(b) claims alleging violations of Rule 10b-5(a) and (c) rise and fall with the misrepresentations claim under Rule 10b-5(b).  For quite some time, the law in this Circuit was clear:  "Misleading statements and omissions only create scheme liability in conjunction with 'conduct *beyond* those misrepresentations or omissions.'" *IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016) (dismissing scheme liability claim premised on the same misrepresentations and omissions as the Rule 10b-5(b) claim) (emphasis added).  However, in 2019, the Supreme Court held that "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5." *Lorenzo v. SEC*, 587 U.S. 71, 78 (2019).  Plaintiff relies on this language from *Lorenzo* to support pleading duplicative misrepresentations claims under § 10(b). *See* DE 115 at 19.  The Court disagrees.

To start, the facts of *Lorenzo* differed.  There, the SEC was not trying to use Rule 10b-5(a) and (c) as an equal alternative to Rule 10b-5(b). *See* 587 U.S. at 78.  Rather, the SEC brought an enforcement action against a defendant who "disseminated" false statements but did not "make"

the statements. *See id.*  In that case, the defendant could not be held liable for violating Rule 10b-5(b) because the allegedly false statements could not be attributed to him. *See id.*  In this case, Plaintiff specifically alleges that each Defendant "made" misrepresentations, bringing the allegations squarely within the gambit of Rule 10b-5(b). SAC ¶¶ 307, 316.  Nonetheless, the language in *Lorenzo* is broad enough to cast a shade of doubt on the rule promulgated by the Eleventh Circuit in *IBEW*. *See Lorenzo*, 587 U.S. at 80 ("[T]his Court and the [SEC] have long recognized considerable overlap among the subsections of [Rule 10b-5] and related provisions of the securities laws.").

Although the Eleventh Circuit has not revisited its ruling in *IBEW* in the wake of *Lorenzo*, other circuits have.  The Court agrees with the Second Circuit's holding in *SEC v. Rio Tinto PLC*, 41 F.4th 47, 52 (2d Cir. 2022), which addressed this exact issue.  The Second Circuit, like the Eleventh Circuit, had a pre-*Lorenzo* precedent stating that an "actionable scheme liability claim also requires something *beyond* misstatements and omissions." *Id.* at 49 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)) (emphasis in original).  The Second Circuit concluded that *Lentell* survived *Lorenzo*. *Id.* at 54.  It explained that "though *Lorenzo* ruled that there was 'considerable overlap' between the misstatement subsections and the scheme subsections, it did not announce that the misstatement subsections were subsumed." *Id.* (internal citation omitted). The Second Circuit highlighted that "[a]n overreading of *Lorenzo* might allow private litigants to repackage their misstatement claims as scheme liability claims to 'evade the pleading requirements imposed in misrepresentation cases.'" *Id.* at 55.  The Court agrees with this logic.  Where a plaintiff alleges scheme liability based *solely* on allegations that the defendant made material misrepresentations and omissions, those claims are subsumed by the Rule 10b-5(b) misrepresentations claim.  In this case, Plaintiff cannot recast the alleged misrepresentations as a

"scheme" to avoid the PSLRA's heightened pleading standards for alleged misrepresentations.[21] The Court therefore dismisses Counts I and II because they are scheme liability claims premised solely on Defendants' alleged misrepresentations and omissions.[22]

**2.     Sections 11 and 12 of the Securities Act**

Section 11 of the Securities Act prohibits issuing a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  The misrepresentation or omission requirement under § 11 is the same as § 10(b) of the Exchange Act and Rule 10b-5(b). *See Carvelli*, 934 F.3d at 1322 n.7 ("[T]he core prohibition of Rule 10b-5(b) is worded in the exact same language as § 11.").  However, there is no scienter element in a § 11 claim.  The plaintiff need not prove any intent to defraud on the part of the defendant, or even knowledge of the misrepresentation or omission. *Herman*, 459 U.S. at 381–82.

---

[21] Even if the same misrepresentations could support a § 10(b) claim alleging a fraudulent scheme in violation of Rule 10b-5(a) and (c), the Court would nevertheless apply the heightened pleading standard and dismiss the claims for the same reasons it dismisses the Rule 10b-5(b) misrepresentations claim. *See* 15 U.S.C. § 78u–4(b)(1) (applying heightened pleading standard for "*any* private action . . . in which *the plaintiff alleges*" material misrepresentations or omissions (emphasis added)).  Because the Second Amended Complaint alleges that Defendants' fraudulent scheme was limited to the "materially false and misleading statements," SAC ¶¶ 307, 316, the PSLRA's pleading requirements apply to each of the § 10(b) claims as pled.  As explained *supra* Part IV.1.b, Plaintiff has failed to plead actionable misrepresentations or omissions.

[22] Because Plaintiff failed to "adequately plead a violation of Section 10(b) and Rule 10b(5), [his] claim[s] under Section 20(a) necessarily fail[] as well." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).  The Court therefore dismisses Counts IV, V, and VI of the Second Amended Complaint.

"Section 12(a)(2) of the Securities Act creates a private cause of action against persons who offer or sell a security 'which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.'" *Ehlert v. Singer*, 245 F.3d 1313, 1315–16 (11th Cir. 2001); *see also* 15 U.S.C. § 77l.  Like with § 11 claims, there is no scienter element, and the plaintiff does not have to allege an intent to defraud or knowledge of the misrepresentation or omission. *See Herman*, 459 U.S. at 381–82.

Plaintiff's §§ 11 and 12(a) must meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b).  *See Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) ("Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10(b)–5."). Plaintiff argues that "the same allegations meet [the Rule 9(b)] standard for the [same] reasons" as the § 10(b) claims. DE 115 at 20; *see also* DE 96 at 23 (defending § 11 claim by pointing to single conclusory allegation that the "Registration Statement . . . contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein").

The alleged misrepresentations in the August 5, 2021, Registration Statement echo the alleged misrepresentations in other documents. *See* SAC ¶ 228 ("commercial operations are planned to launch in 2024"); *id.* ¶ 235 ("the [battery] pouch cells have yielded nominal energy density levels of 330 watt-hour per kilogram, which is projected to enable a physical aircraft range of 155 miles"); *id.* ¶ 241 ("we aim for less than 60 seconds per mission in the pure hover phase"). And, like the other statements discussed above, the Registration Statement included detailed risk factors including that "there is no assurance that our current serial prototype for the Lilium Jet will

receive government certification in a way that is market-viable or commercially successful, in a timely manner or at all" and that the "Lilium Jets require complex software, battery technology and other technology systems that remain in development and need to be commercialized in coordination with our vendors and suppliers to complete serial production." DE 90-3 at 77, 84; *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) ("[W]hen a registration statement warns of the exact risk that later materialized, a [s]ection 11 claim will not lie as a matter of law."). Plaintiff's Securities Act claims suffer the same defects as his § 10(b) claims—the Second Amended Complaint failed to sufficiently plead an actionable misstatement or omission. *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1268 (11th Cir. 2013) (analyzing alleged misrepresentations under §§ 11 and 12(a) of the Securities Act using same standards as alleged misrepresentations of § 10(b) of the Exchange Act). The Court therefore dismisses Counts VII and VIII.[23]

### 3.      Section 14(a) of the Exchange Act

Section 14(a) imposes liability for violations of SEC rules in connection with proxy materials. *See* 15 U.S.C. § 78n(a). Plaintiff alleges that Defendants violated SEC Rule 14a-9, which prohibits false or misleading statements or omissions of material fact in a proxy statement or other proxy materials. 17 C.F.R. § 240.141-9(a). To survive a motion to dismiss on this claim, Plaintiff must "allege that Defendants prepared a proxy statement containing a material misstatement or omission that caused Plaintiffs' injuries." *Theodore v. Purecycle Techs., Inc.*, No.

---

[23] Because Plaintiff failed to plausibly allege a violation of §§ 11 or 12(a)(2) of the Securities Act, he necessarily failed to plausibly allege a violation of § 15 as well. *See* 15 U.S.C. § 77o (imposing joint and several liability upon controlling persons for acts committed by individuals under their control who themselves violate §§ 11 or 12); *see also Miyahira*, 715 F.3d at 1268 ("Because Plaintiffs have failed to establish a primary violation under §§ 11 or 12, their § 15 claim also fails." (quoting *Ehlert*, 245 F.3d at 1320)). The Court therefore dismisses Counts IX and X of the Second Amended Complaint.

6:21-CV-809-PGB-RMN, 2023 WL 4035880, at *11 (M.D. Fla. June 15, 2023).   Again, the Court's earlier analysis applies equally to Plaintiff's §14(a) claim, which is based on the same alleged misrepresentations and omissions as the § 10(b) claims.   *See Vargas v. Citrix Sys., Inc.*, No. 22-CV-62327, 2024 WL 413454, at *5 (S.D. Fla. Feb. 3, 2024) (dismissing § 14(a) claims after applying safe harbor for forward-looking statements).   The Court therefore dismisses Count XI of the Second Amended Complaint.

* * *

Based on the foregoing, Defendants' Second to Dismiss [DE 114] is **GRANTED**.   It is **ORDERED AND ADJUDGED** that Plaintiff's claims in the Second Amended Complaint are dismissed for the reasons set forth in this Order.   Because Plaintiff has now been afforded multiple opportunities to amend, the Court's dismissal is without leave to amend.[24]   The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 23rd day of August, 2024.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

---

[24] Plaintiff requests leave to amend, but he does not provide any basis for doing so. DE 115 at 20; *see also Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 683 (11th Cir. 2018) (affirming denial of leave to amend when plaintiff's only request to amend "was a single line at the end of her motion in opposition to [a] motion to dismiss," and the request "neither contained a proposed amendment, nor did it elaborate on the substance of the proposed amendment").   Plaintiff says he "had no reason to believe edits to the merits" portions of the First Amended Complaint were necessary because the Court previously dismissed the claims as improper shotgun pleadings. DE 115 at 3 n.3.   But the R&R laid out in detail the applicable pleading standards and the elements of each claim. *See generally* DE 105.   Plaintiff had ample notice of the standards he had to meet to survive a motion to dismiss before filing the Second Amended Complaint.   Accordingly, the Court will not allow further amendment.